UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| KIN-YIP CHUN, Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. 3:18-cv-01338-S |
| | § | CLASS ACTION |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| FLUOR CORPORATION, DAVID T. SEATON, BIGGS C. PORTER, BRUCE A. STANSKI, MATTHEW McSORLEY, and GARY G. SMALLEY, | § § § § § | |
| | § | |
| Defendants. | § § | |
| | § | DEMAND FOR JURY TRIAL |

**CONSOLIDATED COMPLAINT
FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF THE FRAUD ...................................................1

II.   JURISDICTION AND VENUE .........................................................................................8

III.  THE PARTIES .................................................................................................................8

    A.   Plaintiffs ..............................................................................................................8

    B.   Defendants ...........................................................................................................9

IV.   FACTUAL BACKGROUND ...........................................................................................10

    A.   Fluor and Its Power Segment ...........................................................................10

    B.   Fixed-Price Contracts and the Backlog ............................................................11

    C.   The Gas-Fired Plants ........................................................................................12

        1.   The Brunswick County Plant ................................................................12

        2.   The Greensville County Plant ...............................................................14

        3.   The Anderson County Plant ...................................................................15

        4.   The Citrus County Plant ........................................................................16

V.    CONFIDENTIAL WITNESS ACCOUNTS ....................................................................19

VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
    AND OMISSIONS DURING THE CLASS PERIOD .....................................................22

    A.   False and Misleading Statements and Omissions Regarding Fluor's
        Purportedly Conservative Bidding Process and Risk Management .....................22

    B.   False and Misleading Statements and Omissions Regarding the Gas-Fired
        Plants ..................................................................................................................40

VII.  ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ...............................59

    A.   Insider Sales .......................................................................................................59

        1.   Seaton's Class Period Sales ..................................................................59

        2.   Porter's Class Period Sales ...................................................................65

        3.   Stanski's Class Period Sales .................................................................68

|  | 4. | Smalley's Class Period Sales | 72 |

|  | 5. | McSorley's Class Period Sales | 75 |

B. Defendants Were Motivated to Win Gas-Fired Power Plant Projects by Any Means Necessary .......77

C. Fluor Issued Debt During the Class Period .......80

D. Fluor Was Motivated to Win Repeat Business from Dominion and Duke .......81

E. High-Level Departures and Reorganization of Power Segment Leadership and Business Model .......82

F. The Individual Defendants Personally Reviewed and Approved the Faulty Bids at Issue and Actively Monitored Construction Progress .......84

G. Fluor's Judicial Admissions in Ongoing Litigation Concerning the Brunswick and Citrus County Plants .......85

    1. The *Mitsubishi* Lawsuit .......85

    2. The *Duke* Lawsuit .......86

H. The Magnitude and Frequency of the Charges .......89

VIII. LOSS CAUSATION .......89

IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET .......100

X. THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS .......102

XI. CLASS ACTION ALLEGATIONS .......104

XII. CLAIMS FOR RELIEF .......105

COUNT I For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants .......105

COUNT II For Violations of §20(a) of the Exchange Act Against All Defendants .......107

PRAYER FOR RELIEF .......108

JURY DEMAND .......108

Lead Plaintiffs Wayne County Employees' Retirement System, the Town of Fairfield Employees' Retirement Plan, and the Town of Fairfield Police and Firemen's Retirement Plan (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings and press releases by Fluor Corporation ("Fluor" or the "Company"), Fluor's earnings calls, Defendants' statements to analysts at presentations and conferences, media and analyst reports about the Company, statements by percipient witnesses, Fluor's stock chart, and Defendants' own Class Period and post-Class Period admissions.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      INTRODUCTION AND SUMMARY OF THE FRAUD

1.      Plaintiffs bring this securities class action on behalf of all persons who purchased or otherwise acquired Fluor common stock between August 14, 2013 and October 10, 2018, inclusive (the "Class Period"), against Fluor; David T. Seaton (Chief Executive Officer ("CEO") during the Class Period); Biggs C. Porter (Chief Financial Officer ("CFO") during part of the Class Period); Bruce A. Stanski (CFO during part of the Class Period); Matthew McSorley (President of the Power Segment during part of the Class Period); and Gary G. Smalley (Chief Accounting Officer during part of the Class Period) (collectively, "Defendants") for issuing materially false and misleading statements and omissions during the Class Period in press releases and filings with the SEC and in oral statements to the media, securities analysts, and investors in violation of the Securities Exchange Act of 1934 ("Exchange Act").

1539752_1

2.      Fluor is a multinational holding company that provides design, engineering, procurement, and construction services in a variety of industries.  Relevant to this action is Fluor's business of providing design, engineering, procurement, and construction services for gas-fired power plants for large utilities and other energy-producing customers.  This securities class action arises from Defendants' misleading statements and omissions to investors regarding Fluor's bidding and construction of four gas-fired power plants in the Southeastern United States – the Brunswick County Plant in Virginia, the Greensville County Plant in Virginia, the Anderson County Plant in South Carolina, and the Citrus County Plant in Florida (together, the "Gas-Fired Plants").

3.      Prior to and during the Class Period, Fluor was engaged, through its Power Segment (defined below), in bidding for and, if its bids were accepted, constructing large-scale, gas-fired power plants.  Bidding for these gas-fired power plant contracts was a competitive process whereby Fluor submitted bids to the company commissioning a plant in an effort to win the project.  If Fluor's bids were accepted, Fluor would be named the Engineering, Procurement, and Construction ("EPC") contractor and be responsible for designing and engineering the plant, procuring necessary plant equipment, and constructing the plant.

4.      Leading into and during the Class Period, at a time when Fluor was bidding for the Gas-Fired Plants at issue, Defendants continuously highlighted the increasing demand for clean-burning gas-fired power plants as a growth driver for Fluor's Power Segment.  For example, in its 2013 and 2014 Annual Reports, Fluor claimed that it was seeing its "greatest activity and largest opportunities in the North American gas market" and that coal-fired plant retirements and low prices of natural gas were "creating large-scale opportunities for gas-fired power plants."  Similarly, on September 11, 2013, Porter claimed that Fluor was positioned to capitalize on the accelerating demand for gas-fired power plant business, which was increasing due to regulations restricting coal-fired power plants.  On November 5, 2013, Fluor's Vice President of Investor Relations, Ken

- 2 -

Lockwood, stated: "[D]on't overlook the potential that the Power business could contribute to Fluor. It has in the past, and we expect that it will again once the US gets its act together in terms of clean air rules and requirements."  On a May 1, 2014 earnings call regarding Fluor's Q1 2014 financial results, Defendants again highlighted the expected future revenue from gas-fired plants, stating that "somewhere in the neighborhood of $2 billion, $1.7 billion to $2 billion in revenue – new order revenue" was in the pipeline.  Market analysts took note of the importance of the gas-fired power market, highlighting Fluor's bidding and execution abilities as key factors in maintaining competitiveness in the $40 billion gas-fired power plant market.

5.     Having established the importance of the gas-fired power plant construction business, Defendants assured the market that Fluor was able to build power plants for its customers on time, on budget, and at a profit.  This assurance was critical, as Fluor designed, engineered, and constructed gas-fired plants pursuant to fixed-price, lump-sum contracts under which Fluor committed to construct a plant pursuant to specifications provided by the customer for a set amount of money.  In other words, Fluor's bids, if accepted, obligated Fluor to perform all contracted activities for the fixed price identified in Fluor's bid.  As a result, these fixed-price contracts were risky endeavors – if the construction schedule and costs did not proceed according to Fluor's bid, Fluor could not recover cost overruns except in certain limited situations and would have to bear the cost overages.

6.     Because of the risks inherent in fixed-price, lump-sum contracts, analysts and investors were intensely focused on Fluor's bidding of gas-fired power plants.  On virtually every single quarterly and annual earnings call during the Class Period, analysts asked Defendants about the competitive landscape surrounding the gas-fired power plant market.  Moreover, in light of the risks and competitive landscape, analysts asked repeatedly whether Fluor was appropriately conservative in bidding for these projects.  This focus was especially acute because, leading up to

- 3 -

and during the Class Period, many of Fluor's competitors – other gas-fired power plant construction companies – were in a "race to the bottom" to win contracts by aggressive bids with thin profit margins.

7.      It was therefore imperative that Defendants convince the market that Fluor's bids were conservative and reliably profitable.  Accordingly, throughout the Class Period Defendants assured the market, in response to direct questions from analysts concerning Fluor's bidding practices, that Fluor – unlike its competitors – was "***highly selective***" and "***very conservative***." Indeed, Seaton stated that Defendants were focused on "being selective in the projects we pursue." Similarly, Defendants in Annual Reports throughout the Class Period stated that "[m]any of our competitors may be more inclined to take greater or unusual risks or terms and conditions in a contract that we might not deem acceptable."  In response to analyst questions about the increased risk of fixed-price gas-fired projects, Seaton stated in no uncertain terms: "We have ***not*** seen our risk profile increase . . . ."  And Seaton went to great lengths to convince the market that Fluor was different than its race-to-the-bottom competitors: "[T]his is going to sound arrogant, and I don't mean it that way – we have the ability . . . to ***say no*** and make sure that we get projects that we want at the price we want, that allows us to earn the profitability we expect."  In contrast, Seaton explained, "there will be some folks that will do some silly things" to win business who "in a few years will . . . regret that."  The message throughout the Class Period was clear – investors need not worry about Fluor's potentially risky gas-fired business because Defendants "don't chase everything that is out there."  Rather, Seaton assured, "we have been ***very conservative*** in what we take in and how confident we are in that going forward."  Defendants' assurances concerning Fluor's conservative bidding process had their intended effect – Fluor's stock price traded at or near its Class Period high at the time Defendants provided these assurances.

- 4 -

8.     Defendants' representations regarding the conservative nature of Fluor's gas-fired plant bids were knowingly and materially misleading.  The truth was that Fluor was no different than its race-to-the-bottom competitors, and Defendants knew it.  Prior to and during the Class Period, fixed-price gas-fired power plant bids were reviewed and approved by CEO Seaton, CFO Porter, and President of the Power Segment McSorley, among other senior-level officers.  Contrary to their Class Period statements, Defendants systematically understated costs and underbid and approved gas-fired power plant project estimates in order to win new business.  Indeed, after the Class Period, Defendants admitted that "there's always some contractor that is willing to say okay to [a] lower number, using some excuse to justify the win, *Fluor included*."  Defendants also admitted unequivocally that all of the Gas-Fired Plants suffered from a "fundamental problem" due, in part, to "*improper estimating*," and that there were "*fatal flaws* in the bidding process of all of those projects."  And despite Defendants' Class Period drumbeat – emphasizing repeatedly that Fluor was conservative – Defendants admitted that "*10 of the 12*" gas-fired projects undertaken by Fluor since 2003 "have underperformed our as-sold expectation, with 3 suffering losses."  Confidential witnesses ("CWs") corroborate Defendants' admissions, describing that their estimates for required labor and equipment were reduced by management so that Fluor could remain competitive in the bidding process.  These witnesses further explained that Fluor's gas-fired power plant projects suffered because of poor estimates and a process by which Fluor would whittle its bid down to an unrealistic "best and final" number in order to win contracts.  Moreover, Defendants spoke about Fluor's purportedly conservative bidding process on nearly every single earnings call throughout the Class Period, demonstrating that the topic was high on Defendants' radar and that Defendants knew or were reckless in not knowing the truth – that Fluor's bids were not conservative.

9.     Throughout the Class Period, Defendants also made repeated statements concerning the construction and budget progress of the Gas-Fired Plants.  These statements, too, were

- 5 -

knowingly and materially misleading when made.  For example, although Defendants knowingly underbid the Brunswick County Plant, Seaton stated, in connection with announcing the notice to proceed with its construction, that "we are quite comfortable with fixed-price work."  When asked in October 2014 for an update "on how the execution is going on your fixed-price projects right now," Seaton stated that he "*[felt] really good about where we stand*."  Days later, in November 2014, McSorley specifically referenced Fluor's relationship with Mitsubishi, the manufacturer of the turbines used in the Brunswick County Plant: "We [are] focused largely on having ***very good [original equipment manufacturer] relations.  This is with turbine manufacturers" such as "Mitsubishi[]*."  And in June 2014, Seaton touted Fluor's ability to install any "gas cycle regardless of what the turbine choice is," indicating that Fluor was not experiencing any turbine issues.

10.     The truth, however, was that months earlier – as early as April 2014 – Fluor was experiencing irreparable delays and problems with the Mitsubishi turbines at the Brunswick County Plant.  In fact, Fluor later judicially admitted that "*[b]y April 2014*, Mitsubishi had already begun failing to meet" the delivery schedule and, "[i]n addition to their lateness, the deliveries evidenced a complete lack of quality control."  These problems, Fluor admitted, "forced [Fluor] to accelerate the construction process at ***great additional cost***."  Defendants knew or recklessly disregarded these same issues that plagued the other Gas-Fired Plants, which used the same or substantially similar Mitsubishi turbines.  Further, when Defendants began recognizing charges on particular gas-fired plants, they routinely assured investors that they were one-time events at particular projects and were not "symptomatic" of Fluor's other gas-fired projects.  In reality, all of the Gas-Fired Plants "had a fundamental problem.  The projects did not meet the original baseline assumptions due to improper estimating, craft productivity and equipment issues."

11.     Defendants' motive to underbid contracts and misrepresent the true state of affairs at its gas-fired projects was clear.  For example, the Individual Defendants accumulated more than ***$30***

- 6 -

*million* in net gains from illicit insider sales when Fluor's stock price was artificially inflated as a result of Defendants' false and misleading statements, before the truth was revealed. Fluor itself also raised *$1.6 billion* in offerings while its securities were inflated by the alleged fraud. The Individual Defendants also had an unusual incentive compensation structure whereby they were rewarded for winning new business with increased expected profit margin, regardless of how the plants performed in the future. In other words, by winning contracts with low bids, Defendants created artificially high expected profit margins for projects and correspondingly high incentive compensation for themselves. Defendants were also desperate to win and maintain business from Duke Energy ("Duke") and Dominion Virginia Electric and Power Company ("Dominion"), the customers that commissioned the Gas-Fired Plants. According to a CW, Dominion was a key customer from which Fluor wanted to win repeat business after having previously lost its work, while Duke had not worked with Fluor since some problematic projects in the 1990s and 2000s.

12.    When the effects of Defendants' woefully underbid contracts could no longer be concealed, investors were blindsided with the news that Fluor would incur charges related to the Gas-Fired Plants. Beginning in July 2015 and continuing to the end of the Class Period, Fluor recognized charges totaling nearly *$500 million* related to those plants. Defendants also admitted that Fluor's bidding practices were no different than the competitors from whom Defendants had falsely distinguished Fluor, ultimately causing Fluor to make the drastic decision, near the end of the Class Period, to exit the gas-fired power plant construction business altogether. Through a series of partial disclosures, the truth slowly leaked regarding Fluor's improper bids and project execution, causing Fluor's stock price to decline and investors to suffer significant monetary damage. By the end of the Class Period, Fluor's stock price had fallen to $46.53 – a *45% decline* from its Class Period high of $83.93. It has never recovered.

## II.      JURISDICTION AND VENUE

13.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

14.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

15.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Fluor is headquartered in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

16.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

## III.     THE PARTIES

### A.     Plaintiffs

17.      Lead Plaintiff Wayne County Employees' Retirement System ("Wayne County") purchased Fluor common stock during the Class Period as set forth in the Certification previously filed (*see* ECF No. 17-2) and incorporated herein, and was damaged thereby.

18.      Lead Plaintiff the Town of Fairfield Employees' Retirement Plan and the Town of Fairfield Police and Firemen's Retirement Plan (together, the "Town of Fairfield") purchased Fluor common stock during the Class Period as set forth in the Certification previously filed (*see* ECF No. 11-2) and incorporated herein, and the amended Certification submitted in connection with this Consolidated Complaint, and was damaged thereby.

- 8 -

19.     Wayne County and Town of Fairfield are collectively referred to herein as "Plaintiffs."

**B.     Defendants**

20.     Defendant Fluor Corporation is a multinational holding company incorporated in Delaware.  Through various subsidiaries, Fluor provides engineering, procurement, construction, fabrication and modularization, commissioning and maintenance, and management services for clients in a variety of industries such as oil and gas, chemicals and petrochemicals, mining and metals, transportation, power, life sciences, and advanced manufacturing.  Fluor maintains its headquarters at 6700 Las Colinas Boulevard, Irving, Texas 75039.  At all relevant times, Fluor's common stock traded on the NYSE under the ticker symbol "FLR."

21.     Defendant David T. Seaton ("Seaton") was the CEO and Chairman of the Company at all relevant times.

22.     Defendant Biggs C. Porter ("Porter") was the CFO from the beginning of the Class Period to August 4, 2017.

23.     Defendant Bruce A. Stanski ("Stanski") was the CFO from August 4, 2017 to the end of the Class Period.

24.     Defendant Matthew McSorley ("McSorley") was the President of the Power Segment from the beginning of the Class Period to October 2015.  Thereafter, McSorley held various senior officer roles at Fluor through the end of the Class Period.

25.     Defendant Gary G. Smalley ("Smalley") was the Chief Accounting Officer from the beginning of the Class Period to July 2015.

26.     The Defendants referenced above in ¶¶20-25 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants and the Company are collectively referred to herein as "Defendants."   The Individual Defendants made, or caused to be made, false and

- 9 -

misleading statements that caused the price of Fluor common stock to be artificially inflated during the Class Period, as alleged herein.

27.     The Individual Defendants, because of their positions, possessed the power and authority to control the contents of the Company's quarterly and annual reports, other SEC filings, shareholder letters, press releases, securities offering materials, earnings teleconferences, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of and/or contributed to the Company's statements alleged herein to have been false or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements and omissions pleaded herein.

## IV.   FACTUAL BACKGROUND

### A.   Fluor and Its Power Segment

28.     Fluor is a holding company that provides, through various entities and divisions, engineering, procurement, fabrication and modularization, commissioning and maintenance, and management services for clients across a wide array of industries.  Fluor describes itself as one of the world's largest providers of engineering, procurement, construction, maintenance, and project management services.  As of November 2018, Fluor was the largest engineering and construction company listed on the *Fortune 500*.

29.     From the beginning of the Class Period to 2016, Fluor's business operations were organized into five principal segments: Oil & Gas, Industrial & Infrastructure, Government, Global

- 10 -

Services, and Power.  In 2016, the Company reorganized its operations into four principal segments, and the Power segment was moved into the segment titled Industrial, Infrastructure & Power.  In 2018, the mining and metals group was moved into the same business segment and is now titled Mining, Industrial, Infrastructure & Power.   The pre-2016 Power segment, the Industrial, Infrastructure & Power segment, and the Mining, Industrial, Infrastructure & Power segment are collectively and interchangeably referred to herein as the "Power Segment."

30.     Through its Power Segment, Fluor provides a range of engineering, procurement construction, and other services to the gas-fired, nuclear, environmental compliance, renewables, and solid-fueled power markets.  Fluor's clients in these markets include utilities, independent power producers, original equipment manufacturers, and other third parties.

31.     In the gas-fired market, the Power Segment designs, builds, commissions, retrofits, and maintains gas-fired power generation facilities throughout the United States.  This litigation concerns Fluor's misrepresentations and omissions concerning Fluor's faulty bids and flawed execution on the construction of the four Gas-Fired Plants.

32.     According to Bruce Stephens, Director of Project Execution at Fluor, a typical combined cycle project like the Gas-Fired Plants always has three or four so-called "activity paths" that are critical or near-critical.  The activities are the gas turbines, the heat recovery steam generators, the steam turbine, and piping.  *See* Aaron Larson, *Power Plant Construction and Upgrade Best Practices*, Power, Feb. 1, 2018.

**B.     Fixed-Price Contracts and the Backlog**

33.     Fluor performs services for its clients through either "reimbursable contracts" or "fixed-price contracts."  Fixed-price contracts include both negotiated and competitively bid fixed-price contracts.  In the case of "negotiated" fixed-price contracts, Fluor is selected as contractor prior to the price being negotiated with the client.  Under "competitively bid" fixed-price contracts, Fluor

- 11 -

bids on a contract against competitors based upon specifications provided by the client and agrees to develop a project at a fixed price.  As the Company explained in each of its Annual Reports issued during the Class Period, if Fluor "perform[s] well under these contracts, [the Company] can benefit from cost savings; however, if the project does not proceed as originally planned, [the Company] cannot recover cost overruns except in certain limited situations."

34.     A "backlog" in the engineering and construction industry is a measure of the total dollar value of work to be performed on contracts awarded and in progress.  As work is completed, revenue is booked.   Thus, backlog is the expected revenue from awarded contracts and commitments.  Throughout the Class Period, Fluor stated that its backlog represented expected revenue from projects for which it had "an executed contract or commitment" and reported backlog in the Company's quarterly and annual financial reports filed with the SEC.

## C.     The Gas-Fired Plants

### 1.     The Brunswick County Plant

35.     On July 31, 2012, Fluor entered into an EPC contract with Dominion for a 1,358 megawatt natural gas-fired power plant in Brunswick County, Virginia (the "Brunswick County Plant").  Under the terms of the EPC contract, Fluor agreed to perform all design work, engineering, procurement, construction, installation, start-up, and other necessary services for the Brunswick County Plant in exchange for the agreed-upon lump sum price.  The EPC contract also contained performance guarantees backed by liquidated damages provisions to ensure that the Brunswick County Plant was completed on schedule and performed as designed.  Accordingly, Fluor could not delay construction to address construction issues mid-project and maintain its expected profitability.

36.     Fluor was awarded the Brunswick County Plant EPC contract as a result of a competitive bidding process.  Prior to executing the EPC contract with Fluor, Dominion had sent a Request for Proposal to three different qualified bidders, including Fluor, in March 2012.  Each

- 12 -

bidder was required to submit a fixed-price bid in order to be considered for the Brunswick County Plant project. Fluor's bid was the lowest evaluated cost proposal of the three, leading to Fluor being awarded the EPC contract.

37.     The Brunswick County Plant was designed to include three Mitsubishi "G" class combustion turbine generators, three heat recovery steam generators, and one steam turbine generator – a configuration commonly referred to as a 3x1 combined-cycle. Dominion entered into a Turbine Supply Agreement ("TSA") with Mitsubishi in February 2012 to supply the necessary turbines, which was partially assigned to Fluor as the EPC contractor on July 31, 2012.

38.     On August 14, 2013, Fluor announced that it had received full notice to proceed from Dominion to begin construction on the Brunswick County Plant. As a result of this notice, Fluor booked approximately $800 million into its backlog during Q3 2013.

39.     In February 2014, Fluor began construction work on the Brunswick County Plant.

40.     Unbeknownst to investors, by April 2014, Fluor was already experiencing major issues in the quality and timing of the deliveries for the Mitsubishi turbine components. As Fluor later disclosed, these "late and mis-labeled deliveries continued and worsened, which delayed Fluor's progress under the EPC contract and exposed it to the liquidated delay damages provided therein" and required Fluor to "accelerate the construction process at great additional cost." *See Fluor Enterprises, Inc. v. Mitsubishi Hitachi Power Systems Americas, Inc.*, No. 3:17-cv-00622-MHL (E.D. Va.) (the "*Mitsubishi* Lawsuit"), ECF No. 1, ¶¶26-27.

41.     On November 13, 2014, Defendants represented that the Brunswick County Plant was "about 35% to 40% complete."

42.     On May 4, 2015, Dominion reported the Brunswick County Plant was approximately 60% complete.

- 13 -

43.     On August 5, 2015, Dominion reported the Brunswick County Plant was approximately 75% complete.

44.     On October 29 2015, Fluor released its Q3 2015 financial statements, in which it announced that the Power Segment profit and profit margin had decreased significantly compared to the prior year, "substantially due to the impact of forecast revisions" for the Brunswick County Plant.   On the Company's earnings call that evening, Porter explained that while Fluor had experienced a gain in earnings, "this additional gain was offset by the unusually large cost increase" at the Brunswick County Plant.

45.     On February 18, 2016, Fluor released its Q4 2015 financial statements, in which it disclosed a $31 million charge related to the increased costs at the Brunswick County Plant.

