UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| KIN-YIP CHUN, Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. 3:18-cv-01338-X |
| | § | <u>CLASS ACTION</u> |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| FLUOR CORPORATION, DAVID T. SEATON, BIGGS C. PORTER, BRUCE A. STANSKI, MATTHEW McSORLEY, GARY G. SMALLEY, CARLOS M. HERNANDEZ, D. MICHAEL STEUERT, and ROBIN K. CHOPRA, | § § § § § § § | |
| | § | |
| Defendants. | § § | |
| | § | <u>DEMAND FOR JURY TRIAL</u> |

**FIRST AMENDED CONSOLIDATED COMPLAINT
FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

Page

I.      INTRODUCTION AND SUMMARY OF THE FRAUD..................................................1

        A.      Fixed-Price Contracts...................................................................................4

        B.      Defendants Misrepresented Fluor's Bidding Practices and Ability to
                Execute on Fixed-Price Contracts.............................................................6

        C.      To Assuage the Market Following Disclosures Related to the Gas-Fired
                Plants, Defendants Falsely Represented that Robust Internal Controls
                Ensured Similar Problems Did Not Affect Other Fixed-Price Projects..................7

        D.      Defendants Knew or Were Reckless in Not Knowing that Their Class
                Period Statements Were False .....................................................................8

        E.      The Truth Was Revealed Through a Series of Partial Disclosures that
                Eviscerated 88% of Fluor's Market Capitalization.................................10

II.     JURISDICTION AND VENUE ............................................................................10

III.    THE PARTIES.....................................................................................................11

        A.      Plaintiffs....................................................................................................11

        B.      Defendants .................................................................................................11

IV.     RELEVANT GAAP, FINANCIAL REPORTING, AND INTERNAL PROJECT
        GOVERNANCE RULES ......................................................................................13

        A.      GAAP: Accounting Rules and Policies for Fixed-Price Projects ..........14

        B.      SOX: Internal Controls over Financial Reporting ..................................18

        C.      Fluor's Project Governance ......................................................................20

V.      FIXED-PRICE PROJECTS ..................................................................................21

        A.      The Brunswick County Plant....................................................................21

        B.      The Radford Plant......................................................................................22

        C.      The CPChem Project..................................................................................23

        D.      The Anderson County Plant.......................................................................23

        E.      The Citrus County Plant............................................................................23

Page

F.      The Greensville County Plant ..................................................24

G.      Penguins Offshore Project ......................................................25

H.      The Warren Project ................................................................25

VI.     CONFIDENTIAL WITNESS ACCOUNTS .................................................26

VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
        AND OMISSIONS DURING THE CLASS PERIOD .....................................31

A.      False and Misleading Statements and Omissions Regarding Fluor's
        Purportedly Conservative Bidding Process and Risk Management ...................31

B.      False and Misleading Statements and Omissions Regarding the Gas-Fired
        Plants ...............................................................................42

C.      False and Misleading Statements and Omissions Regarding Fluor's
        Disclosure Controls and Procedures and Its Reported Revenue ..........................56

D.      Defendants Omitted Material Information Regarding Unresolved Change
        Orders, Claims, and Client, Subcontractor, and Supplier Disputes ......................85

VIII.   DEFENDANTS ACTED WITH SCIENTER ....................................................87

A.      The Individual Defendants Personally Reviewed and Approved the Faulty
        Bids at Issue, Monitored Construction Progress, and Misstated These
        Projects Publicly ..................................................................87

B.      Fluor's Judicial Admissions Concerning Problems in the Brunswick and
        Citrus County Plants Establish the Knowing Falsity of Their Prior
        Misstatements ......................................................................90

        1.      The *Mitsubishi* Lawsuit ..................................................90

        2.      The *Duke* Lawsuit ........................................................91

C.      Defendants Knew of or Recklessly Disregarded Red Flags Rendering
        Their Accounting Statements Misleading ..............................................94

D.      The Magnitude and Frequency of the Charges Evidence Scienter .......................98

E.      High-Level Departures and Reorganization of Fluor's Leadership and
        Business Model Evidence Scienter ....................................................99

**Page**

F. The SEC and New Management Are Now Investigating Fluor's Prior Financial Reporting and Control Environment ....................................................101

G. Defendants' Motive and Opportunity to Conceal the Truth ...............................102

1. The Individual Defendants' Insider Stock Sales......................................102

    a. Seaton's Class Period Sales .......................................................103

    b. Porter's Class Period Sales .......................................................110

    c. Stanski's Class Period Sales .....................................................113

    d. Smalley's Class Period Sales ....................................................117

    e. McSorley's Class Period Sales ..................................................121

    f. Hernandez's Class Period Sales................................................122

    g. Chopra's Class Period Sales .....................................................125

2. The Individual Defendants Were Motivated to Lower Cost Estimates, Underbid Projects, and Win Projects Regardless of Enhanced Risk so as to Increase Their Compensation ...........................128

3. Fluor Was Motivated to Win Repeat Business from Dominion and Duke Even if Doing so Required Underbidding on Projects .................135

4. Fluor Issued Debt During the Class Period..............................................136

IX. LOSS CAUSATION..................................................................................................137

X. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE ..................................................................150

XI. THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS.........151

XII. CLASS ACTION ALLEGATIONS ...........................................................................153

XIII. CLAIMS FOR RELIEF ............................................................................................155

COUNT I For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ......................................................................................................155

- iii -

**Page**

COUNT II For Violations of §20(a) of the Exchange Act Against the Individual
        Defendants ..................................................................................................................157

PRAYER FOR RELIEF ............................................................................................................157

JURY DEMAND .......................................................................................................................158

Cases\4811-6149-9064.v2-4/2/20

Lead Plaintiffs Wayne County Employees' Retirement System, the Town of Fairfield Employees' Retirement Plan, and the Town of Fairfield Police and Firemen's Retirement Plan (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings and press releases by Fluor Corporation ("Fluor" or the "Company"), Fluor's earnings calls, Defendants' statements to analysts at presentations and conferences, media and analyst reports about the Company, statements by percipient witnesses, Fluor's stock chart, and Defendants' own Class Period and post-Class Period admissions.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION AND SUMMARY OF THE FRAUD

1.    Plaintiffs bring this securities class action on behalf of all persons who purchased or otherwise acquired Fluor common stock between August 14, 2013 and February 14, 2020, inclusive (the "Class Period"), against Fluor; David T. Seaton (Chief Executive Officer ("CEO") during part of the Class Period); Biggs C. Porter (Chief Financial Officer ("CFO") during part of the Class Period); Bruce A. Stanski (CFO during part of the Class Period); Matthew McSorley (President of the Power segment during part of the Class Period); Gary G. Smalley (Chief Accounting Officer ("CAO") during part of the Class Period); Carlos M. Hernandez (interim CEO and CEO during part of the Class Period); D. Michael Steuert (CFO during part of the Class Period); and Robin K. Chopra (CAO during part of the Class Period) (collectively, "Defendants") for issuing materially false and misleading statements and omissions during the Class Period in press releases and filings with the

SEC and in oral statements to the media, securities analysts, and investors in violation of the Securities Exchange Act of 1934 ("Exchange Act").

2.     Fluor is a multinational holding company that provides design, engineering, procurement, and construction services in a variety of industries.  Relevant to this action is Fluor's business of providing such services for large fixed-price projects, including gas-fired power plant projects and other infrastructure projects.  This securities class action arises from Defendants' misleading statements and omissions to investors regarding Fluor's bidding and construction of such projects pursuant to fixed-price contracts.

3.     During the Class Period, Defendants systematically underbid fixed-price projects in a "race to the bottom" with Fluor's competitors, while stating the very opposite – that Fluor was conservative and selective in its bidding for fixed-price projects.  When financial charges later became necessary to bring the Company's faulty bids in line with reality, Defendants falsely stated that the problems were contained and fully identified, delaying revelation as to the extent of the damage.  The dire ramifications of Fluor's bidding strategy appeared first in connection with financial charges on four gas-fired power plants in the Southeastern United States – the Brunswick County Plant in Virginia, the Greensville County Plant in Virginia, the Anderson County Plant in South Carolina, and the Citrus County Plant in Florida (together, the "Gas-Fired Plants").  By 2015, Defendants were forced to admit that Fluor was required to take financial charges related to the Brunswick County Plant, with additional financial charges occurring throughout the remainder of the Class Period related to the other Gas-Fired Plants.

4.     In connection with recognizing charges on the Gas-Fired Plants, Defendants repeatedly – in response to extensive, direct analyst questioning – assured the market that the bidding and construction execution problems causing the financial charges on the Gas-Fired Plants were not systemic throughout the Company.  Rather, Defendants repeatedly misrepresented that the

- 2 -

bidding and execution problems were contained to the Gas-Fired Plants and that only a select few projects were affected by improper bidding and execution. Defendants misleadingly announced that they understood the source of their issues and stated they had implemented corrective measures that would rectify these problems. Defendants also falsely represented that the Company had robust internal controls such that its critical accounting policies were adhered to, including performing robust quarter-end estimates of the total costs to complete each of Fluor's in-progress, fixed-price projects and accurately accounting for revenue. Defendants even stated that the Company's internal controls and risk management processes had been enhanced because of the charges on the Gas-Fired Plants.

5.      In truth, however, many of Fluor's other fixed-price projects suffered from similar bidding and execution problems. Although Defendants worked to mislead the market into believing that the ramifications from underbid contracts were contained in the gas-fired power plant market, they now admit that similar problems infected several of Fluor's other fixed-price projects, leading to an announcement on August 2, 2019 that the Company had recognized $714 million in charges related to three of the Gas-Fired Plants and other fixed-price projects. Defendants have also made admissions indicating that, contrary to their Class Period statements, their internal controls were deficient, resulting in a failure to adhere to critical accounting policies related to estimating costs and revenue, in a series of revelations extending into February 2020.

6.      Having been led to believe that the bidding and execution problems were limited to the Gas-Fired Plants and that fixed-price-related charges were fully accounted for, the market was stunned by the news that these problems were widespread. As a result of Defendants' conduct, the SEC opened an investigation into the Company's "past accounting and financial reporting, and has requested documents and information related to projects for which the Company recorded charges in the second quarter of 2019." Separately, the Company announced that it is conducting an internal

investigation of its own into its prior financial reporting, "related control environment," and "revenue recognition charges." As a result of the SEC and internal investigations, Fluor announced that it would be unable to timely file its 2019 Annual Report on Form 10-K by the end of February 2020. To date, the Company still has not yet filed its 2019 Annual Report.

### A. Fixed-Price Contracts

7. Prior to and during the Class Period, Fluor was engaged in bidding for and, if its bids were accepted, constructing large-scale projects such as power plants and other infrastructure. Bidding for these contracts was a competitive process whereby Fluor submitted fixed-price bids to the company commissioning the project in an effort to win the project. If Fluor's bids were accepted, Fluor would be named the Engineering, Procurement, and Construction ("EPC") contractor and be responsible for designing and engineering the project, procuring necessary equipment, and constructing the project, in exchange for compensation capped at the level of its accepted, fixed-price bid.

8. Defendants assured the market that Fluor was able to build projects pursuant to fixed-price contracts for its customers on time, on budget, and at a profit. This assurance was critical, because these projects were bid and constructed pursuant to fixed-price, lump-sum contracts under which Fluor committed to construct a project pursuant to specifications provided by the customer for a set amount of money. In other words, Fluor's bids, if accepted, obligated Fluor to perform all contracted activities for the fixed price identified in Fluor's bid. As a result, these fixed-price contracts were risky endeavors – if the construction schedule and costs did not proceed according to Fluor's bid, Fluor could not recover cost overruns, except in certain very limited situations, and would have to bear the cost overages.

9. Because of the risks inherent in fixed-price, lump-sum contracts, analysts and investors were intensely focused on Fluor's bidding of fixed-price projects. On nearly every

- 4 -

quarterly and annual earnings call during the Class Period, analysts asked repeatedly whether Fluor was appropriately conservative in bidding for fixed-price work.  This focus was especially acute because, leading up to and during the Class Period, many of Fluor's competitors – other EPC companies – were in a "race to the bottom" to win contracts by overly aggressive bids.

10.     To elevate Fluor's stock price, it was therefore imperative that Defendants mislead the market into believing that Fluor's bids were conservative and reliably profitable.  Accordingly, throughout the Class Period, Defendants assured the market, in response to direct questions from analysts concerning Fluor's bidding practices, that Fluor – unlike its competitors – was "**highly selective**" and "**very conservative**."  Indeed, Seaton stated that Defendants were focused on "being selective in the projects we pursue."  Similarly, Defendants in Annual Reports throughout the Class Period stated that "[m]any of our competitors may be more inclined to take greater or unusual risks or terms and conditions in a contract that we might not deem acceptable."  In response to analyst questions about the increased risk of fixed-price power plant projects, Seaton stated in no uncertain terms: "We have **not** seen our risk profile increase . . . ."  And Seaton went to great lengths to convince the market that Fluor was different than its race-to-the-bottom competitors: "[T]his is going to sound arrogant, and I don't mean it that way – we have the ability . . . to **say no** and make sure that we get projects that we want at the price we want, that allows us to earn the profitability we expect."  In contrast, Seaton explained, "there will be some folks that will do some silly things" to win business who "in a few years will . . . regret that."  The message throughout the Class Period was clear – investors need not worry about Fluor's potentially risky fixed-price business because Defendants "don't chase everything that is out there."  Rather, Seaton assured, "we have been **very conservative** in what we take in and how confident we are in that going forward."  Defendants' assurances concerning Fluor's conservative bidding process had their intended effect – Fluor's stock

- 5 -

price traded at or near its Class Period high at the time Defendants provided these assurances and when they themselves made millions in ill-gotten gains from insider transactions.

**B.    Defendants Misrepresented Fluor's Bidding Practices and Ability to Execute on Fixed-Price Contracts**

11.    Defendants' representations regarding the conservative nature of Fluor's fixed-priced bids were misleading.  Contrary to their Class Period public statements, Defendants systematically understated costs and underbid and approved fixed-priced estimates in order to win Fluor new business, which personally enriched them due to the structure of their incentive compensation packages tied to new contract awards.  The truth was that Fluor was no different than its race-to-the-bottom competitors, and Defendants were aware of this fact because they personally reviewed and approved each fixed-price bid.  Directly conflicting with the assurances they gave investors, Defendants ultimately admitted that "there's always some contractor that is willing to say okay to [a] lower number, using some excuse to justify the win, *Fluor included*."  Indeed, Defendants later admitted unequivocally that all of the Gas-Fired Plants suffered from a "fundamental problem" due, in part, to "*improper estimating*," and that there were "*fatal flaws* in the bidding process of all of those projects."  And despite Defendants' Class Period drumbeat – emphasizing repeatedly that Fluor was conservative – Defendants admitted that "*10 of the 12*" gas-fired projects undertaken by Fluor *since 2003* "have underperformed our as-sold expectation, with 3 suffering losses."  Confidential witnesses ("CWs") corroborate Defendants' admissions, describing how their estimates for required labor and equipment were routinely reduced so that Fluor could remain competitive in the bidding process.  These witnesses further explained that Fluor's projects suffered because of poor estimates and a process by which Fluor would whittle its bid down to an unrealistic "best and final" number in order to win contracts.  As CW-9 recounted, Fluor followed a "*bid it low, let it grow*" motto whereby the Company would offer lowball bids in order to win the contract, knowing that the bid amount was insufficient to complete the work under the contract.

- 6 -

12.     Throughout the Class Period, Defendants also made repeated statements concerning the construction and budget progress of the Gas-Fired Plants.  These statements, too, were misleading.  For example, in June 2014, Seaton touted Fluor's ability to install any "gas cycle regardless of what the turbine choice is," indicating that Fluor was not experiencing any turbine issues.  And in November 2014 and March 2015, Defendants told investors that the Brunswick County Plant in particular was "***on track, on schedule***" and "***on budget***."  Unbeknownst to investors, the truth, however, was that months earlier – as early as April 2014 – Fluor was experiencing irreparable delays and problems with the Mitsubishi turbines at the Brunswick County Plant.  In fact, Fluor later judicially admitted that "***[b]y April 2014***, Mitsubishi had already begun failing to meet" the delivery schedule for the components necessary to assemble the turbines and, "[i]n addition to their lateness, the deliveries evidenced a complete lack of quality control."  These problems, Fluor admitted, "forced [Fluor] to accelerate the construction process at great additional cost."

**C.     To Assuage the Market Following Disclosures Related to the Gas-Fired Plants, Defendants Falsely Represented that Robust Internal Controls Ensured Similar Problems Did Not Affect Other Fixed-Price Projects**

13.     As a result of the problems with the Gas-Fired Plants and their own involvement in Fluor's systematic underbidding, Defendants were on notice of significant red flags with respect to bidding and executions risks inherent in all fixed-price projects.  Understanding that investors feared other fixed-price projects might suffer from bidding and construction issues similar to those affecting the Gas-Fired Plants, Defendants worked to convince the market that they had robust internal controls to ensure that similar problems did not affect other fixed-price projects.  In addition to repeatedly asserting that the problems affecting the Gas-Fired Plants were not "symptomatic" and not systemic across Fluor, Defendants stated that they had enhanced their controls in order to identify problems with the Company's other fixed-price projects and confirmed that no such problems existed.  In Forms 10-Q and 10-K, Defendants certified that the Company's internal

- 7 -

controls were designed "to provide reasonable assurance regarding the reliability of financial reporting" and that the "principal executive officer and principal financial officer have concluded that our disclosure controls and procedures are effective." Seaton also stated that, because of the failures in the gas-fired market, Defendants had "significantly increased the independent review of critical projects" and "changed the review process to where there's more cold eyes review." These statements were made when Defendants knew of red flags and accounting irregularities rendering the Company's internal controls, risk management procedures, and revenue recognition practices deficient, such that they knew, or should have suspected, that their certifications and other statements concerning internal controls and risk management were misleading.

14.     Eventually, however, Defendants were forced to disclose that their bidding and execution deficiencies were not contained to the Gas-Fired Plants. Rather, those issues were endemic to Fluor's portfolio of fixed-price projects. Specifically, beginning in May 2019, the Company announced charges related to three of the Gas-Fired Plants and a large charge related to a fixed-price offshore project. Then, in August 2019, the Company took massive charges – $714 million in total – related to 3 of the Gas-Fired Plants as well as 13 other fixed-price projects. As disclosed on February 18, 2020, the SEC is now investigating these charges and the Company's past financial reporting. The Company is also conducting an internal investigation into the propriety of these charges, its prior revenue recognition, and its internal controls environment. What was initially disclosed as an issue within its Power segment, the problem with underbidding fixed-price contracts was revealed to infect every one of Fluor's business segments, causing **$1.4 billion** in financial charges.

> **D.     Defendants Knew or Were Reckless in Not Knowing that Their Class Period Statements Were False**

15.     Defendants Seaton, Porter, McSorley, and Stanski personally reviewed and approved the disastrous fixed-price bids. Following Defendants' repeated assurances that they had personally

and closely reviewed each bid and in-progress project, and after charges were taken on the Gas-Fired Plants, Defendants were presented with even more red flags alerting Defendants that the Gas-Fired Plants and other fixed-price contracts were underbid and that additional financial charges were necessary. Defendants consistently spoke about Fluor's purportedly conservative bidding process on nearly every single earnings call throughout the Class Period, demonstrating that the topic was a primary market concern and high on Defendants' radar and that Defendants knew or were reckless in not knowing the truth – that Fluor's bids were not conservative and were in actuality far below necessary levels.

16.    Defendants were also motived to underbid contracts and misrepresent the true state of affairs with Fluor's fixed-price projects. For example, as Fluor's stock price was artificially inflated by Defendants' misstatements and omissions about Fluor's bidding and its growing portfolio of underbid fixed-price contracts, the Individual Defendants accumulated more than *$34 million* in net gains from illicit insider sales before the truth was revealed. Fluor itself also raised *$1.6 billion* in offerings while its securities were inflated by the alleged fraud. The Individual Defendants also had an unusual incentive compensation structure whereby they were rewarded for winning new business, regardless of how the plants performed in the future. In other words, by winning contracts with low bids, Defendants created artificially high expected profit margins for projects and correspondingly high present-day incentive compensation for themselves. Notably, in the wake of this fraud, Fluor has reversed this perverse incentive, and now bases incentive compensation on performance, not merely volume. Defendants were also desperate to win and maintain business from Duke Energy ("Duke") and Dominion Virginia Electric and Power Company ("Dominion"), the customers that commissioned the Gas-Fired Plants. According to a CW-3, Dominion was a key customer from which Fluor wanted to win repeat business after having previously lost its work, while Duke had not worked with Fluor since some problematic projects in the 1990s and 2000s. Thus, despite stating to

- 9 -

investors that they were conservative, did not engage in a race-to-the-bottom with their bids, Defendants knew that their bids were not conservative and, instead, were very risky.

**E.     The Truth Was Revealed Through a Series of Partial Disclosures that Eviscerated 88% of Fluor's Market Capitalization**

17.     When the effects of Defendants' woefully underbid contracts and the true extent of the Company's failure with respect to fixed-price contracts could no longer be concealed, investors were blindsided with a series of charges and adverse disclosures related to the Gas-Fired Plants and other fixed-price contracts.  Beginning in July 2015 and continuing to the end of the Class Period, Fluor recognized charges totaling more than ***$1.4 billion*** related to fixed-price projects.  Defendants also admitted that Fluor's bidding practices were no different than the most aggressive competitors from whom Defendants had falsely distinguished themselves, ultimately causing Fluor to make the drastic decision  to exit the gas-fired power plant construction business, seriously restrict its fixed-price bidding practices, and ban fixed-price bids in its Government segment altogether.  Through a series of partial disclosures, the truth slowly leaked regarding Fluor's improper bids and project management and execution, causing Fluor's stock price to decline and investors to suffer significant monetary damage.  By the end of the Class Period, Fluor's stock price had fallen to $14.79 – an ***82% decline*** from its Class Period high of $83.93.  It has never recovered.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

20.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Fluor is headquartered in this District and many of the acts charged herein, including the

- 10 -

preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

21.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

## III.    THE PARTIES

### A.    Plaintiffs

22.     Lead Plaintiff Wayne County Employees' Retirement System ("Wayne County") purchased Fluor common stock during the Class Period as set forth in the Certification previously filed (*see* ECF No. 17-2) and incorporated herein, and was damaged thereby.

23.     Lead Plaintiff the Town of Fairfield Employees' Retirement Plan and the Town of Fairfield Police and Firemen's Retirement Plan (together, the "Town of Fairfield") purchased Fluor common stock during the Class Period as set forth in the Certification submitted in connection with this Complaint, and was damaged thereby.

24.     Wayne County and Town of Fairfield are collectively referred to herein as "Plaintiffs."

### B.    Defendants

25.     Defendant Fluor Corporation is a multinational holding company incorporated in Delaware.  Through various subsidiaries, Fluor provides engineering, procurement, construction, fabrication and modularization, commissioning and maintenance, and management services for clients in a variety of industries such as oil and gas, chemicals and petrochemicals, mining and metals, transportation, power, life sciences, and advanced manufacturing.  Fluor maintains its

- 11 -

headquarters at 6700 Las Colinas Boulevard, Irving, Texas 75039.  At all relevant times, Fluor's common stock traded on the NYSE under the ticker symbol "FLR."

26.     Defendant David T. Seaton ("Seaton") was Fluor's CEO and Chairman of the Company from the beginning of the Class Period until May 1, 2019.

27.     Defendant Biggs C. Porter ("Porter") was Fluor's CFO from the beginning of the Class Period to August 4, 2017.

28.     Defendant Bruce A. Stanski ("Stanski") was Fluor's CFO from August 4, 2017 until May 31, 2019.  Prior to becoming CFO and throughout the Class Period, Stanski was President of Fluor's Government group.

29.     Defendant Matthew McSorley ("McSorley") was the President of the Power segment at Fluor from the beginning of the Class Period to October 2015.  Thereafter, McSorley has held various senior officer roles at Fluor.

30.     Defendant Gary G. Smalley ("Smalley") was Fluor's CAO from the beginning of the Class Period to July 2015.

31.     Defendant Carlos M. Hernandez ("Hernandez") was Fluor's interim CEO from May 1, 2019 until May 16, 2019, when he was appointed as CEO, and has served as the CEO until the present.  Hernandez also served as the Chief Legal Officer from October 2007 until May 2019.

32.     Defendant D. Michael Steuert ("Steuert") has served as Fluor's CFO from June 1, 2019 to the present.

33.     Defendant Robin K. Chopra ("Chopra") has served as Fluor's CAO from March 1, 2016 to the present.

34.     The Defendants referenced above in ¶¶26-33 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants and the Company are collectively referred to herein as "Defendants."  The Individual Defendants made, or caused to be made, false and

- 12 -

misleading statements that caused the price of Fluor common stock to be artificially inflated during the Class Period, as alleged herein.

35.     The Individual Defendants, because of their positions, possessed the power and authority to control the contents of the Company's quarterly and annual reports, other SEC filings, shareholder letters, press releases, securities offering materials, earnings teleconferences, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of and/or contributed to the Company's statements alleged herein to have been false or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements and omissions pleaded herein.

## IV.   RELEVANT GAAP, FINANCIAL REPORTING, AND INTERNAL PROJECT GOVERNANCE RULES

36.     The applicable Generally Accepted Accounting Principles ("GAAP") contract accounting rules, described below, required Defendants to identify, estimate, and accumulate all contract costs with a high degree of precision before Fluor could recognize any revenue on each of its fixed-price contracts.  Likewise, the Sarbanes-Oxley Act of 2002 ("SOX") and SEC rules, described below, required Defendants to maintain internal controls over financial reporting sufficient to ensure that for each fixed-price project, all costs were appropriately captured, accounted for, and reported in the Company's quarterly project cost estimates.

### A.     GAAP: Accounting Rules and Policies for Fixed-Price Projects

37.     Fluor's accounting policy for fixed-price contracts required the Company to comply with GAAP and SEC Rules.[1]   The SEC mandated that each of Fluor's Class Period financial statements comply with GAAP.   Specifically, SEC Rule 4-01(a)(1) of the SEC's Regulation S-X states:

> ***Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate***, despite footnote or other disclosures, unless the Commission has otherwise provided.   This article and other articles of Regulation S-X provide clarification of certain disclosures which must be included in any event, in financial statements filed with the Commission.

17 C.F.R. §210.4-01(a)(1).

38.     During the Class Period, Defendants stated that one of the Company's most "critical accounting policies" was to prepare and assess updated quarter-end estimates of the total costs to complete each of Fluor's in-progress, fixed-price projects.   The Company described its purported accounting for long-term contracts in each of its Class Period financial statements as follows:

> *Engineering and Construction Contracts*.   Contract revenue is recognized on the percentage-of-completion method based on contract cost incurred to date compared to total estimated contract cost.   Contracts are generally segmented between types of services, such as engineering and construction, and accordingly, gross margin related to each activity is recognized as those separate services are rendered.   ***The percentage-of-completion method of revenue recognition requires the company to prepare estimates of cost to complete for contracts in progress.   In making such estimates, judgments are required to evaluate contingencies such as potential variances in schedule and the cost of materials, labor cost and productivity, the impact of change orders, liability claims, contract disputes and achievement of contractual performance standards.   Changes in total estimated contract cost and losses, if any, are recognized in the period they are determined.***

---

[1]     During the Class Period, authoritative GAAP were promulgated by the Financial Accounting Standards Board ("FASB") and contained within the FASB's Accounting Standards Codification ("ASC").   The use of GAAP brings consistency, conformity, and over time, comparability to financial reporting.   It includes not only broad guidelines of general application, but also detailed practices and procedures.

39.     **Revenue Recognition on Fixed-Price Contracts**.  As noted above, Fluor stated that it measured and recognized revenue on fixed-price contracts based upon the "percentage-of-completion" method.  Under the "percentage-of-completion" accounting method, the quarter-end estimates of "costs-to-complete" dictated how much revenue Fluor could recognize on each of its fixed-price contracts.  Thus, Defendants' quarter-end cost estimates impacted billions of dollars of revenue recognized by Fluor on fixed-price projects during the Class Period.

40.     To comply with GAAP, Fluor was required to develop reasonable estimates of costs relating to estimates of the extent of progress toward completion, contract revenues, and contract costs.  *See* ASC 605-35-25-56.  The American Institute of Certified Public Accountants ("AICPA") Audit and Accounting Guide for Construction Contractors provides that the "estimated cost to complete" an arrangement is a "significant variable in the process of determining income earned and is thus a significant factor in accounting for contracts."  ASC 605-35-25-44.

41.     Thus, Defendants were required under GAAP to maintain a sophisticated cost accounting system to accurately track the costs of each of Fluor's fixed-price contracts.  Specifically, in order to use the percentage-of-completion accounting method to record revenue, ASC 605 requires that "contract costs shall be identified, estimated, and accumulated with a reasonable degree of accuracy."  ASC 605-35-25-32.  ASC 605 notes that as a prerequisite to applying percentage-of-completion method, "entities with significant contracting operations generally have the ability to produce reasonably dependable estimates."  ASC 605-35-25-58.  Under ASC 605-35-25-44, Defendants were required to apply the following approaches when estimating the costs to complete Fluor's fixed-price contracts:

    a.     Systematic and consistent procedures that are correlated with the cost accounting system should be used to provide a basis for periodically comparing actual and estimated costs.

    b.     In estimating total contract costs, the quantities and prices of all significant elements of cost should be identified.

c.     The estimating procedures should provide that estimated cost to complete includes the same elements of cost that are included in actual accumulated costs.  Also, those elements should reflect expected price increases.

d.     The effects of future wage and price escalations should be taken into account in cost estimates, especially when the contract performance will be carried out over a significant period of time.  Escalation provisions should not be blanket overall provisions but should cover labor, materials, and indirect costs based on percentages or amounts that take into consideration experience and other pertinent data.

e.     Estimates of cost to complete should be reviewed periodically and revised as appropriate to reflect new information.

42.     **Recording Losses on Fixed-Price Contracts**.  In addition to revenue, Defendants' quarter-end estimates of "costs-to-complete" also determined whether any of the fixed-price projects were in a loss position.  If Defendants identified a contract in a loss position - meaning the estimated total costs to complete the project exceeded the fixed-price value of the contract - the Company was required to immediately recognize the entire amount of the estimated loss.  GAAP required that Fluor recognize anticipated losses "as soon as the loss becomes evident."  ASC 605-35-25-45. Specifically, ASC 605-35-25-45 and ASC 605-35-25-46 state:

For a contract on which a loss is anticipated, GAAP requires recognition of the entire anticipated loss as soon as the loss becomes evident. ***An entity without the ability to update and revise estimates continually with a degree of confidence could not meet that essential requirement of GAAP***.

. . . When the current estimates of total contract revenue and contract cost indicate a loss, a provision for the entire loss on the contract shall be made. Provisions for losses shall be made in the period in which they become evident under either the percentage-of-completion method or the completed-contract method.

43.     **Accounting for Contract Change Orders and Claims on Fixed-Price Contracts**. As part of their quarter-end estimates of the "costs-to-complete" each of Fluor's fixed-price projects, Defendants were required to properly account for change orders and open claims.  Change orders and claims are modifications of an original contract that effectively change the scope of the contract without adding new provisions.  Initiation of the change order can be from the contractor or the

- 16 -

customer, and can include changes in specification or design, manner, or method of performance or other modifications.  GAAP, namely ASC 605-25-30, addresses the appropriate accounting for the three primary types of change orders: approved change orders, unpriced change orders, and unapproved change orders.

(a)      *Approved change orders*.  Approved change orders regarding the scope and price of the work are approved by both parties.  The result is a change in the fixed contract price and total estimated costs to reflect the amounts approved by the customer and the contractor.

(b)      *Unpriced change orders*.  Unpriced change orders define the work to be performed, but the price (adjustment to contract price) is to be negotiated at a later time.  For all unpriced change orders, recovery should be deemed probable if the future event or events necessary for recovery are likely to occur.  Factors to consider in evaluating whether recovery is probable include the following:

(i)      Obtaining the customer's written approval of the scope of the change order;

(ii)      Separate documentation for change order costs that are identifiable and reasonable; and

(iii)      The contractor's favorable experience in negotiating change orders.  GAAP requires that all costs attributable to unpriced change orders are treated as costs of contract performance in the period in which the costs are incurred if it is not probable that the costs will be recovered through a change in contract price.  This would result in no change in contract price and a decrease in estimated gross profit.

(c)      *Unapproved change orders*.  Change orders unapproved as to both scope and price should be evaluated as a claim.  The recognition of additional revenue relating to claims is appropriate only if it is probable that the claim will result in additional contract revenue and if the

- 17 -

amount can be reliably estimated.  The satisfaction of those two requirements is contingent upon the existence of all of the following conditions:

(i)     The contract or other evidence provides a legal basis for the claim; or a legal opinion has been obtained, stating that under the circumstances there is a reasonable basis to support the claim.

(ii)    Additional costs are caused by circumstances that were unforeseen at the contract date and are not the result of deficiencies in the contractor's performance.

(iii)   Costs associated with the claim are identifiable or otherwise determinable and are reasonable in view of the work performed.

(iv)    The evidence supporting the claim is objective and verifiable, not based on management's feel for the situation or on unsupported representation.

**B.     SOX: Internal Controls over Financial Reporting**

44.     In addition to complying with GAAP, Fluor was also subject to the provisions of SOX.  SOX, including Sections 302 ("SOX §302") and 404 ("SOX §404"), required that Defendants assess Fluor's internal controls over financial reporting and disclose whether or not such controls were effective to prevent or detect a material GAAP misstatement.

45.     **Quarterly Certifications**.  Defendants Seaton, Porter, Stanski, Hernandez, and Steuert signed certifications accompanying each of Fluor's Class Period financial statements attesting that they were responsible for establishing and maintaining disclosure controls and procedures[2] and internal control over financial reporting[3] designed to provide reasonable assurance

---

[2]   "Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure."  *See* 17 C.F.R. §240.13a-15(e).

regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.  *See* ¶¶141-143, *infra*.

46.     **Evaluation and Testing of Internal Controls Pertaining to Fixed-Price Contracts**.

Prior to signing quarterly certifications attesting that Fluor's internal controls were effective, Defendants were required to evaluate the financial reporting controls over the Company's critical accounting policies, including the cost estimation process on fixed-price contracts described above. The SEC's interpretative guidance on SOX §404 dictates that an evaluation of internal controls begins with management's identification and assessment of the risks of potential material misstatement occurring within its financial statements.  The cost estimation process on fixed-price contracts, as described above, was one such risk area – with the potential to affect billions of dollars of revenues and losses in Fluor's financial statements.  Further, the SEC stated that internal controls impacting significant accounting estimates or critical accounting policies are generally assessed as higher risk, including, for example, areas involving significant estimates such as the application of the percentage-of-completion methodology.  In this regard, the SEC required that Defendants "perform more extensive testing in high-risk areas."  *See* 17 C.F.R. §241.  In particular, SOX §404 required Defendants to perform testing necessary to evaluate the (a) design and (b) operating effectiveness of the internal controls covering Fluor's quarter-end cost estimation process.

---

[3]     "[I]nternal control over financial reporting [is] a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that: (1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer; (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and (3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements."  *See* 17 C.F.R. §240.13a-15(f).

47.    **Assessing Control Deficiencies**.  If Defendants determined that a control was not designed or operating effectively, Defendants were required to assess the control deficiency and disclose it to investors.  The classification of a control deficiency as a significant deficiency or a material weakness is based on the amount of potential misstatements that could occur as a result of the deficiency.

48.    A significant deficiency is a control deficiency, or combination of control deficiencies, that adversely affects the company's ability to initiate, authorize, record, process, or report external financial data reliably in accordance with GAAP such that there is more than a remote likelihood that a misstatement of the company's annual or interim financial statements that is more than inconsequential will not be prevented or detected.  A material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.  *Id.*

### C.    **Fluor's Project Governance**

49.    One of the critical internal processes that Defendants used throughout the Class Period to stay apprised of the estimated "costs-to-complete" was Fluor's Project Status Reviews (or "PSRs").  Fluor highlighted these PSRs as a "consistent monthly review of the status of [the Company's] projects" that provided "objective, accurate, and timely information" that would "inform[] proposed mitigating actions when needed."

50.    In November 2018, Fluor stated that it had gone a "step further" and established an Office of Project Execution Governance in 2017 to ensure that this PSR process "occurs across all projects."

## V.        FIXED-PRICE PROJECTS

51.        Fluor performs services for its clients through either "reimbursable contracts" or "fixed-price contracts."  Fixed-price contracts include both negotiated and competitively bid fixed-price contracts.  In the case of "negotiated" fixed-price contracts, Fluor is selected as contractor prior to the price being negotiated with the client.  Under "competitively bid" fixed-price contracts, Fluor bids on a contract against competitors based upon specifications provided by the client and agrees to develop a project at a fixed price.  As the Company explained in each of its Annual Reports issued during the Class Period, if Fluor "perform[s] well under these contracts, [the Company] can benefit from cost savings; however, if the project does not proceed as originally planned, [the Company] cannot recover cost overruns except in certain limited situations."