46.     On May 5, 2016, Defendants announced that the Brunswick County Plant was "essentially complete."

### 2.     The Greensville County Plant

47.     On April 8, 2015, Fluor entered into an EPC contract with Dominion for a 1,588 megawatt natural gas-fired power plant in Greensville County, Virginia (the "Greensville County Plant").   Under the terms of the EPC contract, Fluor agreed to perform all design work, engineering, procurement, construction, installation, start-up, and other necessary services for the Greensville County Plant in exchange for an agreed-upon lump sum price.   The EPC contract also contained performance guarantees backed by liquidated damages provisions to ensure that the Greensville County Plant was completed on schedule and performed as designed.   Accordingly, Fluor could not delay construction to address construction issues mid-project and maintain its expected profitability.

48.     Fluor was awarded the Greensville County Plant EPC contract as a result of a competitive bidding process.   Prior to executing the EPC contract with Fluor, Dominion had sent a Request for Proposal to four different qualified bidders, including Fluor, in July 2014.   Each bidder

- 14 -

was required to submit a fixed-price bid in order to be considered for the Greensville County Plant project. Fluor's bid was the lowest evaluated cost proposal of the four considered, leading to Fluor being awarded the EPC contract.

49.     The Greensville County Plant was designed to include three Mitsubishi "J" class combustion turbine generators, three heat recovery steam generators, and one steam turbine generator – the same configuration as the Brunswick County Plant. Dominion entered into a TSA with Mitsubishi in July 2014 to supply the necessary turbines.

50.     On July 7, 2016, Fluor announced that it had received full notice to proceed from Dominion to begin construction on the Greensville County Plant.

51.     On November 30, 2016, Dominion reported the Greensville County Plant was approximately 10% complete.

52.     On August 3, 2017, Fluor released its Q2 2017 financial statements, in which it disclosed pre-tax charges totaling $194 million and $219 million for the three and six months ended June 30, 2017, respectively, due to forecast revisions at three ongoing fixed-price, gas-fired power plant projects – including the Greensville County Plant.

53.     On February 20, 2018, Fluor reported that the Greensville County Plant was "approximately 75% complete and [would] be completed by year-end."

54.     On December 10, 2018, Dominion announced that the Greensville County Plant was "up and running."

### 3.     The Anderson County Plant

55.     In the third quarter of 2014, Fluor announced that it had been awarded an EPC contract with Duke for a 750 megawatt natural gas-fired power plant at the W.S. Lee Station in Anderson County, South Carolina (the "Anderson County Plant").

56.     Fluor was awarded the Anderson County Plant EPC contract as a result of a competitive bidding process.

57.     The Anderson County Plant was designed to include two combustion turbine generators, two heat recovery steam generators, and one steam turbine generator – a configuration commonly referred to as a 2x1 combined-cycle.

58.     On May 4, 2017, Fluor released its Q1 2017 financial statements, in which it disclosed a "decrease in segment profit . . . driven by cost increases and forecast revisions of approximately $30 million, primarily for a gas-fired power plant in South Carolina," *i.e.*, the Anderson County Plant.

59.     On August 3, 2017, Fluor released its Q2 2017 financial statements, in which it disclosed additional pre-tax charges totaling $194 million and $219 million for the three and six months ended June 30, 2017, respectively, due to forecast revisions at three ongoing fixed-price, gas-fired power plant projects – including the Anderson County Plant.

60.     On February 20, 2018, Fluor announced the Anderson County Plant was "substantially complete."

61.     The Anderson County Plant became operational in April 2018.

### 4.     The Citrus County Plant

62.     On October 15, 2014, Fluor entered into an EPC contract with Duke for a 1,640 megawatt natural gas-fired power plant in Citrus County, Florida (the "Citrus County Plant").  Under the terms of the EPC contract, Fluor agreed to perform all design work, engineering, procurement, construction, installation, start-up, and other necessary services for the Citrus County Plant in exchange for the agreed-upon lump sum price.  The EPC contract also contained performance guarantees, such as dates for Guaranteed Mechanical Completion and Guaranteed Substantial Completion, backed by liquidated damages provisions to ensure that the Citrus County Plant was

- 16 -

completed on schedule and performed as designed.  Accordingly, Fluor could not delay construction to address construction issues mid-project and maintain its expected profitability.

63.     Fluor was awarded the Citrus County Plant EPC contract as a result of a competitive bidding process.

64.     The Citrus County Plant was designed to be composed of two separate 820 megawatt generating units, or "Power Blocks."  Each Power Block was designed to include two Mitsubishi "G" class combustion turbine generators (the same turbines used at the Brunswick County Plant), two heat recovery steam generators, and one steam turbine generator – the same configuration as the Anderson County Plant.

65.     On October 5, 2015, Fluor received full notice to proceed from Duke to begin construction on the Citrus County Plant.

66.     On August 3, 2017, Fluor released its Q2 2017 financial statements, in which it disclosed pre-tax charges totaling $194 million and $219 million for the three and six months ended June 30, 2017, respectively, due to forecast revisions at three ongoing fixed-price, gas-fired power plant projects – including the Citrus County Plant.  The same day, Fluor disclosed that the Citrus County Plant was 42% or 45% complete.

67.     Unbeknownst to investors, on November 14, 2017, as a result of ongoing delays in the construction of the Citrus County Plant, Fluor and Duke entered into Change Order No. 51. Change Order No. 51 extended the Guaranteed Substantial Completion and Guaranteed Mechanical Completion dates for Power Blocks 1 and 2.

68.     On February 20, 2018, Fluor released its Q4 2017 financial statements.  On the earnings call that evening, Fluor reported that the Citrus County Plant was "approximately 75% complete and [would] be completed by year-end."  Fluor also disclosed that a certain gas-fired

power plant had incurred an additional charge of $41 million in the quarter.  As clarified in the next quarter's earnings call, the Citrus County Plant was the cause of those additional charges.

69.     Unbeknownst to investors, on April 6, 2018, as a result of continued delays in the construction of the Citrus County Plant, Fluor and Duke entered into Change Order No. 59.  Change Order No. 59 again extended the Guaranteed Substantial Completion and Guaranteed Mechanical Completion dates for Power Blocks 1 and 2.

70.     As later revealed in litigation between Fluor and Duke concerning the Citrus County Plant, by late spring 2018, "Fluor was facing well over $100 million in liquidated damages" due to the continued delays on the project, "with that number growing daily."  *See Fluor Enterprises, Inc. v. Duke Energy Florida, LLC*, No. 8:19-cv-00224-WFJ-AAS (M.D. Fla.) (the "*Duke* Lawsuit"), ECF No. 17 at 9.

71.     On May 3, 2018, Fluor released its Q1 2018 financial statements, in which it disclosed yet another set of forecast revisions for the Citrus County Plant – this time a $125 million charge to reflect the project's estimated cost growth.

72.     Unbeknownst to investors, on July 9, 2018, Fluor and Duke entered into Change Order No. 73.  Change Order No. 73 provided that so long as both Power Blocks went into service prior to December 31, 2018, Duke would agree to waive all otherwise claimable liquidated damages incurred under the EPC contract.  Fluor would still be liable for certain "additional costs incurred by Duke Energy due to the failure to meet the agreed milestone dates previously set forth" in the EPC contract and Change Order No. 59.

73.     On August 2, 2018, Fluor released its Q2 2018 financial statements, in which it disclosed another pre-tax charge of $16 million due to forecast revisions on the Citrus County Plant.  On the earnings call that evening, Defendants disclosed that the Citrus County Plant was 93% complete.

74.    On October 10, 2018, Fluor released preliminary Q3 2018 results, in which it disclosed an additional charge of $35 million for forecast revisions on the Citrus County Plant.

75.    On October 26, 2018, Power Block 1 of the Citrus County Plant went online.

76.    On November 24, 2018, Power Block 2 of the Citrus County Plant went online.

77.    On February 21, 2019, Fluor released Q4 2018 results, in which it disclosed an additional charge of $12 million for forecast revisions on the Citrus County Plant.

## V.    CONFIDENTIAL WITNESS ACCOUNTS

78.    Several former Fluor employees have provided information demonstrating that Defendants' Class Period statements were false and misleading and that Defendants knew or recklessly disregarded the falsity or misleading nature of their statements.   The CWs include individuals formerly employed at Fluor during the Class Period, whose accounts corroborate one another, other sources set forth herein, and facts now admitted by Fluor.   The CWs provided information to Plaintiffs' counsel and/or their investigator on a confidential basis and are particularly described by job description, responsibility, and duration of employment, thereby providing sufficient detail to establish their reliability and personal knowledge.   As set forth below, the information provided by the CWs supports a strong inference that Defendants acted with scienter.

79.    Confidential Witness No. 1 ("CW-1") worked in the Health, Safety, and Environment division of the Power Segment between May 2014 and March 2017 in the Charlotte office.   CW-1 was responsible for estimating gas-fired and other projects from the health, safety, and environment perspective.   CW-1 stated that all hard-number bids were reviewed and approved through the Executive Review Board process and the Business Risk Management Framework ("BRMF").   This process included review by Seaton, the President of the Power Segment (McSorley during CW-1's tenure), and other senior management.   CW-1 stated that the problems associated with the gas-fired plants were the result of poor estimates, lack of execution, and bad management of the projects once

- 19 -

they were underway.  CW-1 described the "best and final" process whereby Fluor submitted a bid to a customer, Fluor met with the customer who suggested that Fluor needed to reduce its price, and then Fluor amended its bid to a "best and final" price in hopes of winning the contract.  CW-1 stated that CW-1's estimates to cover health, safety, and environment issues on gas-fired plants were routinely reduced by management.  CW-1 was also told by management to cut costs so that Fluor could stay competitive in the bidding process for these projects.  With respect to the Brunswick County Plant, CW-1 stated that Fluor underestimated the amount of piping and other expenses during the design and construction phases.

80.     Confidential Witness No. 2 ("CW-2") was Lead Electrical Design Engineer from May 2007 through September 2017 in the Charlotte office.  CW-2 was the Lead Electrical Engineer for the Citrus County Plant and a Senior Electrical Engineer on the Brunswick, Greensville, and Anderson County Plants.  According to CW-2, Fluor understated the estimates concerning the labor costs needed to build the plants, which costs constituted a large portion of the projects' budgets. CW-2 also stated that the projects suffered setbacks caused by crafts and trades because the quality of work for trades declined and Fluor did not hire quality tradesmen.

81.     Confidential Witness No. 3 ("CW-3") was an Engineer from January 2013 to February 2014 and a Lead Engineer from February 2014 to April 2016.  CW-3 worked on the Brunswick County and Greensville County Plants.  CW-3 stated that CW-3 believed the project estimates were approved by senior management.  CW-3 said that Fluor used the Brunswick County Plant as a "go-by" for estimating the Greensville County Plant.  CW-3 was responsible for estimating the engineering hours and equipment for the Greensville County Plant.  CW-3 stated that CW-3's estimates for required equipment and engineering hours for the Greensville County Plant were cut by management during the estimating phase in order to reduce the bid.  CW-3 explained that Dominion – the customer responsible for the Brunswick County and Greensville County Plants

- 20 -

– was a key customer for which Fluor wanted to do more work. CW-3 said that Fluor had previously lost work for Dominion, including the Warren County Power Station, and wanted to get back in Dominion's good graces at the time it was bidding the Brunswick County and Greensville County Plants.

82.     Confidential Witness No. 4 ("CW-4") was Vice President of the Power Gas Business from January 2013 to September 2013, and Vice President, US Operations, Power Business from September 2013 to August 2017, working in the Charlotte office. CW-4 stated that bids on the gas-fired plants went all the way up to Seaton for approval. The proposals also went to the Executive Team, Power Group President, Chief Risk Assessment Officer, and CFO (Porter was CFO at the time the Gas-Fired Plants at issue were bid and approved).

83.     Confidential Witness No. 5 ("CW-5") worked in the Charlotte office in the Power Segment as a Senior Mechanical Engineer from 2014 to 2016 working on the Citrus County Plant. CW-5 stated the view that Fluor did not devote sufficient resources to the estimating and bidding process before the contract was awarded, explaining that there was not a desire to devote substantial time and resources to estimating and bidding before winning the contract, since those resources would be wasted if Fluor did not win the contract. CW-5 stated that management compressed the design phase of the Citrus County Plant to six months, whereas the design phase typically took one to one-and-a-half years. CW-5 stated this compression caused scheduling issues, including problems with the piping design team. CW-5 stated that, during construction on the Citrus County Plant, issues arose regarding large pieces of equipment that were underestimated in or omitted from the original bid, including large valves, which added costs and required additional engineering hours. CW-5 stated there was a discrepancy between the bid provided to win the contract and the bid once Fluor won the contract. CW-5 stated that, prior to the Anderson and Citrus County Plants, Duke did not want to work with Fluor because of some problematic projects Duke had with Fluor in the 1990s

- 21 -

and 2000s.  CW-5 stated that Fluor really wanted to obtain Duke projects and that winning Duke projects was a focus.  CW-5 stated that there were issues with the Mitsubishi turbines, which CW-5 stated were the same or substantially similar turbines used for the Brunswick County Plant.  CW-5 stated that Mitsubishi was not responsive and that it would sometimes take Mitsubishi months to respond to Fluor, which caused delays on the project.  CW-5 also described problems encountered with the turbine pressure release valves.  CW-5 stated that the Mitsubishi turbines at the Brunswick County Plant experienced the same turbine pressure release valve problems.  CW-5 also stated that there was still design work being performed relating to the turbines as they were being installed.

## VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.   False and Misleading Statements and Omissions Regarding Fluor's Purportedly Conservative Bidding Process and Risk Management

84.   Defendants made numerous materially false and misleading statements and omissions regarding Fluor's purportedly conservative bidding process and risk management.  These statements, as described below, are referred to herein as the "Bidding Fraud."

85.   Immediately prior to the beginning of the Class Period, on Fluor's August 1, 2013 Q2 2013 earnings call, Seaton stated: "I think *we are quite comfortable with fixed-price work*; we have done that for a lot of years."  Similarly, in the 2012 Annual Report Shareholder Letter, dated March 8, 2013, Seaton wrote:

> [W]e are focused on sustainable growth – adapting to market changes and client needs, investing in our people, *being selective in the projects we pursue*, and building trusted relationships with our stakeholders.

86.   The message was clear – despite the risks inherent to fixed-price projects, investors could take solace in the fact that Fluor's bids were conservative and that Fluor was remarkable in its ability to execute projects on time and on budget.

- 22 -

87.     Throughout the Class Period, Fluor touted its "Risk Management" as a competitive strength in its Forms 10-K for fiscal years 2013-2017, signed by Seaton, Porter, Stanski, and Smalley and SOX-certified by Seaton, Porter, and Stanski,[1] in identical or substantially similar form:

> We believe that our ability to assess, understand, gauge and mitigate project risk, especially in difficult locations or circumstances or in a ***fixed-price contracting environment***, gives us the ability to selectively enter into markets or accept projects where we feel we can best manage risks. ***We have an experienced management team, particularly in risk management and project execution, which helps us to better anticipate and understand potential risks and, therefore, how to manage them***. Our risk management capabilities allow us to better control costs and ensure timely performance, which in turn leads to clients who are satisfied with the delivered product.

88.     Throughout the Class Period, Fluor also downplayed its disclosed risk factors relating to large-scale project awards in its Forms 10-K, in identical or substantially similar form:

> We may not win contracts that we have bid upon due to price, a client's perception of our ability to perform and/or perceived technology advantages held by others. ***Many of our competitors may be more inclined to take greater or unusual risks or terms and conditions in a contract that we might not deem acceptable***.

89.     On February 18, 2014, Fluor released its 2013 Annual Report on Form 10-K, signed by Seaton, Porter, and Smalley and SOX-certified by Seaton and Porter.  On the earnings call held that evening, in response to a question regarding whether Fluor needed to take on extra risk to achieve the higher margins it anticipated, Seaton stated that Fluor's risk was properly managed and that it could profitably execute fixed-price projects across the Company, including in the Power Segment:

> [Analyst:] David, [LDS] margins had a nice uptick in 4Q, you had been talking about it.  Do think you're still on track for the 5% margin that you alluded to in the second half of this year?  Can you tell us how much of the improvement that you saw in 4Q based on better mix versus better pricing?  Maybe a follow on to that, David, around ***do you have to take extra risk to get to these higher levels?*** Because you know, we do notice more [LSTK] work that Fluor's taking and maybe you could talk about that.

---

[1]     "SOX" refers to the Sarbanes-Oxley Act of 2002.

*      *      *

[Seaton:] *We have not seen our risk profile increase, based on the new awards that we are booking right now.  Yes, there are some that are fixed-price in nature.  But I would say that we feel very comfortable in taking the projects that we are on the fixed price basis, and that's not just in oil and gas, but I would say across the Company*.

90.     Thereafter, an analyst for Credit Suisse described Fluor as a "Top Pick in E[ngineering] & C[onstruction]" as the Company "continue[d] to clean house on awards and deliver on the margin side."

91.     Fluor's 2013 Annual Report, issued on March 7, 2014, touted the Company's ability to properly bid lump-sum projects, including its ability to bid labor in key markets in the United States and Canada:

THE BLUEPRINT FOR GROWTH

*Leveraging our capabilities as a lump-sum project provider*, the Power group helps our customers bring megawatts online through a variety of fuel sources, from natural gas to nuclear, coal and solar.

*      *      *

THE BLUEPRINT

Creating the right blueprint for growth in the power industry starts with geographic focus.  Fluor only targets countries that are showing strong economic progress and have a stable and established power market.  *We also focus on markets where we can deliver a strong lump-sum advantage.  Right now, we can offer superior labor resources in existing key markets like the United States and Canada* . . . .

92.     Defendants knew or recklessly disregarded that the Bidding Fraud statements set forth in ¶¶87-89, 91, *supra*, were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

(a)     Contrary to Defendants' representations, Fluor was not able to "anticipate and understand potential risks" or recklessly disregarded those risks to win contracts, its bids were not

- 24 -

more conservative that its competitors, and its risk profile had increased as a result of the Brunswick County Plant.  Rather, Defendants knowingly lowballed Fluor's Brunswick County Plant bid in order to win Dominion's business, as they later admitted:

(i)     After the statements in ¶¶87-89, 91, *supra*, were uttered, Defendants admitted that Fluor's gas-fired power plant bids were never realistic: "We . . . have led our clients to believe that a gas-fired power project costs approximately 650 kilowatts – $650 per kilowatt, although virtually no one has delivered one for that value.  The customers start at that figure [*i.e.*, price to build a gas-fired plant] and negotiate downward, and there's always some contractor that is willing to say okay to lower number, using some excuse to justify the win, Fluor included."  ¶215, *infra*.

(ii)    Similarly, Defendants later admitted that the Brunswick County Plant suffered from a "fundamental problem" and "did not meet the original baseline assumptions due to improper estimating, craft productivity and equipment issues" and that "all 4 of those [Gas-Fired Plants] were bid at a time when we didn't have good information on the new first-of-a-kind equipment, nor did we really have a good handle on the level of skill and number of craft employees that we would have available to us in some of these locations."  ¶212, *infra*.

(iii)   Proving that the bidding team neither appropriately considered risks nor erred on the side of being conservative, Defendants admitted that "[t]hese projects, the Power project specifically, were bid at a time by a bidding team that did not follow the rules."  ¶220, *infra*.

(iv)    In the end, Defendants admitted that of the 12 gas-fired projects the Company undertook since 2003, "10 of the 12 have underperformed our as-sold expectations, with 3 suffering losses."  ¶215, *infra*.

(b)     Seaton, Porter, McSorley, and other senior management personally approved all gas-fired plant bids.  Seaton admitted: "We, being me and my management team, accepted those

- 25 -

bids" for the Gas-Fired Plants.  Seaton's admission is corroborated by confidential witnesses, such as CW-1, who similarly described that all hard-number bids were reviewed and approved through the Executive Review Board process and the BRMF, which included review by Seaton, the President of the Power Segment (McSorley during CW-1's tenure), and other senior management.  CW-4 stated that gas-fired bids went to Seaton for approval, as well as the Executive Team, Power Group President, Chief Risk Assessment Officer, and CFO (Porter during CW-4's tenure).  CW-3 similarly stated CW-3's belief that gas-fired project estimates were approved by senior management.

(c)     Confidential witnesses also corroborate Defendants' admissions, describing that Fluor's bids were not conservative and were routinely reduced in order to remain competitive.  Indeed, CW-1 stated that Fluor understated the estimates for piping and other expenses during the design and construction phases of the Brunswick County Plant.  CW-1 also stated that CW-1's estimates were routinely reduced by management, who told CW-1 that CW-1 needed to cut costs so that Fluor could stay competitive in the bidding process.  CW-1 described a "best and final" process at Fluor whereby Fluor submitted a bid to a customer, Fluor met with the customer who suggested that Fluor needed to reduce its price, and then Fluor amended its bid to a "best and final" price in hopes of winning the contract.  CW-2, who worked on the Brunswick County Plant, stated that Fluor understated the estimates for labor costs needed to build the gas-fired projects, which costs constituted a large portion of the projects' budgets.

(d)     The faulty bid assumptions and underestimations regarding the Brunswick County Plant were apparent at the time Defendants uttered the statements in ¶¶87-89, 91, *supra*.  Indeed, the Brunswick County Plant bid was accepted more than a year before the start of the Class Period.  In that intervening period, Fluor had completed detailed "engineering and procurement services on the plant from its Charlotte, North Carolina office" (¶112, *infra*), which revealed that its "baseline assumptions" underlying its bid were not achievable – something Defendants later

- 26 -

admitted (¶131, *infra* ("The projects did not meet the original baseline assumptions due to improper estimating, craft productivity and equipment issues.")).  As CW-5 described, there was not a desire to devote substantial time and resources to estimating and bidding before winning the contract, since those resources would be wasted if Fluor did not win the contract.  In fact, Fluor compressed the critical design phase to six months, whereas that phase typically takes one to one-and-a-half years.  Thus, much of the work was performed only after Fluor was awarded an EPC contract, at which time Fluor determined that its original bid was insufficient.

(e)    Defendants knew or recklessly disregarded at the time Fluor bid for the Brunswick County Plant, and certainly by the time the statements in ¶¶87-89, 91, *supra*, were uttered, that Fluor's bid assumptions concerning the requirements and availability of craft labor in Southeastern Virginia – the site of the Brunswick County Plant – were faulty.  They also knew that Fluor could not "offer superior labor resources in existing key markets like the United States and Canada" when they stated as much on March 7, 2014 (¶91, *supra*), as Fluor was then-experiencing craft labor availability and skill issues related to the Brunswick County Plant.  Defendants later admitted, "we really [did not] have a good handle on the level of skill and number of craft employees that we would have available to us in some of these locations."  Defendants also later admitted that craft labor inputs must be considered because each gas-fired plant was unique and not a "cookie-cutter project[] . . . These projects have different machines, different site locations, different labor pools, all of which produce different outcomes."  Ultimately, craft labor was a "major issue" tied to the cost overruns at the Brunswick County Plant.

(f)    Defendants knew or recklessly disregarded that Fluor's bid for the Brunswick County Plant was not conservative, based on its prior bids for gas-fired power plant projects.  Six of eight fixed-price gas-fired power projects awarded to Fluor prior to the Brunswick County Plant EPC contract – or 75% – had underperformed Fluor's bid assumptions.  Defendants also knew that

- 27 -

Fluor's competitors had experienced similar problems and later admitted that no fixed-price gas-fired power plant projects had performed as expected.

(g)     Defendants spoke about Fluor's purportedly conservative bidding process on nearly every single earnings call throughout the Class Period, demonstrating that the topic was high on Defendants' radar and a key concern for analysts and that Defendants knew or were reckless in not knowing that Fluor's bids were not conservative when they repeatedly stated, often in response to direct questions from analysts, that Fluor's bids were conservative.

(h)     Seaton, Porter, Stanski, and Smalley signed the consolidated Forms 10-K containing the statements in ¶¶87-88, *supra*.[2]  In addition, Seaton, Porter, and Stanski signed Certifications pursuant to SOX in which they attested that the reports containing these statements did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  Seaton, Porter, and Stanski also attested that they had designed disclosure controls to ensure that material information relating to Fluor was made known to them.