52.        A "backlog" in the engineering and construction industry is a measure of the total dollar value of work to be performed on contracts awarded and in progress.  As work is completed, revenue is booked.   Thus, backlog is the expected revenue from awarded contracts and commitments.  Throughout the Class Period, Fluor stated that its backlog represented expected revenue from projects for which it had "an executed contract or commitment" and reported backlog in the Company's quarterly and annual financial reports filed with the SEC.

### A.        The Brunswick County Plant

53.        On July 31, 2012, Fluor entered into an EPC contract with Dominion for a 1,358 megawatt natural gas-fired power plant in Brunswick County, Virginia (the "Brunswick County Plant").  Under the terms of the EPC contract, Fluor agreed to perform all design work, engineering, procurement, construction, installation, start-up, and other necessary services for the Brunswick County Plant in exchange for the agreed-upon lump sum price.  The EPC contract also contained performance guarantees backed by liquidated damages provisions to ensure that the Brunswick

- 21 -

County Plant was completed on schedule and performed as designed.  Accordingly, Fluor could not delay construction to address construction issues mid-project and maintain its expected profitability.

54.     Fluor was awarded the Brunswick County Plant EPC contract as a result of a competitive bidding process.  Fluor's bid was the lowest evaluated cost proposal of the three bidders for the project, leading to Fluor being awarded the EPC contract.

55.     The Brunswick County Plant was designed to include three Mitsubishi "G" class combustion turbine generators, three heat recovery steam generators, and one steam turbine generator – a configuration commonly referred to as a 3x1 combined-cycle.

56.     On August 14, 2013, Fluor announced that it had received full notice to proceed from Dominion to begin construction on the Brunswick County Plant.  As a result of this notice, Fluor booked approximately $800 million into its backlog during Q3 2013.

**B.      The Radford Plant**

57.     In 2013, Fluor bid on a subcontract for BEA Systems on the Department of Defense's plan to update the Radford Army Ammunition Plant's power, infrastructure, and manufacturing facilities.  The project was a fixed-price contract that included six gas-fired boilers ("Radford Plant").  Fluor began the design phase in 2015, and an April 21, 2016 article in *The Roanoke Times* reported that officials broke ground on the $60 million project that day.  When Fluor began to disclose that it was taking charges on the Radford Plant in 2019, it also disclosed that the Radford Plant was in the Government segment.

58.     United States government agencies operate under annual fiscal appropriations by Congress and fund various federal contracts only on an incremental basis.  But as of December 31, 2013, the Company began including the unfunded portion of multi-year government contract awards in its backlog.

### C.   The CPChem Project

59.    On October 3, 2013, Fluor issued a press release announcing that it was awarded a contract by Chevron Phillips Chemical for its Gulf Coast petrochemicals project in Bayou, Texas ("CPChem Project").  Fluor's scope of work was under a fixed-price contract, and included engineering and construction for the outside battery limit scope as well as the direct-hire construction for the entire cracker project.

60.    Fluor stated that it recorded the undisclosed contract value as a new award on its books for Q3 2013.  However, in its Q3 2016 conference call, Fluor admitted that in light of the charges taken on the CPChem Project, the project was a loss.

### D.   The Anderson County Plant

61.    In the Q3 2014, Fluor announced that it had been awarded an EPC contract with Duke for a 750 megawatt natural gas-fired power plant at the W.S. Lee Station in Anderson County, South Carolina (the "Anderson County Plant").

62.    Fluor was awarded the Anderson County Plant EPC contract as a result of a competitive bidding process.

63.    The Anderson County Plant was designed to include two combustion turbine generators, two heat recovery steam generators, and one steam turbine generator – a configuration commonly referred to as a 2x1 combined-cycle.

### E.   The Citrus County Plant

64.    On October 15, 2014, Fluor entered into an EPC contract with Duke for a 1,640 megawatt natural gas-fired power plant in Citrus County, Florida (the "Citrus County Plant").  Under the terms of the EPC contract, Fluor agreed to perform all design work, engineering, procurement, construction, installation, start-up, and other necessary services for the Citrus County Plant in exchange for the agreed-upon lump sum price.  The EPC contract also contained performance

guarantees, such as dates for Guaranteed Mechanical Completion and Guaranteed Substantial Completion, backed by liquidated damages provisions to ensure that the Citrus County Plant was completed on schedule and performed as designed. Accordingly, Fluor could not delay construction to address construction issues mid-project and maintain its expected profitability.

65.     Fluor was awarded the Citrus County Plant EPC contract as a result of a competitive bidding process.

66.     The Citrus County Plant was designed to be composed of two separate 820 megawatt generating units, or "Power Blocks." Each Power Block was designed to include two Mitsubishi "G" class combustion turbine generators (the same turbines used at the Brunswick County Plant), two heat recovery steam generators, and one steam turbine generator – the same configuration as the Anderson County Plant.

67.     On October 5, 2015, Fluor received full notice to proceed from Duke to begin construction on the Citrus County Plant.

**F.     The Greensville County Plant**

68.     On April 8, 2015, Fluor entered into an EPC contract with Dominion for a 1,588 megawatt natural gas-fired power plant in Greensville County, Virginia (the "Greensville County Plant"). Under the terms of the EPC contract, Fluor agreed to perform all design work, engineering, procurement, construction, installation, start-up, and other necessary services for the Greensville County Plant in exchange for an agreed-upon lump sum price. The EPC contract also contained performance guarantees backed by liquidated damages provisions to ensure that the Greensville County Plant was completed on schedule and performed as designed. Accordingly, Fluor could not delay construction to address construction issues mid-project and maintain its expected profitability.

- 24 -

69.     Fluor was awarded the Greensville County Plant EPC contract as a result of a competitive bidding process.  Fluor's bid was the lowest evaluated cost proposal of the four bidders for the project, leading to Fluor being awarded the EPC contract.

70.     The Greensville County Plant was designed to include three Mitsubishi "J" class combustion turbine generators, three heat recovery steam generators, and one steam turbine generator – the same configuration as the Brunswick County Plant.

71.     On July 7, 2016, Fluor announced that it had received full notice to proceed from Dominion to begin construction on the Greensville County Plant.

**G.     Penguins Offshore Project**

72.     On January 16, 2018, Fluor issued a press release announcing that it was awarded a contract by Shell for design, procurement, and fabrication of a floating storage and offloading vessel in the Penguins oil and gas field in the North Sea ("Penguins Offshore Project").  It also said that it recorded the undisclosed contract value as a new award on its books for Q4 2017.

**H.     The Warren Project**

73.     On December 11, 2018, Fluor announced that it was awarded a contract with the U.S. Army Corps of Engineers at the Frances E. Warren Air Force Base located west of Cheyenne, Wyoming.  The project was a fixed-price contract to construct a nuclear weapons storage and maintenance facility ("Warren Project").

74.     When Fluor began to disclose that it was taking millions of dollars of charges on the Warren Project in 2019, it also disclosed that the Warren Project was in the Government segment. Fluor booked the $145 million contract value in Q4 2018, and the groundbreaking event was held on May 21, 2019.

## VI.    CONFIDENTIAL WITNESS ACCOUNTS

75.    Several former Fluor employees have provided information demonstrating that Defendants' Class Period statements were false and misleading and that Defendants knew or recklessly disregarded the falsity or misleading nature of their statements.  The CWs include individuals formerly employed at Fluor during the Class Period, whose accounts corroborate one another, other sources set forth herein, and facts now admitted by Fluor.  The CWs provided information to Plaintiffs' counsel and/or their investigator on a confidential basis and are particularly described by job description, responsibility, and duration of employment, thereby providing sufficient detail to establish their reliability and personal knowledge.  As set forth below, the information provided by the CWs supports a strong inference that Defendants acted with scienter.

76.    Confidential Witness No. 1 ("CW-1") worked in the Health, Safety, and Environment division of the Power segment between May 2014 and March 2017 in the Charlotte office.  CW-1 was responsible for estimating gas-fired and other projects from the health, safety, and environment perspective.  CW-1 stated that all hard-number bids were reviewed and approved through the Executive Review Board process and the Business Risk Management Framework ("BRMF").  This process included review by Seaton, the President of the Power segment (McSorley during CW-1's tenure), and other senior management.  CW-1 stated that the problems associated with the gas-fired plants were the result of poor estimates, lack of execution, and bad management of the projects once they were underway.  CW-1 described the "best and final" process whereby Fluor submitted a bid to a customer, Fluor met with the customer who suggested that Fluor needed to reduce its price, and then Fluor amended its bid to a "best and final" price in hopes of winning the contract.  CW-1 stated that CW-1's estimates to cover health, safety, and environment issues on gas-fired plants were routinely reduced by management.  CW-1 was also told by management to cut costs so that Fluor could stay competitive in the bidding process for these projects.  With respect to the Brunswick

- 26 -

County Plant, CW-1 stated that Fluor underestimated the amount of piping and other expenses during the design and construction phases.

77.    Confidential Witness No. 2 ("CW-2") was Lead Electrical Design Engineer from May 2007 through September 2017 in the Charlotte office.  CW-2 was the Lead Electrical Engineer for the Citrus County Plant and a Senior Electrical Engineer on the Brunswick, Greensville, and Anderson County Plants.  According to CW-2, Fluor understated the estimates concerning the labor costs needed to build the plants, which costs constituted a large portion of the projects' budgets.  CW-2 also stated that the projects suffered setbacks caused by crafts and trades because the quality of work for trades declined and Fluor did not hire quality tradesmen.

78.    Confidential Witness No. 3 ("CW-3") was an Engineer from January 2013 to February 2014 and a Lead Engineer from February 2014 to April 2016.  CW-3 worked on the Brunswick County and Greensville County Plants.  CW-3 stated that CW-3 believed the project estimates were approved by senior management.  CW-3 said that Fluor used the Brunswick County Plant as a "go-by" for estimating the Greensville County Plant.  CW-3 was responsible for estimating the engineering hours and equipment for the Greensville County Plant.  CW-3 stated that CW-3's estimates for required equipment and engineering hours for the Greensville County Plant were cut by management during the estimating phase in order to reduce the bid.  CW-3 explained that Dominion – the customer responsible for the Brunswick County and Greensville County Plants – was a key customer for which Fluor wanted to do more work.  CW-3 said that Fluor had previously lost work for Dominion, including the Warren County Power Station, and wanted to get back in Dominion's good graces at the time it was bidding the Brunswick County and Greensville County Plants.

79.    Confidential Witness No. 4 ("CW-4") was Vice President of the Power Gas Business from January 2013 to September 2013, and Vice President, US Operations, Power Business from

- 27 -

September 2013 to August 2017, working in the Charlotte office.  CW-4 stated that bids on the gas-fired plants went all the way up to Seaton for approval.  The proposals also went to the Executive Team, Power Group President, Chief Risk Assessment Officer, and CFO (Porter was CFO at the time the Gas-Fired Plants at issue were bid and approved).

80.     Confidential Witness No. 5 ("CW-5") worked in the Charlotte office in the Power segment as a Senior Mechanical Engineer from 2014 to 2016 working on the Citrus County Plant. CW-5 stated the view that Fluor did not devote sufficient resources to the estimating and bidding process before the contract was awarded, explaining that there was not a desire to devote substantial time and resources to estimating and bidding before winning the contract, since those resources would be wasted if Fluor did not win the contract.  CW-5 stated that management compressed the design phase of the Citrus County Plant to six months, whereas the design phase typically took one to one-and-a-half years.  CW-5 stated this compression caused scheduling issues, including problems with the piping design team.  CW-5 stated that, during construction on the Citrus County Plant, issues arose regarding large pieces of equipment that were underestimated in or omitted from the original bid, including large valves, which added costs and required additional engineering hours. CW-5 stated there was a discrepancy between the bid provided to win the contract and the bid once Fluor won the contract.  CW-5 stated that, prior to the Anderson and Citrus County Plants, Duke did not want to work with Fluor because of some problematic projects Duke had with Fluor in the 1990s and 2000s.  CW-5 stated that Fluor really wanted to obtain Duke projects and that winning Duke projects was a focus.  CW-5 stated that there were issues with the Mitsubishi turbines, which CW-5 stated were the same or substantially similar turbines used for the Brunswick County Plant.  CW-5 stated that Mitsubishi was not responsive and that it would sometimes take Mitsubishi months to respond to Fluor, which caused delays on the project.  CW-5 also described problems encountered with the turbine pressure release valves.  CW-5 stated that the Mitsubishi turbines at the Brunswick

- 28 -

County Plant experienced the same turbine pressure release valve problems. CW-5 also stated that there was still design work being performed relating to the turbines as they were being installed.

81.     Confidential Witness No. 6 ("CW-6") was a Subcontracts Administrator for Fluor's Government business from May 2011 to October 2017, working in the Greenville, South Carolina office. CW-6 stated that deficiencies in the engineering and design work for Fluor's projects, such as the Radford Plant, negatively impacted the schedule and costs of the projects. CW-6 stated that when bidding on these projects, Fluor sought to reduce the estimated costs in its bids to win work given the hyper-competitive market. In accord with the account of CW-1, CW-6 stated that if Fluor could not win a project with its current bid, supervisors asked CW-6 to submit a "best and final" bid to drive down the price of the bid. CW-6's team would attempt to trim as many of the costs as possible off the bid. In addition, CW-6 stated that defendant Stanski would lead "red tape" conference calls to conduct a comprehensive review of Government bids in the range of $50-$75 million and higher, where details of a project would be discussed to "cut out all the fat." CW-6 experienced issues with obtaining quotes from subcontractors due to the fast turnaround time required to submit Government project bids, oftentimes limited to just 45 days. It was difficult for CW-6 to find qualified subcontractors to provide adequate and timely bids to be incorporated into Fluor's bid. As a result, CW-6 believed there were instances where Fluor entered misallocated labor hours into its initial bid, and then if Fluor won the bid or was in the final running, Fluor would attempt to revise the bid through a change order to more accurately reflect the number of subcontractor hours required.

82.     Confidential Witness No. 7 ("CW-7") worked at Fluor from October 2007 to October 2014 in the Sugar Land, Texas office. Beginning in October 2011, CW-7 served in a Materials Management Specialist role in Fluor's purchasing department. CW-7 was a primary contact for some of Fluor's large vendors and negotiated contract terms. CW-7 had exposure to the bidding

process by performing validity checks on different portions of the bids.  CW-7 described a review

board at Fluor, of which Seaton was a member, that conducted a review of all large bids, including a

review of the "estimating packet" for bids.  CW-7 learned from his supervisor that Seaton personally

reviewed the bids for large or high-profile projects.  The review board would revise numbers based

on their review.  CW-7 also developed a database of historical analyses of Fluor's past bids,

including failed bids, to be referenced to estimate future bids.  The database was designed to be a

library to provide a more accurate picture of what cost trends were over time.

83.    Confidential Witness No. 8 ("CW-8") was a Principal Design Engineer from August

2016 to January 2018 in the Charlotte, North Carolina office.  CW-8 planned the piping for the Duke

Energy plants, Anderson County and Citrus County.  CW-8 stated that the projects were on an

impossible budget and schedule because the entire EPC industry, Fluor included, had to underbid

projects in order to win them.  CW-8 observed that "[e]veryone does the best they can to keep the

quality up and to meet the scheduling and budget, even though everybody knows that you can't do

it."  Accordingly, cost-cutting measures were regularly discussed at meetings at the office.  CW-8

explained that cost issues on the Duke Energy projects accelerated in the construction phase and the

projects were seriously into the red about midway through construction.  Fluor underestimated labor

costs and labor quality which resulted in Fluor being unable to find workers with proper skills and

motivation.  CW-8 observed that Fluor's CEO and CFO closely monitored the employees' weekly

timesheets and charges and thus would have or could have been aware of ongoing information on the

projects.  CW-8 believed that executives would have reviewed the budget performance of Fluor's

projects on a weekly or monthly basis, and had access to budgeting data as often as they wanted.

84.    Confidential Witness No. 9 ("CW-9") worked for Fluor from 2012 to 2013 as a

Project Finance Manager, and again from August 2017 to July 2018 as a Deputy Program

Manager/Business Manager.  CW-9 worked on Fluor's fixed-price government contract for the

Naval Air Station ("NAS") in Jacksonville, Florida.  CW-9 described a "bid it low, let it grow" motto used by project management.  In essence, Fluor would bid low to win the government project, knowing it would be unable to profitably perform the contract.  To recoup the frequent cost overruns, CW-9 stated that Fluor submitted additional task order requests at significantly higher rates by claiming the work was outside the scope of the initial contract.  For example, CW-9 noted the Jacksonville NAS Project Manager, Henry Fuentes, instructed Fluor employees to refuse to work on tasks the employees understood to be part of the contract.  CW-9 noted the government refused to pay, which led to payment disputes between Fluor and the U.S. government.  CW-9 learned that the Radford Plant was underbid and executed similarly to the Jacksonville project, as described by CW-6.

## VII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.  False and Misleading Statements and Omissions Regarding Fluor's Purportedly Conservative Bidding Process and Risk Management

85.     Immediately prior to the beginning of the Class Period, in the 2012 Annual Report Shareholder Letter dated March 8, 2013, Seaton wrote:

> [W]e are focused on sustainable growth – adapting to market changes and client needs, investing in our people, ***being selective in the projects we pursue***, and building trusted relationships with our stakeholders.

86.     The message was clear – despite the risks inherent to fixed-price projects, investors could take solace in the fact that Fluor's bids were conservative and that Fluor was remarkable in its ability to execute projects on time and on budget.

87.     **Statement No. 1**: Throughout the Class Period, Fluor touted its "Risk Management" as a competitive strength in its Forms 10-K for fiscal years 2013-2017, signed by Seaton, Porter, Stanski, and Smalley and SOX-certified by Seaton, Porter, and Stanski, in identical or substantially similar form:

- 31 -

We believe that our ability to assess, understand, gauge and mitigate project risk, especially in difficult locations or circumstances or in a *fixed-price contracting environment*, gives us the ability to selectively enter into markets or accept projects where we feel we can best manage risks. *We have an experienced management team, particularly in risk management and project execution, which helps us to better anticipate and understand potential risks and, therefore, how to manage them*. Our risk management capabilities allow us to better control costs and ensure timely performance, which in turn leads to clients who are satisfied with the delivered product.

88.     **Statement No. 2**: Throughout the Class Period, Fluor also downplayed its disclosed

risk factors relating to large-scale project awards in its Forms 10-K, in identical or substantially

similar form:

We may not win contracts that we have bid upon due to price, a client's perception of our ability to perform and/or perceived technology advantages held by others. *Many of our competitors may be more inclined to take greater or unusual risks or terms and conditions in a contract that we might not deem acceptable*.[4]

89.     On February 18, 2014, Fluor released its fiscal year 2013 Form 10-K, signed by

Seaton, Porter, and Smalley and SOX-certified by Seaton and Porter, which contained Statement

Nos. 1 and 2 set forth in ¶¶87-88, *supra*.

90.     **Statement No. 3**: On the earnings call held that evening, in response to a question

regarding whether Fluor needed to take on extra risk to achieve the higher margins, Seaton stated

that Fluor's risk was properly managed and that it could profitably execute fixed-price projects

across the Company:

[Analyst:] David, [LDS] margins had a nice uptick in 4Q, you had been talking about it. Do think you're still on track for the 5% margin that you alluded to in the second half of this year? Can you tell us how much of the improvement that you saw in 4Q based on better mix versus better pricing? Maybe a follow on to that, David, around *do you have to take extra risk to get to these higher levels*? Because you know, we do notice more [LSTK] work that Fluor's taking and maybe you could talk about that.

*            *            *

---

[4]     This statement was repeated in every Form 10-K issued during the Class Period, and expressly incorporated in every Form 10-Q issued during the Class Period.

- 32 -

[Seaton:] *We have not seen our risk profile increase, based on the new awards that we are booking right now. Yes, there are some that are fixed-price in nature. But I would say that we feel very comfortable in taking the projects that we are on the fixed price basis, and that's not just in oil and gas, but I would say across the Company.*

91.    Thereafter, an analyst for Credit Suisse described Fluor as a "Top Pick in E[ngineering] & C[onstruction]" as the Company "continue[d] to clean house on awards and deliver on the margin side."

92.    **Statement No. 4**: On June 5, 2014, during a Credit Suisse Engineering & Construction Conference, Seaton continued to state that Fluor was conservative in its bids despite the competition in the market. As Seaton explained:

Power, as I mentioned, has just kind of been on its ear. I would suggest that that's probably one of the most competitive markets that we work in right now. We have been fairly successful on the coal-fired side. We've got a lot of proposals pending and we feel good about that.

However, we have lost a few to competition who need it more than we do. One of the things that we enjoy is that diversity and it allows us – this is going to sound arrogant, and I don't mean it that way – *we have the ability because of that diversity to say no and make sure that we get projects that we want at the price we want, that allows us to earn the profitability we expect.*

*So we are pretty conservative in how we do things like that, but it does give us I think an advantage in making sure we don't take projects that begin in a challenged nature.*

93.    **Statement No. 5**: On July 31, 2014, Fluor released its Q2 2014 financial results. On the earnings call held that day, Seaton continued to tout Fluor's ability to win projects with conservative bids:

*We do a really good job of choosing carefully the projects we want to chase. We're conservative in how we take them in, and in those projects are holding to the schedules that we expected.*

94.    **Statement No. 6**: In response to analyst questioning regarding overly aggressive bidding by competitors, Seaton again expressed confidence in Fluor's bidding quality and practice of foregoing riskier projects:

- 33 -

[Analyst:] . . . There's been a lot of discussion about pricing maybe getting a little bit more aggressive in North America from the Western competitors. What are you guys seeing there?

[Seaton:] . . . We've seen some really aggressive pricing in the power market, and in the infrastructure market.

*Again, we've got the profit expectations built into what our offering is*. And we'll let the chips fall where they may. But I would say that we've seen an increased competitive landscape in North America.

95.    **Statement No. 7**: On August 14, 2014, Fluor presented at the Jefferies Global Industrials Conference. During the conference, Fluor's Vice President of Investor Relations, Ken Lockwood, acknowledged the risks inherent to the Company's fixed-price contracts, but represented that Fluor effectively managed the risk:

And then from a contract type, if you look at an engineering and construction company, there are basically two types of contracts, fixed-price contracts and reimbursable contracts. Reimbursable by nature, by definition, are low risk or no risk. *Fixed-priced contracts, obviously, have a risk element that is fixed cost and fixed schedule. We tend to do those predominantly in infrastructure and in power. We are very comfortable with that risk and we are very comfortable with this risk profile. So, really nothing noteworthy there*.

96.    **Statement No. 8**: On November 13, 2014, Fluor held its Investor Day conference. At the conference, Seaton again highlighted Fluor's bidding quality:

We do believe that some of our competitors are in a weakened state. As you've heard me say, *because of that diversity, we've had an ability to say no* in certain markets when our competition – if that's the only market they're in and they have a different position. Now, I hope that doesn't sound arrogant; I certainly don't mean it that way. *But we believe that our strategy and the discipline we have around how we bid, who we bid to, what projects are actually going to go to FID [final investment decision], which ones are actually going to get to the field, I think provides a lot more confidence, at least for me, in terms of insight into those longer-term earning cycles*.

97.    **Statement No. 9**: McSorley added that because of Fluor's selectivity, estimating capability, and execution, Fluor's power projects were on budget, on schedule, and had no claims:

Let's talk about some of our existing projects. As I said, our work is lump sum in the power industry. And over the past three to five years, we have really had a solid execution of our projects. *Many of you in here hear about companies*

- 34 -

*struggling in the power EPC space, some of them wanted to maybe even exit the space*.

> *All of our projects over the past four or five years: on budget, on schedule, no claims.  This is largely due to our selectivity.  We don't chase everything that is out there.  Our estimating capability and, of course, our execution of the work*.

98.     On February 18, 2015, Fluor released its Q4 2014 financial statements and its fiscal year 2014 Form 10-K, signed by Seaton, Porter, and Smalley and SOX-certified by Seaton and Porter, which contained Statement Nos. 1 and 2 set forth in ¶¶87-88, *supra*.

99.     **Statement No. 10**: On the earnings call that evening, analysts asked whether Fluor's purportedly "disciplined bidding" would prevent it from gaining market share.  Seaton assured analysts that Fluor was in a good competitive position, omitting that the Company could only continue to win projects if it lowered its bids and weakened is bidding practices:

> *So regardless of the competitive situation, we feel like we are in the best position to give them the best asset at the best price and at the same time maintain the profitability that we expect*.  So, I think we've kind of changed the game here and I think that is going to bode well for us for many, many years to come.

100.     **Statement No. 11**: Seaton was also questioned with respect to Fluor's growth in fixed-price contract awards.  Seaton responded that, unlike its competitors, Fluor had been and would continue to be conservative in selecting projects on which to bid:

> *I think over time we have been very conservative in what we take in and how confident we are in that going forward*.

> *So I don't really see a lot of risk in our current backlog from a cancellation or a delay perspective*.

> *       *       *

> Well, I think Power has become, if you can believe it, more competitive. *There is a lot of people that don't have the diversity that we have that are forced to make some, in my opinion, some poor decisions on what they expect and what they will accept*.

> *I do believe we are in a good position to grow backlog in Power over the short term.  And I feel good about our position regardless of the fuels choice*.

- 35 -

101.    **Statement No. 12**: On March 5, 2015, Fluor issued its 2014 Annual Report, which stated that "[t]he Power group serves a geographically focused, fiercely competitive, lump-sum industry.  In this environment, ***we have to be highly selective in the projects we bid***.  We had an active year, winning and progressing projects in the gas, renewables and nuclear sectors."

102.    **Statement No. 13**: On April 30, 2015, Fluor held a Q1 2015 earnings call during which Seaton was questioned about Fluor's bidding discipline in light of "competitors trying to get more competitive on pricing in an attempt to fill volumes."  Seaton reassured the analysts that Fluor continued to remain disciplined and did not, like its competitors, reduce its bids in order to win projects:

> ***Well I'm sure they will, I'm sure they will.  That's the normal herd mentality I think that damages our industry.  I think what we've proven is that we focused on a better delivery model, and therefore, we don't have to have margin suffer because we're competitive in other ways***.
>
> ***But there's always somebody that's going to drop their price to ensure that they have the volumes that they want***.  And frankly, there's nothing I can do about that.  I'm going to focus and our people are going to focus on continuing to improve our offering and meet my expectation and your expectation in terms of creating shareholder value through enhanced margin performance.  ***So we're just going to stick to our knitting and let others do what they think they need to do to meet their needs***.

103.    **Statement No. 14**: On June 4, 2015, Defendants presented at the Credit Suisse Engineering & Construction Conference.  In response to analyst concerns that the increase in fixed-price work, coupled with a competitive bidding environment, could hurt Fluor's profit margins, Porter confirmed that the Company continued to bid conservatively:

> ***[W]e're not changing our approach at all.  I think we've proven over the last two years that we have kind of changed how we look at projects, and have the ability to deliver those things on a more cost-effective basis.  That does not mean that we are dropping margin***.
>
> And I think it's kind of one of these things where our diversity is a positive overall, but it also puts us in an awkward position sometimes where many of our competition, depending on whatever market it is, that that's all they do.  ***We kind of***

*have the ability to say no.  And we'll continue to do that on these projects that are marginal* . . . .

> *Two, they don't provide the profitability that we expect, or the contract is in a form that puts undue risk on our books as opposed to the balanced approach we like to see.  So, we have not changed our DNA in terms of how we look at projects, and the conservative nature that we are, and the way we put things in the backlog, and how we execute things.  So that hasn't changed at all.*

104.   **Statement No. 15**: Seaton echoed Porter with respect to Fluor's purportedly conservative bidding process:

> [Analyst:] David, you mentioned some competitive pressures in the marketplace, but that Fluor isn't really going to change how they approach projects.  Do you think that some of the competitive pressures go beyond price and maybe into concessions towards terms and conditions?

> [Seaton:] I think we've seen that.  I mean, you know, this isn't my first rodeo.  I mean, I've seen this cycle significant up and down, this is probably the fourth or fifth time in my career.  And when that happens, people do what they feel they have to do to maintain their core competency.

> *As I mentioned, we are* – and I hope this doesn't come across as arrogant because I don't mean it that way – *being able to say no, I think is the right thing in terms of shifting from a competitive price to where we are actually, as an industry, accepting liabilities that should be borne by the customer or somebody else.  So, we are seeing some of those types of behaviors again.  And we'll stick to our knitting.*

105.   **Statement No. 16**: On November 10, 2015, Fluor presented at the Robert W. Baird and Co. Industrial Conference.  Geoff Telfer, Fluor's Senior Vice President of Corporate Finance, assured analysts that any concerns about Fluor's fixed-price projects were misguided:

> The lump sum plays are – traditionally it is the power play and the infrastructure.  And they were starting to see more now and especially when we work for the NOCS.  They tend to like the fixed-price work.  But we are not – *we are very comfortable going fixed price on anything now.  With the way that we are executing our projects with our supply chain, we are very comfortable doing fixed price.*

106.   Defendants' misrepresentations and omissions had their intended effect.  For example, in a November 18, 2015 Credit Suisse Sell Side Dinner Takeaways report, Credit Suisse

- 37 -

reported that Fluor management confirmed that "[Fluor] will remain disciplined and walk away from work."  Sterne Agee similarly reported in "High Notes from Meetings with CEO" that:

> Competition to bid on combined cycle gas power plants remains extremely competitive and commoditized which should result in FLR passing on or losing some projects as the competition goes through its learning curve.  A typical project might have six bidders.  Management noted that it does not plan[] to take risks that exceed potential economic benefits.

107.    On February 18, 2016, Fluor released its Q4 2015 financial statements and its fiscal year 2015 Form 10-K, signed and SOX-certified by Seaton and Porter, which contained Statement Nos. 1 and 2 set forth in ¶¶87-88, *supra*.

108.    **Statement No. 17**: On November 3, 2016, Fluor released its Q3 2016 financial statements.  During the earnings call, Seaton continued to tout improvements to Fluor's costs, scheduling, and bid discipline:

> [Analyst:] Just one, first, to follow up on your comments regarding rational pricing and risk.  Is it just more concentrated in the energy projects?  Or are you seeing other clients maybe in power industry or infrastructure taking advantage of the competitive nature and also trying to push down pricing?

> *       *       *

> [Seaton:] So like I said, this isn't the first time I've seen this.  ***And we are going to maintain our discipline.  And there will be some folks that will do some silly things, and maybe in a few years they will regret that***.

> ***But it is what it is.  But we've proven over time that we can compete***.

109.    **Statement No. 18**: On November 7, 2016, Fluor held its Investor Day where Seaton confirmed, in response to an analyst question about "how tempting is it to sort of take on work that's maybe a little more borderline from the execution perspective or risk perspective to sort of fill in the gaps,"  Fluor's purported bid and risk discipline:

> [Seaton:] I'm going to kind of push part of this question along, but I think the short answer is ***we're going to maintain our discipline.  We're not going to do stupid things like we're starting to see in the marketplace***.

We've proven over time that when we focus on our own knitting and changing our own world and controlling the things that we can control, we do better and we're going to continue that.  So, again, in the short term, ***I don't see us doing things like that***.

110.     On February 17, 2017, Fluor released its Q4 2016 financial statements and its 2016 Annual Report Form 10-K signed by Seaton, Porter, and Chopra and SOX-certified by Seaton and Porter, which contained Statement Nos. 1 and 2 set forth in ¶¶87-88, *supra*.

111.     **Statement No. 19**: During the May 9, 2017 Wells Fargo Industrial and Construction Conference, Porter continued to represent that Fluor had avoided, and would continue to avoid, aggressive and risky bidding:

> The markets that were competitive today are competitive – they are the same ones that were competitive 4 or 5 years ago.  And those largely have been the Power business more than any other.  On the Power business, we can see as many as 5 competitors on a particular proposal.  When you get to energy and chemicals, it may just be a couple.  So it's rational.  We haven't – so broadly speaking, the markets are rational.  We haven't seen a situation like there was many years ago with the Korean companies coming in and bidding very aggressively.  I think they got punished for that, and the customers weren't happy with how it all turned out.  And we haven't seen a return of that kind of environment.  And so happily, it's rational.  I believe it will stay that way, but ***if somebody did decide to be irrational, we're not going to chase it.  We're not going to take that risk***.

112.     On February 20, 2018, Fluor released its Q4 2017 financial statements and its fiscal year 2017 Form 10-K, signed by Seaton, Stanski and Chopra and SOX-certified by Seaton and Stanski, which contained Statement Nos. 1 and 2 set forth in ¶¶87-88, *supra*.

113.     Statement Nos. 1-19 were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

(a)     Contrary to Defendants' representations, Fluor was not able to "anticipate and understand potential risks" or recklessly disregarded those risks to win contracts, and its risk profile had greatly increased as a result of its bids for the Gas-Fired Plants and other fixed-price contracts. Over the course of the Class Period, the Company ultimately recognized $643 million in pre-tax

- 39 -

charges and/or losses due to forecast revisions and cost overruns at the Gas-Fired Plants and more than $750 million related to other fixed-price projects arising from similar problems. §VIII.D., *infra*. Indeed, the Company recognized pre-tax charges and/or losses related to the Gas-Fired Plants in eight out of nine consecutive quarters from Q1 2017 to Q2 2019. *Id.*

(b)　　Contrary to Defendants' representations, Fluor was not conservative, was not selective, and did not produce bids based on expected profit but, rather, to ensure Fluor won the bid at any price – as Individual Defendants Seaton, Porter, McSorley, and Stanski knew because they were the ones who effectuated unachievable revisions to project revisions during the "best and final" bidding process described by multiple CWs. Defendants later admitted that Fluor's Gas-Fired Plant bids were not conservative, establishing that Statement Nos. 1-19 were misleading:

(i)　　After Statement Nos. 1-19 were uttered, Defendants admitted that Fluor's gas-fired power plant bids were never realistic: "We . . . have led our clients to believe that a gas-fired power project costs approximately 650 kilowatts – $650 per kilowatt, although virtually no one has delivered one for that value. The customers start at that figure [*i.e.*, price to build a gas-fired plant] and negotiate downward, and there's always some contractor that is willing to say okay to lower number, using some excuse to justify the win, Fluor included." ¶275, *infra*.

(ii)　　Similarly, Defendants later admitted that the Gas-Fired Plants suffered from a "fundamental problem" and "did not meet the original baseline assumptions due to improper estimating, craft productivity and equipment issues" and that "all 4 of those [Gas-Fired Plants] were bid at a time when we didn't have good information on the new first-of-a-kind equipment, nor did we really have a good handle on the level of skill and number of craft employees that we would have available to us in some of these locations." ¶273, *infra*.

(iii)　　Proving that the bidding team – which included Individual Defendants Seaton, Porter, McSorley, and Stanski – neither appropriately considered risks nor erred on the side

- 40 -

of being conservative, Defendants later admitted that "[t]hese projects, the Power project specifically, were bid at a time by a bidding team that did not follow the rules." ¶163, *infra*. That is, Defendants ultimately conceded that there were "fatal flaws in the bidding process of all of those projects," ¶276, *infra*, and that they "were more aggressive than [they] should have been in bidding those [gas-fired] projects." ¶171, *infra*.

        (iv)    Defendants later admitted that of the 12 gas-fired projects the Company undertook since 2003, "10 of the 12 have underperformed our as-sold expectations, with 3 suffering losses." ¶275, *infra*. That means that prior to the four Gas-Fired Plants at issue, six of eight fixed-price gas-fired power projects awarded to Fluor since 2003 – or 75% – had underperformed Fluor's bid assumptions.

        (c)    Contrary to Defendants' November 2014 assertion that all of their fixed-price Power projects over the past four or five years were "on budget, on schedule, no claims . . . largely due to our selectivity," Defendants later admitted in 2018 that of the 12 gas-fired projects the Company undertook ***since 2003***, "10 of the 12 have underperformed our as-sold expectations, with 3 suffering losses." ¶275, *infra*.

        (d)    Confidential witnesses also corroborate Defendants' admissions, describing that Fluor's bids were not conservative and were routinely reduced in order to remain competitive:

        (i)    CW-1, who participated in bidding all of the Gas-Fired Plants, stated that estimates were routinely reduced by the Executive Review Board, which included Seaton, McSorley, and other senior management, who told CW-1 that CW-1 needed to cut costs so that Fluor could stay competitive in the bidding process. Indeed, CW-1 stated that Fluor understated the estimates for piping and other expenses during the design and construction phases of the Brunswick County Plant. CW-1 described a "best and final" process at Fluor whereby Fluor submitted a bid to

a customer, Fluor met with the customer who suggested that Fluor needed to reduce its price, and then Fluor amended its bid to a "best and final" price in hopes of winning the contract.

(ii)     CW-2, who worked on the Brunswick County Plant, stated that Fluor understated the estimates for labor costs needed to build the gas-fired projects, which costs constituted a large portion of the projects' budgets.

(iii)    CW-3, who was responsible for estimating engineering requirements for the Greensville County Plant, stated that CW-3's estimates for required engineering hours and equipment were reduced by management in order to lower Fluor's bids on the Greensville County Plant.

(iv)    CW-4 said that Seaton approved bids for Gas-Fired Plants and that Porter and other senior executives reviewed the bids.

(v)     CW-6 corroborated that a "best and final" process was used to drive down bids, with Stanski leading a comprehensive review of all Government bids valued at $50-$75 million or higher.