(i)     Defendants were motivated to win the gas-fired power plant work by any means necessary in a rapidly growing, increasingly competitive market, including business from key customers such as Duke and Dominion.  CW-3 explained that Dominion – the customer that commissioned the Brunswick County Plant – was a key customer for which Fluor wanted to do more work.  CW-3 said that Fluor had previously lost work for Dominion, including the Warren County Power Station, and wanted to get back in Dominion's good graces at the time it was bidding the Brunswick County Plant.  CW-5 stated that, prior to the Anderson and Citrus County Plants, Duke

---

[2]     Specifically, Seaton signed the Forms 10-K for the years 2013-2017, Porter signed the Forms 10-K for the years 2013-2016, Stanski signed the Form 10-K for the year 2017, and Smalley signed the Forms 10-K for the years 2013-2014.

did not want to work with Fluor because of some problematic projects Duke had with Fluor in the 1990s and 2000s.  Moreover, at the time the statements in ¶¶87-88, 91, *supra*, were uttered, Fluor was in the process of bidding for Duke's Anderson County Plant.  CW-5 stated that Fluor really wanted to obtain Duke projects and that winning Duke projects was a focus.

(j)     The Individual Defendants were motivated to convince the market that Fluor's gas-fired business was conservative in order to profit from illicit insider sales.  Shortly after making the statements in ¶¶87-89, 91, *supra*, but before the truth was revealed, Defendants engaged in the following transactions, among others:

(i)     Seaton sold $10,750,201 in Fluor stock on November 7, 2013 and November 8, 2013 and $2,309,879 in Fluor stock on February 28, 2014.

(ii)     Porter sold $1,004,730 in Fluor stock on November 6, 2013 and $95,263 in Fluor stock on March 6, 2014.

(iii)     Stanski sold $2,667,881 in Fluor stock on November 5, 2013 and $345,021 in Fluor stock on February 28, 2014.

(iv)     Smalley sold $483,471 in Fluor stock on November 5, 2013 and $163,071 in Fluor stock on February 28, 2014.

(k)     The Individual Defendants were motivated to win the Brunswick County Plant EPC contract with a low bid in order to profit from their unusual executive compensation plan, which directly and significantly tied their compensation to new contract awards and profit margin, regardless of how those plants performed in the future.

93.     On June 5, 2014, during a Credit Suisse Engineering & Construction Conference, Seaton continued to state that Fluor's Power Segment was conservative in its bids despite the competition in the market.  As Seaton explained:

Power, as I mentioned, has just kind of been on its ear.  I would suggest that that's probably one of the most competitive markets that we work in right now.  We have been fairly successful on the coal-fired side.  We've got a lot of proposals pending and we feel good about that.

However, we have lost a few to competition who need it more than we do. One of the things that we enjoy is that diversity and it allows us – this is going to sound arrogant, and I don't mean it that way – *we have the ability because of that diversity to say no and make sure that we get projects that we want at the price we want, that allows us to earn the profitability we expect*.

*So we are pretty conservative in how we do things like that, but it does give us I think an advantage in making sure we don't take projects that begin in a challenged nature*.

94.     On July 31, 2014, Fluor released its Q2 2014 financial results.  Although the Power Segment saw a decrease in revenue from the prior years due to the completion of legacy projects, on the earnings call held that day, Seaton continued to tout Fluor's ability to win projects with conservative bids:

*We do a really good job of choosing carefully the projects we want to chase.  We're conservative in how we take them in, and in those projects are holding to the schedules that we expected*.

95.     In response to analyst questioning regarding overly aggressive bidding in the gas-fired power market, Seaton again expressed confidence in Fluor's bidding quality and practice of foregoing riskier projects:

[Analyst:] . . . There's been a lot of discussion about pricing maybe getting a little bit more aggressive in North America from the Western competitors.  What are you guys seeing there?

[Seaton:] . . . We've seen some really aggressive pricing in the power market, and in the infrastructure market.

*Again, we've got the profit expectations built into what our offering is*.  And we'll let the chips fall where they may.  But I would say that we've seen an increased competitive landscape in North America.

96.     On August 14, 2014, Fluor presented at the Jefferies Global Industrials Conference. During the conference, Fluor's Vice President of Investor Relations, Ken Lockwood, acknowledged

- 30 -

the risks inherent to fixed-price contracts in the Power Segment, but represented that Fluor

effectively managed the risk:

> And then from a contract type, if you look at an engineering and construction company, there are basically two types of contracts, fixed-price contracts and reimbursable contracts. Reimbursable by nature, by definition, are low risk or no risk. *Fixed-priced contracts, obviously, have a risk element that is fixed cost and fixed schedule. We tend to do those predominantly in infrastructure and in power. We are very comfortable with that risk and we are very comfortable with this risk profile. So, really nothing noteworthy there*.

97. On November 13, 2014, Fluor held its Investor Day conference. At the conference,

Seaton again highlighted Fluor's bidding quality:

> We do believe that some of our competitors are in a weakened state. As you've heard me say, *because of that diversity, we've had an ability to say no* in certain markets when our competition – if that's the only market they're in and they have a different position. Now, I hope that doesn't sound arrogant; I certainly don't mean it that way. *But we believe that our strategy and the discipline we have around how we bid, who we bid to, what projects are actually going to go to FID [final investment decision], which ones are actually going to get to the field, I think provides a lot more confidence, at least for me, in terms of insight into those longer-term earning cycles*.

98. McSorley added that because of Fluor's selectivity, estimating capability, and

execution, Fluor's power projects were on budget, on schedule, and had no claims:

> Let's talk about some of our existing projects. As I said, our work is lump sum in the power industry. And over the past three to five years, we have really had a solid execution of our projects. *Many of you in here hear about companies struggling in the power EPC space, some of them wanted to maybe even exit the space*.
>
> *All of our projects over the past four or five years: on budget, on schedule, no claims. This is largely due to our selectivity. We don't chase everything that is out there. Our estimating capability and, of course, our execution of the work*.

99. On February 18, 2015, Fluor released its Q4 2014 financial statements and its 2014

Annual Report Form 10-K signed by Seaton, Porter, and Smalley and SOX-certified by Seaton and

Porter, which contained the false and misleading statements set forth in ¶¶87-88, *supra*. On the

earnings call that evening, analysts asked whether Fluor's purportedly "disciplined bidding" would

- 31 -

prevent it from gaining market share in the gas-fired power plant market.  Seaton assured analysts that Fluor was in a good competitive position, omitting that the Company could only continue to win projects if it lowered its bids and weakened is bidding practices:

> *So regardless of the competitive situation, we feel like we are in the best position to give them the best asset at the best price and at the same time maintain the profitability that we expect*.  So, I think we've kind of changed the game here and I think that is going to bode well for us for many, many years to come.

100.   Seaton was also questioned with respect to Fluor's growth in Power Segment awards and if it expected further growth in its Power Segment backlog.  Seaton responded that, unlike its competitors, Fluor had been and would continue to be conservative in selecting projects on which to bid:

> Yes, I think when you look at the current backlog we feel pretty good about what is in there.  A lot of the things that have been announced that have pushed a little bit to the right, really the majority of that is not in our backlog at this moment.  *I think over time we have been very conservative in what we take in and how confident we are in that going forward*.
>
> *So I don't really see a lot of risk in our current backlog from a cancellation or a delay perspective*.  However, when you look at what is not in our backlog but we anticipate it to be in our backlog as we get into the first half of the year, some of it has been pushed to the right.
>
> *                      *          *          *
>
> Well, I think Power has become, if you can believe it, more competitive.  *There is a lot of people that don't have the diversity that we have that are forced to make some, in my opinion, some poor decisions on what they expect and what they will accept*.
>
> *I do believe we are in a good position to grow backlog in Power over the short term.  And I feel good about our position regardless of the fuels choice*.  So when you look at Diablo Canyon, being able to re-sign that agreement in the nuclear space, when you look at some of the shutdown turn around work that we do, gas is obviously driving the ship there.

101.   On March 5, 2015, Fluor issued its 2014 Annual Report, which stated that "[t]he Power group serves a geographically focused, fiercely competitive, lump-sum industry.  In this

environment, *we have to be highly selective in the projects we bid*.  We had an active year, winning and progressing projects in the gas, renewables and nuclear sectors."

102.    On April 30, 2015, Fluor held a Q1 2015 earnings call during which Seaton was questioned about Fluor's bidding discipline in light of "competitors trying to get more competitive on pricing in an attempt to fill volumes."  Seaton reassured the analysts that Fluor continued to remain disciplined and did not, like its competitors, reduced its bids in order to win projects:

> *Well I'm sure they will, I'm sure they will.  That's the normal herd mentality I think that damages our industry.  I think what we've proven is that we focused on a better delivery model, and therefore, we don't have to have margin suffer because we're competitive in other ways.*
>
> *But there's always somebody that's going to drop their price to ensure that they have the volumes that they want*.  And frankly, there's nothing I can do about that.  I'm going to focus and our people are going to focus on continuing to improve our offering and meet my expectation and your expectation in terms of creating shareholder value through enhanced margin performance.  *So we're just going to stick to our knitting and let others do what they think they need to do to meet their needs*.

103.    On June 4, 2015, Defendants presented at the Credit Suisse Engineering & Construction Conference.  In response to analyst concerns that the increase in fixed-price work, coupled with a competitive bidding environment, could hurt Fluor's profit margins, Porter confirmed that the Company continued to bid conservatively:

> *[W]e're not changing our approach at all.  I think we've proven over the last two years that we have kind of changed how we look at projects, and have the ability to deliver those things on a more cost-effective basis.  That does not mean that we are dropping margin*.
>
> And I think it's kind of one of these things where our diversity is a positive overall, but it also puts us in an awkward position sometimes where many of our competition, depending on whatever market it is, that that's all they do.  *We kind of have the ability to say no.  And we'll continue to do that on these projects that are marginal* . . . .
>
> *Two, they don't provide the profitability that we expect, or the contract is in a form that puts undue risk on our books as opposed to the balanced approach we like to see.  So, we have not changed our DNA in terms of how we look at projects,*

- 33 -

*and the conservative nature that we are, and the way we put things in the backlog, and how we execute things.  So that hasn't changed at all*.

104.    Seaton echoed Porter with respect to Fluor's purportedly conservative bidding process:

> [Analyst:] David, you mentioned some competitive pressures in the marketplace, but that Fluor isn't really going to change how they approach projects. Do you think that some of the competitive pressures go beyond price and maybe into concessions towards terms and conditions?
>
> [Seaton:] I think we've seen that. I mean, you know, this isn't my first rodeo. I mean, I've seen this cycle significant up and down, this is probably the fourth or fifth time in my career.  And when that happens, people do what they feel they have to do to maintain their core competency.
>
> *As I mentioned, we are* – and I hope this doesn't come across as arrogant because I don't mean it that way – *being able to say no, I think is the right thing in terms of shifting from a competitive price to where we are actually, as an industry, accepting liabilities that should be borne by the customer or somebody else.  So, we are seeing some of those types of behaviors again.  And we'll stick to our knitting*.

105.    On November 10, 2015, Fluor presented at the Robert W. Baird and Co. Industrial Conference.  Geoff Telfer, Fluor's Senior Vice President of Corporate Finance, assured analysts that any concerns about Fluor's fixed-price projects were misguided:

> The lump sum plays are – traditionally it is the power play and the infrastructure.  And they were starting to see more now and especially when we work for the NOCS.  They tend to like the fixed-price work.  But we are not – *we are very comfortable going fixed price on anything now.  With the way that we are executing our projects with our supply chain, we are very comfortable doing fixed price*.

106.    Defendants' misrepresentations and omissions had their intended effect.  For example, in a November 18, 2015 Credit Suisse Sell Side Dinner Takeaways report, Credit Suisse reported that Fluor management confirmed that "[Fluor] will remain disciplined and walk away from work."  Sterne Agee similarly reported in "High Notes from Meetings with CEO" that:

> Competition to bid on combined cycle gas power plants remains extremely competitive and commoditized which should result in FLR passing on or losing some projects as the competition goes through its learning curve.  A typical project might

- 34 -

have six bidders.  Management noted that it does not plan[] to take risks that exceed potential economic benefits.

107.    On November 3, 2016, Fluor released its Q3 2016 financial statements.  During the earnings call, Seaton continued to tout improvements to Fluor's costs, scheduling, and bid discipline:

[Analyst:] Just one, first, to follow up on your comments regarding rational pricing and risk.  Is it just more concentrated in the energy projects?  Or are you seeing other clients maybe in power industry or infrastructure taking advantage of the competitive nature and also trying to push down pricing?

\*       \*       \*

[Seaton:] So like I said, this isn't the first time I've seen this.  *And we are going to maintain our discipline.  And there will be some folks that will do some silly things, and maybe in a few years they will regret that*.

*But it is what it is.  But we've proven over time that we can compete*.

108.    On November 7, 2016, Fluor held its Investor Day where it confirmed its purported bid and risk discipline:

[Analyst:] . . . So, it sounds like there are several opportunities shaping up for award in 2018 and '19, maybe late '17 if this timing works out.  Now, are you thinking that this is a one year earnings transition or a two-year transition? *And then how tempting is it to sort of take on work that's maybe a little more borderline from the execution perspective or risk perspective to sort of fill in the gaps*.  I know you talked about being more disciplined, but maybe there are things that are on the borderline that you might be tempted to fill in.

[Seaton:] I'm going to kind of push part of this question along, but *I think the short answer is we're going to maintain our discipline.  We're not going to do stupid things like we're starting to see in the marketplace*.

We've proven over time that when we focus on our own knitting and changing our own world and controlling the things that we can control, we do better and we're going to continue that.  So, again, in the short term, *I don't see us doing things like that*.

109.    During the May 9, 2017 Wells Fargo Industrial and Construction Conference, Porter continued to represent that Fluor had avoided, and would continue to avoid, aggressive and risky bidding:

- 35 -

The markets that were competitive today are competitive – they are the same ones that were competitive 4 or 5 years ago.  And those largely have been the Power business more than any other.  On the Power business, we can see as many as 5 competitors on a particular proposal.  When you get to energy and chemicals, it may just be a couple.  So it's rational.  We haven't – so broadly speaking, the markets are rational.  We haven't seen a situation like there was many years ago with the Korean companies coming in and bidding very aggressively.  I think they got punished for that, and the customers weren't happy with how it all turned out.  And we haven't seen a return of that kind of environment.  And so happily, it's rational.  ***I believe it will stay that way, but if somebody did decide to be irrational, we're not going to chase it.  We're not going to take that risk***.

110.    Defendants knew or recklessly disregarded that the Bidding Fraud statements set forth in ¶¶93-105, 107-109, *supra*, were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

(a)    Contrary to Defendants' representations, Fluor was not conservative, was not selective, and did not produce bids based on expected profit but, rather, to ensure Fluor won the bid at any price.  Defendants later admitted that Fluor's Gas-Fired Plant bids were not conservative, establishing that the statements in ¶¶93-105, 107-109, *supra*, were misleading.  *See* ¶92(i)-(iv), *supra*.

(b)    Seaton, Porter, McSorley, and other senior management personally approved all gas-fired plant bids.  *See* ¶92(b).

(c)    Confidential witnesses corroborate Defendants' admissions that Fluor's bids for the Gas-Fired Plants were not conservative.  CW-1, who participated in bidding all of the Gas-Fired Plants, stated that CW-1's estimates were routinely reduced in order to remain competitive.  CW-1 described a "best and final" process at Fluor whereby Fluor submitted a bid to a customer, met with the customer who suggested that Fluor needed to reduce its price, and then Fluor amended its bid to a "best and final" price in hopes of winning the contract.  CW-3, who was responsible for estimating engineering requirements for the Greensville County Plant, stated that CW-3's estimates

for required engineering hours and equipment were reduced by management in order to lower Fluor's bids on the Greensville County Plant.

(d)     By January 2014 – before Defendants made the statements in ¶¶93-105, 107-109, *supra* – Defendants were aware of problems with the Mitsubishi turbines, which were the most critical components of the Gas-Fired Plants and which were part of the "critical path" for the Gas-Fired Plants, meaning that any delays or problems with the installation of the turbines would necessarily impact the schedule and cost for the entire plant. *See* ¶32, *supra*. According to judicial admissions later made by Fluor in the *Mitsubishi* Lawsuit, by January 2014, Mitsubishi had already missed the delivery schedule for two Minor Components of the Brunswick County Plant. *See Mitsubishi* Lawsuit, ECF No. 1. Similarly, by April 2014, Fluor had placed Mitsubishi on notice that liquidated damages would begin accruing due to Mitsubishi's "fail[ure] to meet the Minor Component delivery schedule it had accepted" and that, "[i]n addition to their lateness, the deliveries evidenced a complete lack of quality control." *Id.*, ¶¶23-24. These problems, Fluor has admitted, "forced [Fluor] to accelerate the construction process at great additional cost." *Id.*, ¶27. When faced with Mitsubishi's noncompliance in April 2014, Fluor undertook "extraordinary measures in an effort to mitigate the impact of Mitsubishi's chronically late and improperly labeled deliveries of Minor Components, but its efforts did not succeed entirely." *Id.*, ¶29. Fluor used these same or substantially similar Mitsubishi turbines on the other Gas-Fired Plants, all of which were "next generation" turbines with which Fluor had never worked, and therefore the problems arising at the Brunswick County Plant equally affected and illustrated identical risks at the other Gas-Fired Plants. For example, CW-5 described a pressure valve problem affecting the Citrus County Plant turbines that had also affected the Brunswick County Plant turbines. Indeed, as Defendants later admitted, "all 4 projects were based on next-gen turbines or steam generators that were first of a kind for Fluor. The quality control and completeness of these turbines delivered to the site were not in line

- 37 -

with our bid assumptions." ¶131, *infra*.  Defendants also admitted that they bid the projects "when we didn't have good information on the new first-of-a-kind equipment."  *Id.*

(e)        The faulty bid assumptions and underestimations regarding the Gas-Fired Plants were apparent to Defendants at the time Defendants uttered the statements in ¶¶93-105, 107-109, *supra*.  For example, Fluor had already begun experiencing problems and cost overruns at the Gas-Fired Plants at the time these statements were made.  Fluor had also completed detailed design, engineering, procurement, and construction services on the Gas-Fired Plants, which revealed that its "baseline assumptions" underlying its bid were not achievable – something Defendants later admitted.  *See* ¶131.

(f)        Defendants knew or recklessly disregarded at the time Fluor bid for the Gas-Fired Plants, and certainly by the time the statements in ¶¶93-105, 107-109, *supra*, were uttered, that Fluor's bid assumptions concerning the requirements and availability of craft labor in the locales surrounding the Gas-Fired Plants were faulty.  Moreover, Fluor had already begun to experience the effects of craft labor shortages, such as shortages in specialty welders and pipefitters, which were among the most important resources required to complete the Gas-Fired Plants.  Fluor was forced to find workarounds including using multiple "shifts to make the best use of the limited number of welders" and even resorting to starting "a welding school" at  a local community college.[3]  Ultimately, Fluor admitted that craft labor "was a major issue" tied to the cost overruns at the Gas-Fired Plants.

(g)        Defendants knew or recklessly disregarded that Fluor's bids for the Gas-Fired Plants were not conservative based on its prior bids for gas-fired power plant projects.  Six of eight fixed-price gas-fired power projects awarded to Fluor prior to the Gas-Fired Plants' EPC contracts – or 75% – had underperformed Fluor's bid assumptions.  Defendants also knew that Fluor's

---

[3]    Abby L. Harvey, *The Highly Efficient Workhorse of Brunswick County*, Power, Sept. 1, 2017.

competitors had experienced similar problems and later admitted that no fixed-price gas-fired power plant projects had performed as expected.

(h)     Defendants spoke about Fluor's purportedly conservative bidding process on nearly every single earnings call throughout the Class Period, demonstrating that the topic was high on Defendants' radar and a key concern for analysts and that Defendants knew or were reckless in not knowing that Fluor's bids were not conservative when they repeatedly stated, often in response to direct questions by analysts, that Fluor's bids were conservative.

(i)     Seaton, Porter, and Smalley signed the consolidated Form 10-K containing the statements in ¶¶87-88, *supra*.  In addition, Seaton and Porter signed Certifications pursuant to SOX in which they attested that the report containing this statement "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  Seaton and Porter also attested that they had designed disclosure controls to ensure that material information relating to Fluor was made known to them.

(j)     The Individual Defendants were motivated to win the gas-fired power plant work by any means necessary in order to position Fluor to win more gas-fired power work in a rapidly growing, increasingly competitive market, including business from key customers such as Dominion and Duke.  *See* ¶92(i), *supra*.

(k)     The Individual Defendants were motivated to convince the market that its gas-fired business was conservative in order to profit from illicit insider sales.  Shortly after making the statements in ¶¶93-105, 107-109, *supra*, but before the truth was revealed, Defendants engaged in the following transactions, among others:

(i)     Seaton sold $6,849,719 in Fluor stock on August 21, 2014 and $1,617,562 in Fluor stock on February 28, 2015.

- 39 -

(ii)       Porter sold $132,168 in Fluor stock on March 6, 2015, $509,810 in Fluor stock on May 3, 2015, and $96,522 in Fluor stock on May 7, 2015.

(iii)      Stanski sold $145,498 in Fluor stock on June 6, 2014, $227,824 in Fluor stock on February 28, 2015, and $117,559 in Fluor stock on March 6, 2015.

(iv)      Smalley sold $59,298 in Fluor stock on February 25, 2015, $102,312 in Fluor stock on February 28, 2015, $21,083 in Fluor stock on March 6, 2015, and $222,395 in Fluor stock on March 10, 2015.

(l)      The Individual Defendants were motivated to win new contract awards with low bids in order to profit from their unusual executive compensation plan, which directly and significantly tied their compensation to new contract awards and profit margin, regardless of how those plants performed in the future.

**B.     False and Misleading Statements and Omissions Regarding the Gas-Fired Plants**

111.    Defendants made numerous materially false and misleading statements and omissions regarding the Gas-Fired Plants.  These statements are referred to herein as the "Gas-Fired Plants Fraud."  These statements were made in the context of Defendants' assurances throughout the Class Period that Fluor's bids were conservative, as alleged in ¶¶87-89, 91, 93-105, 107-109, *supra*.

112.    On August 14, 2013, Fluor issued a press release announcing that it had received from Dominion full notice to proceed with construction on the Brunswick County Plant, a new 1,358-megawatt, natural gas-fueled power station in Brunswick County, Virginia.  The release stated:

> Fluor Corporation announced today that it received full notice to proceed from Dominion Virginia Power to begin construction on the company's new 1,358-megawatt, natural gas-fueled power station in Brunswick County, Virginia. . . .
>
> "Fluor is pleased that the project has received the approval from the Virginia State Corporation Commission to move forward with construction," said Matt McSorley, senior vice president and head of Fluor's Power business.  "We look

forward to continuing to provide Dominion with our full suite of engineering, procurement and construction services on this significant new power source in the eastern United States."

*Fluor began providing engineering and procurement services on the plant from its Charlotte, North Carolina office last year while Dominion awaited regulatory approvals to begin construction*.  The project is expected to staff approximately 600 craft workers at peak during the construction phase.

113.    On October 31, 2013, Fluor released its Q3 2013 financial results and held a conference call with analysts.  On the earnings call, Seaton stated: "I feel good about our position and the fact that *the Dominion project is up and running – up and off to a good start from an execution standpoint*.  Our ability to prove that we can execute is clear."

114.    Defendants knew or recklessly disregarded that the Gas-Fired Plants Fraud statements set forth in ¶¶112-113, *supra*, were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

(a)    Contrary to Defendants' positive statements regarding the initiation of construction on the Brunswick County Plant, Defendants knew or recklessly disregarded that Fluor's bid for the Brunswick County Plant was artificially low and based on faulty assumptions.  *See* ¶92, *supra*.

(b)    Fluor was awarded the EPC contract for the Brunswick County Plant in July 2012.  Thus, by August 14, 2013, when Fluor was given notice to proceed with construction, Fluor had already "beg[u]n providing engineering and procurement services on the plant from its Charlotte, North Carolina office" for roughly a year, during which Fluor completed detailed "engineering and procurement services on the plant." ¶112, *supra*.  This detailed work revealed that Fluor's "baseline assumptions" underlying its bid for the Brunswick County Plant were not achievable – something Defendants later admitted.  ¶131, *infra* ("The projects did not meet the original baseline assumptions due to improper estimating, craft productivity and equipment issues.").