(vi)    CW-8 noticed that Fluor routinely underbid fixed-price projects as it was necessary to win contracts.

(vii)   CW-9 stated that Fluor followed a "bid it low, let it grow" motto whereby the Company would offer lowball bids in order to win the contract, knowing that the bid amount was insufficient to complete the work under the contract.

### B.    False and Misleading Statements and Omissions Regarding the Gas-Fired Plants

114.    **Statement No. 20**: On August 14, 2013, Fluor issued a press release announcing that it had received from Dominion full notice to proceed with construction on the Brunswick County Plant, a new 1,358-megawatt, natural gas-fueled power station in Brunswick County, Virginia.  The

- 42 -

release touted the project and emphasized that Fluor had been working on the project for months, but omitted that the project was won through an unrealistic, risky bid:

> Fluor Corporation announced today that it received full notice to proceed from Dominion Virginia Power to begin construction on the company's new 1,358-megawatt, natural gas-fueled power station in Brunswick County, Virginia. . . .
>
> "Fluor is pleased that the project has received the approval from the Virginia State Corporation Commission to move forward with construction," said Matt McSorley, senior vice president and head of Fluor's Power business.  "We look forward to continuing to provide Dominion with our full suite of engineering, procurement and construction services on this significant new power source in the eastern United States."
>
> ***Fluor began providing engineering and procurement services on the plant from its Charlotte, North Carolina office last year while Dominion awaited regulatory approvals to begin construction***.  The project is expected to staff approximately 600 craft workers at peak during the construction phase.

115.    Statement No. 20 omitted material information necessary to make it not misleading for the following reasons that were unbeknownst to investors:

(a)    Defendants' positive statements regarding the initiation of construction on the Brunswick County Plant omitted the fact that Fluor's bid for the Brunswick County Plant was artificially low and based on faulty assumptions.  *See* ¶113, *supra*.

(b)    Fluor was awarded the EPC contract for the Brunswick County Plant in July 2012.  Thus, by August 14, 2013, when Fluor was given notice to proceed with construction, Fluor had already "beg[u]n providing engineering and procurement services on the plant from its Charlotte, North Carolina office" for roughly a year, during which Fluor completed detailed "engineering and procurement services on the plant." ¶114, *supra*.  This detailed work revealed that Fluor's "baseline assumptions" underlying its bid for the Brunswick County Plant were not achievable – something Defendants later admitted.  ¶273, *infra* ("The projects did not meet the original baseline assumptions due to improper estimating, craft productivity and equipment issues.").  As CW-5 described, there was not a desire to devote substantial time and resources to estimating and

- 43 -

bidding before winning the contract, since those resources would be wasted if Fluor did not win the contract, and the design phase was severely compressed.  Thus, much of the work was performed only after Fluor was awarded the Brunswick County Plant EPC contract, at which time Fluor confirmed that its original, lowball bid was insufficient.

116.    **Statement No. 21**: On February 18, 2014, Fluor released its Q4 2013 and fiscal 2013 financial results and held a conference call with analysts.  In its 2013 Form 10-K, signed by Seaton, Porter, and Smalley and SOX-certified by Seaton and Porter, Fluor stated: "[Power] [r]evenue in 2013 was 65 percent higher compared to 2012, primarily attributable to a significant increase in *project execution activities for* a solar power project in the western United States and two *gas-fired power plant projects* in Texas and Virginia."  The Form 10-K also noted that "*[n]ew awards of $1.5 billion in 2013 included a natural gas-fired power plant project in Virginia*," *i.e.*, the Brunswick County Plant.

117.    **Statement No. 22**: On the earnings call, in response to a question regarding whether Fluor had taken on additional risk as part of its recent contract awards, Seaton stated:

> *We have not seen our risk profile increase, based on the new awards that we are booking right now*.  Yes, there are some that are fixed-price in nature.  *But I would say that we feel very comfortable in taking the projects that we are on the fixed price basis*, and that's not just in oil and gas, but I would say across the Company.
>
> *We feel pretty good about our ability to execute against that*.

118.    **Statement No. 23**: On October 30, 2014, Fluor released its Q3 2014 financial results and held an earnings call with analysts.  On the earnings call, Seaton responded to an analyst question regarding progress at the Brunswick County Plant and other fixed-price projects on which Fluor was currently working:

> [Analyst:] David can you just comment on how the execution is going on your fixed-price projects right now?

- 44 -

[Seaton:] Pretty good.  *I feel really good about where we stand*.  It's got the normal puts and takes as any project does, but *I feel really good about where we are at this stage of the game on our fixed-price projects*.

119.    **Statement No. 24**: On November 13, 2014, Fluor announced that it had been awarded EPC contracts for the Anderson and Citrus County Plants.  On that day,  Fluor held its Investor Day conference during which McSorley highlighted Fluor's performance on existing fixed-price power EPC projects and distinguished Fluor from competitors who might exit the power market (as Fluor itself would later do):

> Let's talk about some of our existing projects.  As I said, our work is lump sum in the power industry.  And over the past three to five years, *we have really had a solid execution of our projects.  Many of you in here hear about companies struggling in the power EPC space, some of them wanted to maybe even exit the space*.
>
> *All of our projects over the past four or five years: on budget, on schedule, no claims.  This is largely due to our selectivity.  We don't chase everything that is out there.  Our estimating capability and, of course, our execution of the work*.

120.    **Statement No. 25**: McSorley also assured investors that the construction of the Brunswick County Plant was "on track, on schedule and cost":

> Dominion Brunswick County, this is one of our largest ones we have going right now.  This is about a $900 million lump sum project.  It is a three-on-one combined cycle project in Virginia.  Again, we have about [900 craft] there, about 35% to 40% complete, *and we are on track, on schedule and cost*.

121.    **Statement No. 26**: On March 5, 2015, Fluor issued its 2014 Annual Report, which highlighted Fluor's successful execution on gas-fired projects, including the Brunswick County Plant:

> [Fluor] [c]ontinued work on Dominion Brunswick, an immense 3-on-1 combined-cycle plant in Virginia.  *The project is about 40% finished, on schedule and on budget*.

122.    On April 27, 2015, Fluor issued a press release announcing it was awarded the EPC contract for the Greensville County Plant.  In the press release, McSorley highlighted the Brunswick

- 45 -

County Plant, stating: "'Fluor has a proven track record supporting Dominion in their goal to provide

clean, reliable, and low-cost energy to their Virginia customers.'"

123.    **Statement No. 27**: On April 30, 2015, Fluor released its Q1 2015 financial results

and held an earnings conference call with analysts.   On the call, Seaton emphasized Fluor's

performance on existing fixed-price projects:

> *[O]ur relationship with Dominion, I think Greensville shows that we execute for them on the projects that they need*.  That's a very large project that we're going to backlog next year when we get to final notice to proceed.
>
> So I think they're kind of on a roll, and I think that we've looked at the things we need to look at around competitiveness.  *I think our execution approach is sharpened relative to how we do those projects*.  Those projects were typically lump sum, so it's how well are we performing.  And *I think we're performing very, very well in the power sector*.
>
> *So I'm pretty bullish on them being able to deliver on what we've got in front of us*, but I wouldn't suggest what number projects that are out there in front for award in the next little while.  *But Greensville is a very, very important win and a very large project*.

124.    **Statement No. 28**: On June 4, 2015, Seaton presented at the Credit Suisse

Engineering & Construction Conference.  Seaton commented on the recent uptick in power projects,

and how Fluor's capabilities resulted in increased contract wins.  Specifically, Seaton emphasized

Fluor's successful implementation of the most critical component of Fluor's gas-fired Power projects

– the turbines.  Seaton's statements assured investors that Fluor was not encountering any problems

with the Mitsubishi turbines that were being installed at the Brunswick County Plant and the other

Gas-Fired Plants:

> You go to power, *we are seeing a big uptick in power.  I feel good about where we are there.  We are probably one of the few that can actually implement the gas cycle regardless of what the turbine choice is*.  And we see a significant uptick in terms of project load as we go into the next couple of years.

125.    Statement Nos. 21-28 were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

(a)    Contrary to Defendants' positive statements regarding Fluor's project execution and the Mitsubishi turbines, Fluor was not executing on schedule or on budget and the installation of the Mitsubishi turbines was a disaster.  By January 2014 – before Defendants made Statements Nos. 21-28 – Defendants were aware of problems with the Mitsubishi turbines, which were the most critical components of the Gas-Fired Plants and which were part of the "critical path" for the construction of the Gas-Fired Plants.  As described in more detail in §VIII.B.1., *infra*, by January 2014, Mitsubishi had already missed the delivery schedule for two Minor Components[5] of the Brunswick County Plant.  By April 2014, Fluor determined that Mitsubishi's deliveries "evidenced a complete lack of quality control," which "forced [Fluor] to accelerate the construction process at *great additional cost*."  ¶189, *infra*.  Thus, Defendants knew that the Brunswick County Plant was not "on track, on schedule and cost" or "on schedule and on budget" when they stated so on November 13, 2014 and March 5, 2015.  ¶¶120-121, *supra*.  Nor was it true that Fluor could "implement the gas cycle regardless of what the turbine choice is" when Defendants stated so on June 4, 2015.  ¶124, *supra*.  Finally, Fluor used these same or substantially similar Mitsubishi turbines on the other Gas-Fired Plants, all of which were "next generation" turbines with which Fluor had never worked, and therefore the problems equally affected and illustrated identical risks at the other Gas-Fired Plants – a fact Defendants later admitted.  *See* ¶180, *infra*.

---

[5]    Mitsubishi's failure to properly deliver the Minor Components was anything but minor.  As Fluor has judicially admitted, the meaning of Minor Components within the Turbine Supply Agreement includes "*all equipment and materials related to and necessary for the installation of the Turbines*."  ¶186, *infra*.

(b)     At the time Defendants made Statement Nos. 21-28, Defendants were also aware of significant schedule delays and cost overruns due to "issues with labor productivity" at the Brunswick County Plant.  By the start of the Class Period, Defendants knew or recklessly disregarded that Fluor's bids for the Gas-Fired Plants were artificially low and based on faulty assumptions.  *See* ¶113, *supra*.  Moreover, Defendants acknowledge that bidding issues generally "raise their heads" when a project reaches "about 40% – 30% to 40% construction progress."  ¶181, *infra*.  CW-8 confirmed that cost issues arose during the construction phase and that projects would already be seriously into the red by midway through construction.  Thus, by March 2015, when Defendants announced that the Brunswick County Plant was "about 40% finished," they were aware or recklessly disregarded the craft labor shortages.  In particular, Fluor encountered a lack of experienced welders, which forced it to find costly workarounds, including using multiple "shifts to make the best use of the limited number of welders" and even resorting to starting "a welding school" at a local community college.  Ultimately, Fluor admitted that it did not have "a good handle on the level of skill and number of craft employees" that would be available on site, and that craft labor was a "major issue" tied to the cost overruns at the Brunswick County Plant.

126.     **Statement No. 29**: By October 29, 2015, Defendants could no longer fully conceal the problems plaguing the Brunswick County Plant.  On that day, Fluor released its Q3 2015 financial results, announcing a $21 million charge related to the Brunswick County Plant, and held an earnings call with analysts and investors.  On the call, however, Defendants continued to omit and misstate material facts regarding problems plaguing all of the Gas-Fired Plants and other fixed-price projects.  Rather than disclose the true extent of the fixed-price problems, Seaton affirmatively stated that the issues occurring at the Brunswick County Plant were ***not*** symptomatic across Fluor's other fixed-price projects:

Cases\4811-6149-9064.v2-4/2/20

[Analyst:] Related to Brunswick County, David, you've been very careful on setting up the organization to manage these fixed-price projects to minimize risk. And I do remember that this plant had been competitively bid. Just trying to get comfortable with the fixed-price mix that's in the rest of the backlog now. Is there something different about the way the organization was structured for Brunswick County versus the other gas-fired power plants you have in backlog and you're going to put in there? And then more broadly, the other oil and gas projects now you have in backlog on a fixed-price basis, just trying to be comfortable with the fixed-price now.

[Seaton:] That's a great question. ***I would put the Brunswick situation in three categories. None of which, do I believe are embedded in how we've done any of the others. And in fact, we've learned from this and have implemented some of those learnings as we bid some of these other programs***. It falls into three categories. One is the weather that we experienced was a huge factor. As you remember, last winter was the coldest winter in a long, long time, maybe in history. And certainly Appalachia, I come from not too far from there, it can be really, really cold. And we had issues associated with weather. Secondly, we had issues with labor productivity, something that is both in and outside of our control. But in terms of the learnings, I think that's where we've learned the most. The third piece is that Mitsubishi machine, that's the first time it's been installed in the United States, and the learnings from that put us in I think a better position going forward.

***So it's not symptomatic within the organization***. You are correct; we've taken a very measured look at many of the programs and projects we're doing, including the ones that are fixed-price. And I don't see a fly in the ointment, so to speak, and I guess that's kind of what you were getting at, relative to what we've got in backlog or the competitive nature of our offerings.

127.   **Statement No. 30**: Porter stated that Fluor had "done well" on fixed-price projects, and reiterated that the issues were limited to execution only at the Brunswick County Plant project, and denied that there were systemic issues with bidding:

The power projects have been competitively bid for the last many years, and ***we've done well on them over the last several that were competitive bids***. I wouldn't put something in a distinct category just because it happened to be competitively bid. ***It's more attributable to the things David just described, as opposed to it being a competitive situation***.

128.   On February 18, 2016, Fluor released its Q4 2015 financial statements and its fiscal year 2015 Form 10-K signed and SOX-certified by Seaton and Porter, and held an earnings conference call with analysts. The Form 10-K disclosed a fourth quarter $31 million pre-tax loss resulting from forecast revisions to the Brunswick County Plant. Fluor also reported that the Power

- 49 -

segment "profit for 2015 included a loss of $60 million (including the reversal of previously recognized profit) resulting from forecast revisions for a large gas-fired power plant in Brunswick County, Virginia." Defendants, however, omitted that the issues affecting the Brunswick County Plant were affecting Fluor's other Gas-Fired Plants.

129. Statement Nos. 29-30 were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

(a) Contrary to Defendants' assurances that the turbine and craft labor issues occurring at the Brunswick County Plant were one-off events and were not "symptomatic" of Fluor's other gas-fired projects, as Defendants later admitted, all of the Gas-Fired Plants "had a fundamental problem" and all of the plants suffered from the same "improper estimating, craft productivity and equipment issues." ¶273, *infra.*

(b) Problems with the Mitsubishi turbines at the Brunswick County Plant were not isolated to that plant – they were "symptomatic" across all of the Gas-Fired Plants. Because the other Gas-Fired Plants used the same or substantially similar Mitsubishi turbines, they were plagued by the same problems. For example, CW-5 described a pressure valve problem affecting the Citrus County Plant turbines that had also affected the Brunswick County Plant turbines. Indeed, as Defendants later admitted, "all 4 projects were based on next-gen turbines or steam generators that were first of a kind for Fluor," and "all 4 of those projects were bid at a time when we didn't have good information on the new first-of-a-kind equipment." ¶273, *infra.*

(c) The craft labor issues at Brunswick were also "symptomatic" across all of the Gas-Fired Plants. CW-8 observed that at the Anderson County and Citrus County Plants, Fluor was unable to find workers with proper skills and motivation due to Fluor's faulty labor cost estimates. As Defendants later admitted, craft labor was a "major issue" and "all 4 of those projects were bid at

- 50 -

a time when we didn't . . . have a good handle on the level of skill and number of craft employees that we would have available to us in some of these locations."  ¶273, *infra*.

(d)     Seaton's representation that Fluor had taken "a very measured look" at the other gas-fired projects and the problems at the Brunswick County Plant were not "embedded in how we've done any of the others" was knowingly or recklessly misleading when made.  ¶126, *supra*. The truth, however, was that all of the gas-fired projects were bid "by the same pursuit team" who used "the same statistics and information" and who "did not follow the rules."  ¶163, *infra*.

(e)     Porter's representation that Fluor had "done well" on gas-fired projects was knowingly or recklessly misleading when made.  Since 2003, six of eight fixed-price gas-fired power projects awarded to Fluor prior to the Brunswick County Plant EPC contract – or 75% – had underperformed Fluor's bid assumptions.

130.     **Statement No. 31**: On May 4, 2017, Fluor released its Q1 2017 financial results and held an earnings conference call with analysts and investors.  The Form 10-Q, signed by Porter and SOX-certified by Seaton and Porter, disclosed a $30 million charge related to cost overruns on the Anderson County Plant: "The decrease in segment profit was driven by cost increases and forecast revisions of approximately $30 million, primarily for a gas-fired power plant in South Carolina." Defendants, however, omitted the full scope of the problems, cost overruns, and delays plaguing the Anderson County Plant.  Rather, Seaton stated the opposite by falsely assuring investors that Fluor's execution problems at the Anderson County Plant were not significant and Fluor could even ***reverse*** some of its losses in the future.  On the earnings call, Seaton declined to provide any details regarding the charge, and instead assured investors:

> [T]he South Carolina project is nearing completion, and ***there are some issues there that I really don't want to talk about because we've got some opportunities, hopefully, to maybe reverse some of that***.

131.    On August 3, 2017, Fluor released its Q2 2017 financial results and held an earnings

conference call with analysts and investors.  The Form 10-Q, signed by Porter and SOX-certified by

Seaton and Porter, disclosed a $194 million charge related to three of its fixed-price gas-fired power

plants: "The Industrial, Infrastructure & Power segment reported a segment loss of $168 million,

compared to a segment profit of $51 million in the second quarter of 2016.  *Results for the quarter*

*include approximately $194 million in pre-tax project expenses related to forecast adjustments on*

*three gas-fired power projects*."  On the call, Seaton provided an update regarding ongoing issues at

the Gas-Fired Plants:

> I want to start our call today discussing the issues we are experiencing in our
> Industrial, Infrastructure & Power segment, specifically the concerns on 3 gas-fired
> projects currently under construction.  *All 3 projects, 4 if you include the Brunswick*
> *project that incurred a charge in 2015, had a fundamental problem*.  The projects
> did not meet the original baseline assumptions due to improper estimating, craft
> productivity and equipment issues.  All of these projects were bid in 2014 by the
> same pursuit team.  In addition, all 4 projects were based on next-gen turbines or
> steam generators that were first of a kind for Fluor.  The quality control and
> completeness of these turbines delivered to the site were not in line with our bid
> assumptions and we are pursuing our options.

132.    **Statement No. 32**: Defendants, however, continued to omit the full scope of the

problems, cost overruns, and delays plaguing the Gas-Fired Plants.  On the earnings call, Seaton

represented that a new management team had reviewed the Gas-Fired Plants and any problems were

captured in the newly announced forecast:

> So where are we today?  Of the 3 currently active projects, 1 is 92%
> complete, with an expected mechanical completion in Q4.  One is 45% complete,
> with an estimated completion date of Q2 2018.  And the last project [the Citrus
> County Plant] is 42% complete, and is expected to be complete in Q4 2018.  I'd
> make a comment that those are construction completion percentages, not overall
> project percent completes.  So this is specifically related to the construction scope.
>
> I've discussed the problems, and now I'd like to talk about we've changed.
> After we had the initial charge last quarter, we changed the Power leadership team
> and brought in Simon Nottingham as the President of that group – of the Power
> group.  Simon comes from our oil and gas group, and he brings to this role his
> extensive background in project and program management.  *He and his team, in*
> *coming to this role, led a review of the 3 projects in the second quarter and*

- 52 -

*developed a path forward that is reflected in our current estimates*. Some members of the Power management team have exited Fluor. We also informed our employees that we are closing our Charlotte office and consolidating Power operations in Greenville, where it will be closer to our other businesses and leadership.

\*      \*      \*

In addition to the changes in management of Power group, our strategic evaluation of the gas-fired power market, *we're also implementing other changes to give us greater confidence that these types of earnings adjustments are diminished and less frequent*.

\*      \*      \*

*We – as I said, we've changed the review process to where there's more cold eyes review. And I feel reasonably good about where we are*.

133.    On February 20, 2018, Fluor released its Q4 2017 financial results and held an earnings call with analysts and investors. Fluor disclosed a $41 million charge related to the Citrus County Plant, but continued to omit ongoing problems and mounting costs.

134.    On May 3, 2018, Fluor released its Q1 2018 financial results and held an earnings call for analysts and investors. Fluor disclosed another $125 million charge for the Citrus County Plant. The Form 10-Q, signed by Stanski and SOX-certified by Seaton and Stanski, stated: "The decrease in segment profit was primarily driven by forecast revisions of approximately $125 million for estimated cost growth for the [Citrus County] fixed-price, gas-fired power plant project . . . ." On the call, Seaton described the additional issues and charges on the Citrus County Plant:

Let's start off by discussing the challenges that we are experiencing on the same gas-fired power project we discussed last quarter and the steps we're taking to complete this project and in Fluor's participation in the specific end market. *Craft productivity and estimating were materially different than the original baseline expectations we made in the initial charge on this project last year. While those factors were included in our initial charge, the majority of the $125 million charge taken this quarter is driven by extremely low ongoing productivity and the financial impact that this has relative to initial expected timing of when the 2 units would be available for power production based on the current outlook*.

135.    **Statement No. 33**: In an exchange with an analyst, Seaton assured investors that the Gas-Fired Plants would be completed within the charges that the Company took:

- 53 -

[Analyst:] . . . So David, *the power project is 86% done, you've said.  I think you have one more project in backlog of the same A-grade*.  And it is probably the same level done.  *Is there anything else you could do on the projects to assure investors that they can invest, really for the next couple of quarters, in Fluor until the projects are done*?  I think I remember back in the day, Alan Boeckmann saying he was going to visit his embassy problem project every week toward the end of it.  Can you do that?  Shouldn't you do that?  Anything more you can do.

*       *       *

So I just said that – yes, back in, I think it was 2006 or something, I'm showing my age.  But Alan Boeckmann had said that he was going to go visit the embassy project, his problem projects literally every week until it's done.  *So as a CEO, what more can you do, David?  Like we always get the question, "Can I invest in Fluor until these problem projects are done?"  How would you answer that*?

[Seaton:] Yes, I mean, *I've been in the project site twice this year*, and I have personally directed different resources there.   And I am – *I hate to even say confident, but I am in the ability of the project to complete within this number*, as well – and look, we used an abysmal productivity rate in setting the number that we wrote down.  *So I have confidence that we'll be able to finish*.  As you said, we're high 80s percentage.  We're starting to turn over systems to the customer on unit 1.  Unit 2, I think, will be an easier finish than unit 1 has been.  So I feel pretty good about the team that's there now.  Yes, I'm not going to say that I will be there every week, *but I'm going to be there on a routine basis, and I have already taken personal review of this project*.  With regard to the other one, and this is a hell of it, is *the project in Virginia is going very well*.  It is in the same kind of completion percentage.  *And those guys have done a better job relative to managing that craft and making the progress that they need to make.  So I feel very good about that project and what that team is doing.  But yes, I mean when things go bad, the boss has got to be there, and I get that.  And I have been and will be as we finish this project*.

136.   **Statement No. 34**: In Seaton's closing remarks, he repeated his assurance that all the

issues with the Gas-Fired Plants had been captured by the charge and completion was near:

Despite a disastrous quarter and our disappointment, I'm really excited about the future.  No one's more disappointed than I am relative to where we are on a very finite sample of projects.  *And we do know where the end is, and we believe we've captured that*.

137.   **Statement No. 35**: Likewise, a slide presented on the earnings call represented that

"[t]he underperforming gas-fired projects have been *de-risked*."

138.     On August 2, 2018, Fluor released its Q2 2018 financial results and held an earnings call for analysts and investors.  Fluor disclosed another $16 million charge for the Citrus County Plant.  The Form 8-K announcing the results disclosed "[t]he Mining, Industrial, Infrastructure & Power segment . . . [r]esults for the quarter include a pre-tax charge of $16 million for forecast revisions on a gas-fired power project."  On the earnings call, Seaton commented on the Citrus County Plant losses on the Company's overall performance: "It's just a shame that this noise on legacy projects has dampened what could have been some really good quarters over the last 2 years."

139.     **Statement No. 36**: Defendants, however, continued to conceal the full scope of the problems, cost overruns, and delays plaguing the remaining gas-fired plants: "*[W]e've done everything in our power to lessen that risk and give us better insight and surety in terms of our performance going forward*."

140.     Statements Nos. 31-36 were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

(a)     At the time Seaton stated that Fluor had "developed a path forward that is reflected in our current estimates" (¶132, *supra*), the Citrus County Plant was already suffering from material and costly schedule delays.  As described in §VIII.B.2., *infra*, by November 2017, the delays were so severe that Fluor was forced to enter into a change order with Duke to push back the Guaranteed Mechanical Completion Date from December 2017 to March 2018.  Ultimately, the Citrus County Plant charges were the result of these schedule delays; Fluor admitted that the charges were due to the "financial impact . . . relative to initial expected timing of when the 2 units would be available for power production."  ¶275, *supra*.

(b)     Although Defendants claimed the Citrus County Plant had been "de-risked" and Fluor had captured the risks in its estimates by May 2018, the Citrus County Plant continued to

suffer from material schedule delays and execution problems.  As described in §VIII.B.2, *infra*, Fluor missed the amended Guaranteed Mechanical Completion Date deadline of March 2018 by approximately six months.  As a result, Fluor was liable for "all additional costs incurred by Duke Energy due to the failure to meet the agreed milestone dates."

(c)      Contrary to Defendants' representation that the Gas-Fired Plants had been "de-risked" and that all possible future losses had been "captured" by the charges taken in Q1 2018, the Company continued taking massive charges on the Gas-Fired Plants in every consecutive quarter from Q2 2018 to Q2 2019.  §VIII.D., *infra*.

**C.      False and Misleading Statements and Omissions Regarding Fluor's Disclosure Controls and Procedures and Its Reported Revenue**

141.    **Statement No. 37**: Throughout the Class Period, Fluor provided investors with its "Management's Report on Internal Control Over Financial Reporting" in its Forms 10-K for fiscal years 2013-2018, signed by Seaton, Porter, Stanski, and Smalley and SOX-certified by Seaton, Porter, and Stanski:

> The company's internal control over financial reporting is a process designed, as defined in Rule 13a-15(f) under the Exchange Act, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with generally accepted accounting principles in the United States.
>
> In connection with the preparation of the company's annual consolidated financial statements, management of the company has undertaken an assessment of the effectiveness of the company's internal control over financial reporting . . . . Management's assessment included an evaluation of the design of the company's internal control over financial reporting and testing of the operational effectiveness of the company's internal control over financial reporting.  Based on this assessment, ***management has concluded that the company's internal control over financial reporting was effective*** as of [the end of the period covered by this annual report].

142.    **Statement No. 38**: Defendants also provided an "Evaluation" of these controls and procedures in their Forms 10-K and 10-Q issued throughout the Class Period:

- 56 -

Based on their evaluation as of . . . the end of the period covered by this . . . report, ***our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures . . . are effective*** . . . .[6]

143.    **Statement No. 39**: In connection with the filing of each Form 10-K and Form 10-Q issued during the Class Period, Seaton, Porter, Stanski, Hernandez, and Steuert stated that the financial statements of the Company were prepared in accordance with GAAP and signed SOX certifications, certifying that:

(a)    each report "fairly present[ed] in all material respects the financial condition [and] results of operations" of the Company;

(b)    each report "d[id] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading";

(c)    they had "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the [Company] . . . is made known to [them]";

(d)    they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles";

(e)    they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures"; and

(f)    they had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to

---

[6]    This statement was repeated in every Form 10-K and Form 10-Q issued during the Class Period in identical or substantially similar form.

adversely affect the registrant's ability to record, process, summarize and report financial information."

144.     **Statement No. 40**: In connection with the filing of each Form 10-K and Form 10-Q issued during the Class Period, Defendants also assured investors that, in recognizing revenue for that period, all currently estimated fixed-contract costs had been recognized:

> The percentage-of-completion method of revenue recognition requires the company to prepare estimates of cost to complete for contracts in progress.  In making such estimates, judgments are required to evaluate contingencies such as potential variances in schedule and the cost of materials, labor cost and productivity, the impact of change orders, liability claims, contract disputes and achievement of contractual performance standards.  ***Changes in total estimated contract cost and losses, if any, are recognized in the period they are determined***.[7]

145.     **Statement No. 41**: On February 18, 2016, Fluor released its Q4 2015 financial statements and its fiscal year 2015 Form 10-K, signed and SOX-certified by Seaton and Porter. Fluor reported total revenue of approximately $18.1 billion for fiscal year 2015.  The Company also reported that it had recorded $30 million in claim revenue as of the end of 2015.  In discussing revenues, it attributed the Power segment's impact as being due to the Gas-Fired Plants:

> Revenue in 2015 decreased 6 percent compared to 2014, principally due to a decrease in project execution activities for a solar energy project in California and a large gas-fired plant in Brunswick County, Virginia.  The overall revenue decline was partially offset by increased project execution activities for several projects in the early stages of project execution, including a gas-fired power plant in Greensville County, Virginia and two large gas-fired power plants in South Carolina and Florida.

It stated: "Consolidated new awards for 2015 were $21.8 billion compared to $28.8 billion in 2014 and $25.1 billion in 2013.  The Oil & Gas and Power segments were the major contributors to the new award activity during 2015."  It added: "Consolidated backlog was $44.7 billion as of December 31, 2015, $42.5 billion as of December 31, 2014, and $34.9 billion as of December 31, 2013.  The

---

[7]     This statement was repeated in every Form 10-K issued during the Class Period in identical or substantially similar form.

higher backlog at the end of 2015 was primarily due to significant new awards in the Power segment . . . ."

146.    **Statement No. 42**: On May 5, 2016, Fluor released its Q1 2016 Form 10-Q, signed by Porter and Chopra and SOX-certified by Seaton and Porter.  Fluor reported total revenue of approximately $4.4 billion for Q1 2016, and net earnings of approximately $119 million.  The Company also reported that it had recorded $36 million in claim revenue as of the end of Q1 2016. In discussing revenues, it credited growth in the Power segment as offsetting declines:

> Consolidated revenue of $4.4 billion for the three months ended March 31, 2016 decreased slightly compared to $4.5 billion for the three months ended March 31, 2015.  Revenue in the Energy, Chemicals & Mining segment decreased in the current year period due to reduced levels of project execution activities in the mining and metals business line and for certain large upstream projects progressing to completion.  Revenue growth in the Industrial, Infrastructure & Power segment due to increased project execution activities for several power projects, as well as revenue contributions from the Stork acquisition, largely offset this revenue decline.

It elaborated:

> Revenue for the three months ended March 31, 2016 increased by 52 percent compared to the three months ended March 31, 2015 primarily due to increased project execution activities in the power business line for several projects in the early stages of project execution including two nuclear projects and several gas-fired power plants in the southeastern United States.

It also stated:

> Consolidated new awards were $4.7 billion for the three months ended March 31, 2016 compared to new awards of $4.4 billion for the three months ended March 31, 2015.  The Government and Industrial, Infrastructure & Power segments were the major contributors to the new award activity in the first quarter of 2016.

It added: "Consolidated backlog as of March 31, 2016 was $46.0 billion compared to $41.2 billion as of March 31, 2015.  The increase in backlog was primarily due to significant new awards booked after the first quarter of 2015 in the Industrial, Infrastructure & Power segment."

147.    **Statement No. 43**: On August 4, 2016, Fluor released its Q2 2016 Form 10-Q, signed by Porter and Chopra and SOX-certified by Seaton and Porter.  Fluor reported total revenue of

- 59 -

approximately $4.8 billion for Q2 2016, and net earnings of approximately $120 million.  The

Company also reported that it had recorded $49 million in claim revenue as of the end of Q2 2016.

In discussing revenues, it stated:

> Consolidated revenue of $4.9 billion and $9.3 billion for the three and six months ended June 30, 2016, respectively, was essentially flat when compared to consolidated revenue of $4.8 billion and $9.4 billion for the three and six months ended June 30, 2015.  During both periods, revenue growth in the Industrial, Infrastructure & Power, Government and Maintenance, Modification & Asset Integrity segments were offset by revenue declines in the Energy, Chemicals & Mining segment.  The revenue growth in both periods resulted primarily from increased project execution activities for several power projects, as well as revenue contributions from the Stork acquisition.

It also highlighted the Power segment as favorably offsetting lowered earnings elsewhere, stating:

> Net earnings attributable to Fluor Corporation were $102 million and $206 million for the three and six months ended June 30, 2016, respectively, compared to net earnings attributable to Fluor Corporation of $149 million and $293 million, respectively, for the corresponding periods of 2015.  The three and six month periods of 2016 reflect lower earnings contributions from the Energy, Chemicals & Mining segment compared to the prior year periods, partially offset by higher contributions from power projects in the Industrial, Infrastructure & Power segment.

It elaborated as to the Power segment's contributions, stating: "[Power] [s]egment profit for the three

and six months ended June 30, 2016 significantly increased from the corresponding periods in 2015,

primarily due to higher contributions associated with the project execution activities for several

power business line projects in the early stages of project execution."  It highlighted the Power and

Government segments as driving Fluor's new contract awards, stating:

> Consolidated new awards were $6.4 billion and $11.1 billion for the three and six months ended June 30, 2016, respectively,  compared to new awards of $4.3 billion and $8.7 billion for the three and six months ended June 30, 2015.  The Industrial, Infrastructure & Power and Government segments were the major contributors to the new award activity in the first half of 2016.

It similarly touted the Power segment as fueling increases in Fluor's backlog, stating: "Consolidated

backlog as of June 30, 2016 was $47.3 billion compared to $41.6 billion as of June 30, 2015.  The

increase in backlog was primarily due to new awards booked after the second quarter of 2015 in the Industrial, Infrastructure & Power segment."

148.    **Statement No. 44**: On November 3, 2016, Fluor released its Q3 2016 Form 10-Q, signed by Porter and Chopra and SOX-certified by Seaton and Porter.  Fluor reported total revenue of approximately $4.8 billion for Q3 2016, and net earnings of approximately $17 million.  The Company also reported that it had recorded $56 million in claim revenue as of the end of Q3 2016. It highlighted the Power and Government segments as revenue drivers:

> Consolidated revenue for the three months ended September 30, 2016 increased 9 percent from $4.4 billion to $4.8 billion compared to the three months ended September 30, 2015.  Consolidated revenue for the nine months ended September 30, 2016 increased 2 percent from $13.7 billion to $14.0 billion compared to the first nine months of the prior year.  During both periods, revenue growth in the Industrial, Infrastructure & Power, Government and Maintenance, Modification & Asset Integrity segments were partially offset by revenue declines in the Energy, Chemicals & Mining segment.  The revenue growth in both periods resulted primarily from increased project execution activities for several power projects, as well as revenue contributions from the Stork acquisition.

Regarding the Power segment specifically, it added:

> Revenue for the three and nine months ended September 30, 2016 increased by 89 percent and 72 percent, respectively, compared to the three and nine months ended September 30, 2015 primarily due to increased project execution activities in the power business line for several projects, including two nuclear projects and several gas-fired power plants in the southeastern United States, as well as increased project execution activities in the infrastructure business line for several projects in the early stages of project execution.

It said the Power segment offset earnings declines elsewhere, stating:

> Earnings from continuing operations attributable to Fluor Corporation were $5 million and $211 million for the three and nine months ended September 30, 2016, respectively, compared to earnings from continuing operations attributable to Fluor Corporation of $176 million and $469 million, respectively, for the corresponding periods of 2015.  Earnings from continuing operations attributable to Fluor Corporation for the three and nine month periods of 2016 were adversely affected by after-tax charges of $154 million and $170 million, respectively, related to forecast revisions for estimated cost increases on a petrochemical project in the Energy, Chemicals & Mining segment, which were partially offset by higher contributions from power projects in the Industrial, Infrastructure & Power segment.

- 61 -

It elaborated:

> [Power] [s]egment profit for the three and nine months ended September 30, 2016 significantly increased from the corresponding periods in 2015 primarily due to the higher volume of project execution activities for the power projects mentioned above, as well as the adverse impact on segment profit for the prior year periods resulting from forecast revisions on a large gas fired power plant.

It also touted the Power and Government segments as driving new contract awards:

> Consolidated new awards were $7.0 billion and $18.1 billion for the three and nine months ended September 30, 2016, respectively, compared to new awards of $5.3 billion and $14.0 billion for the three and nine months ended September 30, 2015. The Energy, Chemicals & Mining, Industrial, Infrastructure & Power, and Government segments were the major contributors to the new award activity in the first nine months of 2016 . . . .

It also touted the Power segment as increasing backlog:

> Consolidated backlog as of September 30, 2016 was $44.3 billion compared to $41.7 billion as of September 30, 2015. The increase in backlog was primarily due to new awards booked after the third quarter of 2015 in the Energy, Chemicals & Mining and Industrial, Infrastructure & Power segments partially offset by a current period adjustment for a liquefied natural gas project that was suspended in the third quarter.

149. **Statement No. 45**: Seaton began the earnings call that evening call by discussing the "significant charge" the Company had taken on its "fixed-price project for CPChem in the Gulf Coast," and assured investors that changes in the Company's internal processes would prevent such charges in the future:

> [W]e took a really hard look at this, almost a conservative look at this, because of what we knew we had to get done.
>
> I will mention that this project was bid prior to some of the changes that we've made and some of the innovations that we've applied in the integrated solutions model. So when you look at where we are going, we shouldn't have these kinds of issues in our backlog or in the projects that we win.