- 41 -

As CW-5 described, there was not a desire to devote substantial time and resources to estimating and bidding before winning the contract, since those resources would be wasted if Fluor did not win the contract, and the design phase was severely compressed.  Thus, much of the work was performed only after Fluor was awarded the Brunswick County Plant EPC contract, at which time Fluor confirmed that its original, lowball bid was insufficient.

(c)     Defendants spoke specifically and in response to analysts' direct questions regarding the initiation of construction on the Brunswick County Plant, demonstrating that the topic was high on Defendants' radar and important to analysts and that Defendants knew or were reckless in not knowing that the Brunswick County Plant would experience execution problems.

(d)     The Individual Defendants were motivated to convince the market that the Brunswick County Plant would result in high profit margins in order to profit from illicit insider sales.  Shortly after making the statements in ¶¶112-113, *supra*, but before the truth was revealed, they made the following transactions, among others:

(i)     Seaton sold $10,750,201 in Fluor stock on November 7, 2013 and November 8, 2013.

(ii)     Porter sold $1,004,730 in Fluor stock on November 6, 2013.

(iii)     Stanski sold $2,667,881 in Fluor stock on November 5, 2013.

(iv)     Smalley sold $483,471 in Fluor stock on November 5, 2013.

(e)     Defendants were motivated to win the Brunswick County Plant EPC contract with a low bid in order to profit from their unusual executive compensation plan, which directly and significantly tied their compensation to new contract awards and profit margin, regardless of how those plants performed in the future.

115.     On February 18, 2014, Fluor released its Q4 2013 and fiscal 2013 financial results and held a conference call with analysts.  In its 2013 Form 10-K, signed by Seaton, Porter, and

- 42 -

Smalley and SOX-certified by Seaton and Porter, Fluor stated: "[Power] [r]evenue in 2013 was 65 percent higher compared to 2012, primarily attributable to a significant increase in *project execution activities for* a solar power project in the western United States and two *gas-fired power plant projects* in Texas and *Virginia*."  The Form 10-K also noted that "*[n]ew awards of $1.5 billion in 2013 included a natural gas-fired power plant project in Virginia*," *i.e.*, the Brunswick County Plant.

116.    On the earnings call, in response to a question regarding whether Fluor had taken on additional risk as part of its recent contract awards, Seaton stated:

> *We have not seen our risk profile increase, based on the new awards that we are booking right now*.  Yes, there are some that are fixed-price in nature.  *But I would say that we feel very comfortable in taking the projects that we are on the fixed price basis*, and that's not just in oil and gas, but I would say across the Company.
>
> *We feel pretty good about our ability to execute against that*.

117.    On October 30, 2014, Fluor released its Q3 2014 financial results and held an earnings call with analysts.  On the earnings call, Seaton responded to an analyst question regarding progress at the Brunswick County Plant and other fixed-price projects on which Fluor was currently working:

> [Analyst:] David can you just comment on how the execution is going on your fixed-price projects right now?
>
> [Seaton:] Pretty good.  *I feel really good about where we stand*.  It's got the normal puts and takes as any project does, but *I feel really good about where we are at this stage of the game on our fixed-price projects*.

118.    On November 13, 2014, Fluor announced that it had been awarded EPC contracts for the Anderson and Citrus County Plants.  On that day,  Fluor held its Investor Day conference during which McSorley touted Fluor's excellent relationship with the manufacturers of the most critical component of Fluor's gas-fired power plant projects – the turbines.  In fact, McSorley specifically

- 43 -

referenced Fluor's relationship with Mitsubishi, the manufacturer of the turbines being installed at the Brunswick County Plant:

> *We also focused largely on having very good [original equipment manufacturer] relations. This is with turbine manufacturers*, [NSSSes], those who make nuclear reactors and other key equipment.  And this is the likes of the GEs and the *Mitsubishis*, Toshibas.  *This is important because they interface with our clients a lot and, in many cases, we partner with them to execute the work*.

119.   McSorley also highlighted Fluor's performance on existing fixed-price power EPC projects and distinguished Fluor from competitors who might exit the power market (as Fluor itself would later do):

> Let's talk about some of our existing projects.  As I said, our work is lump sum in the power industry.  And over the past three to five years, *we have really had a solid execution of our projects.  Many of you in here hear about companies struggling in the power EPC space, some of them wanted to maybe even exit the space*.
>
> *All of our projects over the past four or five years: on budget, on schedule, no claims.  This is largely due to our selectivity.  We don't chase everything that is out there.  Our estimating capability and, of course, our execution of the work*.

120.   McSorley also assured investors that the construction of the Brunswick County Plant was "on track, on schedule and cost":

> Dominion Brunswick County, this is one of our largest ones we have going on right now.  This is about a $900 million lump sum project.  It is a three-on-one combined cycle project in Virginia.  Again, we have about [900 craft] there, about 35% to 40% complete, *and we are on track, on schedule and cost*.

121.   On March 5, 2015, Fluor issued its 2014 Annual Report, which highlighted Fluor's successful execution on gas-fired projects, including the Brunswick County Plant:

> [Fluor] [c]ontinued work on Dominion Brunswick, an immense 3-on-1 combined-cycle plant in Virginia.  *The project is about 40% finished, on schedule and on budget*.

122.   On April 27, 2015, Fluor issued a press release announcing it was awarded the EPC contract for the Greensville County Plant.  In the press release, McSorley highlighted the Brunswick

- 44 -

County Plant, stating: "'Fluor has a proven track record supporting Dominion in their goal to provide

clean, reliable, and low-cost energy to their Virginia customers.'"

123.    On April 30, 2015, Fluor released its Q1 2015 financial results and held an earnings

conference call with analysts.  On the call, Seaton emphasized Fluor's performance on existing

fixed-price power plant projects:

> *[O]ur relationship with Dominion, I think Greensville shows that we execute for them on the projects that they need*.  That's a very large project that we're going to backlog next year when we get to final notice to proceed.
>
> So I think they're kind of on a roll, and I think that we've looked at the things we need to look at around competitiveness.  *I think our execution approach is sharpened relative to how we do those projects*.  Those projects were typically lump sum, so it's how well are we performing.  And *I think we're performing very, very well in the power sector*.
>
> *So I'm pretty bullish on them being able to deliver on what we've got in front of us*, but I wouldn't suggest what number projects that are out there in front for award in the next little while.  But *Greensville is a very, very important win and a very large project*.

124.    On June 4, 2015, Seaton presented at the Credit Suisse Engineering & Construction

Conference.  Seaton commented on the recent uptick in power projects, and how Fluor's capabilities

resulted in increased contract wins.   Specifically, Seaton emphasized Fluor's successful

implementation of the most critical component of Fluor's gas-fired Power projects – the turbines.

Seaton's statements assured investors that Fluor was not encountering any problems with the

Mitsubishi turbines that were being installed at the Brunswick County Plant and the other Gas-Fired

Plants:

> You go to power, *we are seeing a big uptick in power.  I feel good about where we are there.  We are probably one of the few that can actually implement the gas cycle regardless of what the turbine choice is*.  And we see a significant uptick in terms of project load as we go into the next couple of years.

125.    Defendants knew or recklessly disregarded that the Gas-Fired Plants Fraud statements

set forth in ¶¶115-124, *supra*, were materially false and misleading or omitted material information

- 45 -

necessary to make them not misleading for the following reasons that were unbeknownst to investors:

(a)     Contrary to Defendants' positive statements regarding Fluor's project execution and the Mitsubishi turbines, Defendants knew or recklessly disregarded that Fluor was not executing on schedule or on budget and that installation of the Mitsubishi turbines was a disaster. By January 2014 – before Defendants made the statements in ¶¶115-124, *supra* – Defendants were aware of problems with the Mitsubishi turbines, which were the most critical components of the Gas-Fired Plants and which were part of the "critical path" for the construction of the Gas-Fired Plants.  As described in more detail in ¶110(d), *supra*, by January 2014, Mitsubishi had already missed the delivery schedule for two Minor Components of the Brunswick County Plant.  *See Mitsubishi* Lawsuit, ECF No. 1.  Similarly, by April 2014, Fluor determined that Mitsubishi's turbine deliveries "evidenced a complete lack of quality control," which "forced [Fluor] to accelerate the construction process at great additional cost."  *Id.*, ¶¶24, 27.  Moreover, CW-5 explained that Mitsubishi was not responsive to Fluor and that it would take months to receive answers to engineering questions.  CW-5 also described a pressure release valve issue on the Citrus County Plant – the same issue that had plagued the Brunswick County Plant turbines.  Thus, Defendants knew Fluor did not have "very good [original equipment manufacturer] relations" with Mitsubishi when they stated so on November 13, 2014.  ¶118, *supra*.  Nor was it true that Fluor could "implement the gas cycle regardless of what the turbine choice is" when Defendants stated so on June 4, 2015.  ¶124, *supra*.  Finally, Fluor used these same or substantially similar Mitsubishi turbines on the other Gas-Fired Plants, all of which were "next generation" turbines with which Fluor had never worked, and therefore the problems equally affected and illustrated identical risks at the other Gas-Fired Plants – a fact Defendants later admitted.  *See* ¶131, *infra*.

(b)     At the time Defendants made the statements in ¶¶115-124, *supra*, Defendants were aware of significant schedule delays and cost overruns due to "issues with labor productivity" at the Brunswick County Plant.  By the start of the Class Period, Defendants knew or recklessly disregarded that Fluor's bids for the Gas-Fired Plants were artificially low and based on faulty assumptions.  *See* ¶92, *supra*.  Moreover, Defendants acknowledge that bidding issues generally "raise their heads" when a project reaches "about 40% – 30% to 40% construction progress."  ¶214, *infra*.  Thus, by March 2015, when Defendants announced that the Brunswick County Plant was "about 40% finished," they were aware or recklessly disregarded the craft labor shortages.  In particular, Fluor encountered a lack of experienced welders, which forced it to find costly workarounds, including using multiple "shifts to make the best use of the limited number of welders" and even resorting to starting "a welding school" at a local community college.  Ultimately, Fluor admitted that it did not have "a good handle on the level of skill and number of craft employees" that would be available on site, and that craft labor was a "major issue" tied to the cost overruns at the Brunswick County Plant.

(c)     Defendants spoke specifically and in response to analysts' direct questions regarding construction of the Brunswick County Plant and the Mitsubishi turbines, demonstrating that these topics were high on Defendants' radar and important to analysts and that Defendants knew or were reckless in not knowing that the Brunswick County Plant construction and Mitsubishi turbines were already experiencing problems.

(d)     Seaton, Porter, and Smalley signed the consolidated Forms 10-K containing the statements in ¶¶87-88, 115, *supra*.  In addition, Seaton and Porter signed Certifications pursuant to SOX in which they attested that the report containing these statements did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to

- 47 -

the period covered by this report." Seaton and Porter also attested that they had designed disclosure controls to ensure that material information relating to Fluor was made known to them.

(e)   The Individual Defendants were motivated to convince the market that the Gas-Fired Plants were on track and to conceal the ongoing problems with the critical Mitsubishi turbines in order to profit from illicit insider sales. Shortly after making the statements in ¶¶115-124, *supra*, but before the truth was revealed, they engaged in the following transactions, among others:

(i)   Seaton sold $2,309,879 in Fluor stock on February 28, 2014, $6,849,719 in Fluor stock on August 21, 2014, and $1,617,562 in Fluor stock on February 28, 2015.

(ii)   Porter sold $95,263 in Fluor stock on March 6, 2014 and $132,168 in Fluor stock on March 6, 2015, $661,892 in Fluor stock on April 9, 2014, $132,168 in Fluor stock on March 6, 2015, $509,810 in Fluor stock on May 3, 2015, and $96,622 in Fluor stock on May 7, 2015.

(iii)   Stanski sold $345,021 in Fluor stock on February 28, 2014, $145,498 in Fluor stock on June 6, 2014, $227,824 in Fluor stock on February 28, 2015, and $117,559 in Fluor stock on March 6, 2015.

(iv)   Smalley sold $163,071 in Fluor stock on February 28, 2014 and $28,202 in Fluor stock on March 6, 2014.

(f)   The Individual Defendants were motivated to win the Brunswick County Plant EPC contract with a low bid in order to profit from their unusual executive compensation plan, which directly and significantly tied their compensation to new contract awards and profit margin, regardless of how those plants performed in the future.

126.   By October 29, 2015, Defendants could no longer fully conceal the problems plaguing the Brunswick County Plant. On that day, Fluor released its Q3 2015 financial results,

- 48 -

announcing a $21 million charge related to the Brunswick County Plant, and held an earnings call with analysts and investors.  On the call, however, Defendants continued to omit and misstate material facts regarding problems plaguing all of the Gas-Fired Plants.  Indeed, Seaton affirmatively stated that the issues occurring at the Brunswick County Plant were not symptomatic across Fluor's other gas-fired projects and would not infect the construction of those plants:

> [Analyst:] Related to Brunswick County, David, you've been very careful on setting up the organization to manage these fixed-price projects to minimize risk.  And I do remember that this plant had been competitively bid.  Just trying to get comfortable with the fixed-price mix that's in the rest of the backlog now.  Is there something different about the way the organization was structured for Brunswick County versus the other gas-fired power plants you have in backlog and you're going to put in there?  And then more broadly, the other oil and gas projects now you have in backlog on a fixed-price basis, just trying to be comfortable with the fixed-price now.
>
> [Seaton:] That's a great question.  ***I would put the Brunswick situation in three categories.  None of which, do I believe are embedded in how we've done any of the others.  And in fact, we've learned from this and have implemented some of those learnings as we bid some of these other programs***.  It falls into three categories.  One is the weather that we experienced was a huge factor.  As you remember, last winter was the coldest winter in a long, long time, maybe in history.  And certainly Appalachia, I come from not too far from there, it can be really, really cold.  And we had issues associated with weather.  ***Secondly, we had issues with labor productivity, something that is both in and outside of our control.  But in terms of the learnings, I think that's where we've learned the most.  The third piece is that Mitsubishi machine, that's the first time it's been installed in the United States, and the learnings from that put us in I think a better position going forward***.
>
> ***So it's not symptomatic within the organization***.  You are correct; we've taken a very measured look at many of the programs and projects we're doing, including the ones that are fixed-price.  And I don't see a fly in the ointment, so to speak, and I guess that's kind of what you were getting at, relative to what we've got in backlog or the competitive nature of our offerings.

127.    Porter stated that Fluor had "done well" on gas-fired projects, and reiterated that the issues were limited to execution only at the Brunswick County Plant project, and denied that there were systemic issues with bidding:

> The power projects have been competitively bid for the last many years, and ***we've done well on them over the last several that were competitive bids***.  I

- 49 -

wouldn't put something in a distinct category just because it happened to be competitively bid. ***It's more attributable to the things David just described, as opposed to it being a competitive situation***.

128.   On February 18, 2016, Fluor released its Q4 2015 financial statements and its 2015 Annual Report on Form 10-K signed and SOX-certified by Seaton and Porter, and held an earnings conference call with analysts.  The Form 10-K disclosed a fourth quarter $31 million pre-tax loss resulting from forecast revisions to the Brunswick County Plant.  Fluor also reported that the Power Segment "profit for 2015 included a loss of $60 million (including the reversal of previously recognized profit) resulting from forecast revisions for a large gas-fired power plant in Brunswick County, Virginia."  Defendants, however, omitted that the issues affecting the Brunswick County Plant were affecting Fluor's other Gas-Fired Plants.

129.   Defendants knew or recklessly disregarded that the Gas-Fired Plants Fraud statements set forth in ¶¶126-128, *supra*, were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

(a)   Contrary to Defendants' assurances that the turbine and craft labor issues occurring at the Brunswick County Plant were one-off events and were not "symptomatic" of Fluor's other gas-fired projects, as Defendants later admitted, all of the Gas-Fired Plants "had a fundamental problem" and all of the plants suffered from the same "improper estimating, craft productivity and equipment issues."

(b)   Problems with the Mitsubishi turbines at the Brunswick County Plant were not isolated to that plant – they were "symptomatic" across all of the Gas-Fired Plants.  Because the other Gas-Fired Plants used the same or substantially similar Mitsubishi turbines, they were plagued by the same problems.  Indeed, as Defendants later admitted, "all 4 projects were based on next-gen

- 50 -

turbines or steam generators that were first of a kind for Fluor" and "all 4 of those projects were bid at a time when we didn't have good information on the new first-of-a-kind equipment."

(c)     The craft labor issues at Brunswick were also "symptomatic" across all of the Gas-Fired Plants.  As Defendants later admitted, craft labor was a "major issue" and "all 4 of those projects were bid at a time when we didn't . . . have a good handle on the level of skill and number of craft employees that we would have available to us in some of these locations."

(d)     Seaton's representation that Fluor had taken "a very measured look" at the other gas-fired projects and the problems at the Brunswick County Plant were not "embedded in how we've done any of the others" was knowingly or recklessly misleading when made.  ¶126, *supra*. The truth, however, was that all of the gas-fired projects were bid "by the same pursuit team" who used "the same statistics and information" and who "did not follow the rules."

(e)     Porter's representation that Fluor had "done well" on gas-fired projects was knowingly or recklessly misleading when made.  Six of eight fixed-price gas-fired power projects awarded to Fluor prior to the Brunswick County Plant EPC contract – or 75% – had underperformed Fluor's bid assumptions.

(f)     Defendants spoke specifically and in response to analysts' direct questions regarding construction execution issues and whether they were symptomatic of all of Fluor's gas-fired projects, demonstrating that these topics were high on Defendants' radar and important to analysts and that Defendants knew or were reckless in not knowing that, in fact, the same execution issues plagued all of the Gas-Fired Plants.

(g)     Seaton and Porter signed the consolidated Form 10-K containing the statements in ¶¶87-88, 128, *supra*.  In addition, Seaton and Porter signed Certifications pursuant to SOX in which they attested that the report containing these statements did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in

- 51 -

light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Seaton and Porter also attested that they had designed disclosure controls to ensure that material information relating to Fluor was made known to them.

(h)     The Individual Defendants were motivated to convince the market that the Gas-Fired Plants were on track and were not experiencing systemic problems and to conceal the ongoing problems with the critical Mitsubishi turbines in order to profit from illicit insider sales. Shortly after making the statements in ¶¶126-128, *supra*, but before the truth was revealed, they engaged in the following transactions, among others:

(i)     Seaton sold $884,716 in Fluor stock on March 6, 2016.

(ii)    Porter sold $216,299 in Fluor stock on March 6, 2016.

(iii)   Stanski sold $141,757 in Fluor stock on March 6, 2016.

130.    On May 4, 2017, Fluor released its Q1 2017 financial results and held an earnings conference call with analysts and investors. The Form 10-Q, signed by Porter and SOX-certified by Seaton and Porter, disclosed a $30 million charge related to cost overruns on the Anderson County Plant: "The decrease in segment profit was driven by cost increases and forecast revisions of approximately $30 million, primarily for a gas-fired power plant in South Carolina." Defendants, however, did not disclose the full scope of the problems, cost overruns, and delays plaguing the Anderson County Plant. Rather, Seaton stated the opposite by falsely assuring investors that Fluor's execution problems at the Anderson County Plant were not significant and Fluor could even *reverse* some of its losses in the future. On the earnings call, Seaton declined to provide any details regarding the charge, and instead assured investors:

> [T]he South Carolina project is nearing completion, and *there are some issues there that I really don't want to talk about because we've got some opportunities, hopefully, to maybe reverse some of that*.

- 52 -

131.    On August 3, 2017, Fluor released its Q2 2017 financial results and held an earnings conference call with analysts and investors.  The Form 10-Q, signed by Porter and SOX-certified by Seaton and Porter, disclosed a $194 million charge related to three of its fixed-price gas-fired power plants: "The Industrial, Infrastructure & Power segment reported a segment loss of $168 million, compared to a segment profit of $51 million in the second quarter of 2016.  *Results for the quarter include approximately $194 million in pre-tax project expenses related to forecast adjustments on three gas-fired power projects*."  On the call, Seaton provided an update regarding ongoing issues at the Gas-Fired Plants:

> I want to start our call today discussing the issues we are experiencing in our Industrial, Infrastructure & Power segment, specifically the concerns on 3 gas-fired projects currently under construction.  *All 3 projects, 4 if you include the Brunswick project that incurred a charge in 2015, had a fundamental problem*.  The projects did not meet the original baseline assumptions due to improper estimating, craft productivity and equipment issues.  All of these projects were bid in 2014 by the same pursuit team.  In addition, all 4 projects were based on next-gen turbines or steam generators that were first of a kind for Fluor.  The quality control and completeness of these turbines delivered to the site were not in line with our bid assumptions and we are pursuing our options.

132.    Defendants, however, continued to omit the full scope of the problems, cost overruns, and delays plaguing the Gas-Fired Plants.  On the earnings call, Seaton represented that a new management team had reviewed the Gas-Fired Plants and any problems were captured in the newly announced forecast:

> So where are we today?  Of the 3 currently active projects, 1 is 92% complete, with an expected mechanical completion in Q4.  One is 45% complete, with an estimated completion date of Q2 2018.  And the last project [the Citrus County Plant] is 42% complete, and is expected to be complete in Q4 2018.  I'd make a comment that those are construction completion percentages, not overall project percent completes.  So this is specifically related to the construction scope.

> I've discussed the problems, and now I'd like to talk about we've changed.  After we had the initial charge last quarter, we changed the Power leadership team and brought in Simon Nottingham as the President of that group – of the Power group.  Simon comes from our oil and gas group, and he brings to this role his extensive background in project and program management.  *He and his team, in coming to this role, led a review of the 3 projects in the second quarter and*

- 53 -

*developed a path forward that is reflected in our current estimates*.  Some members of the Power management team have exited Fluor.  We also informed our employees that we are closing our Charlotte office and consolidating Power operations in Greenville, where it will be closer to our other businesses and leadership.

\*          \*          \*

In addition to the changes in management of Power group, our strategic evaluation of the gas-fired power market, *we're also implementing other changes to give us greater confidence that these types of earnings adjustments are diminished and less frequent*.

\*          \*          \*

*We – as I said, we've changed the review process to where there's more cold eyes review. And I feel reasonably good about where we are*.

133.    On November 2, 2017, Fluor released its Q3 2017 financial results and held an earnings call with analysts and investors.  On the call, Seaton provided a positive update on the Gas-Fired Plants:

I'm pleased to report *we made solid progress on the 3 gas-fired power plants we are currently executing, and remain on track to complete* 2 of those projects in the first part of next year, with the final project to be completed in 2018 – late '18.

134.    On February 20, 2018, Fluor released its Q4 2017 financial results and held an earnings call with analysts and investors.  Fluor disclosed a $41 million charge related to the Citrus County Plant, but continued to omit ongoing problems and mounting costs.  On the earnings call, Seaton represented that the projects were progressing on schedule:

Regarding the remaining 3 gas-fired power plants we are currently executing, one project is substantially complete and in commissioning and start-up activity phases.  *The remaining 2 projects were approximately 75% complete and will be completed by year-end*.

135.    On May 3, 2018, Fluor released its Q1 2018 financial results and held an earnings call for analysts and investors.  Fluor disclosed another $125 million charge for the Citrus County Plant. The Form 10-Q, signed by Stanski and SOX-certified by Seaton and Stanski, stated: "The decrease in segment profit was primarily driven by forecast revisions of approximately $125 million for

- 54 -

estimated cost growth for the [Citrus County] fixed-price, gas-fired power plant project . . . ."  On

the call, Seaton described the additional issues and charges on the Citrus County Plant:

> Let's start off by discussing the challenges that we are experiencing on the same gas-fired power project we discussed last quarter and the steps we're taking to complete this project and in Fluor's participation in the specific end market.  ***Craft productivity and estimating were materially different than the original baseline expectations we made in the initial charge on this project last year.  While those factors were included in our initial charge, the majority of the $125 million charge taken this quarter is driven by extremely low ongoing productivity and the financial impact that this has relative to initial expected timing of when the 2 units would be available for power production based on the current outlook***.

*     *     *

> [Analyst:] . . . So David, ***the power project is 86% done, you've said.  I think you have one more project in backlog of the same A-grade***.  And it is probably the same level done.  ***Is there anything else you could do on the projects to assure investors that they can invest, really for the next couple of quarters, in Fluor until the projects are done***?  I think I remember back in the day, Alan Boeckmann saying he was going to visit his embassy problem project every week toward the end of it.  Can you do that?  Shouldn't you do that? Anything more you can do.