150. **Statement No. 46**: On February 17, 2017, Fluor released its Q4 2016 financial statements and its fiscal year 2016 Form 10-K, signed by Seaton, Porter, and Chopra and SOX-certified by Seaton and Porter. Fluor reported total revenue of approximately $19 billion for fiscal

- 62 -

year 2016.  The Company also reported that it had recorded $61 million in claim revenue as of the end of 2016.  It credited the Power and Government segments with driving revenues:

> Consolidated revenue for 2016 was $19.0 billion compared to $18.1 billion for 2015. During 2016, revenue growth in the Industrial, Infrastructure & Power, Government and Maintenance, Modification & Asset Integrity segments were partially offset by a revenue decline in the Energy, Chemicals & Mining segment. The revenue growth resulted primarily from increased project execution activities for several power projects, as well as revenue contributions from the acquired Stork business.

Elaborating on the Power segment, it stated:

> Revenue in 2016 increased 81 percent compared to 2015, primarily due to increased project execution activities in the power business line for several projects, including two nuclear projects and several gas-fired power plants in the southeastern United States. . . .

> Segment profit increased significantly in 2016 compared to 2015 primarily due to the higher volume of project execution activities for the power projects mentioned above, as well as the adverse impact in the prior year of a loss of $60 million resulting from forecast revisions on a large gas-fired power plant in Brunswick County, Virginia.

It credited the Power segment with offsetting earnings declines elsewhere, stating:

> Earnings from continuing operations before taxes for 2015 decreased 40 percent to $727 million from $1.2 billion in 2014 primarily due to a pre-tax pension settlement charge of $240 million (discussed below).  The decrease in earnings from continuing operations before taxes in 2015 also reflected reduced contributions from the power and infrastructure business lines of the Industrial, Infrastructure & Power segment.

It added:

> Consolidated new awards for 2016 were $21.0 billion compared to $21.8 billion in 2015 and $28.8 billion in 2014.  The Energy, Chemicals & Mining; Industrial, Infrastructure & Power; and Government segments were the significant drivers of new award activity during 2016, including an award for the Tengiz Oil Expansion Project in Kazakhstan that was awarded in the third quarter.

It also stated:

> Consolidated backlog was $45.0 billion as of December 31, 2016, $44.7 billion as of December 31, 2015, and $42.5 billion as of December 31, 2014.  The higher backlog at the end of 2016 was due to significant new awards and project adjustments in the Energy, Chemicals & Mining and Industrial, Infrastructure &

Power segments, partially offset by an adjustment for a liquefied natural gas project that was suspended in the third quarter.

151.     **Statement No. 47**: On May 4, 2017, Fluor released its Q1 2017 Form 10-Q, signed by Porter and Chopra and SOX-certified by Seaton and Porter.  Fluor reported total revenue of approximately $4.8 billion for Q1 2017, and net earnings of approximately $77 million.  The Company also reported that it had recorded $66 million in claim revenue as of the end of Q1 2017.

It again touted the Power and Government segments:

> Consolidated revenue of $4.8 billion for the three months ended March 31, 2017 increased compared to $4.4 billion for the three months ended March 31, 2016. Revenue growth in the Industrial, Infrastructure & Power; Government; and Diversified Services segments were partially offset by revenue declines in the Energy, Chemicals & Mining segment.  The revenue growth resulted primarily from increased project execution activities for several power projects, as well as revenue contributions from the Stork acquisition.

Expanding on the Power segment, it stated:

> Revenue for the three months ended March 31, 2017 increased by 44 percent compared to the three months ended March 31, 2016 primarily due to increased project execution activities for several power projects, including two nuclear projects for Westinghouse and two gas-fired power plants in the southeastern United States, as well as increased project execution activities for several life sciences and advanced manufacturing projects in the early stages of project execution.
>
> Segment profit for the three months ended March 31, 2017 decreased significantly compared to the corresponding period in 2016.  The decrease in segment profit was driven by cost increases and forecast revisions of approximately $30 million, primarily for a gas-fired power plant in South Carolina.

It explained the Power and Government segments' impacts on earnings as follows:

> Net earnings attributable to Fluor Corporation were $61 million and $104 million for the three months ended March 31, 2017 and 2016, respectively.  The first quarter of 2017 reflects lower earnings contributions from the Energy, Chemicals & Mining segment . . . .  The decrease in earnings was further driven by cost increases and forecast revisions on certain Industrial, Infrastructure & Power projects, primarily for a gas-fired power plant in South Carolina, as well as lower earnings contributions from the Diversified Services segment when compared to the prior period.  These declines were partially offset by higher earnings contributions from the Government segment and lower corporate general and administrative expenses . . . .

It added:

> Consolidated new awards were $2.3 billion for the three months ended March 31, 2017 compared to new awards of $4.7 billion for the three months ended March 31, 2016.  The Energy, Chemicals & Mining; Industrial, Infrastructure & Power; and Government segments were the major contributors to the new award activity in the first quarter of 2017 including the A10 Zuidasdok project in Amsterdam and two refinery projects in Texas.

Its discussion of backlog failed to address the Power or Government segments, instead stating:

> Consolidated backlog as of March 31, 2017 was $41.6 billion compared to $46.0 billion as of March 31, 2016.  The decrease in backlog primarily resulted from an adjustment for a liquefied natural gas project in Canada that was suspended in the third quarter of 2016 and an adjustment made in the first quarter of 2017 to limit the contractual term of the Magnox RSRL Project to a five year term, as well as new award activity being outpaced by work performed in the Energy, Chemicals & Mining segment.

152.    **Statement No. 48**: On August 3, 2017, Fluor released its Q2 2017 Form 10-Q, signed by Porter and Chopra and SOX-certified by Seaton and Porter.  Fluor reported total revenue of approximately $4.7 billion for Q2 2017, and a net loss of approximately $7 million.  The Company also reported that it had recorded $75 million in claim revenue as of the end of Q2 2017.  It stated:

> Consolidated revenue of $4.7 billion for the three months ended June 30, 2017 decreased 3 percent compared to $4.9 billion for the three months ended June 30, 2016.  During the three month period, revenue declines in the Energy, Chemicals & Mining and Diversified Services segments were partially offset by revenue increases in the Government segment.  Consolidated revenue of $9.6 billion for the six months ended June 30, 2017 increased 3 percent compared to $9.3 billion for the six months ended June 30, 2016. During the six month period, revenue growth in the Industrial, Infrastructure & Power and Government segments were partially offset by revenue declines in the Energy, Chemicals & Mining segment.

Elaborating as to the Power segment, it stated:

> Revenue for the three and six months ended June 30, 2017 increased by 2 percent and 21 percent, respectively, compared to the three and six months ended June 30, 2016.  Revenue growth for both periods, which primarily resulted from increased project execution activities for several life sciences and advanced manufacturing projects and two nuclear projects for Westinghouse, was adversely affected by forecast revisions for three fixed-price, gas-fired power plant projects in the southeastern United States.

Segment profit and segment profit margin for the three and six months ended June 30, 2017 were adversely affected by charges totaling $194 million and $219 million, respectively, resulting from forecast revisions for estimated cost growth at the three fixed-price, gas-fired power plant projects mentioned above.

In discussing earnings, it stated:

The net loss attributable to Fluor Corporation was $24 million for the three months ended June 30, 2017 compared to net earnings attributable to Fluor Corporation of $102 million for the prior year period. Net earnings attributable to Fluor Corporation were $37 million for the six months ended June 30, 2017 compared to $206 million corresponding period of 2016. Earnings for the three and six months ended June 30, 2017 were adversely affected by charges totaling $194 million and $219 million, respectively, resulting from forecast revisions for estimated cost growth at three fixed-price, gas-fired power plant projects in the southeastern United States.

It continued:

Consolidated new awards were $3.2 billion and $5.5 billion for the three and six months ended June 30, 2017, respectively, compared to new awards of $6.4 billion and $11.1 billion for the three and six months ended June 30, 2016. All business segments contributed to the new award activity in 2017.

It added:

Consolidated backlog as of June 30, 2017 was $37.6 billion compared to $47.3 billion as of June 30, 2016. The decrease in backlog primarily resulted from an adjustment for a liquefied natural gas project in Canada that was suspended in the third quarter of 2016, an adjustment for the July cancellation of a nuclear power plant project for Westinghouse in South Carolina (V.C. Summer), and an adjustment made in the first quarter of 2017 to limit the contractual term of the Magnox nuclear decommissioning project in the United Kingdom ("Magnox RSRL Project") to a five year term, as well as new award activity being outpaced by work performed.

153.    **Statement No. 49**: On the earnings call that evening Defendants discussed the $194 million charge related to three of the Gas-Fired Plants, and Seaton repeatedly assured investors that the Company was improving its internal controls to make further charges "diminished and less frequent":

In addition to the changes in management of Power group, our strategic evaluation of the gas-fired power market, *we're also implementing other changes to give us greater confidence that these types of earnings adjustments are diminished and less frequent*.

- 66 -

*      *      *

*We have significantly increased the independent review of critical projects. We are improving our estimating system.  And we're also making significant investments in applying data analytics to projects so that we can identify challenges earlier, which would allow us to mitigate problems sooner*.  We believe all these actions will minimize downside risk and allow for greater upside opportunities.

*      *      *

We have – we do review all these big projects on a routine basis.  And we do have cold eyes or different lenses that look at them.

*      *      *

I would argue that the lion's share of our lump-sum backlog is performing extremely well.  And that's about as far as I really want to go with that.  But *we're improving our tools and systems.  We – as I said, we've changed the review process to where there's more cold eyes review*.

*      *      *

[W]e're looking at ourselves in terms of what we need to do.  We just – I don't think it's going to take long.  I think that my expectation, and I've kind of coined this phrase, is flawless personal performance.  And what that – it doesn't mean I'm looking for perfection, but what it does mean I'm looking for is accountability and execution excellence.  And we started that process when we found the problem in the CPChem, and we're continuing to do those reviews and make the changes necessary so that we don't have a repeat of what we've had here.  And I'm – I can tell you that – I guess that we've dinged our credibility with you guys and we got to rebuild that.

154.    **Statement No. 50**: On November 2, 2017, Fluor released its Q3 2017 Form 10-Q, signed by Stanski and Chopra and SOX-certified by Seaton and Stanski.  Fluor reported total revenue of approximately $4.9 billion for Q3 2017, and net earnings of approximately $113 million.  The Company also reported that it had recorded $80 million in claim revenue as of the end of Q3 2017.  It stated:

Consolidated revenue of $4.9 billion for the three months ended September 30, 2017 increased 4 percent compared to $4.8 billion for the three months ended September 30, 2016.  During the three month period, revenue increased in the Energy, Chemicals & Mining and Government segments, while revenue from the Industrial, Infrastructure & Power and Diversified Services segments was consistent with prior year levels.  Consolidated revenue of $14.5 billion for the nine months ended September 30, 2017 increased 3 percent compared to $14.0 billion for the nine

- 67 -

months ended September 30, 2016.  During the nine month period, revenue growth in the Industrial, Infrastructure & Power; Government; and Diversified Services segments was partially offset by a revenue decline in the Energy, Chemicals & Mining segment.

Regarding the Power segment, it elaborated:

Revenue for the three months ended September 30, 2017 remained flat when compared to the same period in 2016.  Revenue growth from increased project execution activities for several life sciences and advanced manufacturing projects was offset by reduced levels of project execution for certain power and infrastructure projects.  Revenue for the nine month period ended September 30, 2017 increased by 13 percent compared to the corresponding period in 2016, primarily due to increased project execution activity for several life sciences and advanced manufacturing projects.

It added:

Segment profit for the three months ended September 30, 2017 remained relatively flat compared to the prior year. Segment profit for the nine months ended September 30, 2017 was adversely affected by pre-tax charges of $219 million resulting from forecast revisions for estimated cost growth at three fixed price, gas fired power plants projects, which were recognized in the first half of 2017.

Discussing earnings, it said:

Net earnings attributable to Fluor Corporation were $94 million and $131 million for the three and nine months ended September 30, 2017, respectively, compared to earnings attributable to Fluor Corporation of $5 million and $211 million for the corresponding periods of 2016.  Earnings for the nine months ended September 30, 2017 were adversely affected by after-tax charges totaling $140 million resulting from forecast revisions for estimated cost growth at three fixed-price, gas-fired power plant projects in the southeastern United States, which were recognized in the first half of 2017.

It added:

Consolidated new awards were $3.8 billion and $9.3 billion for the three and nine months ended September 30, 2017, respectively, compared to new awards of $7.0 billion and $18.1 billion for the three and nine months ended September 30, 2016.  All business segments contributed to the new award activity in 2017.

It also stated:

Consolidated backlog as of September 30, 2017 was $32.9 billion compared to $44.3 billion as of September 30, 2016.  The decrease in backlog primarily resulted from the removal of two nuclear power plant projects for Westinghouse Electric Company LLC ("Westinghouse") in South Carolina ("V.C. Summer") and in

- 68 -

Georgia ("Plant Vogtle") and an adjustment made in the first quarter of 2017 to limit the contractual term of the Magnox nuclear decommissioning project in the United Kingdom ("Magnox RSRL Project") to a five year term, as well as new award activity being outpaced by work performed.

155.   **Statement No. 51**: On February 20, 2018, Fluor released its Q4 2017 financial statements and its fiscal year 2017 Form 10-K, signed by Seaton, Stanski, and Chopra and SOX-certified by Seaton and Stanski.  Fluor reported total revenue of approximately $19.5 billion for fiscal year 2017.  The Company also reported that it had recorded $124 million in claim revenue as of the end of 2017.  It stated:

> Consolidated revenue was $19.5 billion, $19.0 billion and $18.1 billion during 2017, 2016 and 2015, respectively.  During both 2017 and 2016, revenue growth in the Industrial, Infrastructure & Power, Government and Diversified Services segments was partially offset by revenue declines in the Energy, Chemicals & Mining segment.

Regarding the Power segment specifically, it stated:

> Revenue in 2017 increased 7 percent compared to 2016 primarily due to increased project execution activity for several life sciences and advanced manufacturing projects, partially offset by reduced levels of project execution for two nuclear projects. . . .
>
> Segment profit in 2017 was adversely affected by pre-tax charges of $260 million resulting from forecast revisions for estimated cost growth at three fixed-price, gas-fired power plant projects.

It added:

> Earnings from continuing operations before taxes for 2017 decreased 29 percent to $386 million from $547 million in 2016.  Earnings in 2017 were adversely affected by pre-tax charges totaling $304 million resulting from forecast revisions for estimated cost growth at three fixed-price, gas-fired power plant projects in the southeastern United States and a downstream project.

It stated:

> Consolidated new awards in 2017 were $12.6 billion compared to $21.0 billion in 2016 and $21.8 billion in 2015.  All business segments contributed to the new award activity in 2017, including a mining project in Chile, a power restoration project in Puerto Rico, a contract extension for the LOGCAP IV program, a propylene oxide project in Texas and infrastructure projects in the United States and the Netherlands.

- 69 -

It also stated:

> Consolidated backlog was $30.9 billion as of December 31, 2017, $45.0 billion as of December 31, 2016, and $44.7 billion as of December 31, 2015. The decrease in backlog at the end of 2017 primarily resulted from the removal of two nuclear power plant projects for Westinghouse Electric Company LLC ("Westinghouse") and an adjustment to limit the contractual term of the Magnox nuclear decommissioning project in the United Kingdom (the "Magnox RSRL Project") to a five year term, as well as new award activity being outpaced by work performed.

156.    **Statement No. 52**: On the earnings call that evening, Seaton continued to tout the

Company's purported improvements to its internal controls:

> We made improvements to our systems and processes to improve project delivery and have invested in new data-centric execution platform that will use historical, standardized data to more accurately analyze and predict project outcomes.

157.    **Statement No. 53**: On May 3, 2018, Fluor released its Q1 2018 Form 10-Q, signed

by Stanski and Chopra and SOX-certified by Seaton and Stanski. Fluor reported total revenue of

approximately $4.8 billion for Q1 2018, and a net loss of approximately $12 million. The Company

also reported that it had recorded $134 million in claim revenue as of the end of Q1 2018. It stated

> Consolidated revenue of $4.8 billion for the three months ended March 31, 2018 remained flat compared to the three months ended March 31, 2017. Revenue growth in the Government and Diversified Services segments was offset by revenue declines in the Mining, Industrial, Infrastructure & Power and Energy & Chemicals segments.

Regarding the Power segment specifically, it stated:

> Revenue for the three months ended March 31, 2018 decreased by 34 percent compared to the three months ended March 31, 2017, primarily due to reduced volume of project execution activities for several power projects, including cancellation of two nuclear projects, as well as forecast revisions for estimated cost growth for a fixed-price, gas-fired power plant project.

It continued:

> [Power] [s]egment profit for the three months ended March 31, 2018 decreased significantly compared to the corresponding period in 2017. The decrease in segment profit was primarily driven by forecast revisions of approximately $125 million for estimated cost growth for the fixed-price, gas-fired power plant project discussed above. The decline in segment profit was also driven by the reduced

volume of project execution activities in the power business line mentioned above, as well as an increase in NuScale expenses, net of qualified reimbursable expenditures.

Regarding earnings, it added:

> For the three months ended March 31, 2018, the company recognized a net loss attributable to Fluor Corporation of $18 million compared to net earnings attributable to Fluor Corporation of $61 million for the three months ended March 31, 2017.  During the first quarter of 2018, losses in the Mining, Industrial, Infrastructure & Power and lower earnings contributions from the Diversified Services segments were partially offset by higher earnings contributions from the Government and Energy & Chemicals segments.  Earnings in the first quarter of 2018 and 2017 were adversely affected by after-tax charges totaling approximately $96 million and $22 million, respectively, resulting from forecast revisions for estimated cost growth on certain fixed-price projects.

It added:

> Consolidated new awards were $2.5 billion for the three months ended March 31, 2018 compared to new awards of $2.3 billion for the three months ended March 31, 2017.  The Mining, Industrial, Infrastructure & Power and Energy & Chemicals segments were the major contributors to the new award activity in the first quarter of 2018.

It also stated:

> Consolidated backlog as of March 31, 2018 was $29.1 billion compared to $41.6 billion as of March 31, 2017.  The decrease in backlog primarily resulted from the removal of two nuclear power plant projects for Westinghouse Electric Company LLC ("Westinghouse") as well as new award activity being outpaced by work performed.

158.    The Form 10-Q also disclosed a formal change in Fluor's internal controls for financial reporting:

> On January 1, 2018, the company adopted ASC Topic 606, "Revenue from Contracts with Customers."  In connection with the adoption, *we implemented certain changes to our processes, systems and controls related to revenue recognition*.  These changes included the development of new policies and practices based on the five-step model outlined in ASC Topic 606, new contract review requirements and new processes and controls related to the additional disclosure requirements.

159.    **Statement No. 54**: On the earnings call that evening, Defendants discussed the charges that the Company had taken on the Gas-Fired Plants and on the fixed-price CPChem Project.

- 71 -

Seaton essentially admitted that the Company's prior controls were inadequate, while stressing that

Fluor had learned from its prior mistakes:

> *Now that project, as well as these other projects, were bid prior to the maturation of our integrated solutions approach.  And there are fatal flaws in the bidding process of all of those projects, and there were execution issues that weren't properly covered.  And you didn't have the coverage ratio as you expect on a project that has a kind of risk that those projects had, part of it driven by market in terms of the power business.  But one of the things we've done is we look at CPChem and the results, and we broke it down into the issues that led to that loss*.

*       *       *

> [W]e're not going to be the low bidder, but we're going to have the best solution, in some cases. *And that should give everyone comfort that we're actually doing the – we're looking at these differently today than we looked at when we bid those 4 power plants*.

*       *       *

> We have 4 power projects that were bid by the same management team at the same time.  And we accepted.  We, being me and my management team, accepted those bids, primarily because we just come off of a project in that market where we had bettered the [as sold] margin expectation.  Different things happened, we ended up with a problem, but it's a confined problem within a group.  And I acknowledge the question by Jamie on E&C and specifically, the CPChem project, again bid before we exercised this. *So I believe when we look at the risk in the backlog, based on our reviews and based on our – where we are on finishing projects that are questionable without benefit of the integrated solutions, I think we're in a good place* . . . .  We have invested, over the last 5 years, significantly in our tools and systems and in this model, which includes fabrication, construction, our supply chain capabilities.  When we're able to deploy those, I think we're going to be in a very good place.  And where we're not, there will be a risk-adjusted approach to that.

160.    That same day, Fluor disclosed a formal change in its internal controls for financial

reporting in its Form 10-Q for Q1 2018:

> On January 1, 2018, the company adopted ASC Topic 606, "Revenue from Contracts with Customers."  In connection with the adoption, *we implemented certain changes to our processes, systems and controls related to revenue recognition*.  These changes included the development of new policies and practices based on the five-step model outlined in ASC Topic 606, new contract review requirements and new processes and controls related to the additional disclosure requirements.

- 72 -

161.     **Statement No. 55**: On August 2, 2018, Fluor released its Q2 2018 Form 10-Q, signed by Stanski and Chopra and SOX-certified by Seaton and Stanski.  Fluor reported total revenue of approximately $4.9 billion for Q2 2018, and net earnings of approximately $131 million.  The Company also reported that it had recorded $132 million in claim revenue as of the end of Q2 2018. It stated:

> Consolidated revenue of $4.9 billion for the three months ended June 30, 2018 increased 4 percent compared to $4.7 billion for the three months ended June 30, 2017.  Revenue growth in the Mining, Industrial, Infrastructure & Power, Government and Diversified Services segments was partially offset by revenue declines in the Energy & Chemicals segment.  Consolidated revenue of $9.7 billion for the six months ended June 30, 2018 increased slightly compared to $9.6 billion for the six months ended June 30, 2017.  Revenue growth in the Government and Diversified Services segments was offset by revenue declines in the Energy & Chemicals and Mining, Industrial, Infrastructure & Power segments.

For the Power segment, it elaborated:

> Revenue for the three months ended June 30, 2018 increased by 13 percent compared to the same period in 2017. . . .  This revenue growth was partially offset by reduced levels of project execution activity for several power projects, including two nuclear projects that were cancelled during 2017.  Revenue for the six months ended June 30, 2018 declined by 12 percent compared to the same period in the prior year, largely due to the reduced volume of project execution activity for the power projects discussed above.

It added:

> Segment profit and segment profit margin for the three and six months ended June 30, 2018 were adversely affected by charges totaling $16 million and $142 million, respectively, resulting from forecast revisions for estimated cost growth at a fixed-price, gas-fired power plant project.  Segment profit and segment profit margin for the three and six months ended June 30, 2017 were also adversely affected by charges totaling $194 million and $219 million, respectively, resulting from forecast revisions for estimated cost growth at three fixed-price, gas-fired power plant projects.

Regarding earnings, it stated:

> Net earnings attributable to Fluor Corporation were $115 million and $97 million for the three and six months ended June 30, 2018, respectively, compared to a net loss attributable to Fluor Corporation of $24 million for the three months ended June 30, 2017 and net earnings attributable to Fluor Corporation of $37 million for the six months ended June 30, 2017.  Earnings for the three and six months ended

- 73 -

June 30, 2018 were adversely affected by after-tax charges totaling $80 million and $176 million, respectively, resulting from forecast revisions for estimated cost growth at a fixed-price, gas-fired power plant project and a fixed-price downstream project. Earnings for the three and six months ended June 30, 2017 were adversely affected by after-tax charges totaling $124 million and $140 million, respectively, resulting from forecast revisions for estimated cost growth at three fixed-price, gas-fired power plant projects.

It added:

Consolidated new awards were $5.4 billion and $7.9 billion for the three and six months ended June 30, 2018 compared to new awards of $3.2 billion and $5.5 billion for the three and six months ended June 30, 2017. The Mining, Industrial, Infrastructure & Power and Energy & Chemicals segments were the major contributors to the new award activity in the first half of 2018.

It also stated:

Consolidated backlog as of June 30, 2018 was $29.3 billion compared to $37.6 billion as of June 30, 2017. The decrease in backlog primarily resulted from the removal of a nuclear power plant project for Westinghouse Electric Company LLC ("Westinghouse") as well as new award activity being outpaced by work performed.

162.     **Statement No. 56**: On the earnings call that evening, Seaton again claimed that the Company had turned a corner from its problematic fixed-price projects: "It's just a shame that this noise on legacy projects has dampened what could have been some really good quarters over the last 2 years. And *we've done everything in our power to lessen that risk and give us better insight and surety in terms of our performance going forward*."

163.     **Statement No 57**: On October 10, 2018, Fluor announced its preliminary financial results for Q3 2018 in a press release and held an earnings call. On the call, Seaton was asked whether the Company had done any "soul-searching" to determine whether the consistent charges it had taken on its fixed-price projects were "a function of something structural within the company," to which Seaton responded:

Well, speaking as a frustrated CEO, I can tell you that having this call and the last calls we've had, had taken years off my life. We've done a lot of soul-searching, to your point, but I will point you back to one fact that I think is relevant, and that is that this is 2 projects out of 1,000 that are operating at any given time. ***These***

- 74 -

*projects, the Power project specifically, were bid at a time by a bidding team that did not follow the rules. Those people are no longer in our company. And so the review processes have been changed accordingly*. The refining project was bid at about the same time, and they've made some fundamental flaws in terms of how they transition from engineering into the construction phase of the project, again, *things that we've taken to heart and have strengthened the decision-making process*. But as I mentioned in the previous question, *that project governance organization and what their responsibilities are to make sure that: a, it's bid correctly; b, it transitions from the different phases of a project*. And I see them as an early warning system, in addition to what we've done with – that we announced with IBM and the use of Watson. *So we've done a lot of things* . . . .

164.    **Statement No. 58**: On November 1, 2018, Fluor released its Q3 2018 Form 10-Q, signed by Stanski and Chopra and SOX-certified by Seaton and Stanski. Fluor reported total revenue of approximately $4.7 billion for Q3 2018, and net earnings of approximately $96 million. The Company also reported that it had recorded $156 million in claim revenue as of the end of Q3 2018. It stated:

> Consolidated revenue of $4.7 billion for the three months ended September 30, 2018 decreased 6 percent compared to $4.9 billion for the three months ended September 30, 2017. Revenue declines in the Energy & Chemicals and Diversified Services segments were partially offset by revenue growth in the Mining, Industrial, Infrastructure & Power and Government segments.

Elaborating as to the Power segment, it stated:

> Revenue for the three months ended September 30, 2018 increased by 4 percent compared to the same period in 2017. . . . This revenue growth was substantially offset by reduced levels of project execution activity for several power projects, including two nuclear projects that were cancelled during 2017. Revenue for the nine months ended September 30, 2018 declined by 7 percent compared to the same period in the prior year due to the reduced volume of project execution activity for the power projects discussed above, largely offset by increased levels of project execution activity in the mining & metals, infrastructure and life sciences & advance manufacturing business lines.

It continued:

> [Power] segment profit for the three and nine months ended September 30, 2018 was adversely affected by charges totaling $35 million and $177 million, respectively, resulting from forecast revisions for estimated cost growth at a fixed-price, gas-fired power plant project.

Regarding earnings, it stated:

- 75 -

> Net earnings attributable to Fluor Corporation were $77 million and $175 million for the three and nine months ended September 30, 2018, respectively, compared to net earnings attributable to Fluor Corporation of $94 million and $131 million for the three and nine months ended September 30, 2017. . . . [E]arnings for the three and nine months ended September 30, 2018 were adversely affected by after-tax charges totaling $70 million and $244 million, respectively, resulting from forecast revisions for estimated cost and schedule impacts at a fixed-price, gas-fired power plant project and a fixed-price downstream project.

It continued:

> Consolidated new awards were $9.6 billion and $17.6 billion for the three and nine months ended September 30, 2018, respectively, compared to new awards of $3.8 billion and $9.3 billion for the three and nine months ended September 30, 2017. The Mining, Industrial, Infrastructure & Power and Government segments were the major contributors to the new award activity in the first nine months of 2018.

It added: "Consolidated backlog as of September 30, 2018 was $34.9 billion compared to $32.9 billion as of September 30, 2017."

165.   **Statement No. 59**: On February 21, 2019, Fluor released its Q4 2018 financial statements and its fiscal year 2018 Form 10-K, signed by Seaton, Stanski, and Chopra and SOX-certified by Seaton and Stanski. Fluor reported total revenue of approximately $19.2 billion for fiscal year 2018. The Company also reported that it had recorded $166 million in claim revenue as of the end of 2018. It stated:

> Consolidated revenue was $19.2 billion, $19.5 billion and $19.0 billion during 2018, 2017 and 2016, respectively. During 2018, a revenue decline in the Energy & Chemicals segment was partially offset by revenue growth in the Government segment. Revenue in the Mining, Industrial, Infrastructure & Power and Diversified Services segments remained flat compared to 2017.

Elaborating on the Power segment, it stated:

> Revenue in 2018 remained flat compared to 2017. Revenue growth from increased project execution activity for certain existing and recently awarded mining & metals and infrastructure projects was offset by reduced levels of project execution activity for several power projects, including two nuclear projects that were canceled during 2017.

It added:

[Power] [s]egment profit in 2018 was adversely affected by charges totaling $188 million resulting from forecast revisions for estimated cost growth at a fixed-price, gas-fired power plant project.

Discussing the Government segment, it added:

Total assets in the Government segment were $823 million as of December 31, 2018 compared to $732 million as of December 31, 2017. The increase in total assets primarily resulted from increased working capital in support of project execution activities for several projects including the LOGCAP IV program in Afghanistan and the Radford Munition Facility.

Discussing earnings, it stated:

Earnings before taxes for 2018 increased 25 percent to $482 million from $386 million in 2017. Earnings in 2018 were adversely affected by pre-tax charges totaling $361 million resulting from forecast revisions for estimated cost and schedule impacts on a fixed-price, gas-fired power plant project, a fixed-price downstream project and a fixed-price, offshore project.

It stated:

Consolidated new awards in 2018 were $27.7 billion compared to $12.6 billion in 2017 and $21.0 billion in 2016. The Energy & Chemicals and Mining, Industrial, Infrastructure & Power segments were the significant drivers of new award activity during 2018 . . . .

It added:

Consolidated backlog was $40.0 billion as of December 31, 2018, $30.9 billion as of December 31, 2017, and $45.0 billion as of December 31, 2016. The increase in backlog in 2018 primarily resulted from the new award activity discussed above.

166.   **Statement No. 60**: On the earnings call that evening, Seaton emphasized that the changes in the Company's internal governance processes would "limit the issues that [the Company] experienced over the last few years":

I feel really good about the investments that we've made in terms of tools and systems, and the discipline and governance around how we bid projects, how we start projects, how we go through the various phases and what those requirements are going to be.

\*      \*      \*

- 77 -

*I'm really confident that the changes that we've made over the last few years in terms of governance and tools and systems is going to provide a more sure outcome for Fluor and limit, I can't say eliminate, but limit the issues that we've experienced over the last few years*.

167.    **Statement No. 61**: In the 2018 Annual Report Shareholder Letter dated March 4, 2019, Seaton again touted the changes in internal controls and governance processes, and the effect they would have on the Company's financial reporting for fixed-price contracts:

> We continue to refine and improve our approach to executing fixed-price projects. ***In 2018 we introduced an advanced governance process which employs technology that can vastly improve predictability on complex projects***. We are using predictive data analytics supported by IBM Watson to assist in every stage, from bidding to real-time tracking throughout the project, by learning from over 100 completed Fluor projects and what their success teaches us. We believe the creation of these tools and processes will help us identify risks sooner and provide a path toward preserving project profitability.

168.    **Statement No. 62**: On May 2, 2019, Fluor released its Q1 2019 Form 10-Q, signed by Stanski and Chopra and SOX-certified by Hernandez and Stanski. Fluor reported total revenue of approximately $4.2 billion for Q1 2019, and a net loss of approximately $43 million. The Company also reported that it had recorded $175 million in claim revenue as of the end of Q1 2019. It stated:

> Consolidated revenue of $4.2 billion for the three months ended March 31, 2019 decreased 13 percent compared to $4.8 billion for the three months ended March 31, 2018. Revenue declines in the Energy & Chemicals, Government and Diversified Services segments were partially offset by revenue growth in the Mining, Industrial, Infrastructure & Power segment.

It elaborated concerning the Power segment, stating:

> Revenue for the three months ended March 31, 2019 increased by 52 percent compared to the three months ended March 31, 2018, primarily due to increased project execution activity for recently awarded mining & metals projects and an existing infrastructure project. The increase in revenue was partially offset by reduced levels of project execution activity for certain power and life sciences & advanced manufacturing projects nearing completion.

> Segment profit during the three months ended March 31, 2019 and 2018 was adversely affected by charges totaling $26 million and $125 million, respectively, resulting from forecast revisions for estimated cost growth at certain fixed-price, gas-fired power plant projects.

- 78 -

\*        \*        \*

The company is currently in a dispute with a customer over costs totaling approximately $110 million that were allegedly incurred by the customer in connection with one of the gas-fired power plant projects discussed above. The customer has withheld payment of certain invoices outstanding as of March 31, 2019 and drew down in January 2019 on a letter of credit issued on behalf of the company. The company believes that certain of the customer's claims are without merit and is vigorously pursuing recovery of the amounts from the customer. Based upon its evaluation as of March 31, 2019, the company does not believe it is probable that a loss will be incurred in excess of amounts reserved for this matter.

Regarding Fluor's net loss, it stated:

The company recognized net losses attributable to Fluor Corporation of $58 million and $18 million during the three months ended March 31, 2019 and 2018, respectively. Earnings in 2019 were adversely affected by after-tax charges totaling $91 million resulting from forecast revisions for certain projects in the Energy & Chemicals and Mining, Industrial, Infrastructure & Power segments and after-tax restructuring charges totaling $21 million.

It continued:

Consolidated new awards were $3.4 billion for the three months ended March 31, 2019 compared to new awards of $2.5 billion for the three months ended March 31, 2018. The Mining, Industrial, Infrastructure & Power and Energy & Chemicals segments were the major contributors to the new award activity in the first quarter of 2019.

It added:

Consolidated backlog as of March 31, 2019 was $39.3 billion compared to $29.1 billion as of March 31, 2018. The increase in backlog primarily resulted from new awards booked in the latter part of 2018 in the Energy & Chemicals and Mining, Industrial, Infrastructure & Power segments.

It separated from backlog the Company's remaining unsatisfied performance obligations, or RUPO,

and stated:

The company's remaining unsatisfied performance obligations ("RUPO") as of March 31, 2019 represent a measure of the total dollar value of work to be performed on contracts awarded and in progress. The company had $37 billion in RUPO as of March 31, 2019.

169.    That same day, Fluor disclosed that Seaton was stepping down as CEO, to be replaced by interim CEO Hernandez.

- 79 -

170.    **Statement No. 63**: On the earnings call that evening, Hernandez was asked by several

analysts whether or not the Company had "scrub[bed]" its fixed-price backlog to de-risk future

losses:

> [Analyst:] Good to talk to you, and welcome, Carlos.  I guess my first question, understanding this is all relatively new, but have we had the opportunity – obviously we had more charges in the quarter.  Have we had the opportunity to scrub the entire backlog?  Or is this something that's on the come?

> \*        \*        \*

> [Hernandez:] Jamie, let me answer the other part of your question about whether we've done a full scrub of all of our projects.  And let me just say that our focus, *our renewed and enhanced focus, is going to be on operations*.  We're going to have our fingers on the projects.  *We're going to have our thumb on the pulse of every project, and that will be a company-wide area of focus*.

> \*        \*        \*

> [Analyst:] Carlos, can I follow up on Jamie's question around the projects themselves?  When do you think we can put the power projects actually behind us?  I know we're in punch list there, so it should be relatively soon.  How far along is the offshore project?  And *are there any other projects at this point that have sort of a yellow flag around them*?

> \*        \*        \*

> [Hernandez:] . . . I believe you had one other question.  What was that?  Oh, do we have any other projects?  *We don't have any other projects.  We look at projects, as you know, every quarter.  We do a scrub every quarter where we are on each project, and we report those where we have an issue or not*.

171.    When further asked about whether the "issues on the problem projects" were "more

related to pricing the bid or more on the execution side," Hernandez admitted that the Gas-Fired

Plants had suffered from overly aggressive bidding:

> If you look back at some of the power – gas-fired power projects, that was a little bit different.  That was a very competitive market.  *We probably were more aggressive than we should have been in bidding those projects*.

> And so everything had to go absolutely right, and in some couple of those projects, they did not.