*     *     *

> So I just said that – yes, back in, I think it was 2006 or something, I'm showing my age.  But Alan Boeckmann had said that he was going to go visit the embassy project, his problem projects literally every week until it's done.  ***So as a CEO, what more can you do, David?  Like we always get the question, "Can I invest in Fluor until these problem projects are done?"  How would you answer that***?

> [Seaton:] Yes, I mean, ***I've been in the project site twice this year***, and I have personally directed different resources there.  And I am – ***I hate to even say confident, but I am in the ability of the project to complete within this number***, as well – and look, we used an abysmal productivity rate in setting the number that we wrote down.  ***So I have confidence that we'll be able to finish***.  As you said, we're high 80s percentage.  We're starting to turn over systems to the customer on unit 1.  Unit 2, I think, will be an easier finish than unit 1 has been.  So I feel pretty good about the team that's there now.  Yes, I'm not going to say that I will be there every week, ***but I'm going to be there on a routine basis, and I have already taken personal review of this project***.  With regard to the other one, and this is a hell of it, is ***the project in Virginia is going very well***.  It is in the same kind of completion percentage.  ***And those guys have done a better job relative to managing that craft and making the progress that they need to make.  So I feel very good about that project and what that team is doing.  But yes, I mean when things go bad, the boss***

- 55 -

*has got to be there, and I get that.  And I have been and will be as we finish this project.*

136.     In Seaton's closing remarks, he repeated his assurance that all the issues with the Gas-Fired Plants had been captured by the charge and completion was near:

> Despite a disastrous quarter and our disappointment, I'm really excited about the future.  No one's more disappointed than I am relative to where we are on a very finite sample of projects.  *And we do know where the end is, and we believe we've captured that*.

137.     Defendants, however, omitted the full scope of the problems, cost overruns, and delays plaguing the Citrus County Plant, as well as those same problems that were also affecting the other Gas-Fired Plants.  On the call, Seaton represented that the Citrus County Plant was "86% complete with an expected completion date in Q4 of this year."  Likewise, a slide presented on the earnings call represented that "[t]he underperforming gas-fired projects have been *de-risked*."

138.     On August 2, 2018, Fluor released its Q2 2018 financial results and held an earnings call for analysts and investors.  Fluor disclosed another $16 million charge for the Citrus County Plant.  The Form 8-K announcing the results disclosed "[t]he Mining, Industrial, Infrastructure & Power segment . . . [r]esults for the quarter include a pre-tax charge of $16 million for forecast revisions on a gas-fired power project."  On the earnings call, Seaton commented on the Citrus County Plant losses on the Company's overall performance: "It's just a shame that this noise on legacy projects has dampened what could have been some really good quarters over the last 2 years."

139.     In response to an analyst's concern with the ongoing gas-fired power project issues, Seaton confirmed that he was personally involved in managing the project and stated that the remainder of the projects could be completed within their current estimates, or even see some of the losses reversed through execution improvements and workarounds:

> [Analyst:] . . . [O]n the cost saving opportunities and, David, on the problem projects, just how comfortable are you?

- 56 -

[Seaton:] . . . *I'll start with the power project.  I hold a weekly call with the project team, including the president of that group, which is almost resident at the site.  I can't overstate the importance of first fire today because it supports the schedules that we have, notwithstanding the charge that we had.  The charge that we had this quarter was (technical difficulty) both in terms of material and labor associated with it, which on other projects, that would have been handled by contingency.  And because this thing's out in lights, everything stands out, and that's why we had to announce it.  I still believe that because of the schedule, there's a positive adjustment at the end of the year available to us, assuming that we continue to perform.*  But my accounting friends have made us report it the way that we've reported it. . . . *But that project is all but done.  So I think these legacy issues, as we get to December, will be – are behind us*.

140.    Defendants, however, did not disclose the full scope of the problems, cost overruns, and delays plaguing the remaining gas-fired plants.  Rather, Fluor continued to misstate and omit material facts regarding those plants: "*[W]e've done everything in our power to lessen that risk and give us better insight and surety in terms of our performance going forward*."

141.    Defendants knew or recklessly disregarded that the Gas-Fired Plants Fraud statements set forth in ¶¶130-140, *supra*, were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

(a)    At the time Seaton stated that he was "pleased to report" that Fluor "made solid progress on the 3 gas-fired power plants" (¶133, *supra*), the Citrus County Plant was suffering from material and costly schedule delays.  As described in §VII.G.2., *infra*, the Baseline Schedule for the project called for a "Guaranteed Mechanical Completion date" for the Citrus County Plant of December 1, 2017.  *Duke* Lawsuit, ECF No. 1, ¶17.  By November 2017, however, it was clear that this deadline was not feasible, requiring Fluor to sign a change order pushing back the completion date to March 1, 2018.  *Id.*, ¶28; *see also Duke* Lawsuit, ECF No. 17 at 9.  Ultimately, the Citrus County Plant charges were the result of the schedule delays; Fluor admitted that the charges on the "financial impact . . . relative to initial expected timing of when the 2 units would be available for power production."  ¶135, *supra*.

- 57 -

(b)     Although Defendants claimed the Citrus County Plant had been "de-risked" and Fluor had captured the risks in its estimates by May 2018, the Citrus County Plant continued to suffer from material schedule delays and execution problems.  As described in §VII.G.2., *infra*, Fluor missed the amended Guaranteed Mechanical Completion Date deadline of March 2018 by approximately six months.  As a result, Fluor was liable for "all additional costs incurred by Duke Energy due to the failure to meet the agreed milestone dates."

(c)     Seaton witnessed the delays firsthand.  Fluor's official Twitter account tweeted a picture of Seaton at the Citrus County Plant on January 30, 2018 with the caption: "Fluor CEO David Seaton recently toured @Duke Energy's Citrus combined-cycle natural gas plant construction site in Florida, which is over 70% complete."  By May 2018, Seaton had already taken "a personal review of this project," had been to the site twice in the prior four months, conducted "weekly calls with the project team, including the president of that group" who was on-site, and vowed to visit the site on a routine basis going forward.

(d)     Porter and Stanski signed the consolidated Forms 10-Q containing the statements in ¶¶130-131, 135, *supra*.  In addition, Seaton, Porter, and Stanski signed Certifications pursuant to SOX in which they attested that the reports containing these statements did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  Seaton, Porter, and Stanski also attested that they had designed disclosure controls to ensure that material information relating to Fluor was made known to them.

(e)     Defendants were motivated to conceal the true extent of the issues plaguing the Gas-Fired Plants until the end of the Class Period in order to profit from illicit insider sales. Shortly after making the statements in ¶¶130-140, *supra*, but before the truth was revealed:

- 58 -

(i)    Seaton sold $1,902,640 in Fluor stock on November 21, 2017 and $3,185,075 in Fluor stock on March 1, 2018 and March 6, 2018.

(ii)    Stanski sold $135,351 in Fluor stock on November 30, 2017 and $251,428 in Fluor stock on March 6, 2018.

(iii)    McSorley sold $88,543 in Fluor stock on March 6, 2018.

## VII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

### A.    Insider Sales

142.    Defendants' scienter is further evidenced by the Class Period transactions in Fluor stock, options, and stock-related units by the Individual Defendants, which were suspicious in both timing and amount, permitting them to accumulate more than ***$30 million*** total in ill-gotten gains during the fraud alleged herein.

### 1.    Seaton's Class Period Sales

143.    During the four-year period preceding the Class Period (March 1, 2009 through August 13, 2013), Seaton exercised 57,621 Performance Rights ("PRs"),[4] exercised 32,879 Restricted Stock Units ("RSUs"),[5] exercised 102,739 stock options, and sold 192,843 Fluor shares (and 90,104 net shares) for gross proceeds of $12,129,067 and net proceeds of $7,989,524.  Seaton

---

[4]    Fluor's corporate Performance Incentive Plans from the Class Period listed different executive compensation award types, including Incentive Awards, which they described as a "bonus opportunity" "pursuant to which a Participant may become entitled to receive an amount payable either in cash, Shares or other property based on satisfaction of such performance criteria as are specified in the document(s) evidencing the Award."  The Individual Defendants' Form 4 filings during the Class Period define a Performance Right (PR) as follows: "Each performance right represents a contingent right to receive one share (or the cash equivalent of one share) of Fluor common stock."

[5]    Among the other executive compensation award types listed in Fluor's corporate Performance Incentive Plans from the Class Period were Stock Unit Awards, which they described as a "right to receive the fair market value of a specified number of Shares," subject to certain enumerated terms and conditions.  The Individual Defendants' Form 4 filings during the Class Period described the Restricted Stock Units (RSUs) at issue as subject to various vesting schedules and having a "1-for-1" "[c]onversion or [e]xercise [p]rice."

entered the Class Period with balances of 191,772 Fluor shares, 376,094 stock options, 57,621 PRs, and 173,863 RSUs.  Seaton's transactions during the Class Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| Transaction Date | Options Grants / Exercises | Shares | Vesting Date | Strike Price | Funds Spent / Gained |
| 11/7/2013 | Exercise of Options [*expiration date 3/4/2018*] | 9,195 | 1/3 each on 3/6/2009; 3/6/2010; 3/6/2011 | $68.3600 | ($628,570) |
| 11/8/2013 | Exercise of Options [*expiration date 3/4/2018*] | 2,871 | 1/3 each on 3/6/2009; 3/6/2010; 3/6/2011 | $68.36 | ($196,262) |
| 11/8/2013 | Exercise of Options [*expiration date 3/4/2018*] | 31,042 | 1/3 each on 3/6/2011; 3/6/2012; 3/6/2013 | $42.75 | ($1,327,046) |
| 11/8/2013 | Exercise of Options [*expiration date 3/2/2020*] | 58,726 | 1/3 each on 3/6/2012; 3/6/2013; 3/6/2014 | $70.76 | ($4,155,452) |
| 11/8/2013 | Exercise of Options [*expiration date 2/27/2022*] | 39,492 | 1/3 each on 3/6/2013; 3/6/2014; 3/6/2015 | $62.50 | ($2,468,250) |
| 2/21/2014 | Grant of Options | 120,333 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $79.19 | $0 |
| 8/21/2014 | Exercise of Options [*expiration date 2/27/202*] | 39,492 | 1/3 each on 3/6/2013; 3/6/2014; 3/6/2015 | $62.50 | ($2,468,250) |
| 8/21/2014 | Exercise of Options [*expiration date 2/25/2023*] | 52,892 | 1/3 each on 3/6/2014; 3/6/2015; 3/6/2016 | $61.45 | ($3,250,213) |

- 60 -

| 2/23/2015 | Grant of Options | 173,655 | 1/3 each on 3/6/2016; 3/6/2017; 3/6/2018 | $59.05 | $0 |
|---|---|---|---|---|---|
| 2/23/2017 | Grant of Options | 154,599 | 1/3 each on 3/6/2018; 3/6/2019; 3/6/2020 | $55.35 | $0 |
| 2/23/2018 | Grant of Options | 33,615 | 1/3 each on 3/6/2019; 3/6/2020; 3/6/2021 | $58.15 | $0 |
| | | | | | |
| **Sub-Total Options from Grants/Compensation** | | 482,202 | | **Cost** | **($0)** |
| **Sub-Total Options Exercised** | | 233,710 | | **Cost** | **($14,494,042)** |

| Performance Rights Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/5/2014 | Award of PRs | 58,282 | 3/5/2016 | $0 | $0 |
| 2/28/2014 | Exercise of PRs | (29,732) | 1/2 each on 2/28/2012; 2/28/2014 | $0 | $0 |
| 2/4/2015 | Award of PRs | 72,132 | 2/6/2017 | $0 | $0 |
| 2/28/2015 | Exercise of PRs | (27,889) | 1/2 each on 2/28/2013; 2/28/2015 | $0 | $0 |
| 2/5/2016 | Exercise of PRs | (58,282) | 2/5/2016 | $0 | $0 |
| 2/6/2017 | Exercise of PRs | (72,132) | 2/6/2017 | $0 | $0 |
| | | | | | |
| **Sub-Total Grants of PRs** | | 130,414 | | **Cost** | **($0)** |
| **Sub-Total Exercises of PRs** | | (188,035) | | **Proceeds** | n/a |

| RSU Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/21/2014 | Award of RSUs | 35,007 | 1/3 each on 3/6/2015; 3/6/2016; | $0 | $0 |

- 61 -

| | | | | | |
|---|---|---|---|---|---|
| | | | 3/6/2017 | | |
| 2/23/2015 | Award of RSUs | 49,179 | 1/3 each on 3/6/2016; 3/6/2017; 3/6/2018 | $0 | $0 |
| 2/23/2016 | Award of RSUs | 107,385 | 1/3 each on 3/6/2017; 3/6/2018; 3/6/2019 | $0 | $0 |
| 2/23/2017 | Award of RSUs | 44,391 | 1/3 each on 3/6/2018; 3/6/2019; 3/6/2020 | $0 | $0 |
| 2/23/2018 | Award of RSUs | 75,669 | 1/3 each on 3/6/2019; 3/6/2020; 3/6/2021 | $0 | $0 |
| | | | | | |
| **Sub-Total Grants of RSUs** | | 311,631 | | **Cost** | **($0)** |
| **Sub-Total Exercises of RSUs** | | (0) | | **Proceeds** | $0 |

| Stock Transactions | | | | |
|---|---|---|---|---|
| **Transaction Date** | **Purchases / Sales** | **Shares** | **Price** | **Funds Spent / Gained** |
| 11/7/2013 | Acquired by options exercise | 9,195 | *See above* | *See above* |
| 11/7/2013 | Sale | (9,195) | $77.0250 | $708,245 |
| 11/8/2013 | Acquired by options exercise | 132,131 | *See above* | *See above* |
| 11/8/2013 | Sale | (132,131) | $76.0000 | $10,041,956 |
| 2/5/2014 | Sale | (267) | $74.8600 | $19,988 |
| 2/28/2014 | Acquired by PR exercise | 29,732 | n/a | $0 |
| 2/28/2014 | Sale | (29,732) | $77.6900 | $2,309,879 |
| 8/21/2014 | Acquired by options exercise | 92,384 | *See above* | *See above* |
| 8/21/2014 | Sale | 92,384 | $74.1440 | $6,849,719 |
| 2/28/2015 | Acquired by PR exercise | 27,889 | n/a | $0 |
| 2/28/2015 | Sale | (27,889) | $58.0000 | $1,617,562 |
| 2/5/2016 | Acquired by PR | 58,282 | n/a | $0 |

- 62 -

| | exercise | | | |
|---|---|---|---|---|
| 2/5/2016 | Sale | (58,282) | $44.8400 | $2,613,365 |
| 3/6/2016 | Sale | (17,993) | $49.1700 | $884,716 |
| 2/6/2017 | Acquired by PR exercise | 72,132 | n/a | $0 |
| 2/6/2017 | Sale | (72,132) | $55.3400 | $3,991,785 |
| 11/21/2017 | Sale | (40,000) | $47.5660 | $1,902,640 |
| 3/1/2018 | Sale | (50,000) | $56.7210 | $2,836,050 |
| 3/6/2018 | Sale | (6,070) | $57.5000 | $349,025 |
| | | | | |
| **Sub-Total Stock Sales** | | **(536,075)** | **Proceeds** | **$34,124,929** |
| | | | | |
| 3/14/2014 | Gift | (10,001) | n/a | n/a |
| 3/5/2015 | Gift | (8,602) | n/a | n/a |
| 3/3/2016 | Gift | (5,139) | n/a | n/a |
| 3/8/2017 | Gift | (7,480) | n/a | n/a |
| | | | | |
| **Sub-Total Stock Gifts** | | **(31,222)** | **Proceeds** | **n/a** |
| | | | | |
| **Totals** | **Shares Purchased** | **0** | **Transaction Costs** | **($0)** |
| | **Shares Acquired by Options Exercise** | **233,710** | **Transaction Costs** | **($14,494,042)** |
| | **Shares Acquired by RSU Exercise** | **0** | **Transaction Costs** | **($0)** |
| | **Shares Acquired By PR Exercise** | **129,753** | **Transaction Costs** | **($0)** |
| | **Shares Sold** | **(536,075)** | **Transaction Proceeds** | **$34,124,929** |
| | | | **Net Gain to Defendant Seaton** | **$19,630,887** |

144.   The timing of Seaton's sales further supports a finding of scienter.  For instance:

(a)   Seaton sold $10,750,201 in Fluor stock on November 7, 2013 and November 8, 2013, when the stock traded near the Class Period high.[6]  These sales were made after multiple misleading statements and omissions by Defendants, including Seaton himself, in 2013, as set forth herein, and after statements and omissions Seaton made just eight days prior to these sales on the Q3 2013 earnings call on October 31, 2013.  *See* ¶113; *see also* ¶112.

---

[6]   Fluor's common stock reached its Class Period high of $83.93 on January 22, 2014.

(b)     Seaton sold $2,309,879 in Fluor stock on February 28, 2014, when the stock traded near the Class Period high.  Seaton made this trade when Fluor had initiated construction of the Brunswick County Plant, but before investors were alerted to problems with the bid and construction process.  This sale also occurred after multiple misleading statements and omissions by Defendants, including Seaton himself, and after statements and omissions Seaton made just ten days prior to this sale on the February 18, 2014 earnings call.  *See* ¶116; *see also* ¶¶112-113.

(c)     Seaton sold $6,849,719 in Fluor stock on August 21, 2014, shortly after Fluor announced its Q2 2014 financial results and after Fluor's undisclosed but ongoing problems with construction execution, including major, costly issues with the Mitsubishi turbines, had already occurred. This sale also occurred after multiple misleading statements and omissions by Defendants, including a statement made just six days prior, on August 14, 2014.  *See* ¶96; *see also* ¶¶87-91, 93-95, 112-113, 115-116.

(d)     Seaton sold $1,617,562 in Fluor stock on February 28, 2015, ten days after Fluor announced its 2014 financial results.  On the earnings call on February 18, 2015, Defendants made misleading statements and omissions and continued to conceal the issues with the Brunswick County Plant that were well developed by this time.  *See* ¶¶99-100.  In Q2 2015, the very next quarter after Seaton sold these shares, Fluor would take a $10 million charge related to the Brunswick County Plant, which later ballooned to $60 million for 2015, wiping out the Power Segment's 2015 profitability.

(e)     Seaton sold $3,185,075 in Fluor stock on March 1, 2018 and March 6, 2018. Seaton's March 1, 2018 sales occurred within weeks of Fluor's February 20, 2018 announcement of 2017 results in which Defendants announced their initial 2018 earnings after having delayed the guidance announcement from Q3 2017, as was Fluor's usual practice.  While Defendants claimed that the delay was to incorporate a new revenue recognition standard, the guidance significantly beat

market expectations and caused many analysts to raise their targets and ratings.  For example, Deutsche Bank in its February 20, 2018 report said that the Company "issued initial 2018 EPS guidance well ahead of street expectations (even after factoring in tax reform and rev rec changes)," and UBS in its February 21, 2018 report raised its target 26% from $46 to $58.  After Defendants set 2018 initial earnings guidance, Seaton immediately sold his stock.  However, at the same time that 2018 initial earnings guidance was being announced, Fluor was accumulating an undisclosed $125 million charge for the Citrus County Plant, which was later announced along with downward-revised 2018 guidance.  In connection with additional Gas-Fired Plant charges in Q2 2018 and Q3 2018, Fluor continued to revise guidance downward.  Through 2018, Fluor would take $188 million in charges, wiping out the Power Segment profits.  Fluor would settle at $1.59 per share for 2018, well below the initial 2018 earnings guidance of $3.10 to $3.50 per share that was in place when Seaton sold his stock.  Although Seaton was able to cash out before these negative announcements, investors were not able to do so.

### 2.    Porter's Class Period Sales

145.    During the four-year period preceding the Class Period (March 1, 2009 through August 13, 2013), Porter exercised 8,685 PRs, exercised 0 RSUs, exercised 0 options, and sold 17,650 Fluor shares for gross and net proceeds of $1,077,581.  Porter entered the Class Period with balances of 75,935 Fluor shares, 42,573 stock options, 60,116 PRs, and 62,857 RSUs.  Porter's transactions during the Class Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Options Grants / Exercises** | **Shares** | **Vesting Date** | **Strike Price** | **Funds Spent / Gained** |
| 2/21/2014 | Grant  of Options | 28,653 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $79.19 | $0 |
| 2/23/2015 | Grant of Options | 39,468 | 1/3 each on 3/6/2016; | $59.05 | $0 |

| Transaction Date | Unit Grants / Exercises | Units | Vesting Date | Price | Funds Spent / Gained |
|---|---|---|---|---|---|
| | | | 3/6/2017; 3/6/2018 | | |
| 2/23/2017 | Grant of Options | 52,443 | 1/3 each on 3/6/2018; 3/6/2019; 3/6/2020 | $55.35 | $0 |
| | | | | | |
| **Sub-Total Options from Grants/Compensation** | | 120,564 | | **Cost** | ($0) |
| **Sub-Total Options Exercised** | | 0 | | **Cost** | ($0) |
| **Performance Rights Transactions** | | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/5/2014 | Award of PRs | 15,638 | 3/5/2016 | $0 | $0 |
| 2/4/2015 | Award of PRs | 17,174 | 2/6/2017 | $0 | $0 |
| 5/3/2015 | Exercise of PRs | (8,685) | 1/2 each on 5/3/2013; 5/3/2015 | $0 | $0 |
| 2/5/2016 | Exercise of PRs | (15,638) | 2/5/2016 | $0 | $0 |
| 2/6/207 | Exercise of PRs | (17,174) | 2/6/2017 | $0 | $0 |
| | | | | | |
| **Sub-Total Awards of PRs** | | 32,812 | | **Cost** | ($0) |
| **Sub-Total Exercises of PRs** | | (41,497) | | **Proceeds** | n/a |
| **RSU Transactions** | | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/21/2014 | Award of RSUs | 8,337 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $0 | $0 |
| 2/23/2015 | Award of RSUs | 11,178 | 1/3 each on 3/6/2016; 3/6/2017; 3/6/2018 | $0 | $0 |
| 2/23/2016 | Award of RSUs | 31,545 | 1/3 each on 3/6/2017; 3/6/2018; 3/6/2019 | $0 | $0 |
| 2/23/2017 | Award of RSUs | 15,060 | 1/3 each on 3/6/2018; 3/6/2019; 3/6/2020 | $0 | $0 |
| | | | | | |
| **Sub-Total Awards of RSUs** | | 66,120 | | **Cost** | ($0) |

| Sub-Total Exercises of RSUs | | (0) | | Proceeds | $0 |
|---|---|---|---|---|---|
| **Stock Transactions** | | | | | |
| **Transaction Date** | **Purchases / Sales** | **Shares** | | **Price** | **Funds Spent / Gained** |
| 11/6/2013 | Sale | (13,078) | | $76.8260 | $1,004,730 |
| 3/6/2014 | Sale | (1,189) | | $80.1200 | $95,263 |
| 4/9/2014 | Sale | (8,556) | | $77.3600 | $661,892 |
| 5/7/2014 | Sale | (1,648) | | $75.4900 | $124,408 |
| 3/6/2015 | Sale | (2,307) | | $57.2900 | $132,168 |
| 4/9/2015 | Sale | (8,556) | | $59.1400 | $506,002 |
| 5/3/2015 | Acquired by PR exercise | 8,685 | | n/a | $0 |
| 5/3/2015 | Sale | (8,685) | | $58.7000 | $509,810 |
| 5/7/2015 | Sale | (1,648) | | $58.6300 | $96,622 |
| 2/5/2016 | Acquired by PR exercise | 15,638 | | n/a | $0 |
| 2/5/2016 | Sale | (15,638) | | n/a | $701,208 |
| 3/6/2016 | Sale | (4,399) | | $49.1700 | $216,299 |
| 2/6/2017 | Acquired by PR exercise | 17,174 | | n/a | $0 |
| 2/6/2017 | Sale | (17,174) | | $55.3400 | $950,409 |
| 3/6/2017 | Sale | (2,730) | | $55.0400 | $150,259 |
| | | | | | |
| **Sub-Total Stock Sales** | | (85,608) | **Proceeds** | | **$5,149,070** |

| | | | | | |
|---|---|---|---|---|---|
| **Totals** | **Shares Purchased** | **0** | **Transaction Costs** | | **($0)** |
| | **Shares Acquired by Options Exercise** | **0** | **Transaction Costs** | | **($0)** |
| | **Shares Acquired by RSU Exercise** | **0** | **Transaction Costs** | | **($0)** |
| | **Shares Acquired By PR Exercise** | **41,497** | **Transaction Costs** | | **($0)** |
| | **Shares Sold** | **(85,608)** | **Transaction Proceeds** | | **$5,149,070** |
| | | **Net Gain to Defendant Porter** | | | **$5,149,070** |

146.    The timing of Porter's sales further supports a finding of scienter.  For instance:

(a)    Porter sold $1,004,730 in Fluor stock on November 6, 2013, when the stock traded near the Class Period high.  These sales occurred after multiple misleading statements and omissions by Defendants, including false statements made on the Q3 2013 earnings call on October 31, 2013.  *See* ¶113; *see also* ¶112.