172.    Statement Nos. 37-63 regarding Fluor's internal controls and procedures, disclosure controls and procedures, revenue recognition policies, and reported revenue were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

(a)    The failure of Fluor's project governance processes and controls rendered Defendants' statements about internal controls and procedures, disclosure controls and procedures, and revenue recognition policies materially misleading.  The Company did not have adequate project governance processes and controls to review project status and execution.  In connection with the massive Q2 2019 charges, the Company announced a new Risk Committee in recognition of the need to "improve [the] visibility into" into its project review and execution oversight.  ¶283, *infra*.  As Hernandez admitted, there were "significant and common issues in many of [the Company's] challenged projects."  *Id.*  Hernandez also admitted that the Company "must take a more disciplined approach to risk assessment on [its] projects" and announced "changes to how we approach engineering and project management to ensure our projects are staying in sequence with work not commencing until the appropriate reviews are complete."  *Id.*

(b)    Although Defendants stated throughout the Class Period that they conduced detailed project reviews and oversight each month and each quarter – pursuant to the PSRs and the Company's internal controls – Hernandez admitted in Q2 2019 there were myriad unresolved issues on fixed-priced projects and that "the company met with a number of our clients, subcontractors and suppliers, in an attempt to resolve a number of matters.  These include ongoing disputes, pending change orders, schedule extensions, closeout items, unpaid receivables and our position on outstanding claims."  *Id.*  For example, the Company announced charges related to "liquidated damages" and "subcontractor negotiations" on the Penguins Offshore Project and "subcontractor negotiations on two fixed-price downstream projects."  The Company also announced charges

- 81 -

related to settlements "associated with client disputes . . . on three fixed-price, gas-fired power plant projects."  The Company stated in the Q2 2019 press release that "[t]hese charges reflect our efforts over the past few months to meet with clients, subcontractors, suppliers and our project teams to evaluate and address the status of our current projects," establishing that such efforts, meetings, and analyses were not previously conducted, in contrast to Defendants' statements touting their internal controls, disclosure controls, and project governance.  The fact that numerous unresolved matters cited by Hernandez, which in total allowed more than $700 million in contract costs to go unrecorded, had accumulated over several years across 16 separate fixed-price projects confirms that Fluor's project governance processes (*e.g.*, its so-called "PSR") were either non-existent or grossly ineffective.

(c)    As detailed in §IV., *supra*, the Company's project governance processes were among the most "critical" components of Fluor's ability to (a) recognize revenue on fixed-price projects and (b) certify that Fluor's internal controls and disclosure controls were effective.  Thus, that these project governance processes were either non-existent or grossly ineffective renders statements about Fluor's internal controls and procedures, disclosure controls and procedures, and revenue recognition policies materially misleading.  Moreover, the Company announced on February 18, 2020 that the SEC "is conducting an investigation of the Company's past accounting and financial reporting" and Defendants are "conducting our own internal review" of "prior period of reporting and related control environment."  ¶289, *infra*.

(d)    Pervasive red flags rendered Defendants' internal controls, disclosure controls, risk management, and revenue recognition policy statements misleading.  As detailed in §IV., *supra*, in order to recognize any revenue on fixed-price projects in compliance with GAAP accounting rules, the Company was required to maintain project governance processes and controls sufficient to identify and capture all evidence of contract costs on each of Fluor's fixed-price

- 82 -

contracts.  Specifically, in order to use the percentage-of-completion accounting method to record revenue, ASC No. 605 requires that "contract costs shall be identified, estimated, and accumulated with a reasonable degree of accuracy."  ASC 605 also states: "An entity without the ability to update and revise estimates continually with a degree of confidence could not meet that essential requirement of GAAP."  ASC 605-35-25-45.  Likewise, under SOX rules, the Company was required to test the design and operation of internal controls around its critical accounting polies, which included the Company's project governance processes and controls.  Under these GAAP and SOX rules, the numerous red flags detailed herein were exactly the type of evidence Defendants were required to identify as part the Company's project governance processes and controls.  *See* §VIII.C., *infra*.  First, and as confirmed by Hernandez on the Q2 2019 earnings call, there were pervasive and obvious project execution issues, such as large subcontractor failures and major disputes with customers that resulted in lawsuits, including a $110 million lawsuit against Duke.  *See* ¶199(a), *infra*.  Second, project execution issues on comparable projects that similarly affected all fixed-price contracts were known to but not accounted for by Defendants, rendering their internal controls and risk management statements misleading.  *See* ¶199(b), *infra*.  Third, Defendants were aware that artificially low fixed-price bids meant those projects were at an increased risk of suffering losses, rendering Defendants' certifications regarding controls and risk management misleading.  *See* ¶199(c), *infra*.  Fourth, significant open and unapproved change orders on troubled fixed-price projects, where defendants had no assurance that payment on those change orders was probable, rendered Defendants' revenue and internal controls statements misleading.  *See* ¶199(d), *infra*.  Fifth, ongoing customer disputes and schedule extensions, and resulting costs, rendered Defendants' internal controls, risk management, and revenue statements misleading.  *See* ¶199(e), *infra*.  The fact that Defendants were aware of or recklessly disregarded this scope and magnitude of serious red flags over a period of several years and across 16 separate fixed-price projects confirms that Fluor's

project governance processes were either non-existent or grossly ineffective, thereby rendering statements about Fluor's internal controls and disclosure controls, and compliance with GAAP revenue recognition rules, materially misleading.

(e)     The failure of Fluor's project governance processes and controls, including Defendants' disregard for pervasive red flags, rendered Defendants' statements about reported revenue materially false and misleading.  First, Fluor failed to meet the prerequisite for revenue recognition under GAAP.  As described in §IV., *supra*, Defendants could not recognize any revenue on contracts for which a reliable estimate of costs could not be calculated.  *See* ASC 605-35-25-45 ("An entity without the ability to update and revise estimates continually with a degree of confidence could not meet that essential requirement of GAAP.").  Second, if Defendants could establish the perquisite to recognize revenue, Fluor was required to immediately recognize losses for any contracts in a loss position.  Specifically, GAAP revenue recognition rules state: "For a contract on which a loss is anticipated, GAAP requires recognition of the entire anticipated loss as soon as the loss becomes evident. . . .  When the current estimates of total contract revenue and contract cost indicate a loss, a provision for the entire loss on the contract shall be made."  ASC 605-35-25-45; ASC 605-35-25-46.  Third, Fluor recognized revenue on unapproved change orders and open claims in violation of GAAP.  Under GAAP, Fluor can only recognize "claim revenue" from unapproved change orders if it is "probable" the customer will agree to pay the change order.  *See* §IV.A., *supra*. During the Class Period, Fluor recognized millions of dollars in claim revenue despite that the customers had not approved the claim in question and without a basis to conclude that it was probable the customers would do so.  In Q2 2019, Defendants were forced to take charges related to "certain unapproved change orders" they had previously reported as revenue, demonstrating that the previously recognized claim revenue was unearned and should not have been reported.  As a result of Defendants' violation of GAAP revenue recognition rules, Fluor's statements about reported

- 84 -

revenues were materially misleading.  To that end, the SEC "is conducting an investigation of the Company's past accounting and financial reporting" and Defendants are "conducting our own internal review" of "prior period reporting and related control environment."  ¶289, *infra*.

(f)     The foregoing Statement Nos. 41-44, 46-48, 50-51, 53, 55, 58-59, and 62 were also materially false and misleading because they reported Fluor's financial results and metrics, both on a consolidated and a segment-by-segment basis, including without limitation revenues, net earnings or losses, new awards, and backlog, as well as positive or insufficiently negative reports of Fluor's underlying business segments and specific projects, without disclosing that they were generated through improper underbidding of large, fixed-price contracts, during the execution phase of which cost overruns were occurring, unreported charges were necessary and accruing, Fluor's financial reporting was being done in a non-compliant manner, and Fluor faced material undisclosed risks.  It was materially false and misleading to reference such positive results and metrics or to discuss potentially significant concerns like the sufficiency of Fluor's contract bidding process, the integrity of Fluor's internal controls, and the ability to profitably execute its fixed-price contracts while omitting disclosure of the underlying bidding, controls, and execution problems set forth herein, which both inflated the positive metrics and surpassed in severity the disclosed risks.  It was especially misleading to report Fluor's backlog or to detail its progress on the projects at issue in light of the undisclosed facts set forth herein.  As such, these misstatements and omissions violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2).

### D.     Defendants Omitted Material Information Regarding Unresolved Change Orders, Claims, and Client, Subcontractor, and Supplier Disputes

173.     **Statement No. 64**: In connection with the filing of each Form 10-K and Form 10-Q issued during the Class Period, Seaton, Porter, Stanski, Smalley, and Chopra made affirmative statements about the Company's purported review, analysis, and accounting for change orders,

- 85 -

claims, and disputes between Fluor and its clients, subcontractors, and suppliers.  These statements

created a duty to disclose the existence of significant open claims,  unapproved change orders, and

unresolved disputes between Fluor and its clients, subcontractors, and suppliers on numerous fixed-

price projects:

> The percentage-of-completion method of revenue recognition requires the company
> to prepare estimates of cost to complete for contracts in progress.  In making such
> estimates, judgments are required to evaluate contingencies such as potential
> variances in schedule and the cost of materials, labor cost and productivity, ***the
> impact of change orders, liability claims, contract disputes*** and achievement of
> contractual performance standards.  Changes in total estimated contract cost and
> losses, if any, are recognized in the period they are determined.[8]

174.    Statement No. 64, repeated in each Form 10-K, omitted material information

necessary to render it not misleading for the following reasons that were unbeknownst to investors:

Defendants omitted material information concerning significant unresolved matters,

including open claims, unapproved change orders, and unresolved disputes between Fluor and its

clients, subcontractors, and suppliers that existed on numerous fixed-price projects at the time

Statement No. 64 was made.  In August 2019, Hernandez admitted that significant unresolved

matters, claims, change orders, and disputes had accumulated over several years across 16 separate

fixed-price projects, allowing Defendants to conceal more than $700 million in unrecorded contract

costs from investors.  In Q2 2019, Hernandez announced that Fluor was forced to record charges

stemming from the "resolution of a variety of matters, including outstanding disputes and claims,

pending change orders, schedule extensions, accounts receivable and other project close out items."

Hernandez emphasized that these unresolved matters were "significant and common issues in many

of [the Company's] challenged projects."  The Company cited charges tied to specific unresolved

matters, including  "liquidated damages" and "subcontractor negotiations" on the Penguins Offshore

---

[8]    This statement was repeated in every Form 10-K issued during the Class Period in identical or
substantially similar form.

Project and "client and subcontractor negotiations on two fixed-price downstream projects."  The Company also announced charges related to settlements "associated with client disputes . . . on three fixed-price, gas-fired power plant projects,"  additional charges tied to  "certain unapproved change orders related to a fixed-priced, U.S. government project," and additional charges "related to negotiations with clients and joint venture partners."  The significant unresolved matters, claims, change orders, and disputes between Fluor and its clients, subcontractors, and suppliers that were disclosed in August 2019 (a) existed across numerous fixed-price projects at the time Statement No. 64 was made; (b) represented material information to investors; and (c) were concealed by Defendants.  As such, Statement No. 64 was materially misleading by omission.

## VIII.   DEFENDANTS ACTED WITH SCIENTER

### A.    The Individual Defendants Personally Reviewed and Approved the Faulty Bids at Issue, Monitored Construction Progress, and Misstated These Projects Publicly

175.    During the May 3, 2018 earnings call, Seaton admitted the personal role that he and his management team played in reviewing and authorizing the bids for the Gas-Fired Plants at issue:

> We have 4 power projects that were bid by the same management team at the same time.  ***And we accepted.  We, being me and my management team, accepted those bids***, primarily because we just come off of a project in that market where we had bettered the [as sold] margin expectation.

176.    The accounts of several confidential witnesses confirm Seaton's acknowledgement that Seaton himself and senior management at Fluor were intimately involved in the bidding process. CW-1 stated that all hard-number bids were reviewed and approved through the Executive Review Board process and the BRMF that included Seaton, the President of the Power segment, and other senior management.  Similarly, CW-3 stated that CW-3 believed project estimates were approved by senior management.  CW-4 stated that bids for gas-fired plants went all the way up to Seaton for approval, and included the Executive Team, the Power segment President, the Chief Risk Assessment Officer, and the CFO (Porter and Stanski during the Class Period).  CW-7 identified

- 87 -

Seaton as a member of a review team that reviewed the "estimating packet" for large and high-profile projects prior to bid approval.  CW-6 similarly stated that Stanski conducted a comprehensive review of all bids over $50-$75 million in the Government group.

177.    Furthermore, Defendants spoke about Fluor's purportedly conservative bidding process on nearly every single earnings call throughout the Class Period, demonstrating that the topic was high on Defendants' radar and a key concern for analysts and that Defendants knew or were reckless in not knowing that Fluor's bids were not conservative when they repeatedly stated, often in response to direct questions from analysts, that Fluor's bids were conservative.

178.    Defendants were also aware that they had a history of underbidding gas-fired power plants.  Defendants later admitted that of the 12 gas-fired projects the Company undertook *since 2003*, "10 of the 12 have underperformed our as-sold expectations, with 3 suffering losses."  ¶275, *infra*.  That means that prior to the four Gas-Fired Plants at issue, six of eight fixed-price gas-fired power projects awarded to Fluor since 2003 – or 75% – had underperformed Fluor's bid assumptions.  Defendants knew before and during the Class Period that their bids were not conservative.

179.    By the time that Fluor started work on the Brunswick County Plant, it was apparent to Defendants that their bid for the project was overly aggressive.  Indeed, the Brunswick County Plant bid was accepted more than a year before the start of the Class Period.  In that intervening period, Fluor had completed detailed "engineering and procurement services on the plant from its Charlotte, North Carolina office" (¶114, *supra*), which would have revealed that its "baseline assumptions" underlying its bid were not achievable.  As CW-5 described, there was not a desire to devote substantial time and resources to estimating and bidding before winning the contract, since those resources would be wasted if Fluor did not win the contract.  In fact, Fluor compressed the critical design phase to six months, whereas that phase typically takes one to one-and-a-half years.  Thus,

- 88 -

much of the work necessary to calculate a reasonable bid was performed only after Fluor was awarded an EPC contract, at which time Fluor determined that its original bid was insufficient.

180.    By the time that Fluor started work on the remaining Gas-Fired Plants, it was apparent to Defendants that the same problems that caused the Company to take charges on the Brunswick County Plant would affect the other Gas-Fired Plants.  Fluor used the same or substantially similar Mitsubishi turbines on the other Gas-Fired Plants, §V., *supra*, all of which were "next generation" turbines with which Fluor had never worked, and therefore the problems arising at the Brunswick County Plant equally affected and illustrated identical risks at the other Gas-Fired Plants.  For example, CW-5 described a pressure valve problem affecting the Citrus County Plant turbines that had also affected the Brunswick County Plant turbines.  As Seaton admitted in August 2017:

> All 3 projects, 4 if you include the Brunswick project that incurred a charge in 2015, had a fundamental problem.  The projects did not meet the original baseline assumptions due to improper estimating, craft productivity and equipment issues.  All of these projects were bid in 2014 by the same pursuit team.  In addition, all 4 projects were based on next-gen turbines or steam generators that were first of a kind for Fluor.  The quality control and completeness of these turbines delivered to the site were not in line with our bid assumptions and we are pursuing our options.

181.    Defendants were also made aware of project execution issues as each Gas-Fired Plant progressed.  CW-8 noted that issues arose during the construction phase and projects were already seriously in the red by midway through construction.  Seaton similarly admitted in August 2017, issues would generally "raise their heads" and become apparent when a project reached "about 40% – 30% to 40% construction progress."

182.    Seaton also personally visited the Gas-Fired Plants.  For example, Fluor tweeted a picture of Seaton on site at the Citrus County Plant in January 2018.  By May 2018, Seaton had conducted a close "personal review" of the Citrus County Plant and stated he would visit the site on

- 89 -

a routine basis: "[W]hen things go bad, the boss has got to be there, and I get that. And I have been and will be as we finish this project."

183.     CW-8 noted that the CEO, Seaton, and the CFOs during his employment (Porter and Stanski) closely monitored employees' weekly timesheets and charges and other project performance data on at least a monthly basis showing ongoing budgeting issues at the fixed-price projects.

184.     Defendants therefore had direct knowledge of, and access to, the low-quality bids and execution issues at the time they issued the misleading statements alleged herein.

**B.      Fluor's Judicial Admissions Concerning Problems in the Brunswick and Citrus County Plants Establish the Knowing Falsity of Their Prior Misstatements**

**1.      The *Mitsubishi* Lawsuit**

185.     According to a lawsuit filed by Fluor against Mitsubishi, *Fluor Enterprises, Inc. v. Mitsubishi Hitachi Power Systems Americas, Inc.*, No. 3:17-cv-00622-MHL (E.D. Va.) (the "*Mitsubishi* Lawsuit"), Defendants were aware of major project delays and cost-overruns in the Brunswick County Plant by early 2014.

186.     Upon execution of the EPC contract between Fluor and Dominion for the Brunswick County Plant, Dominion partially assigned its Turbine Supply Agreement ("TSA") with Mitsubishi to Fluor. Under the terms of the TSA, "Mitsubishi supplied the three combustion turbine generators, one steam turbine generator (the 'Turbines') and all equipment and materials related to and necessary for the installation of the Turbines (the "Minor Components") that Fluor was to install on the Project." *Mitsubishi* Lawsuit, ECF No. 56 at 2. According to Fluor, "Mitsubishi was chronically late in delivering these Minor Components" throughout the course of the project. *Id.*

187.     By January 2014, Mitsubishi had already missed the delivery schedule for two Minor Components of the Brunswick County Plant. *Mitsubishi* Lawsuit, ECF No. 1, ¶25.

- 90 -

188.     By April 2014, "Mitsubishi had already begun failing to meet the Minor Component delivery schedule it had accepted in the TSA," and Fluor warned Mitsubishi by letter that a claim for liquidated damages would begin accruing from January 11, 2014.  *Id.*, ¶¶23, 25.  In addition to the late deliveries, Fluor claimed that "the deliveries evidenced a complete lack of quality control . . . thereby requiring Fluor to expend substantial time and effort locating the components required for the current construction activities then underway."  *Id.*, ¶24.

189.     Fluor claimed that the "late and mis-labeled deliveries continued and worsened, which delayed Fluor's progress under the EPC contract and exposed it to the liquidated delay damages provided therein."  *Id.*, ¶26.  In order to avoid the imposition of liquidated damages from Dominion, "Fluor was forced to accelerate the construction process at great additional cost" and to "create a special team to . . . identify[] late deliveries and implement[], at great additional cost, corrective action or 'work arounds' to eliminate or mitigate their adverse impact" on the Brunswick County Plant project.  *Id.*, ¶¶27-28.  Fluor claimed that it was forced to continue these "extraordinary measures" for the duration of the project, but that "its efforts did not succeed entirely."  *Id.*, ¶29.  Fluor stated that the deficient turbine component deliveries "had a material impact on the progress of Fluor's engineering, erection, or installation under the Project Schedule."  *Id.*, ¶30.

190.     On March 18, 2016, Fluor sent a letter to Mitsubishi demanding $207,750,000 in liquidated damages.  *See Mitsubishi* Lawsuit, ECF No. 17 at 6-7.

191.     The *Mitsubishi* lawsuit was dismissed by voluntary stipulation on June 24, 2019, on the eve of trial.  *Mitsubishi* Lawsuit, ECF Nos. 85-86.

### 2.     The *Duke* Lawsuit

192.     According to a lawsuit filed by Fluor against Duke, *Fluor Enterprises, Inc. v. Duke Energy Florida, LLC*, No. 8:19-cv-00224-WFJ-AAS (M.D. Fla.) (the "*Duke* Lawsuit"), ECF No. 17

at 9, Defendants were aware of major project delays and cost-overruns in the Citrus County Plant project prior to November 2017.

193.    The October 15, 2014 EPC contract between Fluor and Duke for the Citrus County Plant contained multiple performance guarantees, such as dates for Guaranteed Mechanical Completion and Guaranteed Substantial Completion, backed by liquidated damages provisions. Pursuant to the terms of the EPC contract, Fluor provided Duke with a $67 million letter of credit that Duke would be entitled to draw down in the event that Fluor "failed to fulfill certain of its obligations under the Agreement." *Duke* Lawsuit, ECF No. 1, ¶27.

194.    There were numerous delays and cost overruns in the course of the Citrus County Plant construction execution.  For example:

(a)    The original Baseline Schedule for the project called for a Guaranteed Mechanical Completion Date of December 1, 2017 for Power Block 1.  However, prior to November 2017, it was apparent that the "[t]he Project was delayed" and, as a result, Fluor was forced to sign a change order that pushed back the Guaranteed Mechanical Completion deadline by three months. *Duke* Lawsuit, ECF No. 17 at 9.  On November 14, 2017, Fluor and Duke entered into Change Order No. 51 to extend the Guaranteed Substantial Completion and Guaranteed Mechanical Completion dates for Power Blocks 1 and 2.  *Id.*

(b)    "Change Order 051 did not have the desired effect" and "the Project continued to lag." *Id.*  As a result, Fluor and Duke entered into Change Order No. 59 on April 6, 2018, which again extended the Guaranteed Substantial Completion and Guaranteed Mechanical Completion dates for Power Blocks 1 and 2.  *Id.*

(c)    As explained by Duke, construction of the Citrus County Plant "ha[d] not gone well" and, by late spring 2018, "Fluor was facing well over $100 million in liquidated damages, with that number growing daily."  *Id.* at 1, 9.

- 92 -

(d)     The delays continued, and Fluor "failed . . . to achieve the Guaranteed Mechanical Completion Dates set forth in Change Order No. 59 and was late by approximately 6 months for each power Block." *Duke* Lawsuit, ECF No. 1, ¶37.

(e)     Fluor has admitted that the Citrus County Plant resulted in "twice the amount of labor to complete the items as compared to our forecast." ¶278, *infra*. According to Duke, "Fluor's productivity reports confirm these assessments." *Duke* Lawsuit, ECF No. 17-5 at 3.

(f)     According to Duke, there were numerous "well-documented delays on the project." *Id.*

(g)     The delays necessitated costly workarounds. "Significant work was, by necessity, being performed on both power blocks simultaneously, which was not planned and would never have occurred had schedules been met" and "the agreed milestone dates . . . been achieved." *Id.* "Such stacking in many instances required . . . more manpower, more materials and equipment (because they were being utilized simultaneously rather than sequentially)." *Id.*

195.     On July 9, 2018, Fluor and Duke entered into Change Order No. 73 in which "Fluor requested relief" from the outstanding liquidated damages that had accrued. *Duke* Lawsuit, ECF No. 17 at 9. Change Order No. 73 provided that so long as both Power Blocks went into service prior to December 31, 2018, Duke would agree to waive all otherwise claimable liquidated damages incurred under the EPC contract. *Id.* at 9-10. Fluor would still be liable for certain "additional costs incurred by Duke Energy due to the failure to meet the agreed milestone dates previously set forth" in the EPC contract and Change Order No. 59. *Id.* at 10.

196.     On December 21, 2018, Duke sent Fluor an invoice for approximately $109 million of "additional costs" incurred by Duke due to Fluor's delays on the Citrus County Plant. *Duke* Lawsuit, ECF No. 1, ¶38. Fluor and Duke could not resolve their disputes concerning the amount and supporting documentation of Duke's demand and, on January 8, 2019, Duke drew down the full

amount of the $67 million letter of credit provided by Fluor. *Id.*, ¶49. In doing so, Duke certified to Fluor's bank that Fluor had "failed to fulfill certain of its obligations" under the EPC contract. *Id.*, ¶50.

197. The *Duke* lawsuit was voluntarily dismissed on August 27, 2019, following a settlement between the parties. *Duke* Lawsuit, ECF Nos. 34-36.

### C.   Defendants Knew of or Recklessly Disregarded Red Flags Rendering Their Accounting Statements Misleading

198. During the Class Period, Defendants recklessly disregarded critical GAAP, SOX, and SEC rules, described above in §IV., pertaining to Fluor's fixed-price contracts. The applicable GAAP contract accounting rules, described above in §IV.A., required Defendants to appropriately identify, estimate, and accumulate all contract costs with a high degree of precision before Fluor could recognize revenue on each of its fixed-price contracts. Likewise, the SOX rules governing internal controls over financial reporting, described above in §VI.B., required Defendants to maintain internal controls over financial reporting sufficient to ensure that for each fixed-price project, all costs were captured and accounted for in the Company's quarterly project cost estimates. The critical lapses in Fluor's accounting and internal controls allowed Defendants to conceal more than a billion dollars of undisclosed losses on 16 troubled fixed-price projects during the Class Period.

199. Defendants represented each quarter that Fluor had: (a) performed quarter-end project cost estimates in compliance GAAP accounting rules; and (b) maintained effective internal controls over financial reporting in compliances with SOX and SEC rules. However, as described below, Defendants were aware of, or recklessly disregarded, pervasive red flags indicating Fluor's Project Status Reviews and quarterly project cost estimates did not properly incorporate all available evidence of cost overages with respect to the troubled fixed-price contracts, and that Fluor's reported

- 94 -

revenue was not supported.  The significant red flags that were known by, and available to, Defendants included:

(a)    ***Specific Project Execution Issues***: Defendants were aware of, or recklessly disregarded, known problems and red flags regarding specific project execution issues on numerous fixed-price gas-powered projects.  For example, as detailed in §VIII.B.1., *supra*, Defendants were aware as early as 2014 that one of its major subcontractors, Mitsubishi, failed to deliver critical turbine equipment, resulting in delays and costs and exposing the Company to liquidated damages. Moreover, as detailed in §VIII.B.2., *supra*, Defendants were aware in late 2017 that they were suffering major delays and cost overruns at the Citrus County Plant, causing the Company to request change orders to excuse them from previously agreed deadlines.  And, as described above in ¶125, Defendants were aware as early as 2015 that shortages in craft labor, such as welding, caused unrecoverable delays and cost overruns.  In light of the extensive project execution issues, Defendants' certifications that they complied with critical accounting policies regarding closely reviewing costs and schedule each quarter, revenue recognition rules, loss recognition rules, and SOX rules concerning internal control over financial reporting were knowingly, or at a minimum recklessly, misleading.

(b)    ***Project Execution Issues on Similar Projects***: Defendants were aware of, or recklessly disregarded, that pervasive project execution issues on the Gas-Fired Plants signaled similar issues on the Company's other fixed-price projects, which were similar in contract type and scope and were reviewed and approved by the same set of Individual Defendants.  As CEO Hernandez admitted in connection with the massive charges the Company recognized on the Gas-Fired Plants and other fixed-price projects in August 2019, "there a few significant and common issues in many of our challenged projects."

(c)     ***Artificially Low Fixed-Price Bids***: Defendants were aware of, or recklessly disregarded, that the Company's fixed-price projects were susceptible to losses because they were improperly bid.  Defendants understood that a project that was bid artificially low was at high risk for losses because if the Company was unable to complete the project pursuant to the bid price, the Company would have to make up the difference.  As early as August 2017, Seaton admitted that the Gas-Fired Plants suffered from a "fundamental problem" and were suffering losses due to "improper estimating, craft productivity and equipment issues."  By May 2018, Seaton admitted that there were "fatal flaws in the bidding process of all of those projects," referring to the Gas-Fired Plants as well as other fixed-price projects.  Defendants' recognition of artificially low fixed-price gas-fired projects served as a red flag that the Company's other fixed-price projects suffered from similar bidding problems.

(d)     ***Open and Unapproved Change Orders***: Defendants were aware of, or recklessly disregarded, significant open and unapproved change orders on the troubled fixed-price contracts.  Fluor utilized change orders to cover-up losses by including the amounts contained in open and unapproved change orders as revenue.  Open and unapproved change orders indicated the likelihood of cost overages and losses on the problem projects.  During the Class Period, Fluor recognized material amounts of revenue on unapproved and open change orders.  As CW-9 described, Fluor instituted a "bid it low, let it grow" motto whereby Fluor would bid low to win the project, knowing it would be unable to profitably perform the contract.  To recoup the frequent cost overruns, CW-9 stated that Fluor submitted additional task order requests at significantly higher rates by claiming the work was outside the scope of the initial contract despite that employees understood the work was part of the contract.  In August 2019, CEO Hernandez conceded that there were prior systemic issues with Defendants' "risk assessment on our projects."  The risk assessment process includes the Project Status Reviews and quarterly estimation of cost-to-complete Fluor's

- 96 -

fixed-price projects, as well as the internal controls that were in place to ensure the cost estimates were accurate and complete.  Hernandez specifically referenced meetings he conducted "with a number of our clients, subcontractors and suppliers" that revealed extensive charges, including charges and settlements related to previously undisclosed "open and unapproved change orders." Importantly, the "open and unapproved change orders" on these fixed-price projects were known, or at a minimum were red flags that were recklessly disregarded, by Defendants during the Class Period.  Moreover, GAAP prohibits recognizing revenue from unapproved change orders unless it is "probable" that the client will approve and pay the change order amount.  Defendants could not reasonably make this determination given that the change orders were, according to CW-6 and CW-9, used by Fluor to recover money for services that Fluor knew would be necessary at the outset of a project but that were omitted from the bid in order to win the contract.

(e)     ***Ongoing Customer and Subcontractor Disputes and Schedule Extensions***: Defendants were aware of, or recklessly disregarded, ongoing customer and subcontractor disputes relating to fixed-price projects.  These disputes were direct evidence or, at a minimum, red flags indicating potential cost overages and losses on the problem projects.  For example, as discussed above in §VIII.B., in April 2014, Fluor warned Mitsubishi that it may seek damages arising out of their dispute over Mitsubishi's delivery of necessary turbine equipment and, in May 2016, Fluor sent a letter to Mitsubishi demanding more than ***$207 million*** in liquidated damages related thereto. Similarly, by November 2017, Fluor was forced to enter a change order with Duke that pushed back the mechanical operation deadline for the Citrus County Plant, which subjected the Company to potential liquidated damages.  The deadline was moved back again in April 2018, which Fluor also missed.  Eventually, Duke drew down a $67 million line of credit with Fluor, prompting Fluor to sue for declaratory relief.  In light of the significant customer and subcontractor disputes and schedule delays, Defendants' certifications that they complied with critical accounting policies regarding

- 97 -

closely reviewing schedule and costs each quarter, revenue recognition rules, loss recognition rules, and SOX rules concerning internal control over financial reporting were knowingly, or at a minimum recklessly, misleading.

### D.    The Magnitude and Frequency of the Charges Evidence Scienter

200.    Over the course of the Class Period, the Company recognized *$643 million* in charges and/or losses due to forecast revisions, cost overruns, and settlements concerning the Gas-Fired Plants.  When accounting for other fixed-price projects, these charges exceed *$1.4 billion*.

201.    As reported in the Company's 2018 Form 10-K, in 2015 the Company recognized "a pre-tax loss of $60 million (or $0.26 per diluted share) resulting from forecast revisions" for the Brunswick County Plant.  In 2017, the Company recognized "pre-tax charges totaling $260 million (or $1.18 per diluted share) resulting from forecast revisions for estimated cost growth" at the Greensville County, Anderson County, and Citrus County Plants.  In 2018, the Company recognized "pre-tax charges totaling $188 million (or $1.02 per diluted share) resulting from forecast revisions for estimated cost growth" at the Citrus County Plant.  The Company's Forms 10-Q for Q1 2019 and Q2 2019 reported additional pre-tax charges of $26 million and $109 million, respectively, for the Gas-Fired Plants.

202.    These pre-tax charges were a near-constant occurrence for the Company towards the end of the Class Period, as Defendants' fraud was incrementally revealed through a series of partial corrective disclosures.  Indeed, the Company recognized the pre-tax charges and/or losses on the Gas-Fired Plants in eight out of nine consecutive quarters in the Class Period – from Q1 2017 to Q2 2019.[9]  The same bidding and execution problems infected Fluor's other fixed-price projects.  For example, in 2018, Fluor recognized $173 million in charges related to a downstream fixed-price

---

[9]    Q3 2017 was the only fiscal quarter in this 30-month period that did not suffer from a charge/loss on the Gas-Fired Plants.

project and an offshore fixed-price project.  In Q1 2019, the Company took a $53 million charge for

a fixed-price offshore project.  Finally, in Q2 2019, the Company recognized more than $600 million

in charges on various fixed-price contracts (in addition to the $109 million charge taken in Q2 2019

related to three of the Gas-Fired Plants).  In total, Fluor has recognized more than $1.4 billion in

charges related to fixed-price contracts.

### E.    High-Level Departures and Reorganization of Fluor's Leadership and Business Model Evidence Scienter

203.    During Q1 and Q2 2017, as the Company was taking charges due to cost overruns at

the Greensville, Anderson, and Citrus County Plants, Fluor announced the departure of several high-

level officers.

204.    On March 8, 2017, Fluor unexpectedly announced that both Porter and Fluor's Chief

Operating Officer, Peter Oosterveer, were departing the Company.  While Defendants claimed that

Porter expected to retire by year-end as "part of normal succession planning," the Company had

named no successor at the time and claimed there was "an ongoing search for a replacement

candidate."  Porter departed *after* netting over $5.1 million in ill-gotten gains from insider sales of

Fluor stock at fraud-inflated prices and *before* the fraud was fully revealed.

205.    On August 3, 2017, Fluor announced the $194 million pre-tax charge for the Gas-

Fired Plants on its Q2 2017 earnings call.  During the call, Seaton also announced that Stanski would

be taking Porter's position as CFO starting the following day, that Fluor would be shuttering its

Charlotte office responsible for bidding the gas-fired plants, and that changes to the leadership of the

Power segment would be instituted specifically because of the issues alleged herein:

> I've discussed the problems, and now I'd like to talk about we've changed.
> After we had the initial charge last quarter, *we changed the Power leadership team*
> and brought in Simon Nottingham as the President of that group – of the Power
> group.  Simon comes from our oil and gas group, and he brings to this role his
> extensive background in project and program management.  He and his team, in
> coming to this role, led a review of the 3 projects in the second quarter and
> developed a path forward that is reflected in our current estimates.  *Some members*

- 99 -

*of the Power management team have exited Fluor.  We also informed our employees that we are closing our Charlotte office and consolidating Power operations in Greenville*, where it will be closer to our other businesses and leadership.

206.     Among the members of the Power segment management team replaced in Q2 2017 was Chris Tye – who had succeeded McSorley as President of the Power segment in November 2015.  Although Tye became President of the Power segment *after* Fluor was awarded the EPC contracts for the Gas-Fired Plants, Seaton explained that Tye and other Power segment employees were replaced because of the bidding issues associated with those Gas-Fired Plants alleged herein.

207.     On May 3, 2018, after consecutive quarters recognizing additional charges on the Citrus County Plant, Seaton made the dramatic announcement that "Fluor will *discontinue the pursuit of lump-sum gas-fired power market[s]*."

208.     On the morning of May 2, 2019, Fluor issued a press release announcing that Seaton had stepped down as CEO of the Company, and that he would no longer serve as a member of the Company's Board of Directors.  Hernandez was named interim CEO until a permanent replacement could be identified.

209.     Numerous media outlets directly tied Seaton's departure to the ongoing charges the Company had recorded on its fixed-price contracts over the years.  For instance, a May 2, 2019 *Bloomberg* article, titled "Fluor Sinks Most on Record as CEO Steps Down After Surprise Loss," noted that:

> Fluor Corp. sank the most in almost two decades as Chief Executive Officer David Seaton resigned following a surprising first-quarter loss.
>
> Profit and investor confidence in the engineering and construction company has been battered in recent years as Fluor absorbed a series of write-downs on projects ranging from refineries to power plants and offshore oil platforms.

210.     A May 7, 2019 piece in *The Dallas Morning News*, titled "Why Fluor's CEO had to go: He oversaw $1 billion in write-offs in three years," similarly noted that:

- 100 -

Cost overruns and bad estimates have been building since 2016, and in the past three years, Fluor has taken 18 quarterly write-offs totaling more than $1 billion. Those problems helped wipe out two-thirds of Fluor's market value since May 2014.

211.    On May 28, 2019, Fluor announced further changes to the leadership structure that oversaw these massive losses, as Steuert would be taking over Stanski's role as CFO.

F.    **The SEC and New Management Are Now Investigating Fluor's Prior Financial Reporting and Control Environment**

212.    On February 18, 2020, Fluor issued a press release disclosing that the SEC was investigating the Company's prior financial reporting and the charges on fixed-price projects the Company recorded in Q2 2019.  The Company also announced that it is conducting an internal investigation into its prior financial reports and related control environment.  As a result, the Company stated that Fluor would not be filing its fiscal year 2019 Form 10-K on time:

> Fluor announced that the Securities and Exchange Commission ("SEC") is conducting an investigation of the Company's past accounting and financial reporting, and has requested documents and information related to projects for which the Company recorded charges in the second quarter of 2019.

> In the course of responding to the SEC's data requests and conducting our own internal review, the Company is reviewing its prior period reporting and related control environment.  The Company has not made a determination at this time as to whether there are prior period material errors in its financial statements, although such remains possible. Given the ongoing internal review and recent developments on two projects, the Company does not expect to complete and file its annual report on Form 10-K prior to the end of February.