- 67 -

(b)      Porter sold $95,263 in Fluor stock on March 6, 2014, when the stock traded near the Class Period high. Porter made this trade when Fluor had initiated construction of the Brunswick County Plant, but before investors were alerted to problems with the bid and construction process. This sale also occurred after multiple misleading statements and omissions by Defendants, including after statements and omissions Defendants made just weeks prior to this sale on the February 18, 2014 earnings call. *See* ¶116; *see also* ¶¶112-113.

(c)      Porter sold $132,168 in Fluor stock on March 6, 2015, one day after Fluor issued a Shareholder Letter, attached to Fluor's 2014 Annual Report, containing false statements. ¶¶101, 121. This trade also occurred just weeks after Defendants discussed Fluor's 2014 financial results on the earnings call on February 18, 2015, on which Defendants made misleading statements and omissions and continued to conceal issues with the Brunswick County Plant that were well developed by that time. *See* ¶¶99-100. In Q2 2015, the very next quarter after Porter sold these shares, Fluor would take a $10 million charge related to the Brunswick County Plant, which later ballooned to $60 million for 2015, wiping out the Power Segment's 2015 profitability.

### 3.      Stanski's Class Period Sales

147.     During the four-year period preceding the Class Period (March 1, 2009 through August 13, 2013), Stanski exercised 0 PRs, exercised 0 RSUs, exercised 18,916 stock options, and sold 22,916 Fluor shares for gross proceeds of $1,891,720 and net proceeds of $1,092,585. Stanski entered the Class Period with balances of 23,680 Fluor shares, 48,779 stock options, 21,179 PRs, and 11,688 RSUs. Stanski's transactions during the Class Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| Transaction Date | Options Grants / Exercises | Shares | Vesting Date | Strike Price | Funds Spent / Gained |
| 11/5/2013 | Exercise of Options [*expiration date 5/6/2019*] | 4,859 | 1/3 each on 5/7/2010; 5/7/2011; 5/7/2012 | $41.77 | ($202,960) |

- 68 -

| 11/5/2013 | Exercise of Options [*expiration date 3/2/2020*] | 18,396 | 1/3 each on 3/6/2011; 3/6/2012; 3/6/2013 | $42.75 | ($788,429) |
|---|---|---|---|---|---|
| 2/21/2014 | Grant of Options | 18,624 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $79.19 | $0 |
| 2/23/2015 | Grant of Options | 28,614 | 1/3 each on 3/6/2016; 3/6/2017; 3/6/2018 | $59.05 | $0 |
| 2/23/2017 | Grant of Options | 28,197 | 1/3 each on 3/6/2018; 3/6/2019; 3/6/2020 | $55.35 | $0 |
| | | | | | |
| **Sub-Total Options from Grants/Compensation** | | 98,690 | | **Cost** | ($0) |
| **Sub-Total Options Exercised** | | 0 | | **Cost** | ($0) |

| Performance Rights Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/5/2014 | Award of PRs | 8,708 | 3/5/2016 | $0 | $0 |
| 2/28/2014 | Exercise of PRs | (4,441) | 1/2 each on 2/28/2012; 2/28/2014 | $0 | $0 |
| 2/4/2015 | Award of PRs | 11,164 | 2/6/2017 | $0 | $0 |
| 2/28/2015 | Exercise of PRs | (3,928) | 1/2 each on 2/28/2013; 2/28/2015 | $0 | $0 |
| 2/5/2016 | Exercise of PRs | (8,708) | 2/5/2016 | $0 | $0 |
| 2/6/2017 | Exercise of PRs | (11,164) | 2/6/2017 | $0 | $0 |
| | | | | | |
| **Sub-Total Grants of PRs** | | 19,872 | | **Cost** | ($0) |
| **Sub-Total Exercises of PRs** | | (28,241) | | **Proceeds** | n/a |

| RSU Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/21/2014 | Award of RSUs | 5,418 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $0 | $0 |
| 2/23/2015 | Award of RSUs | 8,106 | 1/3 each on | $0 | $0 |

- 69 -

| Transaction Date | Purchases / Sales | Shares | | Funds Spent / Gained |
|---|---|---|---|---|
| | | | 3/6/2016; 3/6/2017; 3/6/2018 | |
| 2/23/2016 | Award of RSUs | 18,489 | 1/3 each on 3/6/2017; 3/6/2018; 3/6/2019 | $0 | $0 |
| 2/23/2017 | Award of RSUs | 8,907 | 1/3 each on 3/6/2018; 3/6/2019; 3/6/2020 | $0 | $0 |
| 2/23/2018 | Award of RSUs | 22,356 | 1/3 each on 3/6/2019; 3/6/2020; 3/6/2021 | $0 | $0 |
| | | | | | |
| **Sub-Total Grants of RSUs** | | 63,276 | | **Cost** | ($0) |
| **Sub-Total Exercises of RSUs** | | (0) | | **Proceeds** | $0 |

| Stock Transactions | | | | |
|---|---|---|---|---|
| **Transaction Date** | **Purchases / Sales** | **Shares** | **Price** | **Funds Spent / Gained** |
| 11/5/2013 | Acquired by options exercise | 4,859 | *See above* | *See above* |
| 11/5/2013 | Acquired by options exercise | 18,396 | *See above* | *See above* |
| 11/5/2013 | Sale | (35,247) | $75.6910 | $2,667,881 |
| 2/28/2014 | Acquired by PR exercise | 4,441 | n/a | $0 |
| 2/28/2014 | Sale | (4,441) | $77.6900 | $345,021 |
| 6/6/2014 | Sale | (1,816) | $80.1200 | $145,498 |
| 2/28/2015 | Acquired by PR exercise | 3,928 | n/a | $0 |
| 2/28/2015 | Sale | (3,928) | $58.0000 | $227,824 |
| 3/6/2015 | Sale | (2,052) | $57.2900 | $117,559 |
| 2/5/2016 | Acquired by PR exercise | 8,708 | n/a | $0 |
| 2/5/2016 | Sale | (8,708) | $44.8400 | $390,467 |
| 3/6/2016 | Sale | (2,883) | $49.1700 | $141,757 |
| 2/6/2017 | Acquired by PR exercise | 11,164 | n/a | $0 |
| 2/6/2017 | Sale | (11,164) | $55.3400 | $617,816 |
| 3/6/2017 | Sale | (2,151) | $55.0400 | $118,391 |
| 11/30/2017 | Sale | (2,792) | $48.4780 | $135,351 |
| 3/6/2018 | Sale | (658) | $57.5700 | $37,881 |
| 3/6/2018 | Sale | (3,718) | $57.436 | $213,547 |
| | | | | |
| **Sub-Total Stock Sales** | | (73,301) | **Proceeds** | **$5,158,992** |

| Totals | Shares Purchased | 0 | Transaction Costs | ($0) |
|---|---|---|---|---|
| | Shares Acquired by Options Exercise | 23,255 | Transaction Costs | ($989,389) |
| | Shares Acquired by RSU Exercise | 0 | Transaction Costs | ($0) |
| | Shares Acquired By PR Exercise | 28,241 | Transaction Costs | ($0) |
| | Shares Sold | (79,558) | Transaction Proceeds | $5,158,992 |
| | | Net Gain to Defendant Stanski | | $4,169,603 |

148.    The timing of Stanski's sales further supports a finding of scienter.  For instance:

(a)    Stanski sold $2,667,881 in Fluor stock on November 5, 2013, when the stock traded near the Class Period high.[7]  These sales occurred after multiple misleading statements and omissions by Defendants, including false statements made on the Q3 2013 earnings call on October 31, 2013.  *See* ¶113; *see also* ¶112.

(b)    Stanski sold $345,021 in Fluor stock on February 28, 2014, when the stock traded near the Class Period high.  Stanski made this trade when Fluor had initiated construction of the Brunswick County Plant, but before investors were alerted to problems with the bid and construction process.  This sale also occurred after multiple misleading statements and omissions by Defendants, including after statements and omissions Defendants made just ten days prior to this sale on the February 18, 2014 earnings call.  *See* ¶116; *see also* ¶¶112-113.

(c)    Stanski sold $145,498 in Fluor stock on June 6, 2014, shortly after Fluor announced its 2013 financial results and after Fluor's ongoing problems with construction execution, including major, costly issues with the Mitsubishi turbines, had already occurred.  *See* ¶91; *see also* ¶¶87-91, 112-113, 115-116.

(d)    Stanski sold $227,824 in Fluor stock on February 28, 2015 and $117,559 in Fluor stock on March 6, 2015, shortly after Fluor announced its 2014 financial results.  On the

---

[7]    Fluor's common stock reached its Class Period high of $83.93 on January 22, 2014.

earnings call on February 18, 2015, Defendants made misleading statements and omissions and continued to conceal issues related to the Brunswick County Plant that were well developed by that time.  *See* ¶¶99-100.  In Q2 2015, the very next quarter after Stanski sold these shares, Fluor would take a $10 million charge related to the Brunswick County Plant, which later ballooned to $60 million for 2015, wiping out the Power Segment's 2015 profitability.

(e)     Stanski sold $251,428 in Fluor stock on March 6, 2018, shortly after Fluor announced its 2017 financial results.  Stanski's March 2018 sale, like Seaton's, occurred within weeks of Fluor's February 20, 2018 announcement of 2017 results in which Defendants announced their initial 2018 earnings, which beat market expectations and caused many analysts to raise their targets and ratings.  After Defendants set 2018 initial earnings guidance, Stanski immediately sold his stock.  Fluor would take multiple charges related to the Gas-Fired Plants shortly thereafter, wiping out the Power Segment profits, resulting in guidance reductions.  Stanski's final Class Period sale occurred before these negative announcements.

### 4.     Smalley's Class Period Sales

149.     During the four-year period preceding the Class Period (March 1, 2009 through August 13, 2013), Smalley exercised 8,061 PRs, exercised 0 RSUs, exercised 12,993 options, and sold 24,274 Fluor shares (and 8,324 net shares) for gross proceeds of $1,472,872 and net proceeds of $652,728.  During this time period, Smalley purchased 2,957 shares at a cost of $145,561.  Smalley entered the Class Period with balances of 15,597 Fluor shares, 10,377 stock options, 1,764 PRs, and 19,267 RSUs.  Smalley's transactions during the Class Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| Transaction Date | Options Grants / Exercises | Shares | Vesting Date | Strike Price | Funds Spent / Gained |
| 11/5/2013 | Exercise of Options [*expiration date 3/2/2020*] | 1,725 | 1/3 each on 3/6/2011; 3/6/2012; 3/6/2013 | $68.3600 | ($73,744) |

| 2/21/2014 | Grant of Options | 4,233 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $79.19 | $0 |
|---|---|---|---|---|---|
| 2/23/2015 | Grant of Options | 5,832 | 1/3 each on 3/6/2016; 3/6/2017; 3/6/2018 | $59.05 | $0 |
| | | | | | |
| **Sub-Total Options from Grants/Compensation** | | 10,065 | | **Cost** | ($0) |
| **Sub-Total Options Exercised** | | 1,725 | | **Cost** | ($73,744) |
| **Performance Rights Transactions** | | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/5/2014 | Award of PRs | 4,158 | 3/5/2016 | $0 | $0 |
| 2/28/2014 | Exercise of PRs | (2,099) | 1/2 each on 2/28/2012; 2/28/2014 | $0 | $0 |
| 2/4/2015 | Award of PRs | 4,926 | 3/5/2016 | $0 | $0 |
| 2/28/2015 | Exercise of PRs | (1,764) | 1/2 each on 2/28/2013; 2/28/2015 | $0 | $0 |
| | | | | | |
| **Sub-Total Awards of PRs** | | 9,084 | | **Cost** | ($0) |
| **Sub-Total Exercises of PRs** | | (3,863) | | **Proceeds** | n/a |
| **RSU Transactions** | | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/21/2014 | Award of RSUs | 1,233 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $0 | $0 |
| 2/23/2015 | Award of RSUs | 1,653 | 1/3 each on 3/6/2016; 3/6/2017; 3/6/2018 | $0 | $0 |
| | | | | | |
| **Sub-Total Awards of RSUs** | | 2,886 | | **Cost** | ($0) |
| **Sub-Total Exercises of RSUs** | | (0) | | **Proceeds** | $0 |
| **Stock Transactions** | | | | | |
| **Transaction Date** | **Purchases / Sales** | **Shares** | | **Price** | **Funds Spent / Gained** |
| 11/5/2013 | Acquired by options | 1,725 | | *See* | *See above* |

|  | exercise |  | *above* |  |
|---|---|---|---|---|
| 11/5/2013 | Sale | (6,393) | $75.6250 | $483,471 |
| 2/5/2014 | Sale | (160) | $74.8600 | $11,978 |
| 2/28/2014 | Acquired by PR exercise | 2,099 | n/a | $0 |
| 2/28/2014 | Sale | (2,099) | $77.6900 | $163,071 |
| 3/6/2014 | Sale | (352) | $80.1200 | $28,202 |
| 5/6/2014 | Sale | (1,261) | $74.2855 | $93,674 |
| 2/5/2015 | Sale | (123) | $55.7200 | $6,854 |
| 2/25/2015 | Sale | (1,002) | $59.1800 | $59,298 |
| 2/28/2015 | Acquired by PR exercise | 1,764 | n/a | $0 |
| 2/28/2015 | Sale | (1,764) | $58.0000 | $102,312 |
| 3/6/2015 | Sale | (368) | $57.2900 | $21,083 |
| 3/10/2015 | Sale | (3,883) | $57.2740 | $222,395 |
| **Sub-Total Stock Sales** |  | (85,608) | **Proceeds** | **$5,149,070** |

| | | | | |
|---|---|---|---|---|
| **Totals** | **Shares Purchased** | **0** | **Transaction Costs** | **($0)** |
| | **Shares Acquired by Options Exercise** | **1,725** | **Transaction Costs** | **($73,744)** |
| | **Shares Acquired by RSU Exercise** | **0** | **Transaction Costs** | **($0)** |
| | **Shares Acquired By PR Exercise** | **3,863** | **Transaction Costs** | **($0)** |
| | **Shares Sold** | **(17,405)** | **Transaction Proceeds** | **$1,192,337** |
| | | **Net Gain to Defendant Smalley** | | **$1,118,594** |

150.     The timing of Smalley's sales further supports a finding of scienter.  For instance:

(a)     Smalley sold $483,471 in Fluor stock on November 5, 2013, when the stock traded near the Class Period high.  These sales were made after multiple misleading statements and omissions by Defendants, as set forth herein, including after statements and omissions made just days prior to these sales on the Q3 2013 earnings call on October 31, 2013.  *See* ¶113; *see also* ¶112.

(b)     Smalley sold $163,071 in Fluor stock on February 24, 2014 and $28,202 in Fluor stock on March 6, 2014, when the stock traded near the Class Period high.  Smalley made this trade when Fluor had initiated construction of the Brunswick County Plant, but before investors were alerted to problems with the bid and construction process.  These sales also occurred after multiple

misleading statements and omissions by Defendants, including statements made just six days prior on the February 18, 2014 earnings call.  *See* ¶116; *see also* ¶¶112-113.

(c)      Smalley sold $93,674 in Fluor stock on May 6, 2014, shortly after Fluor announced its 2013 financial results and after Fluor's ongoing problems with construction execution, including major, costly issues with the Mitsubishi turbines, had already occurred.  *See* ¶91; *see also* ¶¶87-91, 112-113, 115-116.

(d)      Smalley sold $59,298 in Fluor stock on February 25, 2015 and $102,312 in Fluor stock on February 28, 2015, shortly after Fluor announced its 2014 financial results.  On the earnings call on February 18, 2015, Defendants made misleading statements and omissions and continued to conceal issues related to the Brunswick Plant that were well developed by that time.  *See* ¶¶99-100.  In Q2 2015, the very next quarter after Smalley sold these shares, Fluor would take a $10 million charge related to the Brunswick County Plant, which later ballooned to $60 million for 2015, wiping out the Power Segment's 2015 profitability.

(e)      Smalley sold $21,083 in Fluor stock on March 6, 2018 and $222,395 in Fluor stock on March 10, 2018.  Smalley's March 2018 sales occurred within weeks of Fluor's February 20, 2018 announcement of 2017 results in which Defendants announced their initial 2018 earnings, which beat market expectations and caused many analysts to raise their targets and ratings.  After Defendants set 2018 initial earnings guidance, Smalley immediately sold his stock.  Fluor would take multiple charges related to the Gas-Fired Plants shortly thereafter, wiping out the Power Segments profits, resulting in guidance reductions.  Smalley's final Class Period sale occurred before these negative announcements.

### 5.      McSorley's Class Period Sales

151.      During the four-year period preceding the Class Period (March 1, 2009 through August 13, 2013), McSorley did not report any PR exercises, RSU exercises, options exercises, or

- 75 -

sales of Fluor stock.  McSorley entered the Class Period with balances of 24,634 Fluor shares, 26,771 stock options, 4,445 PRs, and 0 RSUs.  McSorley's transactions during the Class Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Options Grants / Exercises** | **Shares** | **Vesting Date** | **Strike Price** | **Funds Spent / Gained** |
| None | None | n/a | n/a | n/a | n/a |
| | | | | | |
| **Sub-Total Options from Grants/Compensation** | | 0 | | **Cost** | ($0) |
| **Sub-Total Options Exercised** | | 0 | | **Cost** | ($0) |
| **Performance Rights Transactions** | | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 3/6/2018 | Exercise of PRs | (4,694) | 3/6/2018 | $0 | $0 |
| | | | | | |
| **Sub-Total Awards of PRs** | | 0 | | **Cost** | ($0) |
| **Sub-Total Exercises of PRs** | | (4,694) | | **Proceeds** | n/a |
| **RSU Transactions** | | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/23/2018 | Award of RSUs | 8,601 | 1/3 each on 3/6/2019; 3/6/2020; 3/6/2021 | $0 | $0 |
| | | | | | |
| **Sub-Total Awards of RSUs** | | 8,601 | | **Cost** | ($0) |
| **Sub-Total Exercises of RSUs** | | (0) | | **Proceeds** | $0 |
| **Stock Transactions** | | | | | |
| **Transaction Date** | **Purchases / Sales** | **Shares** | | **Price** | **Funds Spent / Gained** |
| 3/6/2018 | Acquired by PR exercise | 4,694 | | n/a | $0 |
| 3/6/2018 | Sale | (1,538) | | $57.5700 | $88,543 |
| | | | | | |
| **Sub-Total Stock Sales** | | (1,538) | | **Proceeds** | **$88,543** |
| | | | | | |
| **Totals** | **Shares Purchased** | **0** | **Transaction Costs** | | **($0)** |
| | **Shares Acquired by Options Exercise** | **0** | **Transaction Costs** | | **($0)** |
| | **Shares Acquired by** | **0** | **Transaction Costs** | | **($0)** |

| | RSU Exercise | | | |
|---|---|---|---|---|
| | **Shares Acquired By PR Exercise** | **4,694** | **Transaction Costs** | **($0)** |
| | **Shares Sold** | **(1,538)** | **Transaction Proceeds** | **$88,543** |
| | | **Net Gain to Defendant McSorley** | | **$88,543** |

152.    The timing of McSorley's sale further supports a finding of scienter.  For instance:

(a)    McSorley sold $88,543 in Fluor stock on March 6, 2018.  This sale occurred within weeks of Fluor's February 20, 2018 announcement of 2017 results in which Defendants announced their initial 2018 earnings, which beat market expectations and caused many analysts to raise their targets and ratings.  After Defendants set 2018 initial earnings guidance, McSorley immediately sold his stock.  Fluor would take multiple charges related to the Gas-Fired Plants shortly thereafter, wiping out the Power Segment profits, resulting in guidance reductions.  McSorley's sale occurred before these negative announcements.

153.    The Individual Defendants' transactions during the Class Period, while the fraud was ongoing and the true facts of Fluor's business and operations as alleged herein remained hidden from investors, yielded them a combined more than ***$30 million*** in net ill-gotten gains from prices inflated by the fraud alleged herein.  These sales constitute strong evidence of scienter.

**B.    Defendants Were Motivated to Win Gas-Fired Power Plant Projects by Any Means Necessary**

154.    During the Class Period, Defendants were motivated to underbid and win new gas-fired plant contract awards by Fluor's unusual executive compensation plan.  Under the plan, Fluor's executive compensation was directly and significantly tied to new contract awards, regardless of how those plants performed in the future.  In particular, executive compensation was based, in part, on "***new awards gross margin***," which was the expected future profits (*i.e.*, margins) generated by new contracts.  For fixed-price contracts, such as the EPC contracts detailed herein, the "new awards gross margin" was calculated as the difference between the fixed-price contract amount and the

- 77 -

Company's internal estimate of costs to complete the contract.  Thus, by artificially lowering the estimate of costs to complete a particular contract, as Fluor did on each of the Gas-Fired Plants detailed herein, Defendants achieved two objectives important to their self-interest: (i) Fluor's unrealistically low bids significantly increased Fluor's chance of winning the contract over its competitors and (ii) Fluor's unrealistically low bids created greater "new awards gross margin" – or expected future profits – and correspondingly greater executive compensation.  As a result, Defendants directly increased their compensation in the years the Gas-Fired Plant EPC contracts were awarded, regardless of how unrealistic the bid assumptions were or how poorly the contracts would actually perform in the future.

155.    Fluor's 2013 Proxy Statement, filed on Form DEF 14A on March 13, 2013 ("2013 Proxy Statement"), described executive compensation during 2012, the year Fluor was awarded the Brunswick County Plant EPC contract.  The 2013 Proxy Statement listed new contract awards as a "***key factor[]***" contributing to Fluor's executive compensation program.  Notably, three of the six "key factors" affecting executive compensation – "Performance Measures That Drive Business Goals and Stockholder Return," "Performance-Driven Long-Term Incentive Awards," and "Company Performance" – were based, in part, on Fluor winning new contract awards.  *See* 2013 Proxy Statement at 21.  Fluor's 2015 Proxy Statement, filed on Form DEF 14A on March 9, 2015 ("2015 Proxy Statement"), described executive compensation during 2014, the year Fluor was awarded the Citrus County and Anderson County Plants EPC contracts.  The 2015 Proxy Statement also listed new contract awards as a "***key factor[]***" contributing to Fluor's executive compensation program.  Once again, three of the six "key factors" affecting executive compensation – "Performance Measures That Drive Business Goals and Stockholder Return," "Performance-Driven Long-Term Incentive Awards," and "2014 Company Performance" – were based, in part, on Fluor winning new contract awards.  *See* 2015 Proxy Statement at 21-22.

- 78 -

156.    Fluor's Proxy Statements also identified "Pay for Performance" as one of the three "key objective[s]" driving Fluor's executive compensation plan during the Class Period.  To achieve this key objective, Fluor tied its long-term incentive payouts to "new [contract] awards" and related expected profit margins in 2012- 2014.  *See, e.g.*, 2012 Proxy Statement, filed on Form DEF 14A on March 13, 2012 ("2012 Proxy Statement") at 21; *see also* 2014 Proxy Statement, filed on Form DEF 14A on March 11, 2014 ("2014 Proxy Statement") at 19.  This compensation structure allowed Fluor executives to earn significant payouts based on new awards in a particular year, even when the Company's overall financial performance that year did not meet internal targets.  For example, in 2012, when the Company won the Brunswick County Plant EPC contract, Defendants earned significant long-term incentive payouts based on new awards despite otherwise poor earnings performance:

> ### Pay for Performance and CEO Compensation
>
> As noted above, our compensation programs reward achievement of a variety of measures.  In 2012, annual incentive payments were substantially impacted by the lower net earnings and ROAE performance, with annual incentive payments for 2012 being substantially lower than those made for 2011 performance.  However, long-term business prospects, as measured by new awards, remain promising and ***our named executives received above-target VDI payments for their efforts in obtaining higher gross margins on new awards obtained during the performance period***.