213.    According to Probes Reporter, an investment research firm that specializes in issuing Freedom of Information Act ("FOIA") requests to the SEC, the SEC apparently opened its probe into Fluor at some point between March 2017 and February 2018.  In other words, it appears the SEC had been investigating Fluor for potentially three years before the end of the Class Period.  The following chart contains the SEC's responses to Probes Reporter's FOIA requests related to Fluor during the Class Period:

| 5-Nov-2014 | FOIA Response | No SEC investigative records found. |
| 7-May-2015 | FOIA Response | No SEC investigative records found. |

| 19-Feb-2016 | FOIA Response | No SEC investigative records found. |
| 3-Mar-2017 | FOIA Response | No SEC investigative records found. |
| 28-Feb-2018 | FOIA Response | SEC denies access to records over concern their release, "could reasonably be expected to interfere with enforcement activities." |
| 20-Apr-2018 | Appeal Response | Existence of on-going SEC enforcement proceedings confirmed on appeal; Access to records remains blocked. |
| 13-Nov-2018 | FOIA Response | SEC denies access to records over concern their release, "could reasonably be expected to interfere with enforcement activities." |
| 15-Feb-2019 | Appeal Response | Existence of on-going SEC enforcement proceedings confirmed on appeal; Access to records remains blocked. |

### G.     Defendants' Motive and Opportunity to Conceal the Truth

214.     Throughout the Class Period, Defendants were financially motivated to underbid fixed-price contracts in order to win repeat business and personally benefit from the Company's incentive-based executive compensation program.   Once those contracts were won, Defendants sought to conceal the truth about the underlying bid and execution problems in order to maintain Fluor's artificially inflated stock price – allowing the Individual Defendants to profit from insider stock sales and the Company to raise additional capital on favorable terms.

### 1.     The Individual Defendants' Insider Stock Sales

215.     Defendants' scienter is further evidenced by the Class Period transactions in Fluor stock, options, and stock-related units by the Individual Defendants, which were suspicious in both timing and amount, permitting them to accumulate more than *$34 million* total in ill-gotten gains during the fraud alleged herein.

a.  **Seaton's Class Period Sales**

216.   During the six and half-year period preceding the Class Period (February 1, 2007 through August 13, 2013), Seaton exercised 57,621 Performance Rights ("PRs"),[10] exercised 32,879 Restricted Stock Units ("RSUs"),[11] exercised 105,869 stock options, and sold 212,494 Fluor shares (and 106,625 net shares) for gross proceeds of $14,469,595 and net proceeds of $10,057,407.  Seaton entered the Class Period with balances of 191,772 Fluor shares, 376,094 stock options, 57,621 PRs, and 173,863 RSUs.  Seaton's transactions during the Class Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Options Grants / Exercises** | **Shares** | **Vesting Date** | **Strike Price** | **Funds Spent / Gained** |
| 11/7/2013 | Exercise of Options [*expiration date 3/4/2018*] | 9,195 | 1/3 each on 3/6/2009; 3/6/2010; 3/6/2011 | $68.3600 | ($628,570) |
| 11/8/2013 | Exercise of Options [*expiration date 3/4/2018*] | 2,871 | 1/3 each on 3/6/2009; 3/6/2010; 3/6/2011 | $68.36 | ($196,262) |

---

[10]   Fluor's corporate Performance Incentive Plans from the Class Period listed different executive compensation award types, including Incentive Awards, which they described as a "bonus opportunity" "pursuant to which a Participant may become entitled to receive an amount payable either in cash, Shares or other property based on satisfaction of such performance criteria as are specified in the document(s) evidencing the Award."  The Individual Defendants' Form 4 filings during the Class Period define a Performance Right (PR) as follows: "Each performance right represents a contingent right to receive one share (or the cash equivalent of one share) of Fluor common stock."

[11]   Among the other executive compensation award types listed in Fluor's corporate Performance Incentive Plans from the Class Period were Stock Unit Awards, which they described as a "right to receive the fair market value of a specified number of Shares," subject to certain enumerated terms and conditions.  The Individual Defendants' Form 4 filings during the Class Period described the Restricted Stock Units (RSUs) at issue as subject to various vesting schedules and having a "1-for-1" "[c]onversion or [e]xercise [p]rice."

| | | | | | |
|---|---|---|---|---|---|
| 11/8/2013 | Exercise of Options [*expiration date 3/4/2018*] | 31,042 | 1/3 each on 3/6/2011; 3/6/2012; 3/6/2013 | $42.75 | ($1,327,046) |
| 11/8/2013 | Exercise of Options [*expiration date 3/2/2020*] | 58,726 | 1/3 each on 3/6/2012; 3/6/2013; 3/6/2014 | $70.76 | ($4,155,452) |
| 11/8/2013 | Exercise of Options [*expiration date 2/27/2022*] | 39,492 | 1/3 each on 3/6/2013; 3/6/2014; 3/6/2015 | $62.50 | ($2,468,250) |
| 2/21/2014 | Grant of Options | 120,333 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $79.19 | $0 |
| 8/21/2014 | Exercise of Options [*expiration date 2/27/2022*] | 39,492 | 1/3 each on 3/6/2013; 3/6/2014; 3/6/2015 | $62.50 | ($2,468,250) |
| 8/21/2014 | Exercise of Options [*expiration date 2/25/2023*] | 52,892 | 1/3 each on 3/6/2014; 3/6/2015; 3/6/2016 | $61.45 | ($3,250,213) |
| 2/23/2015 | Grant of Options | 173,655 | 1/3 each on 3/6/2016; 3/6/2017; 3/6/2018 | $59.05 | $0 |
| 2/23/2017 | Grant of Options | 154,599 | 1/3 each on 3/6/2018; 3/6/2019; 3/6/2020 | $55.35 | $0 |
| 2/23/2018 | Grant of Options | 33,615 | 1/3 each on 3/6/2019; 3/6/2020; 3/6/2021 | $58.15 | $0 |
| **Sub-Total Options from Grants/Compensation** | | 482,202 | | **Cost** | ($0) |

| Sub-Total Options Exercised | 233,710 | | Cost | ($14,494,042) |
|---|---|---|---|---|
| **Performance Rights Transactions** | | | | |

| Transaction Date | Unit Grants / Exercises | Units | Vesting Date | Price | Funds Spent / Gained |
|---|---|---|---|---|---|
| 2/5/2014 | Award of PRs | 58,282 | 3/5/2016 | $0 | $0 |
| 2/28/2014 | Exercise of PRs | (29,732) | 1/2 each on 2/28/2012; 2/28/2014 | $0 | $0 |
| 2/4/2015 | Award of PRs | 72,132 | 2/6/2017 | $0 | $0 |
| 2/28/2015 | Exercise of PRs | (27,889) | 1/2 each on 2/28/2013; 2/28/2015 | $0 | $0 |
| 2/5/2016 | Exercise of PRs | (58,282) | 2/5/2016 | $0 | $0 |
| 2/6/2017 | Exercise of PRs | (72,132) | 2/6/2017 | $0 | $0 |
| 2/19/2019 | Award of PRs | (23,625) | 3/6/2019 | $0 | $0 |
| | | | | | |
| **Sub-Total Grants of PRs** | 154,039 | | **Cost** | ($0) |
| **Sub-Total Exercises of PRs** | (188,035) | | **Proceeds** | n/a |
| **RSU Transactions** | | | | |

| Transaction Date | Unit Grants / Exercises | Units | Vesting Date | Price | Funds Spent / Gained |
|---|---|---|---|---|---|
| 2/21/2014 | Award of RSUs | 35,007 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $0 | $0 |
| 2/23/2015 | Award of RSUs | 49,179 | 1/3 each on 3/6/2016; 3/6/2017; 3/6/2018 | $0 | $0 |
| 2/23/2016 | Award of RSUs | 107,385 | 1/3 each on 3/6/2017; 3/6/2018; 3/6/2019 | $0 | $0 |
| 2/23/2017 | Award of RSUs | 44,391 | 1/3 each on 3/6/2018; 3/6/2019; 3/6/2020 | $0 | $0 |

| 2/23/2018 | Award of RSUs | 75,669 | 1/3 each on 3/6/2019; 3/6/2020; 3/6/2021 | $0 | $0 |
| 3/28/2019 | Award of RSUs | 121,410 | 1/3 each on 3/6/2020; 3/6/2021; 3/6/2022 | $0 | $0 |
| | | | | | |
| **Sub-Total Grants of RSUs** | | 433,041 | | **Cost** | ($0) |
| **Sub-Total Exercises of RSUs** | | (0) | | **Proceeds** | $0 |

| **Stock Transactions** | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Purchases / Sales** | **Shares** | | **Price** | **Funds Spent / Gained** |
| 11/7/2013 | Acquired by options exercise | 9,195 | | *See above* | *See above* |
| 11/7/2013 | Sale | (9,195) | | $77.0250 | $708,245 |
| 11/8/2013 | Acquired by options exercise | 132,131 | | *See above* | *See above* |
| 11/8/2013 | Sale | (132,131) | | $76.0000 | $10,041,956 |
| 2/5/2014 | Sale | (267) | | $74.8600 | $19,988 |
| 2/28/2014 | Acquired by PR exercise | 29,732 | | n/a | $0 |
| 2/28/2014 | Sale | (29,732) | | $77.6900 | $2,309,879 |
| 8/21/2014 | Acquired by options exercise | 92,384 | | *See above* | *See above* |
| 8/21/2014 | Sale | 92,384 | | $74.1440 | $6,849,719 |
| 2/28/2015 | Acquired by PR exercise | 27,889 | | n/a | $0 |
| 2/28/2015 | Sale | (27,889) | | $58.0000 | $1,617,562 |
| 2/5/2016 | Acquired by PR exercise | 58,282 | | n/a | $0 |
| 2/5/2016 | Sale | (58,282) | | $44.8400 | $2,613,365 |
| 3/6/2016 | Sale | (17,993) | | $49.1700 | $884,716 |
| 2/6/2017 | Acquired by PR exercise | 72,132 | | n/a | $0 |

| 2/6/2017 | Sale | | (72,132) | $55.3400 | $3,991,785 |
|---|---|---|---|---|---|
| 11/21/2017 | Sale | | (40,000) | $47.5660 | $1,902,640 |
| 3/1/2018 | Sale | | (50,000) | $56.7210 | $2,836,050 |
| 3/6/2018 | Sale | | (6,070) | $57.5000 | $349,025 |
| 11/6/2018 | Purchase | | 5,158 | $48.5196 | ($250,264) |
| 2/19/2019 | Purchase | | 1,388 | n/a | $0 |
| 3/6/2019 | Sale | | (9,676) | $26.8000 | $259,317 |
| | | | | | |
| **Sub-Total Stock Sales** | | | (545,751) | **Proceeds** | **$34,384,246** |
| | | | | | |
| 3/14/2014 | Gift | | (10,001) | n/a | n/a |
| 3/5/2015 | Gift | | (8,602) | n/a | n/a |
| 3/3/2016 | Gift | | (5,139) | n/a | n/a |
| 3/8/2017 | Gift | | (7,480) | n/a | n/a |
| 3/28/2019 | Gift | | (3,320) | n/a | n/a |
| 3/28/2019 | Gift | | (9,676) | n/a | n/a |
| **Sub-Total Stock Gifts** | | | (35,872) | **Proceeds** | n/a |
| **Totals** | **Shares Purchased** | **6,546** | **Transaction Costs** | | **($250,264)** |
| | **Shares Acquired by Options Exercise** | **233,710** | **Transaction Costs** | | **($14, 494,042)** |
| | **Shares Acquired by RSU Exercise** | **0** | **Transaction Costs** | | **($0)** |
| | **Shares Acquired By PR Exercise** | **188,035** | **Transaction Costs** | | **($0)** |
| | **Shares Sold** | **(305,495)** | **Transaction Proceeds** | | **$34,384,246** |
| | | | **Net Gain to Defendant Seaton** | | **$19,639,940** |

217.    The timing of Seaton's sales further supports a finding of scienter.  For instance:

- 107 -

(a)      Seaton sold $10,750,201 in Fluor stock on November 7, 2013 and November 8, 2013, when the stock traded near the Class Period high.[12]  These sales were made after multiple misleading statements and omissions by Defendants, including Seaton himself, in 2013, as set forth herein.  *See* ¶114.

(b)      Seaton sold $2,309,879 in Fluor stock on February 28, 2014, when the stock traded near the Class Period high.  Seaton made this trade when Fluor had initiated construction of the Brunswick County Plant, but before investors were alerted to problems with the bid and construction process.  This sale also occurred after multiple misleading statements and omissions by Defendants, including Seaton himself, and after statements and omissions Seaton made just ten days prior to this sale on the February 18, 2014 earnings call.  *See* ¶¶116-117; *see also* ¶114.

(c)      Seaton sold $6,849,719 in Fluor stock on August 21, 2014, shortly after Fluor announced its Q2 2014 financial results and after Fluor's undisclosed but ongoing problems with construction execution, including major, costly issues with the Mitsubishi turbines, had already occurred.  This sale also occurred after multiple misleading statements and omissions by Defendants, including a statement made just six days prior, on August 14, 2014.  *See* ¶94; *see also* ¶¶87-93.

(d)      Seaton sold $1,617,562 in Fluor stock on February 28, 2015, ten days after Fluor announced its 2014 financial results.  On the earnings call on February 18, 2015, Defendants made misleading statements and omissions and continued to conceal the issues with the Brunswick County Plant that were well developed by this time.  *See* ¶¶99-100.  In Q2 2015, the very next quarter after Seaton sold these shares, Fluor would take a $10 million charge related to the Brunswick County Plant, which later ballooned to $60 million for 2015, wiping out the Power segment's 2015 profitability.

---

[12]   Fluor's common stock reached its Class Period high of $83.93 on January 22, 2014.

(e)      Seaton sold $3,185,075 in Fluor stock on March 1, 2018 and March 6, 2018. Seaton's March 1, 2018 sales occurred within weeks of Fluor's February 20, 2018 announcement of 2017 results in which Defendants announced their initial 2018 earnings after having delayed the guidance announcement from Q3 2017, as was Fluor's usual practice.   While Defendants claimed that the delay was to incorporate a new revenue recognition standard, the guidance significantly beat market expectations and caused many analysts to raise their targets and ratings.   For example, Deutsche Bank in its February 20, 2018 report said that the Company "issued initial 2018 EPS guidance well ahead of street expectations (even after factoring in tax reform and rev rec changes)," and UBS in its February 21, 2018 report raised its target 26% from $46 to $58.   After Defendants set 2018 initial earnings guidance, Seaton immediately sold his stock.   However, at the same time that 2018 initial earnings guidance was being announced, Fluor was accumulating an undisclosed $125 million charge for the Citrus County Plant, which was later announced along with downward-revised 2018 guidance.   In connection with additional Gas-Fired Plant charges in Q2 2018 and Q3 2018, Fluor continued to revise guidance downward.   Through 2018, Fluor would take $188 million in charges, wiping out the Power segment's profits.   Fluor would settle at $1.59 per share for 2018, well below the initial 2018 earnings guidance of $3.10 to $3.50 per share that was in place when Seaton sold his stock.   Although Seaton was able to cash out before these negative announcements, investors were not able to do so.

(f)      Seaton sold approximately $260,000 in Fluor stock on March 6, 2019, less than two months before stunning the market with additional fixed-price charges in Fluor's May 2, 2019 release of Q1 2019 financials.   This surprise announcement resulted in Seaton's "resignation" from the Company, but not before he cashed in more than a quarter of a million dollars in stock on his way out.

b.    Porter's Class Period Sales

218.    During the six and half-year period preceding the Class Period (February 1, 2007 through August 13, 2013), Porter exercised 8,685 PRs, exercised 0 RSUs, exercised 0 options, and sold 17,650 Fluor shares for gross and net proceeds of $1,077,581.  Porter entered the Class Period with balances of 75,935 Fluor shares, 42,573 stock options, 60,116 PRs, and 62,857 RSUs.  Porter's transactions during the Class Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| Transaction Date | Options Grants / Exercises | Shares | Vesting Date | Strike Price | Funds Spent / Gained |
| 2/21/2014 | Grant of Options | 28,653 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $79.19 | $0 |
| 2/23/2015 | Grant of Options | 39,468 | 1/3 each on 3/6/2016; 3/6/2017; 3/6/2018 | $59.05 | $0 |
| 2/23/2017 | Grant of Options | 52,443 | 1/3 each on 3/6/2018; 3/6/2019; 3/6/2020 | $55.35 | $0 |
| Sub-Total Options from Grants/Compensation | | 120,564 | | Cost | ($0) |
| Sub-Total Options Exercised | | 0 | | Cost | ($0) |
| Performance Rights Transactions | | | | | |
| Transaction Date | Unit Grants / Exercises | Units | Vesting Date | Price | Funds Spent / Gained |
| | | | | | |
| 2/5/2014 | Award of PRs | 15,638 | 3/5/2016 | $0 | $0 |
| 2/4/2015 | Award of PRs | 17,174 | 2/6/2017 | $0 | $0 |
| 5/3/2015 | Exercise of PRs | (8,685) | 1/2 each on 5/3/2013; 5/3/2015 | $0 | $0 |
| 2/5/2016 | Exercise of PRs | (15,638) | 2/5/2016 | $0 | $0 |
| 2/6/2017 | Exercise of PRs | (17,174) | 2/6/2017 | $0 | $0 |
| | | | | | |
| Sub-Total Awards of PRs | | 32,812 | | Cost | ($0) |

| Sub-Total Exercises of PRs | | (41,497) | | Proceeds | n/a |
|---|---|---|---|---|---|

| RSU Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/21/2014 | Award of RSUs | 8,337 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $0 | $0 |
| 2/23/2015 | Award of RSUs | 11,178 | 1/3 each on 3/6/2016; 3/6/2017; 3/6/2018 | $0 | $0 |
| 2/23/2016 | Award of RSUs | 31,545 | 1/3 each on 3/6/2017; 3/6/2018; 3/6/2019 | $0 | $0 |
| 2/23/2017 | Award of RSUs | 15,060 | 1/3 each on 3/6/2018; 3/6/2019; 3/6/2020 | $0 | $0 |
| | | | | | |
| **Sub-Total Awards of RSUs** | | 66,120 | | **Cost** | ($0) |
| **Sub-Total Exercises of RSUs** | | (0) | | **Proceeds** | $0 |

| Stock Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Purchases / Sales** | **Shares** | | **Price** | **Funds Spent / Gained** |
| 11/6/2013 | Sale | (13,078) | | $76.8260 | $1,004,730 |
| 3/6/2014 | Sale | (1,189) | | $80.1200 | $95,263 |
| 4/9/2014 | Sale | (8,556) | | $77.3600 | $661,892 |
| 5/7/2014 | Sale | (1,648) | | $75.4900 | $124,408 |
| 3/6/2015 | Sale | (2,307) | | $57.2900 | $132,168 |
| 4/9/2015 | Sale | (8,556) | | $59.1400 | $506,002 |
| 5/3/2015 | Acquired by PR exercise | 8,685 | | n/a | $0 |
| 5/3/2015 | Sale | (8,685) | | $58.7000 | $509,810 |
| 5/7/2015 | Sale | (1,648) | | $58.6300 | $96,622 |
| 2/5/2016 | Acquired by PR exercise | 15,638 | | n/a | $0 |
| 2/5/2016 | Sale | (15,638) | | n/a | $701,208 |
| 3/6/2016 | Sale | (4,399) | | $49.1700 | $216,299 |
| 2/6/2017 | Acquired by PR exercise | 17,174 | | n/a | $0 |
| 2/6/2017 | Sale | (17,174) | | $55.3400 | $950,409 |
| 3/6/2017 | Sale | (2,730) | | $55.0400 | $150,259 |
| **Sub-Total Stock Sales** | | (85,608) | | **Proceeds** | **$5,149,070** |

| Totals | Shares Purchased | 0 | Transaction Costs | ($0) |
|---|---|---|---|---|
| | Shares Acquired by Options Exercise | 0 | Transaction Costs | ($0) |
| | Shares Acquired by RSU Exercise | 0 | Transaction Costs | ($0) |
| | Shares Acquired By PR Exercise | 41,497 | Transaction Costs | ($0) |
| | Shares Sold | (85,608) | Transaction Proceeds | $5,149,070 |
| | | | Net Gain to Defendant Porter | $5,149,070 |

219.   The timing of Porter's sales further supports a finding of scienter.  For instance:

(a)   Porter sold $1,004,730 in Fluor stock on November 6, 2013, when the stock traded near the Class Period high.  These sales occurred after multiple misleading statements and omissions by Defendants, including false statements made in August 2013.  *See* ¶114.

(b)   Porter sold $95,263 in Fluor stock on March 6, 2014, when the stock traded near the Class Period high. Porter made this trade when Fluor had initiated construction of the Brunswick County Plant, but before investors were alerted to problems with the bid and construction process.  This sale also occurred after multiple misleading statements and omissions by Defendants, including after statements and omissions Defendants made just weeks prior to this sale on the February 18, 2014 earnings call.  *See* ¶¶116-117; *see also* ¶114.

(c)   Porter sold $132,168 in Fluor stock on March 6, 2015, one day after Fluor issued a Shareholder Letter, attached to Fluor's 2014 Annual Report, containing false statements. ¶¶101, 121.  This trade also occurred just weeks after Defendants discussed Fluor's 2014 financial results on the earnings call on February 18, 2015, on which Defendants made misleading statements and omissions and continued to conceal issues with the Brunswick County Plant that were well developed by that time.  *See* ¶¶99-100.  In Q2 2015, the very next quarter after Porter sold these shares, Fluor would take a $10 million charge related to the Brunswick County Plant, which later ballooned to $60 million for 2015, wiping out the Power segment's 2015 profitability.

- 112 -

c.        **Stanski's Class Period Sales**

220.    During the six and half-year period preceding the Class Period (February 1, 2007

through August 13, 2013), Stanski exercised 3,928 PRs, exercised 0 RSUs, exercised 18,916 stock

options, and sold 27,528 Fluor shares for gross proceeds of $1,923,150 and net proceeds of

$1,124,015.  Stanski entered the Class Period with balances of 23,680 Fluor shares, 48,779 stock

options, 21,179 PRs, and 11,688 RSUs.  Stanski's transactions during the Class Period were as

follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Options Grants / Exercises** | **Shares** | **Vesting Date** | **Strike Price** | **Funds Spent / Gained** |
| 11/5/2013 | Exercise of Options [*expiration date 5/6/2019*] | 4,859 | 1/3 each on 5/7/2010; 5/7/2011; 5/7/2012 | $41.77 | ($202,960) |
| 11/5/2013 | Exercise of Options [*expiration date 3/2/2020*] | 18,396 | 1/3 each on 3/6/2011; 3/6/2012; 3/6/2013 | $42.75 | ($788,429) |
| 2/21/2014 | Grant of Options | 18,624 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $79.19 | $0 |
| 2/23/2015 | Grant of Options | 28,614 | 1/3 each on 3/6/2016; 3/6/2017; 3/6/2018 | $59.05 | $0 |
| 2/23/2017 | Grant of Options | 28,197 | 1/3 each on 3/6/2018; 3/6/2019; 3/6/2020 | $55.35 | $0 |
| **Sub-Total Options from Grants/Compensation** | | 98,690 | | **Cost** | ($0) |
| **Sub-Total Options Exercised** | | 0 | | **Cost** | ($0) |
| **Performance Rights Transactions** | | | | | |

- 113 -

| Transaction Date | Unit Grants / Exercises | Units | Vesting Date | Price | Funds Spent / Gained |
|---|---|---|---|---|---|
| 2/5/2014 | Award of PRs | 8,708 | 3/5/2016 | $0 | $0 |
| 2/28/2014 | Exercise of PRs | (4,441) | 1/2 each on 2/28/2012; 2/28/2014 | $0 | $0 |
| 2/4/2015 | Award of PRs | 11,164 | 2/6/2017 | $0 | $0 |
| 2/28/2015 | Exercise of PRs | (3,928) | 1/2 each on 2/28/2013; 2/28/2015 | $0 | $0 |
| 2/5/2016 | Exercise of PRs | (8,708) | 2/5/2016 | $0 | $0 |
| 2/6/2017 | Exercise of PRs | (11,164) | 2/6/2017 | $0 | $0 |
| 2/19/2019 | Award of PRs | 4,068 | 3/6/2019 | $0 | $0 |
| | | | | | |
| **Sub-Total Grants of PRs** | | 23,940 | | **Cost** | ($0) |
| **Sub-Total Exercises of PRs** | | (28,241) | | **Proceeds** | n/a |
| **RSU Transactions** | | | | | |
| Transaction Date | Unit Grants / Exercises | Units | Vesting Date | Price | Funds Spent / Gained |
| 2/21/2014 | Award of RSUs | 5,418 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $0 | $0 |
| 2/23/2015 | Award of RSUs | 8,106 | 1/3 each on 3/6/2016; 3/6/2017; 3/6/2018 | $0 | $0 |
| 2/23/2016 | Award of RSUs | 18,489 | 1/3 each on 3/6/2017; 3/6/2018; 3/6/2019 | $0 | $0 |
| 2/23/2017 | Award of RSUs | 8,907 | 1/3 each on 3/6/2018; 3/6/2019; 3/6/2020 | $0 | $0 |
| 2/23/2018 | Award of RSUs | 22,356 | 1/3 each on | $0 | $0 |

| Transaction Date | Purchases / Sales | Shares | | Price | Funds Spent / Gained |
|---|---|---|---|---|---|
| | | | | 3/6/2019; 3/6/2020; 3/6/2021 | |
| 2/19/2019 | Award of RSUs | 37,209 | | 1/3 each on 3/6/2020; 3/6/2021; 3/6/2022 | $0 | $0 |
| | | | | | |
| **Sub-Total Grants of RSUs** | | 99,675 | | **Cost** | ($0) |
| **Sub-Total Exercises of RSUs** | | (0) | | **Proceeds** | $0 |

| Stock Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Purchases / Sales** | **Shares** | | **Price** | **Funds Spent / Gained** |
| 11/5/2013 | Acquired by options exercise | 4,859 | | *See above* | *See above* |
| 11/5/2013 | Acquired by options exercise | 18,396 | | *See above* | *See above* |
| 11/5/2013 | Sale | (35,247) | | $75.6910 | $2,667,881 |
| 2/28/2014 | Acquired by PR exercise | 4,441 | | n/a | $0 |
| 2/28/2014 | Sale | (4,441) | | $77.6900 | $345,021 |
| 6/6/2014 | Sale | (1,816) | | $80.1200 | $145,498 |
| 2/28/2015 | Acquired by PR exercise | 3,928 | | n/a | $0 |
| 2/28/2015 | Sale | (3,928) | | $58.0000 | $227,824 |
| 3/6/2015 | Sale | (2,052) | | $57.2900 | $117,559 |
| 2/5/2016 | Acquired by PR exercise | 8,708 | | n/a | $0 |
| 2/5/2016 | Sale | (8,708) | | $44.8400 | $390,467 |
| 3/6/2016 | Sale | (2,883) | | $49.1700 | $141,757 |
| 2/6/2017 | Acquired by PR exercise | 11,164 | | n/a | $0 |
| 2/6/2017 | Sale | (11,164) | | $55.3400 | $617,816 |
| 3/6/2017 | Sale | (2,151) | | $55.0400 | $118,391 |
| 11/30/2017 | Sale | (2,792) | | $48.4780 | $135,351 |
| 3/6/2018 | Sale | (658) | | $57.5700 | $37,881 |
| 3/6/2018 | Sale | (3,718) | | $57.4360 | $213,547 |
| 2/26/2019 | Purchase | 239 | | n/a | $0 |
| 3/6/2019 | Sale | (1,815) | | $36.8000 | $66,792 |
| **Sub-Total Stock Sales** | | (81,373) | | **Proceeds** | **$5,225,784** |

- 115 -

| Totals | Shares Purchased | 239 | Transaction Costs | ($0) |
|---|---|---|---|---|
| | Shares Acquired by Options Exercise | 23,255 | Transaction Costs | ($989,389) |
| | Shares Acquired by RSU Exercise | 0 | Transaction Costs | ($0) |
| | Shares Acquired By PR Exercise | 28,241 | Transaction Costs | ($0) |
| | Shares Sold | (81,373) | Transaction Proceeds | $5,225,784 |
| | | | Net Gain to Defendant Stanski | $4,296,395 |

221.    The timing of Stanski's sales further supports a finding of scienter.  For instance:

(a)      Stanski sold $2,667,881 in Fluor stock on November 5, 2013, when the stock traded near the Class Period high.  These sales occurred after multiple misleading statements and omissions by Defendants, including false statements made In August 2013.  *See* ¶114.

(b)      Stanski sold $345,021 in Fluor stock on February 28, 2014, when the stock traded near the Class Period high.  Stanski made this trade when Fluor had initiated construction of the Brunswick County Plant, but before investors were alerted to problems with the bid and construction process.  This sale also occurred after multiple misleading statements and omissions by Defendants, including after statements and omissions Defendants made just ten days prior to this sale on the February 18, 2014 earnings call.  *See* ¶¶116-117; *see also* ¶114.

(c)      Stanski sold $145,498 in Fluor stock on June 6, 2014, shortly after Fluor announced its 2013 financial results and after Fluor's ongoing problems with construction execution, including major, costly issues with the Mitsubishi turbines, had already occurred.  *See* ¶90; *see also* ¶¶185-191.

(d)      Stanski sold $227,824 in Fluor stock on February 28, 2015 and $117,559 in Fluor stock on March 6, 2015, shortly after Fluor announced its 2014 financial results.  On the earnings call on February 18, 2015, Defendants made misleading statements and omissions and continued to conceal issues related to the Brunswick County Plant that were well developed by that

time. *See* ¶¶99-100.  In Q2 2015, the very next quarter after Stanski sold these shares, Fluor would take a $10 million charge related to the Brunswick County Plant, which later ballooned to $60 million for 2015, wiping out the Power segment's 2015 profitability.

(e)  Stanski sold $251,428 in Fluor stock on March 6, 2018, shortly after Fluor announced its 2017 financial results.  Stanski's March 2018 sale, like Seaton's, occurred within weeks of Fluor's February 20, 2018 announcement of 2017 results in which Defendants announced their initial 2018 earnings, which beat market expectations and caused many analysts to raise their targets and ratings.  After Defendants set 2018 initial earnings guidance, Stanski immediately sold his stock.  Fluor would take multiple charges related to the Gas-Fired Plants shortly thereafter, wiping out the Power segment profits, resulting in guidance reductions.  Stanski's final Class Period sale occurred before these negative announcements.

(f)  Stanski sold more than $66,000 in Fluor stock on March 6, 2019, less than two months before stunning the market with additional fixed-price charges in Fluor's May 2, 2019 release of Q1 2019 financials.  This surprise announcement resulted in Stanski's replacement as CFO just a few weeks later.

### d.  Smalley's Class Period Sales

222.  During the six and half-year period preceding the Class Period (February 1, 2007 through August 13, 2013), Smalley exercised 8,061 PRs, exercised 0 RSUs, exercised 13,670 options, and sold 25,685 Fluor shares (and 8,324 net shares) for gross proceeds of $1,743,281 and net proceeds of $1,047,173.  During this time period, Smalley purchased 2,958 shares at a cost of $145,695.  Smalley entered the Class Period with balances of 15,597 Fluor shares, 10,377 stock options, 1,764 PRs, and 19,267 RSUs.  Smalley's transactions during the Class Period were as follows:

| Stock Options Transactions |
| --- |

| Transaction Date | Options Grants / Exercises | Shares | Vesting Date | Strike Price | Funds Spent / Gained |
|---|---|---|---|---|---|
| 11/5/2013 | Exercise of Options [*expiration date 3/2/2020*] | 1,725 | 1/3 each on 3/6/2011; 3/6/2012; 3/6/2013 | $68.3600 | ($73,744) |
| 2/21/2014 | Grant of Options | 4,233 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $79.19 | $0 |
| 2/23/2015 | Grant of Options | 5,832 | 1/3 each on 3/6/2016; 3/6/2017; 3/6/2018 | $59.05 | $0 |
| **Sub-Total Options from Grants/Compensation** | | 10,065 | | **Cost** | ($0) |
| **Sub-Total Options Exercised** | | 1,725 | | **Cost** | ($73,744) |
| **Performance Rights Transactions** | | | | | |
| Transaction Date | Unit Grants / Exercises | Units | Vesting Date | Price | Funds Spent / Gained |
| 2/5/2014 | Award of PRs | 4,158 | 3/5/2016 | $0 | $0 |
| 2/28/2014 | Exercise of PRs | (2,099) | 1/2 each on 2/28/2012; 2/28/2014 | $0 | $0 |
| 2/4/2015 | Award of PRs | 4,926 | 3/5/2016 | $0 | $0 |
| 2/28/2015 | Exercise of PRs | (1,764) | 1/2 each on 2/28/2013; 2/28/2015 | $0 | $0 |
| | | | | | |
| **Sub-Total Awards of PRs** | | 9,084 | | **Cost** | ($0) |
| **Sub-Total Exercises of PRs** | | (3,863) | | **Proceeds** | n/a |
| **RSU Transactions** | | | | | |
| Transaction Date | Unit Grants / Exercises | Units | Vesting Date | Price | Funds Spent / Gained |
| 2/21/2014 | Award of RSUs | 1,233 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $0 | $0 |
| 2/23/2015 | Award of RSUs | 1,653 | 1/3 each on 3/6/2016; 3/6/2017; 3/6/2018 | $0 | $0 |
| | | | | | |
| **Sub-Total Awards of RSUs** | | 2,886 | | **Cost** | ($0) |

- 118 -

| Sub-Total Exercises of RSUs | | (0) | | Proceeds | $0 |
|---|---|---|---|---|---|
| **Stock Transactions** | | | | | |
| Transaction Date | Purchases / Sales | Shares | Price | Funds Spent / Gained | |
| 11/5/2013 | Acquired by options exercise | 1,725 | *See above* | *See above* | |
| 11/5/2013 | Sale | (6,393) | $75.6250 | $483,471 | |
| 2/5/2014 | Sale | (160) | $74.8600 | $11,978 | |
| 2/28/2014 | Acquired by PR exercise | 2,099 | n/a | $0 | |
| 2/28/2014 | Sale | (2,099) | $77.6900 | $163,071 | |
| 3/6/2014 | Sale | (352) | $80.1200 | $28,202 | |
| 5/6/2014 | Sale | (1,261) | $74.2855 | $93,674 | |
| 2/5/2015 | Sale | (123) | $55.7200 | $6,854 | |
| 2/25/2015 | Sale | (1,002) | $59.1800 | $59,298 | |
| 2/28/2015 | Acquired by PR exercise | 1,764 | n/a | $0 | |
| 2/28/2015 | Sale | (1,764) | $58.0000 | $102,312 | |
| 3/6/2015 | Sale | (368) | $57.2900 | $21,083 | |
| 3/10/2015 | Sale | (3,883) | $57.2740 | $222,395 | |
| **Sub-Total Stock Sales** | | (85,608) | **Proceeds** | **$5,149,070** | |
| **Totals** | Shares Purchased | 0 | Transaction Costs | ($0) | |
| | Shares Acquired by Options Exercise | 1,725 | Transaction Costs | ($73,744) | |
| | Shares Acquired by RSU Exercise | 0 | Transaction Costs | ($0) | |
| | Shares Acquired By PR Exercise | 3,863 | Transaction Costs | ($0) | |
| | Shares Sold | (17,405) | Transaction Proceeds | $1,192,337 | |
| | | | Net Gain to Defendant Smalley | $1,118,594 | |

223.    The timing of Smalley's sales further supports a finding of scienter.  For instance:

(a)    Smalley sold $483,471 in Fluor stock on November 5, 2013, when the stock traded near the Class Period high.  These sales were made after multiple misleading statements and omissions by Defendants, as set forth herein, including after statements and omissions made in August 2013.  *See* ¶114.

(b)    Smalley sold $163,071 in Fluor stock on February 24, 2014 and $28,202 in Fluor stock on March 6, 2014, when the stock traded near the Class Period high.  Smalley made this

trade when Fluor had initiated construction of the Brunswick County Plant, but before investors were alerted to problems with the bid and construction process. These sales also occurred after multiple misleading statements and omissions by Defendants, including statements made just six days prior on the February 18, 2014 earnings call. *See* ¶¶116-117; *see also* ¶114.

(c)     Smalley sold $93,674 in Fluor stock on May 6, 2014, shortly after Fluor announced its 2013 financial results and after Fluor's ongoing problems with construction execution, including major, costly issues with the Mitsubishi turbines, had already occurred. *See* ¶90; *see also* ¶¶185-191.

(d)     Smalley sold $59,298 in Fluor stock on February 25, 2015 and $102,312 in Fluor stock on February 28, 2015, shortly after Fluor announced its 2014 financial results. On the earnings call on February 18, 2015, Defendants made misleading statements and omissions and continued to conceal issues related to the Brunswick Plant that were well developed by that time. *See* ¶¶99-100. In Q2 2015, the very next quarter after Smalley sold these shares, Fluor would take a $10 million charge related to the Brunswick County Plant, which later ballooned to $60 million for 2015, wiping out the Power segment's 2015 profitability.

(e)     Smalley sold $21,083 in Fluor stock on March 6, 2018 and $222,395 in Fluor stock on March 10, 2018. Smalley's March 2018 sales occurred within weeks of Fluor's February 20, 2018 announcement of 2017 results in which Defendants announced their initial 2018 earnings, which beat market expectations and caused many analysts to raise their targets and ratings. After Defendants set 2018 initial earnings guidance, Smalley immediately sold his stock. Fluor would take multiple charges related to the Gas-Fired Plants shortly thereafter, wiping out the Power segments profits, resulting in guidance reductions. Smalley's final Class Period sale occurred before these negative announcements.