*See* 2013 Proxy Statement at 22.  In 2014, when Fluor won the Citrus County and Anderson County Plants EPC contracts, Fluor executives again earned significant long-term incentive payouts despite poor revenue and shareholder return:

> ***New awards remained strong and our named executives received VDI payments that were at maximum levels*** (and substantially above those made in 2013) to reflect the company's performance against the new awards gross margin measures.

*See* 2015 Proxy Statement at 22.

157.     As indicated in the chart below, a significant portion of Seaton's and Porter's total compensation during the relevant time period was derived from long-term incentive payouts, which were tied directly to achieving "higher gross margins on new awards."

| Defendant | 2012 | 2014 |
|---|---|---|
| Seaton | $2,400,000<br><br>25% of total compensation | $2,900,000<br><br>24% of total compensation |
| Porter | $668,000<br><br>25% of total compensation[8] | $680,000<br><br>18% of total compensation |

Fluor's unusual incentive compensation plan, which directly tied a significant portion of Defendants' compensation to new contract awards regardless of how those plants performed in the future, viewed together with Defendants' actions to ensure additional contracts such as those for the Gas-Fired Plants, by artificially underestimating variables and lowballing bids, provide further indicia of scienter.

C.     **Fluor Issued Debt During the Class Period**

158.     During the Class Period, Fluor announced its intention to raise **_over $1.6 billion_** while its securities traded at prices elevated by the fraud alleged herein.

159.     In a November 18, 2014 press release and Form 8-K, signed by Porter, Fluor announced a public offering of $500 million in 3.5% senior unsecured notes maturing in 2024, pursuant to an effective shelf registration statements on file with the SEC, for the express purpose of raising funds to increase Fluor's share repurchase program by 10 million shares, with such offering to close on November 25, 2014.  In a November 25, 2014 press release, which quoted Seaton, Fluor announced that this offering had closed.

160.     Fluor disclosed an Underwriting Agreement, dated March 14, 2016, which it filed with the SEC as an exhibit to a Form 8-K filed March 15, 2016, signed by Porter, pursuant to which

---

[8]     Not including signing bonus.

it would issue and sell €500 million (roughly $556 million) of 1.750% Senior Notes due 2023, with such issuance to occur on March 21, 2016. On March 14, 2016, Bloomberg reported that Fluor marketed the bonds in Euros to take advantage of falling borrowing costs following stimulus measures by the European Central Bank. In a March 21, 2016 press release, which quoted Seaton, Fluor announced that this offering had closed.

161.    In an August 20, 2018 press release, Fluor announced that it had priced an offering of $600 million in 4.250% senior unsecured notes, maturing 2028, made pursuant to an effective shelf registration statement on file with the SEC, with net proceeds expressly to be used to redeem or repay outstanding indebtedness, which offering was expected to close on August 29, 2018.

162.    These offerings, during the fraud alleged herein, are evidence of Fluor's corporate scienter.

**D.    Fluor Was Motivated to Win Repeat Business from Dominion and Duke**

163.    Leading up to and during the Class Period, Defendants were motivated to win Duke's and Dominion's EPC business.

164.    According to CW-3 – who worked on the Brunswick County and Greensville County Plants commissioned by Dominion – Dominion was a key customer with which Fluor wanted to do repeat business. Fluor had previously lost work for Dominion, and wanted to get back in Dominion's good graces at the time it was bidding on the EPC contracts for the Brunswick County and Greensville County Plants.

165.    According to CW-5 – who worked on the Citrus County Plant commissioned by Duke – prior to awarding Fluor the Anderson and Citrus County Plants, Duke did not want to work with Fluor because of some problematic projects Duke had with Fluor in the 1990s and 2000s. CW-5 stated that Fluor was desperate to obtain Duke projects and that winning Duke projects was a focus.

- 81 -

166.    At the June 4, 2015 Credit Suisse Engineering & Construction Conference, Seaton crowed: "You've seen where we've picked up some work in gas with Duke and also with Dominion. So, I feel good about where we stand there."  At Fluor's November 13, 2014 Investor Day, McSorley highlighted the historical business relationship between Duke and the Company's corporate predecessor, Fluor Daniel, and noted that the Company "focus[es] in on some select clients, ones . . . that show the growth plans and have the wherewithal to move forward with those."  After announcing the EPC contract awards for the Anderson and Citrus County Plants, McSorley announced that the Company was "very pleased to be working with Duke" and that it aimed "to perform extremely well here and continue a long-term relationship with them."

167.    Similarly, Seaton stated on April 30, 2015:

I think it's still a competitive marketplace, but I'm comfortable with the ones that we've won.  Getting back with Duke, which was ***really, really important*** for us from a customer's perspective, has been very positive.

And then our relationship with Dominion, I think Greensville shows that we execute for them on the projects that they need.  That's a very large project that we're going to backlog next year when we get to final notice to proceed

168.    With respect to the Greensville County Plant commissioned by Dominion, Seaton went on to state: "Greensville is a very, very important win and a very large project."

169.    Defendants, therefore, were motivated to provide low-ball bids in order to win Duke and Dominion contracts and attract repeat business and to conceal that conduct from investors so as to maintain Fluor's stock price despite its risky bidding practices.

### E.    High-Level Departures and Reorganization of Power Segment Leadership and Business Model

170.    During Q1 and Q2 2017, as the Company was taking charges due to cost overruns at the Greensville, Anderson, and Citrus County Plants, Fluor announced the departure of several high-level officers.

171.    On March 8, 2017, Fluor unexpectedly announced that both Porter and Fluor's Chief Operating Officer, Peter Oosterveer, were departing the Company.  While Defendants claimed that Porter expected to retire by year-end as "part of normal succession planning," the Company had named no successor at the time and claimed there was "an ongoing search for a replacement candidate."  Porter departed *after* netting over $5.1 million in ill-gotten gains from insider sales of Fluor stock at fraud-inflated prices and *before* the fraud was fully revealed.

172.    On August 3, 2017, Fluor announced the $194 million pre-tax charge for the Gas-Fired Plants on its Q2 2017 earnings call.  During the call, Seaton also announced that Stanski would be taking Porter's position as CFO starting the following day, that Fluor would be shuttering its Charlotte office responsible for bidding the gas-fired plants, and that changes to the leadership of the Power Segment would be instituted specifically because of the issues alleged herein:

> I've discussed the problems, and now I'd like to talk about we've changed. After we had the initial charge last quarter, *we changed the Power leadership team* and brought in Simon Nottingham as the President of that group – of the Power group.  Simon comes from our oil and gas group, and he brings to this role his extensive background in project and program management.  He and his team, in coming to this role, led a review of the 3 projects in the second quarter and developed a path forward that is reflected in our current estimates.  *Some members of the Power management team have exited Fluor.  We also informed our employees that we are closing our Charlotte office and consolidating Power operations in Greenville*, where it will be closer to our other businesses and leadership.

173.    Among the members of the Power Segment management team replaced in Q2 2017 was Chris Tye – who had succeeded McSorley as President of the Power Segment in November 2015.  Although Tye became President of the Power Segment *after* Fluor was awarded the EPC contracts for the Gas-Fired Plants, Seaton explained that Tye and other Power Segment employees were replaced because of the bidding issues associated with those Gas-Fired Plants alleged herein.

174. On May 3, 2018, after consecutive quarters recognizing additional charges on the Citrus County Plant, Seaton made the dramatic announcement that "Fluor will **discontinue the pursuit of lump-sum gas-fired power market[s]**."

### F. The Individual Defendants Personally Reviewed and Approved the Faulty Bids at Issue and Actively Monitored Construction Progress

175. During the May 3, 2018 earnings call, Seaton disclosed further forecast revisions for the Citrus County Plant and admitted the personal role he played in reviewing and authorizing the bids for the Gas-Fired Plants at issue:

> We have 4 power projects that were bid by the same management team at the same time. **And we accepted. We, being me and my management team, accepted those bids**, primarily because we just come off of a project in that market where we had bettered the [as sold] margin expectation.

176. The accounts of several confidential witnesses confirm Seaton's acknowledgement that Seaton himself and senior management at Fluor were intimately involved in the bidding process. CW-1 stated that all hard-number bids were reviewed and approved through the Executive Review Board process and the BRMF that included Seaton, the President of the Power Segment, and other senior management. Similarly, CW-3 stated that CW-3 believed project estimates were approved by senior management. CW-4 stated that bids for gas-fired plants went all the way up to Seaton for approval, and included the Executive Team, the Power Segment President, the Chief Risk Assessment Officer, and the CFO (Porter and Stanski during the Class Period).

177. Seaton personally visited the Gas-Fired Plants. For example, Fluor tweeted a picture of Seaton on site at the Citrus County Plant in January 2018. By May 2018, Seaton had conducted a close "personal review" of the Citrus County Plant and stated he would visit the site on a routine basis: "when things go bad, the boss has got to be there, and I get that. And I have been and will be as we finish this project."

- 84 -

178.    Defendants therefore had direct knowledge of, and access to, the low-quality bids and execution issues at the time they issued their false and misleading statements alleged herein.

### G.    Fluor's Judicial Admissions in Ongoing Litigation Concerning the Brunswick and Citrus County Plants

#### 1.    The *Mitsubishi* Lawsuit

179.    On September 13, 2017, Fluor filed the *Mitsubishi* Lawsuit.  Fluor alleges breach of contract and seeks liquidated damages due to alleged deficiencies and delays in Mitsubishi's delivery of turbine components for the Brunswick County Plant.

180.    On July 31, 2012, upon execution of the EPC contract between Fluor and Dominion for the Brunswick County Plant, Dominion partially assigned its TSA with Mitsubishi to Fluor. Among the rights under the TSA that were assigned to Fluor were liquidated damage provisions whereby Mitsubishi would be liable for certain specified damages for each day that certain turbine components were delivered past the required delivery date.

181.    As alleged by Fluor, "[b]y April 2014, Mitsubishi had already begun failing to meet the Minor Component delivery schedule it had accepted in the TSA." *Mitsubishi* Lawsuit, ECF No. 1, ¶23.  In addition to the late deliveries, Fluor claims "the deliveries evidenced a complete lack of quality control . . . thereby requiring Fluor to expend substantial time and effort locating the components required for the current construction activities then underway." *Id.*, ¶24.

182.    Fluor claims that the "late and mis-labeled deliveries continued and worsened, which delayed Fluor's progress under the EPC contract and exposed it to the liquidated delay damages provided therein." *Id.*, ¶26.  In order to avoid the imposition of liquidated damages from Dominion, "Fluor was forced to accelerate the construction process at great additional cost" and to "create a special team to . . . identify[] late deliveries and implement[], at great additional cost, corrective action or 'work arounds' to eliminate or mitigate their adverse impact" on the Brunswick County Plant project.  *Id.*, ¶¶27-28.  Fluor claims that it was forced to continue these "extraordinary

- 85 -

measures" for the duration of the project, but that "its efforts did not succeed entirely." *Id.*, ¶29. Fluor states that the deficient turbine component deliveries "had a material impact on the progress of Fluor's engineering, erection, or installation under the Project Schedule." *Id.*, ¶30.

183.    On March 18, 2016, Fluor sent a letter to Mitsubishi demanding $207,750,000 in liquidated damages. *See Mitsubishi* Lawsuit, ECF No. 17 at 6-7. Fluor had initially warned Mitsubishi on April 22, 2014 that a claim for liquidated damages would begin accruing from January 11, 2014. *Mitsubishi* Lawsuit, ECF No. 1, ¶25.

184.    Significantly, Mitsubishi has denied the substance of Fluor's allegations referenced above, and filed a counterclaim of defamation against Fluor for the following statement made by Seaton on the August 3, 2017 earnings call:

> All 3 projects, 4 if you include ***the Brunswick project*** that incurred a charge in 2015, had a fundamental problem.  The projects did not meet the original baseline assumptions due to improper estimating, craft productivity and ***equipment issues***. All of these projects were bid in 2014 by the same pursuit team.  In addition, all 4 projects ***were based on next-gen turbines or steam generators*** that were first of a kind for Fluor. ***The quality control and completeness of these turbines delivered to the site were not in line with our bid assumptions and we are pursuing our options***.

*See Mitsubishi* Lawsuit, ECF No. 17, ¶15.

185.    On June 15, 2018, the judge presiding over the litigation denied Fluor's motion to dismiss Mitsubishi's defamation counterclaim.

## 2.    The *Duke* Lawsuit

186.    On January 29, 2019, Fluor filed the *Duke* Lawsuit.  Fluor seeks a declaratory judgment and an award of damages due to Duke's draw down of a $67 million letter of credit and refusal to pay invoices in connection with cost overruns incurred at the Citrus County Plant. *See Duke* Lawsuit, ECF No. 1.

187.    The October 15, 2014 EPC contract between Fluor and Duke for the Citrus County Plant contained multiple performance guarantees, such as dates for Guaranteed Mechanical

Completion and Guaranteed Substantial Completion, backed by liquidated damages provisions. Pursuant to the terms of the EPC contract, Fluor provided Duke with a $67 million letter of credit that Duke would be entitled to draw down in the event that Fluor "failed to fulfill certain of its obligations under the Agreement." *Duke* Lawsuit, ECF No. 1, ¶27.

188.    There were numerous delays and cost overruns in the course of the Citrus County Plant construction execution.  For example:

(a)    The original Baseline Schedule for the project called for a Guaranteed Mechanical Completion Date of December 1, 2017 for Power Block 1.  However, prior to November 2017, it was apparent that the "[t]he Project was delayed" and, as a result, Fluor was forced to sign a change order that pushed back the Guaranteed Mechanical Completion deadline by three months. *Duke* Lawsuit, ECF No. 17 at 9.  On November 14, 2017, Fluor and Duke entered into Change Order No. 51 to extend the Guaranteed Substantial Completion and Guaranteed Mechanical Completion dates for Power Blocks 1 and 2.  *Id.*

(b)    "Change Order 051 did not have the desired effect" and "the Project continued to lag." *Id.*  As a result, Fluor and Duke entered into Change Order No. 59 on April 6, 2018, which again extended the Guaranteed Substantial Completion and Guaranteed Mechanical Completion dates for Power Blocks 1 and 2.  *Id.*

(c)    As explained by Duke, construction of the Citrus County Plant "ha[d] not gone well" and, by late spring 2018, "Fluor was facing well over $100 million in liquidated damages, with that number growing daily."  *Id.* at 1, 9.

(d)    The delays continued, and Fluor "failed . . . to achieve the Guaranteed Mechanical Completion Dates set forth in Change Order No. 59 and was late by approximately 6 months for each power Block."  *Duke* Lawsuit, ECF No. 1, ¶37.

- 87 -

(e)     Fluor has admitted that the Citrus County Plant resulted in "twice the amount of labor to complete the items as compared to our forecast." ¶220, *infra*. According to Duke, "Fluor's productivity reports confirm these assessments." *Duke* Lawsuit, ECF No. 17-5 at 3.

(f)     According to Duke, there were numerous "well-documented delays on the project." *Id.*

(g)     The delays necessitated costly workarounds. "Significant work was, by necessity, being performed on both power blocks simultaneously, which was not planned and would never have occurred had schedules been met" and "the agreed milestone dates . . . been achieved." *Id.* "Such stacking in many instances required . . . more manpower, more materials and equipment (because they were being utilized simultaneously rather than sequentially)." *Id.*

189.    On July 9, 2018, Fluor and Duke entered into Change Order No. 73 in which "Fluor requested relief" from the outstanding liquidated damages that had accrued. *Duke* Lawsuit, ECF No. 17 at 9. Change Order No. 73 provided that so long as both Power Blocks went into service prior to December 31, 2018, Duke would agree to waive all otherwise claimable liquidated damages incurred under the EPC contract. *Id.* at 9-10. Fluor would still be liable for certain "additional costs incurred by Duke Energy due to the failure to meet the agreed milestone dates previously set forth" in the EPC contract and Change Order No. 59. *Id.* at 10.

190.    On December 21, 2018, Duke sent Fluor an invoice for approximately $109 million of "additional costs" incurred by Duke due to Fluor's delays on the Citrus County Plant. *Duke* Lawsuit, ECF No. 1, ¶38. Fluor and Duke could not resolve their disputes concerning the amount and supporting documentation of Duke's demand and, on January 8, 2019, Duke drew down the full amount of the $67 million letter of credit provided by Fluor. *Id.*, ¶49. In doing so, Duke certified to Fluor's bank that Fluor had "failed to fulfill certain of its obligations" under the EPC contract. *Id.*, ¶50. Duke also refused to pay approximately $34 million in Fluor invoices, "claiming the right to

offset the amounts due Fluor against the balance due on Duke[]'s $109 Million Invoice." *Id.*, ¶78. Duke describes these actions as "interim protective relief" for the additional costs owed to it by Fluor under Change Order No. 73. *Duke* Lawsuit, ECF No. 17 at 2.

      **H.**    **The Magnitude and Frequency of the Charges**

    191.    Over the course of the Class Period, the Company recognized ***$496 million*** in pre-tax charges and/or losses due to forecast revisions and cost overruns at the Gas-Fired Plants.

    192.    As reported in the Company's 2018 Form 10-K, in 2015 the Company recognized "a pre-tax loss of $60 million (or $0.26 per diluted share) resulting from forecast revisions" for the Brunswick County Plant.  In 2017, the Company recognized "pre-tax charges totaling $260 million (or $1.18 per diluted share) resulting from forecast revisions for estimated cost growth" at the Greensville County, Anderson County, and Citrus County Plants.  In 2018, the Company recognized "pre-tax charges totaling $188 million (or $1.02 per diluted share) resulting from forecast revisions for estimated cost growth" at the Citrus County Plant.[9]

    193.    These pre-tax charges were a near-constant occurrence for the Company towards the end of the Class Period, as Defendants' fraud was incrementally revealed through a series of partial corrective disclosures.  Indeed, the Company recognized the pre-tax charges referenced above in six of the last seven quarters of the Class Period – during Q1-Q4 2017 and Q1-Q3 2018.

    194.    The magnitude and frequency of the pre-tax charges serve as further proof of Defendants' direct knowledge of the bidding and execution issues at the Gas-Fired Plants.

## VIII.   LOSS CAUSATION

    195.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss.  Plaintiffs' claims for securities fraud are asserted

---

[9]    $176 million of the $188 million in pre-tax charges were recognized in the first three quarters of 2018, *i.e.*, during the Class Period.

under the fraud on the market theory of reliance.  The markets for Fluor common stock were open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants made false and misleading statements by misrepresenting Fluor's bidding process and project execution.  Defendants' conduct artificially inflated the price of Fluor common stock and operated as a fraud or deceit on the Class (defined below).

196.    The Class Period inflation in Fluor's stock price was removed when information concealed by Defendants' false or misleading statements was revealed to the market.  The information was disseminated through a series of partial disclosures that slowly revealed the nature and extent of Fluor's underbids and problems related to the Gas-Fired Plants.  These disclosures, as more particularly described below, removed artificial inflation from Fluor common stock, causing economic injury to Plaintiffs and other members of the Class.

197.    The corrective impact of the partial disclosures during the Class Period alleged herein, however, was tempered by Defendants' continued false and misleading statements, including that issues with individual plants were one-off, contained events and were not caused by systemic issues with Fluor's bidding and execution.  Defendants' continued misrepresentations maintained the price of Fluor common stock at a level that was inflated by fraud, inducing members of the Class to continue purchasing shares in Fluor even after Defendants' partial disclosures.

198.    None of the partial disclosures was sufficient on its own to fully remove the inflation from Fluor's stock price because each only partially revealed the nature and extent of the bidding and/or execution issues.  During the Class Period, the price of Fluor common stock declined as a result of these partial disclosures of truth and the materialization of the risks concealed by Defendants' misrepresentations and omissions.

199.    The disclosures that corrected the market price to eliminate the inflation maintained by Defendants' fraud are detailed below.  The following stock price declines are not necessarily

comprehensive since fact and expert discovery are not complete.  These stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific non-fraud factors.

200.    Partial disclosures relating to improper bidding and construction execution issues with Fluor's gas-fired power plant projects began to enter the market on July 30, 2015, when Fluor released its Q2 2015 financial results.  On that date, Fluor announced that it missed its Q2 2015 earnings estimates and lowered its 2015 full year earnings guidance range from $4.40 to $5.00 per share to $4.05 to $4.35 per share.  The decline in earnings was partially attributed to a $10 million loss in Fluor's Power Segment. The Form 8-K, signed by Porter, attached a press release issued on July 30, 2015, stating: "Segment profit results for the quarter reflect reduced contributions from renewable and gas-fired facilities."  Fluor's Form 10-Q for Q2 2015, filed the same day and signed by Porter and Smalley, noted: "Segment profit margins declined in the current year periods due to the increase in NuScale expenses and *reduced contributions from the large gas-fired power plant in [Brunswick County,] Virginia*."

201.    As a result, when the market opened the next day, July 31, 2015, the price of Fluor common stock dropped and ultimately closed at $46.75, which was 8.15% lower than the previous closing price on high trading volume.

202.    However, Defendants' statements caused analysts to discount the Power Segment's loss.  For example, in the same section of the July 30, 2015 Form 10-Q discussing the Power Segment's $10 million Q2 2015 loss attributable, in part, to losses at the Brunswick County Plant project, Fluor reassured investors that revenue was up "principally due to increased project execution activities for a large gas-fired power plant in Virginia and several projects in the early stages of project execution, including two large gas-fired power plants in [Anderson County,] South Carolina

and [Citrus County,] Florida."  Seaton also minimized the Power Segment's losses on Fluor's after-

hours July 30, 2015 earnings call:

> *There's numerous gas-fired combined-cycle plants being planned, and
> we're focused on a lot of them*.  We've got three we're working on right now in
> varying stages – two with Duke and one with Dominion that the final notice of
> receipt on that project's not even in backlog yet.  *I would argue that there's 10 to 20
> on the books that will happen over the next probably five years*, or at least they will
> go to a limited notice to proceed in the next five years.  *I think we've got a good,
> solid earnings stream ahead of us in terms of gas plants*, and the replacement of
> some of the coal float that's been planned.
>
>            \*       \*       \*
>
> You're in the early stages of those projects, but *you'll start to see them grow over
> the next few quarters*.  Clearly, they're lump-sum projects, as well.  You'll see *a
> little back-end loading* in terms of drop in profit to the bottom line on those.

Porter added:

> [Y]ou really need to look at the power margins with and without New Scale.  The
> new scale expenses are what creates the fluctuation there.  *Without those, the power
> margins are positive, and we would expect them to stay positive*.

203.    Defendants' continued false and misleading statements had their intended effect.  For

example, Deutsche Bank's July 31, 2015 report highlighted that "power gen pipeline consist of 10-

20 projects that could move forward in next 5 years."  KeyBanc's July 31, 2015 report concluded

that "power revenues while up sequentially, fell short of our expectations – *we would not read too*

*much into the shortfall* other than our estimate was off on the ramp of backlogged projects.  We

gauge recent projects wins to help the ramp into next year."  Jefferies' August 11, 2015 report states,

"Commentary [on Fluor's Q2 2015 call] around the outlook for power was *favorable* with additional

gas-fired plant awards expected in 2H15."  As a result, Fluor's stock price remained artificially

inflated following these disclosures.

204.    On February 18, 2016, Fluor issued its Q4 2015 financial results on Form 10-K,

which reported that Power "Segment profit in 2015 included a *loss of $60 million (including the*

*reversal of previously recognized profit) resulting from forecast revisions for the gas-fired power*

- 92 -

*plant in Brunswick County, Virginia*."  On the earnings call, Seaton stated that the Brunswick County Plant was "basically done, it's in final throes.  The biggest issue is start-up condition where you introduce lube oil and you recycle lube oil and you make that change.  The suppliers' program and what we were told by the customers said it took 45 days and it took us 90."