### e.   McSorley's Class Period Sales

224.   During the six and half-year period preceding the Class Period (February 1, 2007

through August 13, 2013), McSorley did not report any PR exercises, RSU exercises, options

exercises, or sales of Fluor stock.  McSorley entered the Class Period with balances of 24,634 Fluor

shares, 26,772 stock options, 4,445 PRs, and 0 RSUs.  McSorley's transactions during the Class

Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Options Grants / Exercises** | **Shares** | **Vesting Date** | **Strike Price** | **Funds Spent / Gained** |
| None | None | n/a | n/a | n/a | n/a |
| **Sub-Total Options from Grants/Compensation** | | 0 | | **Cost** | ($0) |
| **Sub-Total Options Exercised** | | 0 | | **Cost** | ($0) |
| Performance Rights Transactions | | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 3/6/2018 | Exercise of PRs | (4,694) | 3/6/2018 | $0 | $0 |
| | | | | | |
| **Sub-Total Awards of PRs** | | 0 | | **Cost** | ($0) |
| **Sub-Total Exercises of PRs** | | (4,694) | | **Proceeds** | n/a |
| RSU Transactions | | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/23/2018 | Award of RSUs | 8,601 | 1/3 each on 3/6/2019; 3/6/2020; 3/6/2021 | $0 | $0 |
| 2/26/2019 | Award of RSUs | 13,710 | 1/3 each on 3/6/2020; 3/6/2021; 3/6/2020 | $0 | $0 |
| | | | | | |
| | | | | | |
| **Sub-Total Awards of RSUs** | | 8,601 | | **Cost** | ($0) |
| **Sub-Total Exercises of RSUs** | | (0) | | **Proceeds** | $0 |
| Stock Transactions | | | | | |
| **Transaction Date** | **Purchases / Sales** | **Shares** | | **Price** | **Funds Spent / Gained** |

- 121 -

| 3/6/2018 | Acquired by PR exercise | 4,694 | n/a | $0 |
|---|---|---|---|---|
| 3/6/2018 | Sale | (1,538) | $57.5700 | $88,543 |
| 3/6/2019 | Sale | (952) | $36.8000 | $35,034 |
| **Sub-Total Stock Sales** | | (1,538) | **Proceeds** | **$88,543** |

| | | | | |
|---|---|---|---|---|
| **Totals** | **Shares Purchased** | **0** | **Transaction Costs** | **($0)** |
| | **Shares Acquired by Options Exercise** | **0** | **Transaction Costs** | **($0)** |
| | **Shares Acquired by RSU Exercise** | **0** | **Transaction Costs** | **($0)** |
| | **Shares Acquired By PR Exercise** | **4,694** | **Transaction Costs** | **($0)** |
| | **Shares Sold** | **(2,490)** | **Transaction Proceeds** | **$123,576** |
| | | | **Net Gain to Defendant McSorley** | **$123,576** |

225.    The timing of McSorley's sale further supports a finding of scienter. For instance:

(a)    McSorley sold $88,543 in Fluor stock on March 6, 2018. This sale occurred within weeks of Fluor's February 20, 2018 announcement of 2017 results in which Defendants announced their initial 2018 earnings, which beat market expectations and caused many analysts to raise their targets and ratings. After Defendants set 2018 initial earnings guidance, McSorley immediately sold his stock. Fluor would take multiple charges related to the Gas-Fired Plants shortly thereafter, wiping out the Power segment profits, resulting in guidance reductions. McSorley's sale occurred before these negative announcements.

**f.    Hernandez's Class Period Sales**

226.    During the six and half-year period preceding the Class Period (February 1, 2007 through August 13, 2013), Hernandez exercised 11,109 PRs, exercised 15,501 RSUs, exercised 42,624 options, and sold 66,286 Fluor shares (and 23,662 net shares) for gross proceeds of $4,242,174 and net proceeds of $2,604,716. Hernandez entered the Class Period with balances of 44,486 Fluor shares, 50,019 stock options, 11,109 PRs, and 11,902 RSUs. Hernandez's transactions during the Class Period were as follows:

- 122 -

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Options Grants / Exercises** | **Shares** | **Vesting Date** | **Strike Price** | **Funds Spent / Gained** |
| 1/17/2014 | Exercise of Options [*expiration date 3/2/2020*] | 13,797 | 1/3 each on 3/6/2011; 3/6/2012; 3/6/2013 | $42.7500 | ($589,822) |
| 2/21/2014 | Grant of options | 28,653 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $79.1900 | $0 |
| 2/23/2015 | Grant of options | 43,416 | 1/3 each on; 3/6/2016; 3/6/2017; 3/6/2018 | $59.0500 | $0 |
| 2/23/2017 | Grant of options | 45,240 | 1/3 each on; 3/6/2018; 3/6/2019; 3/6/2020 | $55.3500 | $0 |
| 5/16/2019 | Grant of options | 123,222 | 1/3 each on 5/16/2020; 5/16/2021; 5/16/2022 | $29.5000 | $0 |
| **Sub-Total Options from Grants/Compensation** | | 240,531 | | **Cost** | ($0) |
| **Sub-Total Options Exercised** | | 13,797 | | **Cost** | ($589,822) |
| Performance Rights Transactions | | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/5/2014 | Award of PRs | 10,663 | 3/5/2016 | $0 | $0 |
| 2/28/2014 | Exercise of PRs | (5,609) | 1/2 each on 2/28/2012; 2/28/2014 | $0 | $0 |
| 2/4/2015 | Award of PRs | 17,174 | 2/6/2017 | $0 | $0 |
| 2/28/2015 | Exercise of PRs | (5,500) | 1/2 each on 2/28/2013; 2/28/2015 | $0 | $0 |
| 2/5/2016 | Exercise of PRs | (10,663) | 2/5/2016 | $0 | $0 |
| 2/6/2017 | Exercise of PRs | (17,174) | 2/6/2017 | $0 | $0 |
| 2/19/2019 | Exercise of PRs | (6,175) | 3/6/2019 | $0 | $0 |

- 123 -

| Sub-Total Grants of PRs | 27,837 | | | Cost | ($0) |
|---|---|---|---|---|---|
| Sub-Total Exercises of PRs | (45,121) | | | Proceeds | n/a |
| **RSU Transactions** | | | | | |
| Transaction Date | Unit Grants / Exercises | Units | Vesting Date | Price | Funds Spent / Gained |
| 2/21/2014 | Award of RSUs | 8,337 | 1/3 each on 3/6/2015; 3/6/2016; 3/6/2017 | $0 | $0 |
| 2/23/2015 | Award of RSUs | 12,297 | 1/3 each on 3/6/2016; 3/6/2017; 3/6/2018 | $0 | $0 |
| 2/23/2016 | Award of RSUs | 28,068 | 1/3 each on 3/6/2017; 3/6/2018; 3/6/2019 | $0 | $0 |
| 2/23/2017 | Award of RSUs | 12,990 | 1/3 each on 3/6/2018; 3/6/2019; 3/6/2020 | $0 | $0 |
| 2/23/2018 | Award of RSUs | 24,507 | 1/3 each on 3/6/2019; 3/6/2020; 3/6/2021 | $0 | $0 |
| 2/26/2019 | Award of RSUs | 42,429 | 1/3 each on 3/6/2020; 3/6/2021; 3/6/2020 | $0 | $0 |
| 5/16/2019 | Award of RSUs | 33,900 | 1/3 each on 5/16/2020; 5/16/2021; 5/16/2022 | $0 | $0 |
| | | | | | |
| **Sub-Total Grants of RSUs** | 162,528 | | | Cost | ($0) |
| **Sub-Total Exercises of RSUs** | (0) | | | Proceeds | $0 |
| **Stock Transactions** | | | | | |
| Transaction Date | Purchases / Sales | Shares | | Price | Funds Spent / Gained |
| 1/17/2014 | Acquired by options exercise | 13,797 | | *See above* | *See above* |
| 1/17/2014 | Sale | (13,797) | | $82.0000 | $1,131,354 |

- 124 -

| 2/28/2014 | Sale | | (2,320) | $77.6900 | $180,241 |
|---|---|---|---|---|---|
| 3/6/2014 | Sale | | (2,972) | $80.1200 | $238,117 |
| 2/28/2015 | Sale | | (1,648) | $58.0000 | $95,584 |
| 3/6/2015 | Sale | | (3,348) | $57.2900 | $191,807 |
| 2/5/2016 | Sale | | (2,980) | $44.8400 | $133,623 |
| 3/3/2016 | Sale | | (4,024) | $49.1700 | $197,860 |
| 2/6/2017 | Sale | | (4,732) | $55.3400 | $261,869 |
| 3/6/2017 | Sale | | (2,886) | $55.0400 | $158,845 |
| 2/26/2018 | Sale | | (30,257) | $58.2530 | $1,762,561 |
| 3/6/2018 | Sale | | (999) | $57.5700 | $57,512 |
| 2/19/2019 | Purchase | | 363 | n/a | $0 |
| 3/6/2019 | Sale | | (1,990) | $36.8000 | $73,232 |
| 5/13/2019 | Purchase | | 17,001 | $29.5150 | ($501,785) |
| | | | | | |
| **Sub-Total Stock Sales** | | | **(71,953)** | **Proceeds** | **$4,482,605** |

| Totals | Shares Purchased | 17,001 | Transaction Costs | ($501,785) |
|---|---|---|---|---|
| | Shares Acquired by Options Exercise | 13,797 | Transaction Costs | ($589,822) |
| | Shares Acquired by RSU Exercise | 0 | Transaction Costs | ($0) |
| | Shares Acquired By PR Exercise | 45,121 | Transaction Costs | ($0) |
| | Shares Sold | (71,953) | Transaction Proceeds | $4,482,605 |
| | | | Net Gain to Defendant Hernandez | $3,390,999 |

### g. Chopra's Class Period Sales

227.    During the six and half-year period preceding the Class Period (February 1, 2007 through August 13, 2013), Chopra did not report any PR exercises, RSU exercises, options exercises, or sales of Fluor stock.  Chopra entered the Class Period with balances of 6,240 Fluor shares, 30,325 stock options, 6,103 PRs, and 0 RSUs.  Chopra's transactions during the Class Period were as follows:

| Stock Options Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Options Grants / Exercises** | **Shares** | **Vesting Date** | **Strike Price** | **Funds Spent / Gained** |
| 2/23/2017 | Grant of Options [*expiration date 2/23/2027*] | 7,818 | 1/3 each on 3/6/2018; 3/8/2019; 3/20/2020 | $55.3500 | $0 |
| 2/23/2018 | Exercise of Options [*expiration date 2/23/2026*] | 2,589 | 2,589 | $46.07 | ($119,275) |
| | | | | | |
| **Sub-Total Options from Grants/Compensation** | | 7,818 | | **Cost** | ($0) |
| **Sub-Total Options Exercised** | | 2,589 | | **Cost** | ($119,275) |
| Performance Rights Transactions | | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/5/2014 | Exercise of PRs | (3,284) | 2/6/2017 | $0 | $0 |
| 3/6/2018 | Exercise of PRs | (2,977) | 3/6/2018 | $0 | $0 |
| | | | | | |
| **Sub-Total Grants of PRs** | | 0 | | **Cost** | ($0) |
| **Sub-Total Exercises of PRs** | | (6,261) | | **Proceeds** | n/a |
| RSU Transactions | | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/23/2017 | Award of RSUs | 3,819 | 1/3 each on 3/6/2018; 3/6/2019; 3/6/2020 | $0 | $0 |

- 126 -

| 2/23/2018 | Award of RSUs | 4,731 | 1/3 each on 3/6/2019; 3/6/2020; 3/6/2021 | $0 | $0 |
|---|---|---|---|---|---|
| **Sub-Total Grants of RSUs** | | 8,550 | | **Cost** | ($0) |
| **Sub-Total Exercises of RSUs** | | (0) | | **Proceeds** | $0 |
| **Stock Transactions** | | | | | |
| **Transaction Date** | **Purchases / Sales** | **Shares** | | **Price** | **Funds Spent / Gained** |
| 2/6/2017 | Sale | (961) | | $55.3400 | $53,182 |
| 3/6/2017 | Sale | (716) | | $55.0400 | $39,409 |
| 3/14/2017 | Sale | (1,800) | | $53.8530 | $96,935 |
| 2/23/2018 | Sale | (5,553) | | $57.4863 | $319,221 |
| 3/6/2018 | Sale | (726) | | $57.5700 | $41,796 |
| 3/6/2018 | Sale | (426) | | $57.5700 | $24,525 |
| 3/6/2018 | Sale | (3,889) | | $57.5700 | $224,350 |
| | | | | | |
| **Sub-Total Stock Sales** | | (14,071) | | **Proceeds** | **$799,417** |
| **Totals** | **Shares Purchased** | **0** | **Transaction Costs** | | **($0)** |
| | **Shares Acquired by Options Exercise** | **5,178** | **Transaction Costs** | | **($238,550)** |
| | **Shares Acquired by RSU Exercise** | **0** | **Transaction Costs** | | **($0)** |
| | **Shares Acquired By PR Exercise** | **6,261** | **Transaction Costs** | | **($0)** |
| | **Shares Sold** | **(14,071)** | **Transaction Proceeds** | | **$799,417** |
| | | **Net Gain to Defendant Chopra** | | | **$560,867** |

228.    The Individual Defendants' transactions during the Class Period, while the fraud was ongoing and the true facts of Fluor's business and operations as alleged herein remained hidden from

investors, yielded them more than *$34 million* in net ill-gotten gains from prices inflated by the fraud alleged herein.  These sales constitute strong evidence of scienter.[13]

### 2.    The Individual Defendants Were Motivated to Lower Cost Estimates, Underbid Projects, and Win Projects Regardless of Enhanced Risk so as to Increase Their Compensation

229.    During the Class Period, Defendants were motivated to underbid and win risky contract awards by Fluor's unusual executive compensation plan.  Fluor's executive compensation plan had three main components: base salary, an annual incentive award, and long-term incentives. The incentive components far outweighed the salary component, by up to as much as nine times. Under the plan, Fluor's executive compensation was directly and significantly tied to new contract awards, regardless of how those projects performed in the future.  This incentive was also passed down to the Individual Defendants' direct reports and other executives.

230.    In particular, a "key factor[]" in the long-term incentive, as described in the 2013 Proxy Statement, filed on Form DEF 14A on March 13, 2013 ("2013 Proxy Statement"), was "the achievement of targets related to new awards gross margin."  New awards gross margin, which "contributes to backlog," was measured in both dollars and percentage, and was an estimate of future profits (*i.e.*, margins) generated by new contracts.  Although these measures were "not reported in our financial statements," the Company explained the measure:

> New awards gross margin dollars measures the total amount of project gross margin that the company expects to receive as a result of projects awarded within the performance period.  New awards gross margin percentage is the total amount of gross margin the company expects to receive as a result of projects awarded within the performance period as a percentage of expected revenue from these projects.

231.    Paradoxically, the Company measured the "long-term" incentive payouts based on a short-term measure – *i.e.*, what the Company currently "expects to receive" from projects.  The

---

[13]   Defendant Steuert was not a reporting person throughout most of the time period at issue, such that his transactions in Fluor securities are not publicly known and cannot fully be assessed for purposes of the scienter analysis.

- 128 -

Company attempted to justify this in their 2013 Proxy Statement, stating that "although measured over a relatively short period, [the new awards gross margin measures] relate to contracts that typically will extend a number of years into the future and thus will generate, and position the company for, increased future earnings."  During the Class Period, long-term incentives vested by various percentages over three years, much quicker than the five- and ten-year vesting schedules in years prior to the Class Period.  What was not disclosed, however, was that this structure provided the Individual Defendants the incentive to sign risky contracts, front load deals, and take charges in future periods when they would not impact their compensation.  As described herein, this is exactly what happened.  The Brunswick County Plant, Greensville County Plant, Anderson County Plant, Citrus County Plant, Radford Plant, CPChem Project, Warren Project, and Penguins Offshore Project – all troubled fixed-price projects on which the Company took massive charges during the Class Period – were awarded or contracted under this perverse incentive structure.

232.    For fixed-price contracts, such as the gas-fired and offshore contracts discussed herein, the "new awards gross margin" was calculated as the difference between the fixed-price contract amount and the Company's internal estimate of costs to complete the contract.  As explained herein, the Individual Defendants had the opportunity to manipulate bids because they personally reviewed, adjusted, and approved the bids.  By artificially lowering the estimate of costs to complete a particular contract, Defendants achieved two objectives important to their self-interest, and correspondingly greater executive compensation: (a) winning the contract by producing a low bid; and (b) creating greater "new awards gross margin" by inflating the appearance of profitability. As a result, the Individual Defendants directly increased their compensation in the years the fixed-price contracts detailed herein were awarded, regardless of how unrealistic the bid assumptions were or how poorly the contracts would actually perform in the future.

233.    Fluor's 2012 executive compensation is described in its 2013 Proxy Statement.[14] Fluor's annual incentive award was tied to earnings, Return on Operating Assets Employed ("ROAE"),[15] and safety, but this constituted only 14% of target total direct compensation.  Target long-term incentives, in contrast, constituted 75% of total direct compensation.  The form of payout for the long-term incentive was roughly equal components of Value Driver Incentive ("VDI," paid in stock or cash), Stock Options, and Restricted Stock Units ("RSU").

234.    For 2012, the year Fluor was awarded the Brunswick County Plant, the Company reported that the actual payout related to new awards gross margin was 147% of the target payout level.  As reported in the 2013 Proxy Statement, Seaton was granted more than $8 million in incentive compensation, or 726% more than his base salary.  Porter was granted more than $6 million in incentive compensation, or 1,135% more than his base salary.  Stanski was granted more than $1.3 million in incentive compensation, or 258% more than his base salary.

235.    Fluor's 2013 executive compensation is described in its 2014 Proxy Statement, filed on Form DEF 14A on March 11, 2014 ("2014 Proxy Statement").  The structure, payout form, granting, vesting, and trading under the plan remained similar to 2012.

236.    For 2013, the year Fluor bid on the Radford Plant and won the CPChem Project, the Company reported that the actual payout related to new awards gross margin was 131% of the target payout level.  As reported in the 2014 Proxy Statement, Seaton was granted more than $9.9 million in incentive compensation, or 839% more than his base salary.  Porter was granted more than $2.9

---

[14]   Fluor determines the prior year's payout and sets targets for the upcoming year typically in February, sometime closely after the prior year's results are available.

[15]   According to the 2013 Proxy Statement, ROAE is calculated by dividing full-year corporate net earnings (excluding interest expense) by net assets employed (total assets (excluding excess cash and current and non-current marketable securities) minus current liabilities (excluding non-recourse debt)).

million in incentive compensation, or 371% more than his base salary. Stanski's incentive compensation was not reported.

237.    Fluor's 2014 executive compensation is described in its 2015 Proxy Statement, filed on Form DEF 14A on March 9, 2015 ("2015 Proxy Statement"). This year, the target annual incentive award was changed slightly to constitute 16% of total direct compensation, and target long-term incentives constituted 73% of total direct compensation. Payout form, granting, vesting, and trading under the plan remained similar to 2012.

238.    For 2014, the year Fluor bid on the Greensville County Plant and was awarded the Anderson and Citrus County Plants, the Company reported that the actual payout related to new awards gross margin was the maximum of the target payout level – 200%. As reported in the 2015 Proxy Statement, Seaton was granted more than $10.5 million in incentive compensation, or 855% more than his base salary. Porter was granted more than $2.7 million in incentive compensation, or 343% more than his base salary. Stanski's incentive compensation was not reported.

239.    For 2015 and 2016, Fluor changed its long-term incentive plan "in order to better align named executive pay with long-term performance." The changes included removing the new awards gross margin measurement from the long-term incentive plan and replacing it with a three-year cumulative EPS and a three-year average ROAE – actual earnings measurements. On February 18, 2015, during Fluor's Q4 2014 earnings call, Seaton explained the changes but stated that Fluor employees were still incentivized by new award margin, and that the changes were made purely in response to changing disclosure laws:

> [Analyst:] David, I wanted to get your perspective a little bit on the change in the executive compensation plan that was announced a couple of weeks ago. Previously the long-term plan was based on gross margin of new awards and new awards in total. It looks like for 2015 the emphasis has been placed on EPS growth over a longer period of time as well as return on assets employed.
>
> Given that what is the thought process around that? Is that just a recognition that there is going to have to be a little bit more operational focus from the Board

given that the award slate is maybe slowing down?  Is this just a pivot point?  I think some perspective as to why those changes are made would be helpful.

[Seaton:] Disclosure laws, it is pretty simple.  I still believe, and many of our people are still compensated on the basis of new award margin and percent margin – dollars and percent margin because I think that is the best indicator of future health and future earnings of the Company.

We are not going to disclose the metrics around there.  So, what we have done is we have changed – *we have changed to EPS and returns specifically to avoid disclosing something that we think is a competitive metric*.

[Analyst:] Got you.  So in the past you have been able to not disclose and still be incentivized on that, but in the future there was some change that you didn't feel like you could still do that and (multiple speakers)?

[Seaton:] *Correct*.

[Analyst:] Okay.

[Seaton:] *Correct*.

240.   For 2015, the Company did not meet its minimum long-term incentive target minimums, and for 2016, it only achieved 22% of its target.  *See* 2018 and 2019 Proxy Statements. Because the long-term incentive was measured by targets reflecting actual earnings, Seaton and Porter's compensation attributable to long-term incentive was significantly reduced.  During 2015 and 2016, however, Fluor did not bid on any of the fixed-price contracts that it has identified by name as those requiring financial charges.

241.   However, in 2017, just in time to capture its bid on the Penguins Offshore Project – another troubled fixed-price project – Fluor reverted to prior years' long-term incentive measurement that paid executives based largely on new awards volume.  Fluor's 2017 executive compensation is described in its 2018 Proxy Statement, filed on Form DEF 14A on March 8, 2018 ("2018 Proxy Statement").  The Company removed its EPS measurement from the long-term incentive and added back the annual new awards gross margin percentage.  Fluor stated that the changes were "to motivate and reward the achievement of superior operating results and stock price

- 132 -

appreciation" but misleadingly stated that "[w]e design compensation programs that do not encourage behavior that could create material adverse risks to our business."  Due to these changes, the Company had to justify why its long-term incentive was still "measured over a relatively short period."  Target long-term incentives were 73% of total direct compensation for the CEO, and 64% for other officers.  The target annual incentive award for the CEO was 16% of total direct compensation and was increased to 17% for other executives.  Fluor also added back stock options as a form of payout, making VDI 50% and options and RSUs equal at 25%, tilting the incentive to take risks to increase the stock price.  This structure provided the Individual Defendants with the incentive to sign risky contracts and take charges in future periods that would not impact their compensation.

242.    For 2017, the year Fluor bid on the Penguins Offshore Project, as reported in the 2018 Proxy Statement, Seaton was granted more than $8.6 million in incentive compensation, or 669% more than his base salary.  Porter was granted more than $2.5 million in incentive compensation, or 306% more than his base salary.  Stanski was granted more than $1.7 million in incentive compensation, or 263% more than his base salary.

243.    Fluor's 2018 executive compensation is described in its 2019 Proxy Statement, filed on Form DEF 14A on March 11, 2019 ("2019 Proxy Statement").  Fluor made changes to its annual incentive plan, this time inserting a "strategic component weighted at 25%" that called for individual goals for the executives.  For the long-term plan, Fluor only modified the long-term incentive award mix back to 50% performance-based VDI awards and 50% RSUs, except with respect the CEO, who also received a 4% stock option.  Fluor stated that its changes were "to reward executives for strategic outcomes that position the Company for future success and to balance corporate and business line or functional goals" and now stated that they "[p]rovide a balanced program" that does not "encourage behavior that could create material adverse risks to our business."  Target long-term

incentives were 74% of total direct compensation for the CEO, and 64% for other officers.  The target annual incentive award for the CEO was 16% of total direct compensation and was increased to 18% for other executives.  This structure provided the Individual Defendants the incentive to sign risky contracts and take charges in future periods that would not impact their compensation.

244.    For 2018, the year Fluor was awarded the Warren Project, as reported in the 2019 Proxy Statement, Seaton was granted more than $11 million in incentive compensation, or 830% more than his base salary.  Stanski was granted more than $2.7 million in incentive compensation, or 391% more than his base salary.

245.    When the millions of dollars' worth of charges from Defendants' unrealistic and risky bids were coming to light, on September 24, 2019 during Fluor's Corporate Strategic Review Webcast, new CEO Hernandez was asked by an analyst from Goldman Sachs Group Inc., Jerry David Revich, about how Fluor would change the compensation structure of executives and management.  Hernandez admitted that Fluor's prior incentive compensation programs were improper – rewarding executives based on contracts awarded not on actual performance of those contracts – including for those throughout the Company:

> [Analyst:] . . . And also can you talk about the performance metrics that you will be implementing going forward for ***your direct reports and key executives*** and touch on how that's different from the prior approach, please?
>
> *       *       *
>
> [Hernandez:] . . . ***In the past, we have had incentives – long-term incentives that were based more on as sold numbers, which, historically, we have always met, but in recent times, we have not.  So now we're going to actually be measuring people and incentivizing people based on actual earnings and return on assets employed, and that's going to be in place with the next LTI Award***.

246.    Fluor has not filed its 2020 Proxy Statement and its 2019 Form 10-K, usually filed before a proxy statement, has been delayed.  Thus, aspects of Fluor's 2019 executive compensation plan and actual payouts remain undisclosed.

247.     Fluor's unusual incentive compensation plan, which directly tied a significant portion of Defendants' compensation to new contract awards regardless of how those plants performed in the future, provides further indicia of scienter.

### 3.     Fluor Was Motivated to Win Repeat Business from Dominion and Duke Even if Doing so Required Underbidding on Projects

248.     Leading up to and during the Class Period, Defendants were motivated to win Duke's and Dominion's EPC business.

249.     According to CW-3 – who worked on the Brunswick County and Greensville County Plants commissioned by Dominion – Dominion was a key customer with which Fluor wanted to do repeat business.  Fluor had previously lost work for Dominion, and wanted to get back in Dominion's good graces at the time it was bidding on the EPC contracts for the Brunswick County and Greensville County Plants.

250.     According to CW-5 – who worked on the Citrus County Plant commissioned by Duke – prior to awarding Fluor the Anderson and Citrus County Plants, Duke did not want to work with Fluor because of some problematic projects Duke had with Fluor in the 1990s and 2000s.  CW-5 stated that Fluor was desperate to obtain Duke projects and that winning Duke projects was a focus.

251.     At the June 4, 2015 Credit Suisse Engineering & Construction Conference, Seaton crowed: "You've seen where we've picked up some work in gas with Duke and also with Dominion.  So, I feel good about where we stand there."  At Fluor's November 13, 2014 Investor Day, McSorley highlighted the historical business relationship between Duke and the Company's corporate predecessor, Fluor Daniel, and noted that the Company "focus[es] in on some select clients, ones . . . that show the growth plans and have the wherewithal to move forward with those."  After announcing the EPC contract awards for the Anderson and Citrus County Plants, McSorley

announced that the Company was "very pleased to be working with Duke" and that it aimed "to perform extremely well here and continue a long-term relationship with them."

252.    Similarly, Seaton stated on April 30, 2015:

I think it's still a competitive marketplace, but I'm comfortable with the ones that we've won.  Getting back with Duke, which was ***really, really important*** for us from a customer's perspective, has been very positive.

> And then our relationship with Dominion, I think Greensville shows that we execute for them on the projects that they need.  That's a very large project that we're going to backlog next year when we get to final notice to proceed

253.    With respect to the Greensville County Plant commissioned by Dominion, Seaton went on to state: "Greensville is a very, very important win and a very large project."

254.    Defendants, therefore, were motivated to provide low-ball bids in order to win Duke and Dominion contracts and attract repeat business and to conceal that conduct from investors so as to maintain Fluor's stock price despite its risky bidding practices.

### 4.    Fluor Issued Debt During the Class Period

255.    During the Class Period, Fluor announced its intention to raise ***more than $1.6 billion*** while its securities traded at prices elevated by the fraud alleged herein.

256.    In a November 18, 2014 press release and Form 8-K, signed by Porter, Fluor announced a public offering of $500 million in 3.5% senior unsecured notes maturing in 2024, pursuant to an effective shelf registration statements on file with the SEC, for the express purpose of raising funds to increase Fluor's share repurchase program by 10 million shares, with such offering to close on November 25, 2014.  In a November 25, 2014 press release, which quoted Seaton, Fluor announced that this offering had closed.

257.    Fluor disclosed an Underwriting Agreement, dated March 14, 2016, which it filed with the SEC as an exhibit to a Form 8-K filed March 15, 2016, signed by Porter, pursuant to which it would issue and sell €500 million (roughly $556 million) of 1.750% Senior Notes due 2023, with

such issuance to occur on March 21, 2016.  On March 14, 2016, *Bloomberg* reported that Fluor marketed the bonds in Euros to take advantage of falling borrowing costs following stimulus measures by the European Central Bank.  In a March 21, 2016 press release, which quoted Seaton, Fluor announced that this offering had closed.

258.    In an August 20, 2018 press release, Fluor announced that it had priced an offering of $600 million in 4.250% senior unsecured notes, maturing 2028, made pursuant to an effective shelf registration statement on file with the SEC, with net proceeds expressly to be used to redeem or repay outstanding indebtedness, which offering was expected to close on August 29, 2018.

259.    These offerings, during the fraud alleged herein, are evidence of Fluor's corporate scienter.

## IX.    LOSS CAUSATION

260.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss.  Plaintiffs' claims for securities fraud are asserted under the fraud on the market theory of reliance.  The markets for Fluor common stock were open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants' false and misleading statements artificially inflated the price of Fluor common stock and operated as a fraud or deceit on the Class (defined below).

261.    The Class Period inflation in Fluor's stock price was removed when information concealed by Defendants' false or misleading statements was revealed to the market.  The information was disseminated through a series of partial disclosures that slowly revealed the nature and extent of Fluor's underbids, execution, and internal controls problems.  These disclosures, as more particularly described below, removed artificial inflation from Fluor common stock, causing economic injury to Plaintiffs and other members of the Class.

262.   The corrective impact of the partial disclosures during the Class Period alleged herein, however, was tempered by Defendants' continued false and misleading statements and omissions, including that issues with individual plants were one-off, contained events and were not caused by systemic issues with Fluor's bidding, execution, and internal controls. Defendants' continued misrepresentations maintained the price of Fluor common stock at a level that was inflated by fraud, inducing members of the Class to continue purchasing shares in Fluor at artificially inflated levels even after Defendants' partial disclosures.

263.   None of the partial disclosures was sufficient on its own to fully remove the inflation from Fluor's stock price because each only partially revealed the nature and extent of the existence, extent, and ramifications of the bidding, execution, and/or internal controls issues. During the Class Period, the price of Fluor common stock declined as a result of these partial disclosures of truth.

264.   The disclosures that corrected the market price to eliminate the inflation maintained by Defendants' fraud are detailed below. The following stock price declines are not necessarily comprehensive since fact and expert discovery are not complete. These stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific non-fraud factors.

265.   Partial disclosures relating to improper bidding, construction execution, and internal controls issues began to enter the market on July 30, 2015, when Fluor released its Q2 2015 financial results. On that date, Fluor announced that it missed its Q2 2015 earnings estimates and lowered its 2015 full year earnings guidance range from $4.40 to $5.00 per share to $4.05 to $4.35 per share. The decline in earnings was partially attributed to a $10 million loss in Fluor's Power segment. The Form 8-K, signed by Porter, attached a press release issued on July 30, 2015, stating: "Segment profit results for the quarter reflect reduced contributions from renewable and gas-fired facilities." Fluor's Form 10-Q for Q2 2015, filed the same day and signed by Porter and Smalley, noted:

"Segment profit margins declined in the current year periods due to the increase in NuScale expenses and *reduced contributions from the large gas-fired power plant in [Brunswick County,] Virginia*."

266.    As a result, when the market opened the next day, July 31, 2015, the price of Fluor common stock dropped 8.15% on high trading volume, closing at $46.75.  Defendants, however, did not disclose the full extent of the fraud and the price of Fluor securities remained artificially inflated.

267.    On February 18, 2016, Fluor issued its Q4 2015 financial results on Form 10-K, which reported that Power "Segment profit in 2015 included a *loss of $60 million (including the reversal of previously recognized profit) resulting from forecast revisions for the gas-fired power plant in Brunswick County, Virginia*."   On the earnings call, Seaton stated that the Brunswick County Plant was "basically done, it's in final throes.  The biggest issue is start-up condition where you introduce lube oil and you recycle lube oil and you make that change.  The suppliers' program and what we were told by the customers said it took 45 days and it took us 90."

268.    As a result of the February 18, 2016 disclosures, Fluor's stock price dropped to a low of $42.41 and closed 2.32% down on heavy trading volume.  However, Defendants did not disclose the true scope of the fraud, and the price of Fluor stock remained artificially inflated.

269.    On May 4, 2017, Fluor issued a Form 10-Q for Q1 2017 disclosing a $30 million loss driven "primarily for a gas-fired power plant in South Carolina [*i.e.*, the Anderson County Plant]." On Fluor's earnings call held after market hours later that day, Seaton claimed that these costs were "[un]expected."

270.    On the next trading day, May 5, 2017, Fluor's common stock fell to a low of $46.53 – down 8.04% down from the prior close – and closed the day 4.78% down on high trading volume. Defendants did not, however, disclose the full extent and ramifications of the fraud, and the price of Fluor stock remained artificially inflated.

- 139 -

271.    On August 3, 2017, Fluor filed its Q2 2017 Form 10-Q, which reported a $194 million charge due to forecast adjustments related to three of the Gas-Fired Plants:

> Segment profit in the Industrial, Infrastructure & Power segment for the three and six months ended June 30, 2017 was adversely affected by pre-tax charges totaling $194 million (or $0.89 per diluted share) and $219 million (or $0.99 per diluted share), respectively, resulting from forecast revisions for estimated cost growth at three fixed-price, gas-fired power plant projects in the southeastern United States.

272.    Fluor's press release, attached to a Form 8-K signed by Porter and filed August 3, 2017, stated:

> As a result of the charge in Industrial, Infrastructure & Power, and, to a lesser extent the wind down of the V.C. Summer Nuclear Station project, the Company is revising its 2017 guidance for EPS to a range of $1.40 to $1.70 per diluted share, from the previous range of $2.25 to $2.75 per diluted share.

273.    On August 3, 2017, Defendants also disclosed that the charges Fluor was taking on the Gas-Fired Plants stemmed from the common issues across the plants and not one-off issues specific to each plant.  On the Q2 2017 earnings call, held after market hours later that day, Seaton announced that the CFO, Porter, was being replaced by Stanski and provided insight into the cause of the charges:

> I want to start our call today discussing the issues we are experiencing in our Industrial, Infrastructure & Power segment, specifically the concerns on 3 gas-fired projects currently under construction.  ***All 3 projects, 4 if you include the Brunswick project that incurred a charge in 2015, had a fundamental problem.  The projects did not meet the original baseline assumptions due to improper estimating, craft productivity and equipment issues***.  All of these projects were bid in 2014 by the same pursuit team.  In addition, all 4 projects were based on next-gen turbines or steam generators that were first of a kind for Fluor.  The quality control and completeness of these turbines delivered to the site were not in line with our bid assumptions and we are pursuing our options.
>
> \*          \*          \*
>
> Some members of the Power management team have exited Fluor. We also informed our employees that we are closing our Charlotte office and consolidating Power operations in Greenville, ***where it will be closer to our other businesses and leadership***.

As we do periodically with all of our markets, we're in the middle of reassessing the gas-fired power market to determine where there are opportunities or returns consistent with our expectations and long-term experience. The power market is extremely competitive. And unfortunately, we are not immune to the challenges others have seen in this segment of the power industry. We will only participate in this market if we believe we can achieve appropriate risk-adjusted returns. *Now every aspect in this market is being reviewed by the team through a different set of lenses*.

In addition to the changes in management of Power group, our strategic evaluation of the gas-fired power market, *we're also implementing other changes to give us greater confidence that these types of earnings adjustments are diminished and less frequent*.

\*　　\*　　\*

Well, historically, [Power] has provided good profitability for us. I mean, Oak Grove, LCRA, I mean, I can list dozens of projects that have been very positive. But your point's well taken. *In the aggregate, it drops pretty dramatically when you write off 3 projects like this. So I understand your point*. I think the other comment I'd make is that the power market is basically 100% – or not 100%, 90% fixed priced. And we do have a good position in that and we do have great resources that are executing with excellence. It's just a situation where I think we had a team that *made some serious mistakes on 4 projects that all hit at one time*, particularly when we bring in a new management team and they look at what they've been given. So I think we've got some work to do in terms of what that is. But I would also – I think, to your point, very few of our competitors have made their expected profitability on gas-fired power plants. *And I would argue that our customers believe in a certain cost per kilowatt that does not exist*. So I think that everybody in the industry needs to kind of sharpen their pencil and look at this market through a different set of lenses.

\*　　\*　　\*

Well, as I said, I've changed some organization, not just the Power stuff. I've changed up some of the other organization and flattened it. And I can tell you that we're looking at all of our projects in making sure that we don't have issues. *I would argue that the lion's share of our lump-sum backlog is performing extremely well*. And that's about as far as I really want to go with that. But we're improving our tools and systems. We – as I said, *we've changed the review process to where there's more cold eyes review*. And I feel reasonably good about where we are. I think I'd point you back to some of my comments on these Power projects. It's really contained in 1 segment of the power market. And as I said, all 4 of those projects were bid at a time when *we didn't have good information on the new first-of-a-kind equipment, nor did we really have a good handle on the level of skill and number of craft employees that we would have available to us in some of these locations*.