205.    As a result of the February 18, 2016 disclosures, Fluor's stock price dropped to a low of $42.41 and closed 2.32% down on heavy trading volume.

206.    Defendants, however, again reassured the market that the issues encountered on the Brunswick County Plant were limited and reasserted the Company's purportedly disciplined risk management approach.  For example, Seaton stated, "I said in the last call that we – we had it under control, and there were no losses, so I'm not going to say it again.  But we're ready to start this thing up. So I don't really anticipate anything that we haven't anticipated happen now."  Analysts took note.  For example, Credit Suisse in its February 19, 2016 report noted Fluor's statement that "the [Brunswick] project is now at mechanical completion" and that "FLR should not see additional one-time expenses moving forward."  As a result, Fluor's stock continued to trade at artificially inflated prices following the February 18, 2016 disclosures.

207.    On May 4, 2017, Fluor issued a Form 10-Q for Q1 2017 disclosing a $30 million loss driven "primarily for a gas-fired power plant in South Carolina [*i.e.*, the Anderson County Plant]."  On Fluor's earnings call held after market hours later that day, Seaton claimed that these costs were "[un]expected."

208.    On the next trading day, May 5, 2017, Fluor's common stock fell to a low of $46.53 – down 8.04% down from the prior close – and closed the day 4.78% down on high trading volume.

209.    Despite this revelation, in response to an analyst's question regarding the Anderson County Plant, Seaton stated that the loss could be reversed: "Well, the South Carolina project is

- 93 -

nearing completion, and there are some issues there that I really don't want to talk about *because we've got some opportunities, hopefully, to maybe reverse some of that*."

210.   Many analysts noted the charge but, based on management's comments, also reported that the cost increase at the Anderson County Plant was a one-time event that could be recovered. For example, Wells Fargo's May 5, 2017 report noted that "II&P (Industrial, Infrastructure and Power) segment margin declined to 0.8% (from 1Q17 4.5% and 4Q16 5.9%) primarily due to a $30M pre-tax charge for unanticipated cost increases on a gas powerplant project." Credit Suisse wrote in their May 5, 2017 report: "The SC plant is largely complete today and *FLR sees the potential for cost recovery*." Because of Defendants' continued false or misleading statements, the market continued to price Fluor's stock at artificially inflated levels.

211.   On August 3, 2017, Fluor filed its Q2 2017 Form 10-Q, which reported a $194 million charge due to forecast adjustments related to three gas-fired power projects:

> Segment profit in the Industrial, Infrastructure & Power segment for the three and six months ended June 30, 2017 was adversely affected by pre-tax charges totaling $194 million (or $0.89 per diluted share) and $219 million (or $0.99 per diluted share), respectively, resulting from forecast revisions for estimated cost growth at three fixed-price, gas-fired power plant projects in the southeastern United States.

Fluor's press release, attached to a Form 8-K signed by Porter and filed August 3, 2017, stated:

> As a result of the charge in Industrial, Infrastructure & Power, and, to a lesser extent the wind down of the V.C. Summer Nuclear Station project, the Company is revising its 2017 guidance for EPS to a range of $1.40 to $1.70 per diluted share, from the previous range of $2.25 to $2.75 per diluted share.

212.   On August 3, 2017, Defendants also disclosed that the charges Fluor was taking on the gas-fired plants stemmed from the same issues across the plants and not one-off issues specific to each plant. On the Q2 2017 earnings call, held after market hours later that day, Seaton announced that the CFO, Porter, was being replaced by Stanski and provided insight into the cause of the charges:

- 94 -

I want to start our call today discussing the issues we are experiencing in our Industrial, Infrastructure & Power segment, specifically the concerns on 3 gas-fired projects currently under construction. ***All 3 projects, 4 if you include the Brunswick project that incurred a charge in 2015, had a fundamental problem. The projects did not meet the original baseline assumptions due to improper estimating, craft productivity and equipment issues***. All of these projects were bid in 2014 by the same pursuit team. In addition, all 4 projects were based on next-gen turbines or steam generators that were first of a kind for Fluor. The quality control and completeness of these turbines delivered to the site were not in line with our bid assumptions and we are pursuing our options.

*       *       *

Some members of the Power management team have exited Fluor. We also informed our employees that we are closing our Charlotte office and consolidating Power operations in Greenville, ***where it will be closer to our other businesses and leadership***.

As we do periodically with all of our markets, we're in the middle of reassessing the gas-fired power market to determine where there are opportunities or returns consistent with our expectations and long-term experience. The power market is extremely competitive. And unfortunately, we are not immune to the challenges others have seen in this segment of the power industry. We will only participate in this market if we believe we can achieve appropriate risk-adjusted returns. ***Now every aspect in this market is being reviewed by the team through a different set of lenses***.

In addition to the changes in management of Power group, our strategic evaluation of the gas-fired power market, ***we're also implementing other changes to give us greater confidence that these types of earnings adjustments are diminished and less frequent***.

*       *       *

Well, historically, [Power] has provided good profitability for us. I mean, Oak Grove, LCRA, I mean, I can list dozens of projects that have been very positive. But your point's well taken. ***In the aggregate, it drops pretty dramatically when you write off 3 projects like this. So I understand your point***. I think the other comment I'd make is that the power market is basically 100% – or not 100%, 90% fixed priced. And we do have a good position in that and we do have great resources that are executing with excellence. It's just a situation where I think we had a team that ***made some serious mistakes on 4 projects that all hit at one time***, particularly when we bring in a new management team and they look at what they've been given. So I think we've got some work to do in terms of what that is. But I would also – I think, to your point, very few of our competitors have made their expected profitability on gas-fired power plants. ***And I would argue that our customers believe in a certain cost per kilowatt that does not exist***. So I think that everybody in the industry needs

- 95 -

to kind of sharpen their pencil and look at this market through a different set of lenses.

            *      *      *

Well, as I said, I've changed some organization, not just the Power stuff. I've changed up some of the other organization and flattened it. And I can tell you that we're looking at all of our projects in making sure that we don't have issues. *I would argue that the lion's share of our lump-sum backlog is performing extremely well.* And that's about as far as I really want to go with that. But we're improving our tools and systems. We – as I said, *we've changed the review process to where there's more cold eyes review*. And I feel reasonably good about where we are. I think I'd point you back to some of my comments on these Power projects. It's really contained in 1 segment of the power market. And as I said, all 4 of those projects were bid at a time when *we didn't have good information on the new first-of-a-kind equipment, nor did we really have a good handle on the level of skill and number of craft employees that we would have available to us in some of these locations*.

            *      *      *

Well, just – let's be specific. *I said we were looking at the gas-fired power market*, and we were looking at it from a Fluor perspective. No messages to anyone intended. And if they took them that way, I apologize. Because that – we're looking at ourselves in terms of what we need to do. We just – *I don't think it's going to take long. I think that my expectation, and I've kind of coined this phrase, is flawless personal performance*. And what that – it doesn't mean I'm looking for perfection, but what it does mean I'm looking for is accountability and execution excellence. And we started that process when we found the problem in the CPChem, and we're continuing to do those reviews and make the changes necessary so that we don't have a repeat of what we've had here. And I'm – I can tell you that – *I guess that we've dinged our credibility with you guys and we got to rebuild that*. And I can commit to you that we're going to do everything we can to regain that trust. *But I don't think it's going to take long for us to kind of right the ship based on these losses and continue to perform*. As I said, we perform over 1,000 projects at any given time. And the vast majority of them are performing at or above our expectations. And in this case, we had 3 bad apples and I'll go ahead and give Jamie her due, *one, was a double-dip in the apple bucket*. And then we had one in infrastructure and in CPChem. I get where we are in your eyes, and we've got some work to do to change that.

213.    As a result of Fluor's aftermarket disclosures on August 3, 2017, the Company's

common stock opened 7.27% down on August 4, 2017 and continued declining on very high trading

volume, closing at $40.06 – down 8.66% – from the previous closing price. On August 15, 2017,

Moody's downgraded Fluor's senior unsecured bond rating to Baa1 from A3 because "operating

results have deteriorated materially," noting that the Power Segment's "income declined to a loss of $102 million for the LTM period due to charges on three gas-fired power plant projects related to improper estimating, craft labor productivity and equipment issues." Fluor's stock continued to slide in August and hit a Class Period low of $37.04 on August 21, 2017.

214.     Defendants, however, also falsely assured the market that the issues were limited and contained, stating that the problems were "not systemic" and that Fluor was not exiting the gas-fired plant construction business. Defendants claimed that "you really don't know where the issues are going to raise their heads until you're at about 40% – 30% to 40% construction progress." Defendants went on to state: "I would argue that the things that we've done, the changes we've made, the people we've got looking at these programs and projects give me greater confidence that we can perform as we expect." Defendants falsely reassured investors that "we do have a good position in that and we do have great resources that are executing with excellence." As a result, Fluor's common stock price continued to be artificially inflated.

215.     On May 3, 2018, Fluor filed its Q1 2018 Form 10-Q, which reported that the Power Segment's profit "during 2018 was adversely affected by forecast *revisions of approximately $125 million (or $0.69 per diluted share) for estimated cost growth for a fixed-price, gas-fired power plant project*," *i.e.*, the Citrus County Plant. Fluor also disclosed that it was "*in the process of exiting the gas-fired power plant market* and does not intend to offer engineering, construction and procurement services for new build projects once its existing contracts are completed." As a result of this charge, Fluor announced a first quarter net loss of $18 million, or $0.13 per share. In addition, in a press release filed on Form 8-K on May 3, 2018 and signed by Stanski, Fluor lowered its 2018 full-year guidance to a range of $2.10 to $2.50. On the Q1 2018 earnings call, held after market hours on May 3, 2018, Seaton stated:

Let's start off by discussing the challenges that we are experiencing on the same gas-fired power project we discussed last quarter and the steps we're taking to complete this project and in Fluor's participation in the specific end market. *Craft productivity and estimating were materially different than the original baseline expectations* we made in the initial charge on this project last year. While those factors were included in our initial charge, *the majority of the $125 million charge taken this quarter is driven by extremely low ongoing productivity* and the financial impact that this has relative to initial expected timing of when the 2 units would be available for power production based on the current outlook. As of last week, this project is 86% complete with an expected completion date in Q4 of this year.

Last August, we made a number of changes to our power business. This included in – bringing in new leadership, removing certain executives and closing our power operation office in Charlotte. I also stated that we were in the process of assessing the gas-fired market to determine if there are opportunities for risk-adjusted returns that are consistent with our expectations and long-term experience. I'd like to share with you the outcome of our review and the further actions that we are taking. I'm going to ask everyone to pay close attention.

The U.S. power consumption growth rate is less than 1%. The power produces – producers do not really need additional capacity, other than satisfying regional needs. *We, the industry and the entire E&C community have led our clients to believe that a gas-fired power project costs approximately 650 kilowatts – $650 per kilowatt, although virtually no one has delivered one for that value. The customers start at that figure and negotiate downward, and there's always some contractor that is willing to say okay to lower number, using some excuse to justify the win, Fluor included*.

We have had 12 gas-fired power projects since 2003. *10 of the 12 have underperformed our as-sold expectation, with 3 suffering losses*. Competition, both public and private had, had similar experiences, *with no current projects performing as expected*. Some industry leaders think these are cookie-cutter projects, but they are not. These projects have different machines, different site locations, different labor pools, all of which produce different outcomes. Craft labor in this case has been the major issue.

Therefore, Fluor will discontinue the pursuit of lump-sum gas-fired power market from the end of Q1.

216.     When asked by an analyst about the charges taken by Fluor over the prior years and Fluor's decision to exit the gas-fired power business, Seaton admitted that there were "*fatal flaws in the bidding process of all of those projects*, and there were execution issues that weren't properly covered."

- 98 -

217.    As a result of these disclosures, on May 4, 2018, Fluor stock fell 22.43% on very high trading volume, closing at $45.76.  The following trading day, May 7, 2018, Fluor stock fell another 2.78% to close at $44.49.

218.    Despite the negative news announced on May 3, 2018, Defendants continued to falsely assure the market that the problems were contained and fully accounted for:

> Despite a disastrous quarter and our disappointment, I'm really excited about the future.  No one's more disappointed than I am relative to where we are on a very finite sample of projects.  ***And we do know where the end is, and we believe we've captured that***.  But I think again, we're in a multiyear, multiindustry growth mode.  And in the past, you've seen Fluor outperform our competition and grow significantly.  And I think we're poised to do so.  And I think ***the new approaches that we're applying give us better visibility in how those executions are going to be performed***.  I appreciate your interest in our company, and I wish you a good day.

219.    Analysts took note of Defendants' false assurances.  Morningstar in their Stock Strategist section on their website stated on May 9, 2018:

> We believe the recent drop in Fluor's (FLR) share price ***is an overreaction*** to disappointing first-quarter results. . . .  Fluor reported a cost overrun at a gas-fired Florida power project and a $1.00 reduction in its 2018 earnings per share outlook to $2.10-$2.50.  ***We believe the cost issue is specific to the project and the region and does not impair Fluor's broader project portfolio***.

Additionally, in a slide presentation titled Investor Overview dated May 12, 2018, Fluor stated that "***[t]he underperforming gas-fired projects have been de-risked*** and the company has discontinued participation in the fixed-price gas-fired power market."  Morningstar in their May 22, 2018 report reiterated that they believed "Fluor's 22% decline in share price to $45.76 on May 4 was mainly due to a cost overrun at a gas-fired Florida power project" and that the "cost issues are specific to the project and the region and do ***not*** impair the broader project portfolio."  Barclays in their May 28, 2018 report wrote, "[t]he most recent power charges have raised eyebrows amongst investors, and ***FLR sees the worst as behind them***."

220.    On October 10, 2018, Fluor announced its preliminary financial results for Q3 2018 in a press release filed on Form 8-K.  The results included an additional charge for "$35 million for

- 99 -

forecast revisions on a gas-fired power project in Citrus County, Florida." On the earnings call, held after market hours on October 10, 2018, Seaton stated that the Citrus County Plant continued to consume "twice the amount of labor to complete the items as compared to our forecasts" and indicated that Fluor would issue revised guidance on the forthcoming Q3 2018 earnings call. Seaton further disclosed:

> *These projects, the Power project specifically, were bid at a time by a bidding team that did not follow the rules. Those people are no longer in our company. And so the review processes have been changed accordingly*.

221.    As a result of these revelations, on October 11, 2018, the price of Fluor common stock dropped 17.24% to close at $46.53 on extremely high trading volume.

222.    The chart below shows Fluor's stock price during the Class Period and the dates of Defendants' disclosures:



## IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

223.    Plaintiffs and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because, during the Class

Period, the material misstatements and omissions alleged herein would induce a reasonable investor to misjudge the value of Fluor common stock and without knowledge of the misrepresented or omitted material facts, Plaintiffs and other members of the Class purchased or acquired Fluor common stock between the time Defendants misrepresented and failed to disclose material facts about their business operations and financial prospects, and the time the true facts were disclosed. Accordingly, Plaintiffs and the other members of the Class relied, and were entitled to have relied, upon the integrity of the market for Fluor common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements during the Class Period.

224.     At all relevant times, the market for Fluor common stock was efficient for the following reasons, among others:

(a)     Fluor common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b)     As a regulated issuer, Fluor filed periodic public reports with the SEC; and

(c)     Fluor regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

225.     Plaintiffs and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

- 101 -

X.   **THE STATUTORY SAFE HARBOR DOES NOT APPLY TO
     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
     MATERIAL OMISSIONS**

226.    The statements alleged herein to be false and misleading are not subject to the

protections of the Private Securities Litigation Reform Act of 1995's ("PSLRA") statutory Safe

Harbor for forward-looking statements because: (a) they are not forward-looking; (b) they are

subject to exclusion; or (c) even if purportedly forward-looking, Defendants cannot meet the

requirements for invoking the protection, *i.e.*, identifying the statements as forward-looking and

demonstrating that the statements were accompanied by meaningful cautionary language.  Many of

the statements were misleading in light of omissions of material present or historical facts and cannot

be considered forward-looking.

227.    Under the PSLRA's statutory Safe Harbor for written statements, a forward-looking

statement is protected if it is: (a) identified as such; and (b) "accompanied by meaningful cautionary

statements."   15  U.S.C.  §78u-5(c)(1)(A)(i).   An oral forward-looking statement must be

accompanied by an oral cautionary statement that it is forward-looking, that actual results may differ

materially, and that additional information concerning risk factors is contained in a readily available

written document.  In addition, the oral statement must: (a) identify the written document, or portion

thereof, that contains such factors; and (b) the referenced written document must contain meaningful

cautionary language.  15 U.S.C. §78u-5(c)(2)(B).

228.    The Safe Harbor excludes from protection all forward-looking statements that are

included in financial statements purportedly prepared in compliance with Generally Accepted

Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K.  15 U.S.C. §78u-

5(b)(2)(A).

229.    Statements of historical fact, current condition, or a mixture thereof are not "forward-

looking" and thus not protected by the Safe Harbor.

- 102 -

230.    To the extent any of the statements were identified as forward-looking statements, they do not fall within the protections of the Safe Harbor because they lacked specific, meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  A warning that identifies a potential risk, but implies that such risk had not materialized – *i.e.*, states that something might occur but does not state that something actually has already occurred – is not meaningful and does not fall within the protections of the Safe Harbor.

231.    Meaningful risk disclosures must also be substantive and tailored to the forward-looking statement they accompany.  Many of Defendants' purported risk disclosures remained unchanged over the course of the Class Period, despite the fact that such risks had in fact materialized, which change in circumstance was material to the reasonable investor.  Defendants' risk disclosures were therefore neither substantive nor tailored and do not satisfy the requirements of the Safe Harbor.

232.    Nor were the historic or present-tense statements made by Defendants assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

233.    Defendants' alleged forward-looking statements also do not fall within the protections of the Safe Harbor because they had no reasonable basis.  Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of Fluor, who knew that those statements were false or misleading when made.

- 103 -

## XI.    CLASS ACTION ALLEGATIONS

234.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons who purchased or otherwise acquired Fluor common stock during the Class Period (the "Class").  Excluded from the Class are Defendants; members of the immediate families of the Individual Defendants; Fluor's subsidiaries and affiliates; any person who was an officer or director of Fluor during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

235.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Fluor common stock was actively traded on the NYSE, the largest stock exchange in the world.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  During the Class Period, the number of outstanding shares of Fluor common stock ranged from 139 million to more than 161 million.  Record owners and other members of the Class may be identified from records maintained by Fluor or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

236.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: (i) whether Defendants violated the Exchange Act; (ii) whether Defendants omitted and/or misrepresented material facts; (iii) whether Defendants knew or recklessly disregarded that their statements were false; (iv) whether Defendants made the

- 104 -

statements and omissions at issue with scienter; (v) whether Defendants' statements and/or omissions artificially inflated the price of Fluor common stock; and (vi) the extent and appropriate measure of damages.

237. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages as a result of Defendants' wrongful conduct.

238. Plaintiffs will adequately protect the interests of the Class and have retained counsel who is experienced in securities and class action litigation. Plaintiffs have no interests which conflict with those of the Class.

239. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   CLAIMS FOR RELIEF

### COUNT I
### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

240. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. Count I is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

241. During the Class Period, Defendants disseminated or approved the false statements specified in ¶¶87-89, 91, 93-105, 107-109, 112-113, 115-124, 126-128, 130-140, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 105 -

242.     Defendants and the Company's officers, management, and agents directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Fluor common stock during the Class Period.  All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

243.     Defendants and the Company's officers, management, and agents did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Fluor common stock during the Class Period.

244.     Fluor is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements made by the Company's officers and agents, as alleged above, as the maker of such statements and under the principle of *respondent superior*.

245.     The allegations above establish a strong inference that Fluor, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth about

- 106 -

Fluor's business operations and financial prospects.  By concealing these material facts from investors, Fluor's share price was artificially inflated during the Class Period.

246.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Fluor common stock.  Plaintiffs and the Class would not have purchased Fluor common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

247.     As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Fluor common stock during the Class Period.

### COUNT II
### For Violations of §20(a) of the Exchange Act
### Against All Defendants

248.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  Count II is brought pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

249.     During the Class Period, the Individual Defendants acted as controlling persons of Fluor within the meaning of §20(a) of the Exchange Act.  Fluor controlled the Individual Defendants and its other officers and employees.  By virtue of their positions and their power to control public statements about Fluor, the Individual Defendants had the power and ability to influence and control and did influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants participated in the conference calls with investors and analysts, described herein at ¶¶89, 93-100, 102-105, 107-109, 113, 116-120, 122-124, 126-127, 130-140, *supra*, and/or prepared and approved the Company's SEC filings, annual reports, and press

- 107 -

releases, described herein at ¶¶87-89, 91, 99, 101, 112, 115, 121, 128, 130-131, 135, *supra*, alleged by Plaintiffs to be misleading.

250.    In particular, Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

251.    As set forth above, Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Fluor common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiffs' counsel as Class Counsel;

B.    Awarding Plaintiffs and the members of the Class damages and interest;

C.    Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  March 8, 2019                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                         DARRYL J. ALVARADO
                                         KEVIN S. SCIARANI
                                         J. MARCO JANOSKI GRAY


                                         _____
                                         /s/ DARRYL J. ALVARADO
                                         DARRYL J. ALVARADO

                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)
                                         dalvarado@rgrdlaw.com
                                         ksciarani@rgrdlaw.com
                                         mjanoski@rgrdlaw.com

DATED:  March 8, 2019                    POMERANTZ LLP
                                         JEREMY A. LIEBERMAN
                                         MATTHEW L. TUCCILLO
                                         J. ALEXANDER HOOD II


                                         _____
                                         /s/ MATTHEW L. TUCCILLO
                                         MATTHEW L. TUCCILLO

                                         600 Third Avenue, 20th Floor
                                         New York, NY  10016
                                         Telephone:  212/661-1100
                                         212/661-8665 (fax)
                                         jalieberman@pomlaw.com
                                         mltuccillo@pomlaw.com
                                         ahood@pomlaw.com

                                         POMERANTZ LLP
                                         PATRICK V. DAHLSTROM
                                         Ten South LaSalle Street, Suite 3505
                                         Chicago, IL  60603
                                         Telephone:  312/377-1181
                                         312/377-1184 (fax)
                                         pdahlstrom@pomlaw.com

                                         Lead Counsel for Lead Plaintiffs


                                        - 109 -

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)
JAMIE J. GILMORE (Texas Bar No. 24045262)
3811 Turtle Creek Blvd., Suite 1450
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com
jgilmore@kendalllawgroup.com

Local Counsel for Wayne County Employees'
Retirement System

VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel for Wayne County Employees'
Retirement System

THE BRISCOE LAW FIRM, PLLC
WILLIE C. BRISCOE (Texas Bar No. 24001788)
3131 McKinney Avenue, Suite 600
Dallas, TX  75204
Telephone:  214/643-6011
281/254-7789 (fax)
wbriscoe@thebriscoelawfirm.com

Local Counsel for the Town of Fairfield Employees'
Retirement Plan and the Town of Fairfield Police and
Firemen's Retirement Plan

- 110 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on March 8, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ DARRYL J. ALVARADO
DARRYL J. ALVARADO

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dalvarado@rgrdlaw.com

# Mailing Information for a Case 3:18-cv-01338-S Chun v. Fluor Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  Malbert@rgrdlaw.com

- **Darryl J Alvarado**
  DAlvarado@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Willie Briscoe**
  wbriscoe@thebriscoelawfirm.com,bthompson@thebriscoelawfirm.com

- **Laurie G Flood**
  lflood@brianlauten.com

- **R Dean Gresham**
  dean@stecklerlaw.com,carol@stecklerlaw.com,lisa@stecklerlaw.com,jamie@stecklerlaw.com

- **Joe Kendall**
  jkendall@kendalllawgroup.com,administrator@kendalllawgroup.com

- **Brian P Lauten**
  blauten@brianlauten.com,mlogan@brianlauten.com

- **Danielle S Myers**
  danim@rgrdlaw.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com

- **Michael L Raiff**
  mraiff@gibsondunn.com,dthorn@gibsondunn.com,cfitzgerald@gibsondunn.com

- **Matthew L. Tuccillo**
  mltuccillo@pomlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)