- 141 -

*     *     *

Well, just – let's be specific.  ***I said we were looking at the gas-fired power market***, and we were looking at it from a Fluor perspective.  No messages to anyone intended.  And if they took them that way, I apologize.  Because that – we're looking at ourselves in terms of what we need to do.  We just – ***I don't think it's going to take long.  I think that my expectation, and I've kind of coined this phrase, is flawless personal performance***.  And what that – it doesn't mean I'm looking for perfection, but what it does mean I'm looking for is accountability and execution excellence.  And we started that process when we found the problem in the CPChem, and we're continuing to do those reviews and make the changes necessary so that we don't have a repeat of what we've had here.  And I'm – I can tell you that – ***I guess that we've dinged our credibility with you guys and we got to rebuild that***.  And I can commit to you that we're going to do everything we can to regain that trust.  ***But I don't think it's going to take long for us to kind of right the ship based on these losses and continue to perform***.  As I said, we perform over 1,000 projects at any given time.  And the vast majority of them are performing at or above our expectations.  And in this case, we had 3 bad apples and I'll go ahead and give Jamie her due, ***one, was a double-dip in the apple bucket***.  And then we had one in infrastructure and in CPChem.  I get where we are in your eyes, and we've got some work to do to change that.

274.     As a result of Fluor's aftermarket disclosures on August 3, 2017, the Company's common stock opened 7.27% down on August 4, 2017 and continued declining on very high trading volume, closing at $40.06 – down 8.66% – from the previous closing price.  On August 15, 2017, Moody's downgraded Fluor's senior unsecured bond rating to Baa1 from A3 because "operating results have deteriorated materially," noting that the Power segment's "income declined to a loss of $102 million for the LTM period due to charges on three gas-fired power plant projects related to improper estimating, craft labor productivity and equipment issues."  Defendants, however, did not disclose the full extent and ramifications of the fraud, and the price of Fluor securities remained artificially inflated.

275.     On May 3, 2018, Fluor filed its Q1 2018 Form 10-Q, which reported that the Power segment's profit "during 2018 was adversely affected by forecast ***revisions of approximately $125 million (or $0.69 per diluted share) for estimated cost growth for a fixed-price, gas-fired power plant project***," *i.e.*, the Citrus County Plant.  Fluor also disclosed that it was "***in the process of***

- 142 -

*exiting the gas-fired power plant market* and does not intend to offer engineering, construction and procurement services for new build projects once its existing contracts are completed."  As a result of this charge, Fluor announced a first quarter net loss of $18 million, or $0.13 per share.  In addition, in a press release filed on Form 8-K on May 3, 2018 and signed by Stanski, Fluor lowered its 2018 full-year guidance to a range of $2.10 to $2.50.  On the Q1 2018 earnings call, held after market hours on May 3, 2018, Seaton stated:

> Let's start off by discussing the challenges that we are experiencing on the same gas-fired power project we discussed last quarter and the steps we're taking to complete this project and in Fluor's participation in the specific end market.  *Craft productivity and estimating were materially different than the original baseline expectations* we made in the initial charge on this project last year.  While those factors were included in our initial charge, *the majority of the $125 million charge taken this quarter is driven by extremely low ongoing productivity* and the financial impact that this has relative to initial expected timing of when the 2 units would be available for power production based on the current outlook.  As of last week, this project is 86% complete with an expected completion date in Q4 of this year.

> Last August, we made a number of changes to our power business.  This included in – bringing in new leadership, removing certain executives and closing our power operation office in Charlotte.  I also stated that we were in the process of assessing the gas-fired market to determine if there are opportunities for risk-adjusted returns that are consistent with our expectations and long-term experience.  I'd like to share with you the outcome of our review and the further actions that we are taking.  I'm going to ask everyone to pay close attention.

> The U.S. power consumption growth rate is less than 1%.  The power produces – producers do not really need additional capacity, other than satisfying regional needs.  *We, the industry and the entire E&C community have led our clients to believe that a gas-fired power project costs approximately 650 kilowatts – $650 per kilowatt, although virtually no one has delivered one for that value.  The customers start at that figure and negotiate downward, and there's always some contractor that is willing to say okay to lower number, using some excuse to justify the win, Fluor included*.

> We have had 12 gas-fired power projects since 2003.  *10 of the 12 have underperformed our as-sold expectation, with 3 suffering losses*.  Competition, both public and private had, had similar experiences, *with no current projects performing as expected*.  Some industry leaders think these are cookie-cutter projects, but they are not.  These projects have different machines, different site locations, different labor pools, all of which produce different outcomes.  Craft labor in this case has been the major issue.

Therefore, Fluor will discontinue the pursuit of lump-sum gas-fired power market from the end of Q1.

276.   When asked by an analyst about the charges taken by Fluor over the prior years and Fluor's decision to exit the gas-fired power business, Seaton admitted that there were "***fatal flaws in the bidding process of all of those projects***, and there were execution issues that weren't properly covered."

277.   As a result of these disclosures, on May 4, 2018, Fluor stock fell 22.43% on very high trading volume, closing at $45.76.  The following trading day, May 7, 2018, Fluor stock fell another 2.78% to close at $44.49.  The full extent and ramifications of the fraud were not disclosed, however, and the price of Fluor securities remained artificially inflated.

278.   On October 10, 2018, Fluor announced its preliminary financial results for Q3 2018 in a press release filed on Form 8-K.  The results included an additional charge of "$35 million for forecast revisions on a gas-fired power project in Citrus County, Florida."  On the earnings call, held after market hours on October 10, 2018, Seaton stated that the Citrus County Plant continued to consume "twice the amount of labor to complete the items as compared to our forecasts" and indicated that Fluor would issue revised guidance on the forthcoming Q3 2018 earnings call.

279.   As a result of these revelations, on October 11, 2018, the price of Fluor common stock dropped 17.24% to close at $46.53 on extremely high trading volume.  Defendants did not disclose the full extent and ramifications of the fraud, and the price of Fluor stock remained artificially inflated.

280.   On May 2, 2019, filed its Q1 2019 Form 10-Q filed with the SEC and announced additional charges on fixed-price projects.  The Company reported that it took another $26 million charge "resulting from forecast revisions for estimated cost growth at certain fixed-price, gas-fired power plant projects," and noted a $110 million dispute with Duke over costs incurred on the Citrus County Plant.  It also reported a charge in its Energy & Chemicals segment of $53 million "resulting

- 144 -

from forecast revisions for estimated cost growth on [a fixed-price] offshore project" and another $31 million charge related to a single customer.  The same day, before market hours, Fluor also announced that Hernandez was taking over as CEO.

281.     As a result of these disclosures, on May 2, 2019, Fluor stock fell 24% on very high trading volume, closing at $29.72.  Because the full extent and ramifications of the fraud were not disclosed, the price of Fluor's stock remained artificially inflated.

282.     On August 1, 2019, after the market closed, Fluor reported additional charges in its Q2 2019 Form 10-Q filed with the SEC.  As explained in a press release attached to Form 8-K filed with the SEC on the same day, Fluor reported $714 million in charges related to fixed-price contracts across the Company's business divisions.  The charges included $109 million on three gas-fired projects, $186 million in charges for a fixed-price offshore project, and $87 million for two fixed-price downstream projects, and $55 million for forecast revisions on several fixed-price infrastructure projects.  For the Government segment, Fluor reported $233 million on a fixed-price project from the Department of Defense.  The Company also entered into monetary settlements with gas-fired customers, such as Duke, which had sued Fluor for cost overruns and delays at the Citrus County Plant.  Fluor also withdrew all guidance.  Analysts viewed this as a "'kitchen sink' type event." *See* UBS August 1, 2019 pre earnings call report.

283.     On August 1, 2019, after market hours, Fluor held its Q2 2019 earnings call.  Fluor announced that it began conducting a "complete review of the business" on May 1, 2019, prior to the previous quarter's results and earnings.  Fluor's executive chairman, Alan Boeckmann, stated that it was "a comprehensive assignment.  And for the last 3 months, we have been relentless in looking into every aspect" of group leaders, the organization, and the portfolio of business.  A new CFO, Steuert, was appointed and the Board formed a new Risk Committee made up of three independent Board members to oversee current and prospective projects.  Lazard, who advises on mergers,

- 145 -

acquisitions, restructuring, capital structure, and strategy, was engaged as a strategic advisor. Boeckmann concluded by stating that "[o]ur Board absolutely recognizes the gravity of this announcement and has taken steps to improve our visibility into the contracting process, including the risks that we're assuming in new projects as well as how we are approaching and executing our existing risk projects."

284.   Hernandez also discussed the results of the Company-wide review:

Please turn to Slide 6. ***It has become apparent to me that there are a few significant and common issues in many of our challenged projects***. In May, we immediately implemented a more rigorous framework to our pursuit process. We have already enacted changes in our bid/no bid process so that our future backlog will be comprised of high-quality projects with a contract structure and execution approach that will generate improved risk-adjusted margins.

\*       \*       \*

With regard to our current backlog, one thing that has become exceedingly clear to me is that ***we must take a more disciplined approach to risk assessment on our projects***. We have identified our challenges and outlined what needs to be done. Additionally, ***we're making changes to how we approach engineering and project management to ensure our projects are staying in sequence with work not commencing until the appropriate reviews are complete***.

\*       \*       \*

During the second quarter, the company met with a number of our clients, subcontractors and suppliers, in an attempt to resolve a number of matters. These include ongoing disputes, pending change orders, schedule extensions, closeout items, unpaid receivables and our position on outstanding claims.

As a result of these discussions, client settlements and revised estimates to complete projects, the company evaluated its position on a number of projects, which resulted in a pretax charge of $714 million. These charges impact a broad range of projects, including certain projects that remain profitable.

285.   As a result of the disclosures, on August 2, 2019, Fluor stock fell nearly 27% on very high trading volume, closing at $22.67. Defendants, however, did not disclose the full extent and ramifications of the fraud, and the price of Fluor stock remained artificially inflated.

286.     On September 24, 2019, before the market opened, Fluor held a Strategic Review Webcast during which the Company announced that it was cutting the dividend by more than half, from $0.21 quarterly to $0.10 per share, and that it would be selling its Government business. Steuert stated that Fluor "reset the dividend to a level that we currently feel is sustainable and appropriate with the level of earnings post restructuring and post asset sales."  The Company also announced that it would be taking still more charges for fixed-priced projects, Radford Plant and Warren Project.  The Company assured investors that it was monitoring "everything" in Fluor's backlog, especially the "fixed price lump sum projects," but did not disclose issues with its accounting control environment, nor did it disclose that the SEC was investigating these issues.

287.     As a result of the disclosures, on September 24, 2019, Fluor stock fell over 8% on high trading volume, closing at $18.95.  The full extent and ramifications of the fraud, however, was not disclosed, and the price of Fluor securities remained artificially inflated.

288.     The additional charges concerned analysts.  Morningstar Research, for example, stated in a September 24, 2019 report: "Given Fluor's exposure to fixed-price contracts and the risk of further cost overruns, we are raising our uncertainty rating to very high from high."  Canaccord Genuity similarly stated, in their September 24, 2019 report, "we were disappointed with the disclosure that further negative costs re-forecasts would be taken in Q3/2019 in the Government segment, including on a newly disclosed troubled project."

289.     On February 18, 2020, Fluor announced that the SEC had opened an investigation into its past accounting practices, financial reporting, and charges on fixed-price projects taken in Q2 2019.  As a result, the Company announced that it would be unable to timely file its annual report for 2019 on Form 10-K.  Fluor issued a press release that day filed on Form 8-K, which stated:

**SEC Investigation and Form 10-K filing**

Fluor announced that the Securities and Exchange Commission ("SEC") is conducting an investigation of the Company's past accounting and financial

- 147 -

reporting, and has requested documents and information related to projects for which the Company recorded charges in the second quarter of 2019.

In the course of responding to the SEC's data requests and conducting our own internal review, the Company is reviewing its prior period reporting and related control environment. The Company has not made a determination at this time as to whether there are prior period material errors in its financial statements, although such remains possible. Given the ongoing internal review and recent developments on two projects, the Company does not expect to complete and file its annual report on Form 10-K prior to the end of February.

290.    On the same day, before the market opened, Fluor held its Q4 2019 earnings call. Defendants disclosed that the Company was conducting its own internal review, not only of its prior financial reporting and control environment, but also its "revenue recognition charges." Defendants stated that, "focusing initially on the Radford contract," the Company was investigating whether "the accounting and financial reporting, along with a limited number of additional projects, was recognized in the appropriate reporting period." Fluor also disclosed that the SEC was investigating 16 projects that it "took charges" on in Q2 2019. It also disclosed that the "intent of the investigation" was to determine whether there were "material errors." Further, Fluor announced that it had empaneled "a special committee of the Board of Directors" to "complete a review with the assistance of external advisers." Fluor also announced that it would no longer be seeking the sale of its Government segment. It went on to state that its Form 10-K would not be filed to the end of February (it still has not been filed), and that the financial information it provided on the call was "preliminary, unaudited and subject to change."

291.    As a result of these disclosures, on February 18-19, 2020, Fluor stock fell 28% on very high trading volume, closing at $14.06.

292.    Analysts were shocked by the disclosures. UBS' February 18, 2020 report, titled "Another messy quarter and a new SEC investigation," stated: "We think the biggest surprises are the SEC investigation, the continued uncertainty around projects, and the decision to retain the

Government business."   Similarly, Deutsche Bank issued a report on the same day, titled "Investigation Casts Shadow on the Quarter."  And Barclays's February 18, 2020 report stated:

> **In what's been a challenging year for FLR, it appears to have gotten a bit tougher**.  2019 results were withheld due to an SEC investigation, the planned sale of its government business was cancelled, and one-off charges (valuation allowance, impairments, and restructuring) crept higher in the quarter. . . .  There will be questions why government was pulled, was it because of interest or truly cash potential, but more impactful is that this was a catalyst that some bulls were hoping for in the 1H that won't be there.

293.   Likewise, Canaccord Genuity's February 19, 2020 report, titled "Light guide & SEC investigation force reset," stated:

**Investment Recommendation**

> *We are downgrading Fluor to HOLD from BUY and cutting our target to US $14.00 from US$25.00*.  Fluor disclosed an SEC investigation and associated internal review into prior period reporting that, combined with "recent developments on two projects," have delayed the filing of its 10-K.  Additionally, initial 2020 EPS guidance came in below our forecast as revenue and margins will take longer to recover than we estimated.  *All told, clarity on the path back to consistent FCF generation is not what it needs to be to warrant a Buy rating*, in our view.

**Investment Highlights**

> **SEC investigation disclosed and 10-K filing delayed** – Fluor disclosed an SEC investigation of its past accounting and financial reporting, specifically surrounding documents associated with charges taken in Q2/2019.  The company is conducting its own internal review of its prior period reporting and related control environment, focusing initially on the Radford contract.  Management believes the dollar amount of the revenue and subsequent charges taken on the project were correct.  The question is whether the financial reporting was recognized in the appropriate reporting period.  Then there is the disclosure of "recent developments on two projects".  *We do not know what this refers to but understand that these projects remain open to subsequent adjustment*s.  As such, Fluor will not be filing its 10-K before the end of February and provided very few Q4/2019 details.

> **Confidence in internal controls has been impaired** – *Rarely does anything good for the company come out of an SEC investigation into financial reporting. An investigation such as this is particularly worrisome for an E&C company as the nature of work performed requires management to make a number of rather subjective estimates surrounding project completion and the likelihood of future collections from customers, especially related to disputes and change orders*.

- 149 -

294.     As detailed herein, Defendants revealed the truth concealed by the fraud through a series of partial disclosures.  Each disclosure removed artificial inflation from the price of Fluor's stock, causing economic injury to Plaintiffs and other members of the Class.  The chart below shows Fluor's stock price during the Class Period and the dates of Defendants' disclosures:



## X.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE

295.     Plaintiffs and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because, during the Class Period, the material misstatements and omissions alleged herein would induce a reasonable investor to misjudge the value of Fluor common stock and without knowledge of the misrepresented or omitted material facts, Plaintiffs and other members of the Class purchased or acquired Fluor common stock between the time Defendants misrepresented and failed to disclose material facts about their business operations and financial prospects, and the time the true facts were disclosed. Accordingly, Plaintiffs and the other members of the Class relied, and were entitled to have relied, upon the integrity of the market for Fluor common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements during the Class Period.

- 150 -

296.     At all relevant times, the market for Fluor common stock was efficient for the following reasons, among others:

(a)     Fluor common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b)     As a regulated issuer, Fluor filed periodic public reports with the SEC; and

(c)     Fluor regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

297.     Plaintiffs and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## XI.     THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

298.     The statements alleged herein to be false and misleading are not subject to the protections of the Private Securities Litigation Reform Act of 1995's ("PSLRA") statutory Safe Harbor for forward-looking statements because: (a) they are not forward-looking; (b) they are subject to exclusion; or (c) even if purportedly forward-looking, Defendants cannot meet the requirements for invoking the protection, *i.e.*, identifying the statements as forward-looking and demonstrating that the statements were accompanied by meaningful cautionary language.  Many of the statements were misleading in light of omissions of material present or historical facts and cannot be considered forward-looking.

299.    Under the PSLRA's statutory Safe Harbor for written statements, a forward-looking statement is protected if it is: (a) identified as such; and (b) "accompanied by meaningful cautionary statements."   15 U.S.C. §78u-5(c)(1)(A)(i).   An oral forward-looking statement must be accompanied by an oral cautionary statement that it is forward-looking, that actual results may differ materially, and that additional information concerning risk factors is contained in a readily available written document.  In addition, the oral statement must: (a) identify the written document, or portion thereof, that contains such factors; and (b) the referenced written document must contain meaningful cautionary language.  15 U.S.C. §78u-5(c)(2)(B).

300.    The Safe Harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with GAAP, including those filed with the SEC on Form 8-K.  15 U.S.C. §78u-5(b)(2)(A).

301.    Statements of historical fact, current condition, or a mixture thereof are not "forward-looking" and thus not protected by the Safe Harbor.

302.    To the extent any of the statements were identified as forward-looking statements, they do not fall within the protections of the Safe Harbor because they lacked specific, meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  A warning that identifies a potential risk, but implies that such risk had not materialized – *i.e.*, states that something might occur but does not state that something actually has already occurred – is not meaningful and does not fall within the protections of the Safe Harbor.

303.    Meaningful risk disclosures must also be substantive and tailored to the forward-looking statement they accompany.  Many of Defendants' purported risk disclosures remained unchanged over the course of the Class Period, despite the fact that such risks had in fact materialized, which change in circumstance was material to the reasonable investor.  Defendants'

- 152 -

risk disclosures were therefore neither substantive nor tailored and do not satisfy the requirements of the Safe Harbor.

304.    Nor were the historic or present-tense statements made by Defendants assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

305.    Defendants' alleged forward-looking statements also do not fall within the protections of the Safe Harbor because they had no reasonable basis.  Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of Fluor, who knew that those statements were false or misleading when made.

## XII.    CLASS ACTION ALLEGATIONS

306.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons who purchased or otherwise acquired Fluor common stock during the Class Period (the "Class").  Excluded from the Class are Defendants; members of the immediate families of the Individual Defendants; Fluor's subsidiaries and affiliates; any person who was an officer or director of Fluor during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

307.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Fluor common stock was actively traded on

the NYSE, the largest stock exchange in the world.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  During the Class Period, the number of outstanding shares of Fluor common stock ranged in the hundreds of millions. Record owners and other members of the Class may be identified from records maintained by Fluor or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

308.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: (a) whether Defendants violated the Exchange Act; (b)  whether Defendants omitted and/or misrepresented material facts; (c)  whether Defendants knew or recklessly disregarded that their statements were false; (d)  whether Defendants made the statements and omissions at issue with scienter; (e)   whether Defendants' statements and/or omissions artificially inflated the price of Fluor common stock; and (f)  the extent and appropriate measure of damages.

309.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages as a result of Defendants' wrongful conduct.

310.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who is experienced in securities and class action litigation.  Plaintiffs have no interests which conflict with those of the Class.

311.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

- 154 -

of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.   CLAIMS FOR RELIEF

### COUNT I
### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

312.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  Count I is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

313.    During the Class Period, Defendants disseminated or approved the false statements specified herein, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

314.    Defendants and the Company's officers, management, and agents directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Fluor common stock during the Class Period.  All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

315.    Defendants and the Company's officers, management, and agents did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a

course of business which operated as a fraud and deceit upon the purchasers of Fluor common stock during the Class Period.

316.     Fluor is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements made by the Company's officers and agents, as alleged above, as the maker of such statements and under the principle of *respondent superior*.

317.     The allegations above establish a strong inference that Fluor, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth about Fluor's business operations and financial prospects.  By concealing these material facts from investors, Fluor's share price was artificially inflated during the Class Period.

318.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Fluor common stock.  Plaintiffs and the Class would not have purchased Fluor common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

319.     As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Fluor common stock during the Class Period.

**COUNT II**
**For Violations of §20(a) of the Exchange Act**
**Against the Individual Defendants**

320.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  Count II is brought pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

321.    During the Class Period, the Individual Defendants acted as controlling persons of Fluor within the meaning of §20(a) of the Exchange Act.  Fluor controlled the Individual Defendants and its other officers and employees.  By virtue of their positions and their power to control public statements about Fluor, the Individual Defendants had the power and ability to influence and control and did influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants participated in the conference calls with investors and analysts, described herein, and/or prepared and approved the Company's SEC filings, annual reports, and press releases, described herein, alleged by Plaintiffs to be misleading.

322.    In particular, Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

323.    As set forth above, Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Fluor common stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiffs' counsel as Class Counsel;

B.      Awarding Plaintiffs and the members of the Class damages and interest;

C.      Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  April 2, 2020              ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                  DARRYL J. ALVARADO
                                  KEVIN S. SCIARANI
                                  J. MARCO JANOSKI GRAY


                                        /s/ DARRYL J. ALVARADO
                                  DARRYL J. ALVARADO

                                  655 West Broadway, Suite 1900
                                  San Diego, CA  92101
                                  Telephone:  619/231-1058
                                  619/231-7423 (fax)
                                  dalvarado@rgrdlaw.com
                                  ksciarani@rgrdlaw.com
                                  mjanoski@rgrdlaw.com

DATED:  April 2, 2020             POMERANTZ LLP
                                  JEREMY A. LIEBERMAN
                                  MATTHEW L. TUCCILLO
                                  J. ALEXANDER HOOD II
                                  JENNIFER BANNER SOBERS


                                        /s/ MATTHEW L. TUCCILLO
                                  MATTHEW L. TUCCILLO

600 Third Avenue, 20th Floor
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)
jalieberman@pomlaw.com
mltuccillo@pomlaw.com
ahood@pomlaw.com
jsobers@pomlaw.com

POMERANTZ LLP
PATRICK V. DAHLSTROM
Ten South LaSalle Street, Suite 3505
Chicago, IL  60603
Telephone:  312/377-1181
312/377-1184 (fax)
pdahlstrom@pomlaw.com

Lead Counsel for Lead Plaintiffs

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)
3811 Turtle Creek Blvd., Suite 1450
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

Local Counsel for Wayne County Employees'
Retirement System

VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel for Wayne County Employees'
Retirement System

- 159 -

THE BRISCOE LAW FIRM, PLLC
WILLIE C. BRISCOE (Texas Bar No. 24001788)
3131 McKinney Avenue, Suite 600
Dallas, TX  75204
Telephone:  214/643-6011
281/254-7789 (fax)
wbriscoe@thebriscoelawfirm.com

Local Counsel for the Town of Fairfield Employees'
Retirement Plan and the Town of Fairfield Police and
Firemen's Retirement Plan

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      The undersigned, Brenda L. Kupchick and Brian Vahey, on behalf of the Town of Fairfield Employees' Retirement Plan and the Town of Fairfield Police and Firemen's Retirement Plan (collectively, the "Fairfield Funds"), make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      We understand that by order dated December 10, 2018, the Court appointed the Fairfield Funds and Wayne County Employees' Retirement System jointly as Lead Plaintiffs in this litigation. The Fairfield Funds remain willing to serve as representative parties on behalf of a class of investors who purchased or acquired Fluor securities during the Class Period as specified in the First Amended Consolidated Complaint ("FACC"), including providing testimony at deposition and trial, if necessary.

3.      We have reviewed the complaint filed against Fluor Corporation ("Fluor" or the "Company") in this action, and, with authority to enter into litigation on behalf of the Fairfield Funds, do hereby authorize the filing of the FACC on behalf of the Fairfield Funds.

4.      The Fairfield Funds did not purchase or acquire Fluor securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

5.      To the best of our current knowledge, the attached sheet lists all the Fairfield Funds' transactions in Fluor securities during the Class Period outlined in the FACC.

6.      During the three-year period preceding the date on which this Certification is signed, apart from this action, the Fairfield Funds have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      The Fairfield Funds agree not to accept any payment for serving as representative parties on behalf of the class set forth in the FACC, beyond their pro rata shares of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      We declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct to the best of our knowledge, information, and belief.

Executed    4/1/20
               **(Date)**

**(Signature)**
Brenda L. Kupchick
First Selectwoman
Town of Fairfield

Executed _____
               **(Date)**

**(Signature)**
Brian Vahey
Chairman, Joint Retirement Investment Board
Town of Fairfield

2

Executed _____
                        **(Date)**



**(Signature)**
Brenda L. Kupchick
First Selectwoman
Town of Fairfield

Executed ___ MARCH 27, 2020
                        **(Date)**



**(Signature)**
Brian Vahey
Chairman, Joint Retirement Investment Board
Town of Fairfield

2

**FLUOR CORPORATION (FLR)**

**TOWN OF FAIRFIELD EMPLOYEES' RETIREMENT PLAN AND
TOWN OF FAIRFIELD POLICE AND FIREMEN'S RETIREMENT PLAN
("Fairfield Funds")**

**LIST OF PURCHASES AND SALES**

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|------|------------------|------------------------|------------------------|
| 4/22/2015 | Purchase | 1,491 | $59.4771 |
| 4/24/2015 | Purchase | 3 | $59.7488 |
| 4/24/2015 | Purchase | 426 | $59.9900 |
| 4/27/2015 | Purchase | 1 | $60.7713 |
| 4/27/2015 | Purchase | 5 | $60.7504 |
| 4/27/2015 | Purchase | 13 | $60.8234 |
| 4/27/2015 | Purchase | 14 | $60.8113 |
| 4/27/2015 | Purchase | 72 | $60.7692 |
| 4/27/2015 | Purchase | 92 | $60.7805 |
| 4/27/2015 | Purchase | 427 | $60.8881 |
| 4/28/2015 | Purchase | 177 | $60.5055 |
| 4/29/2015 | Purchase | 1,142 | $60.8097 |
| 4/29/2015 | Purchase | 347 | $60.7599 |
| 4/29/2015 | Purchase | 121 | $61.0200 |
| 4/30/2015 | Purchase | 1,020 | $60.6694 |
| 7/29/2015 | Purchase | 1,538 | $50.2645 |
| 8/7/2015 | Purchase | 1 | $47.4300 |
| 8/7/2015 | Purchase | 2 | $47.4880 |
| 8/7/2015 | Purchase | 10 | $47.5033 |
| 8/7/2015 | Purchase | 101 | $47.6900 |
| 8/7/2015 | Purchase | 286 | $47.4925 |
| 8/7/2015 | Purchase | 369 | $47.5065 |
| 8/7/2015 | Purchase | 371 | $47.5997 |
| 8/10/2015 | Purchase | 2 | $48.7720 |
| 8/10/2015 | Purchase | 7 | $48.8178 |
| 8/10/2015 | Purchase | 26 | $48.7836 |
| 8/10/2015 | Purchase | 33 | $48.7859 |
| 8/10/2015 | Purchase | 56 | $48.7654 |
| 8/10/2015 | Purchase | 60 | $48.7505 |
| 8/10/2015 | Purchase | 249 | $48.3981 |
| 8/10/2015 | Purchase | 290 | $48.7396 |
| 8/11/2015 | Purchase | 6 | $47.9714 |
| 8/11/2015 | Purchase | 11 | $47.9718 |
| 8/11/2015 | Purchase | 14 | $47.8589 |
| 8/11/2015 | Purchase | 21 | $47.9993 |
| 8/11/2015 | Purchase | 32 | $47.7667 |
| 8/11/2015 | Purchase | 70 | $47.8876 |
| 8/11/2015 | Purchase | 154 | $47.9664 |
| 8/11/2015 | Purchase | 342 | $47.8429 |
| 8/12/2015 | Purchase | 1,178 | $48.2492 |
| 11/16/2017 | Purchase | 660 | $46.2037 |
| 11/17/2017 | Purchase | 14 | $46.5923 |
| 11/17/2017 | Purchase | 839 | $46.6409 |
| 11/20/2017 | Purchase | 66 | $46.5940 |
| 11/20/2017 | Purchase | 266 | $46.7211 |
| 11/21/2017 | Purchase | 732 | $47.3831 |
| 11/22/2017 | Purchase | 98 | $47.2902 |
| 11/22/2017 | Purchase | 326 | $47.4710 |
| 11/22/2017 | Purchase | 805 | $47.4498 |
| 11/24/2017 | Purchase | 16 | $47.2534 |
| 11/27/2017 | Purchase | 53 | $46.5679 |
| 12/4/2017 | Purchase | 17 | $49.6550 |
| 12/4/2017 | Purchase | 565 | $49.7758 |
| 12/14/2017 | Purchase | 198 | $49.9331 |
| 12/14/2017 | Purchase | 983 | $49.9650 |
| 12/15/2017 | Purchase | 903 | $50.5174 |
| 12/26/2017 | Purchase | 368 | $51.3288 |
| 12/27/2017 | Purchase | 522 | $51.3873 |
| 12/28/2017 | Purchase | 159 | $51.5923 |
| 12/29/2017 | Purchase | 753 | $51.8427 |
| 1/2/2018 | Purchase | 94 | $52.2300 |
| 1/2/2018 | Purchase | 154 | $52.0838 |

**FLUOR CORPORATION (FLR)**

**TOWN OF FAIRFIELD EMPLOYEES' RETIREMENT PLAN AND**
**TOWN OF FAIRFIELD POLICE AND FIREMEN'S RETIREMENT PLAN**
**("Fairfield Funds")**

**LIST OF PURCHASES AND SALES**

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|---|---|---|---|
| 1/3/2018 | Purchase | 57 | $53.0428 |
| 1/3/2018 | Purchase | 88 | $52.9390 |
| 1/5/2018 | Purchase | 381 | $53.2682 |
| 1/5/2018 | Purchase | 662 | $53.1285 |
| 1/8/2018 | Purchase | 79 | $53.3350 |
| 1/8/2018 | Purchase | 856 | $53.5548 |
| 5/4/2018 | Purchase | 17 | $46.4748 |
| 5/4/2018 | Purchase | 1,368 | $46.2366 |
| 5/4/2018 | Purchase | 1,011 | $45.9509 |
| 10/11/2018 | Purchase | 1,446 | $46.6775 |
| 12/22/2015 | Sale | 833 | $47.1944 |
| 1/5/2016 | Sale | 665 | $46.8249 |
| 1/6/2016 | Sale | 651 | $45.5439 |
| 1/6/2016 | Sale | 396 | $45.2943 |
| 1/7/2016 | Sale | 426 | $44.6325 |
| 1/7/2016 | Sale | 190 | $44.7547 |
| 1/7/2016 | Sale | 104 | $44.5864 |
| 1/7/2016 | Sale | 65 | $45.0733 |
| 1/7/2016 | Sale | 40 | $45.1302 |
| 1/7/2016 | Sale | 14 | $44.5782 |
| 1/7/2016 | Sale | 11 | $45.0001 |
| 1/7/2016 | Sale | 9 | $44.7123 |
| 1/7/2016 | Sale | 6 | $44.8071 |
| 1/7/2016 | Sale | 5 | $44.7286 |
| 1/7/2016 | Sale | 2 | $45.1150 |
| 1/8/2016 | Sale | 902 | $43.7626 |
| 1/8/2016 | Sale | 57 | $44.2600 |
| 1/11/2016 | Sale | 703 | $42.1036 |
| 1/13/2016 | Sale | 426 | $42.2316 |
| 1/13/2016 | Sale | 152 | $42.2500 |
| 1/13/2016 | Sale | 44 | $41.8508 |
| 1/14/2016 | Sale | 478 | $42.1904 |
| 1/14/2016 | Sale | 152 | $42.2000 |
| 1/21/2016 | Sale | 280 | $41.7536 |
| 1/27/2016 | Sale | 493 | $43.6390 |
| 1/27/2016 | Sale | 20 | $43.4550 |
| 1/27/2016 | Sale | 12 | $43.3653 |
| 1/27/2016 | Sale | 3 | $42.9110 |
| 1/27/2016 | Sale | 2 | $42.9167 |
| 1/27/2016 | Sale | 2 | $42.9250 |
| 1/28/2016 | Sale | 1,218 | $43.4785 |
| 1/28/2016 | Sale | 253 | $43.4731 |
| 1/28/2016 | Sale | 46 | $44.0401 |
| 1/28/2016 | Sale | 22 | $43.5698 |
| 1/28/2016 | Sale | 9 | $44.0200 |
| 1/28/2016 | Sale | 7 | $44.0986 |
| 1/28/2016 | Sale | 2 | $44.0075 |
| 1/28/2016 | Sale | 1 | $44.0050 |
| 1/29/2016 | Sale | 1,879 | $44.5841 |
| 8/17/2018 | Sale | 470 | $56.8825 |
| 8/17/2018 | Sale | 3 | $56.8983 |
| 8/20/2018 | Sale | 314 | $57.0451 |
| 8/20/2018 | Sale | 220 | $56.9732 |
| 8/20/2018 | Sale | 341 | $56.9190 |
| 8/20/2018 | Sale | 118 | $56.9126 |
| 8/21/2018 | Sale | 118 | $57.5172 |
| 8/21/2018 | Sale | 44 | $57.5702 |
| 8/21/2018 | Sale | 546 | $57.5706 |
| 8/22/2018 | Sale | 421 | $57.5766 |
| 9/25/2018 | Sale | 504 | $58.7044 |
| 9/26/2018 | Sale | 101 | $58.5188 |
| 9/27/2018 | Sale | 211 | $58.4665 |

**FLUOR CORPORATION (FLR)**

**TOWN OF FAIRFIELD EMPLOYEES' RETIREMENT PLAN AND
TOWN OF FAIRFIELD POLICE AND FIREMEN'S RETIREMENT PLAN
("Fairfield Funds")**

**LIST OF PURCHASES AND SALES**

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|---|---|---|---|
| 9/28/2018 | Sale | 453 | $58.3590 |
| 11/14/2018 | Sale | 1 | $45.7650 |
| 11/14/2018 | Sale | 996 | $45.1122 |
| 11/15/2018 | Sale | 140 | $45.2644 |
| 11/15/2018 | Sale | 1,534 | $45.7660 |
| 12/21/2018 | Sale | 2,016 | $30.2330 |
| 1/8/2019 | Sale | 201 | $35.2789 |
| 1/10/2019 | Sale | 1,005 | $35.9963 |
| 1/11/2019 | Sale | 634 | $36.4067 |
| 3/11/2019 | Sale | 4,165 | $37.1940 |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 2, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ DARRYL J. ALVARADO
DARRYL J. ALVARADO

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dalvarado@rgrdlaw.com

# Mailing Information for a Case 3:18-cv-01338-X Chun v. Fluor Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  Malbert@rgrdlaw.com

- **Darryl J Alvarado**
  DAlvarado@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Willie Briscoe**
  wbriscoe@thebriscoelawfirm.com,bthompson@thebriscoelawfirm.com,tsims@thebriscoelawfirm.com

- **Patrick Dahlstrom**
  pdahlstrom@pomlaw.com,tcrockett@pomlaw.com

- **Laurie G Flood**
  lflood@brianlauten.com

- **R Dean Gresham**
  dean@stecklerlaw.com,carol@stecklerlaw.com,lisa@stecklerlaw.com,jamie@stecklerlaw.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Joseph Marco Janoski Gray**
  mjanoski@rgrdlaw.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Joe Kendall**
  jkendall@kendalllawgroup.com,administrator@kendalllawgroup.com

- **Brian P Lauten**
  blauten@brianlauten.com,mlogan@brianlauten.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,lfportnoy@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Danielle S Myers**
  danim@rgrdlaw.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com

- **Lissa Percopo**
  LPercopo@gibsondunn.com

- **Michael L Raiff**
  mraiff@gibsondunn.com,dthorn@gibsondunn.com,cfitzgerald@gibsondunn.com

- **Kevin S. Sciarani**
  ksciarani@rgrdlaw.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jennifer B Sobers**
  jbsobers@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com

- **Matthew L. Tuccillo**
  mltuccillo@pomlaw.com,abarbosa@pomlaw.com

- **Meryl L Young**
  myoung@gibsondunn.com,pmclean@gibsondunn.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)