**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| KIN-YIP CHUN, Individually and on Behalf of All Others Similarly Situated, | § § § | |
| Plaintiff, | § | Civil Action No. 3:18-cv-01338-X |
| vs. | § § § | <u>CLASS ACTION</u> |
| FLUOR CORPORATION, et al., | § § | |
| Defendants. | § § § | |
| | § | |

**<u>DEFENDANTS' MOTION TO DISMISS AND SUPPORTING BRIEF</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... III

INTRODUCTION AND SUMMARY ............................................................. 1

BACKGROUND ............................................................................................ 3

      A.     Fluor Corporation ................................................................. 3

      B.     Fixed-Price Contracts .......................................................... 4

      C.     Financial Reporting on Fixed-Price Projects ...................... 5

      D.     The Projects ......................................................................... 6

      E.     Challenges in the Execution of the Projects ....................... 8

      F.     Procedural History ............................................................... 11

ARGUMENT ................................................................................................. 12

    I.     Federal Securities Laws Set Heightened Pleading Burdens. ................ 12

    II.     The Complaint Does Not Plead Any False or Misleading Statement with Particularity. ........................................................................................... 14

      A.     Plaintiffs Do Not Fix the Pleading Failures Identified by the Court. ....... 14

      B.     The Challenged Statements Are Nonactionable Opinion or Puffery. ........ 16

      C.     Plaintiffs Fail to Adequately Allege that the Challenged Statements Were False or Misleading When They Were Made. .................................. 20

            1.     Plaintiffs Fail to Adequately Allege that the Bidding Statements Were False or Misleading When They Were Made. ...................................................................... 20

            2.     Plaintiffs Fail to Adequately Allege that the Progress Statements Were False or Misleading When They Were Made. ...................................................................... 24

            3.     Plaintiffs Fail to Adequately Allege that the Control and Revenue Statements Were False or Misleading When They Were Made. ................................................................ 26

    III.     Plaintiffs Do Not Plead a Cogent and Compelling Inference of Scienter. ............ 31

## TABLE OF CONTENTS
(continued)

Page

A.    Plaintiffs Fail to Offer Factual Allegations regarding Any Individual Defendant's State of Mind.......................................... 32

B.    The Confidential Witnesses Add Nothing. ................................................. 34

C.    The Complaint Offers Only Fraud-By-Hindsight and Conclusory Assertions regarding the Bidding and Progress Statements. .................... 36

   1.    Plaintiffs' Reliance on Later "Admissions" Is Improper and Does Not Help Them. .................................................... 37

   2.    Plaintiffs' Conclusory Assertions of Fraud Are Insufficient. ....... 38

   3.    Plaintiffs' Allegations about the Mitsubishi and Duke Litigations Add Nothing. ............................................... 40

D.    Plaintiffs' Conclusory Assertions and Hindsight Allegations regarding the Control and Revenue Statements Are Insufficient. ............ 41

E.    Plaintiffs' Additional "Scienter" Allegations Add Nothing. .................... 44

F.    The Powerful Competing Inference—That Defendants Made Good Faith Judgments and Updated Investors Regularly—Is More Compelling than Plaintiffs' Theory that Defendants Deliberately Misled Investors.......................................................................... 49

IV.    Because There Is No Primary Violation, the Control Person Claims Fail............ 50

CONCLUSION..................................................................................................... 50

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ABC Arbitrage Plaintiffs' Grp. v. Tchuruk*,
    291 F.3d 336 (5th Cir. 2002) ...............................................................13, 16, 27, 29

*Abrams v. Baker Hughes Inc.*,
    292 F.3d 424 (5th Cir. 2002) ........................................................................42, 45, 48

*In re Alamosa Holdings, Inc.*,
    382 F. Supp. 2d 832 (N.D. Tex. 2005) ..............................................................34, 35

*Alaska Elec. Pension Fund v. Asar*,
    768 F. App'x 175 (5th Cir. 2019) ............................................................................45

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................38

*In re Azurix Corp. Sec. Litig.*,
    198 F. Supp. 2d 862 (S.D. Tex. 2002) .....................................................................22

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004)......................................................................47

*Budde v. Glob. Power Equip. Grp.*,
    No. 15-cv-1679, 2017 WL 6621540 (N.D. Tex. Dec. 27, 2017)..............................45

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)...................................................................................45

*In re Capstead Mortg. Corp. Sec. Litig.*,
    258 F. Supp. 2d 533 (N.D. Tex. 2003) .........................................................13, 31, 48

*City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*,
    908 F.3d 872 (3d Cir. 2018)......................................................................................36

*Collins v. Morgan Stanley Dean Witter*,
    224 F.3d 496 (5th Cir. 2000) .....................................................................................4

*Cox v. Richards*,
    761 F. App'x 244 (5th Cir. 2019) ..............................................................................4

*In re Fannie Mae 2008 Sec. Litig.*,
    742 F. Supp. 2d 382 (S.D.N.Y. 2010)................................................................29, 31

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Fener v. Belo Corp.*,
   425 F. Supp. 2d 788 (N.D. Tex. 2006) ...............................................................32, 33

*Fin. Acquisition Partners LP v. Blackwell*,
   440 F.3d 278 (5th Cir. 2006) ...........................................................................32, 38

*Goldstein v. MCI WorldCom*,
   340 F.3d 238 (5th Cir. 2003) ...........................................................................32, 45

*Greenberg v. Crossroads Sys., Inc.*,
   364 F.3d 657 (5th Cir. 2004) ...........................................................16, 17, 19, 20

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
   No. CV 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017) .....................19, 20, 29

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
   537 F.3d 527 (5th Cir. 2008) .............................................22, 36, 41, 42, 43, 47, 49

*Izadjoo v. Helix Energy Sols. Grp., Inc.*,
   237 F. Supp. 3d 492 (S.D. Tex. 2017) ...................................................................48

*In re Key Energy Servs., Inc. Sec. Litig.*,
   166 F. Supp. 3d 822 (S.D. Tex. 2016) ...............................................34, 35, 44, 45

*Lemmer v. Nu-Kote Holding, Inc.*,
   No. CIV. A. 398CV0161L, 2001 WL 1112577 (N.D. Tex. Sept. 6, 2001)...........20, 21, 26, 29

*Local 371 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
   810 F.3d 951 (5th Cir. 2016) .................................................................................13

*Lormand v. U.S. Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) .................................................................................44

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014)......................................................................50

*Magruder v. Halliburton Co.*,
   No. 3:05-CV-1156-M, 2009 WL 854656 (N.D. Tex. Mar. 31, 2009).............................17, 42

*Martin v. Quartermain*,
   732 F. App'x 37 (2d Cir. 2018) .......................................................................29, 31

*Masel v. Villarreal*,
   924 F.3d 734 (5th Cir. 2019) ...........................................................................21, 26

## TABLE OF AUTHORITIES
(continued)

Page(s)

*N. Port Firefighters' Pension—Local Option Plan v. Temple-Inland, Inc.*,
    No. 3:11-CV-3119-B, 2013 WL 4405537 (N.D. Tex. July 30, 2013).....................................36

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) ........................................................................................16, 45

*Neiman v. Bulmahn*,
    854 F.3d 741 (5th Cir. 2017) ................................................................................................50

*Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015).............................................................................................13, 16, 31

*Owens v. Jastrow*,
    789 F.3d 529 (5th Cir. 2015) .....................................................................................32, 33, 48

*R2 Invs. LDC v. Phillips*,
    401 F.3d 638 (5th Cir. 2005) ................................................................................................14

*Ret. Sys. v. Whole Foods Mkt., Inc.*,
    905 F.3d 892 (5th Cir. 2018) ................................................................................................16

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ....................................................................16, 17, 21, 26, 36

*S.E.C. v. World-Wide Coin Investments, Ltd.*,
    567 F. Supp. 724 (N.D. Ga. 1983)........................................................................................20

*Schiller v. Physicians Res. Grp., Inc.*,
    No. CIV.A. 3:97-CV-3158L, 2002 WL 318441 (N.D. Tex. Feb. 26, 2002) ..........................42

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ..........................................................16, 36, 40, 45, 46, 48, 50

*In re Stratasys Ltd. S'holder Sec. Litig.*,
    864 F.3d 879 (8th Cir. 2017) ................................................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).............................................................................................................13

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
    273 F. Supp. 3d 650 (N.D. Tex. 2017) ................................................................................32

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
    325 F. Supp. 3d 728 (N.D. Tex. 2018) ............................................................44, 47, 48, 50

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Va. Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991)................................................................................................16

**Statutes**

15 U.S.C. § 78u-4 ...........................................................................................................1

15 U.S.C. § 78u-4(b)(1)..................................................................................................22

15 U.S.C. § 78u-4(b)(2)(A).............................................................................................13

**Rules**

Fed. R. Civ. P. 9(b) ...............................................................................................1, 12, 16

Fed. R. Civ. P. 12(b)(6)....................................................................................................1

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 et seq., and Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, Defendants Fluor Corp. ("Fluor"), David T. Seaton, Biggs C. Porter, Bruce A. Stanski, Matthew McSorley, Gary G. Smalley, Carlos M. Hernandez, D. Michael Steuert, and Robin K. Chopra (collectively "Individual Defendants" and, with Fluor, "Defendants") move to dismiss this case with prejudice for failure to state a claim.

## INTRODUCTION AND SUMMARY

The Court should dismiss this case with prejudice because (1) Plaintiffs have not cured their fundamental failure to plead with specificity that the statements they challenge were false or misleading at the time they were made, and (2) Plaintiffs fail to plead particularized facts that Defendants made the challenged statements with fraudulent intent, as required under the heightened standard for pleading securities fraud. This is a classic "fraud by hindsight" case in which Plaintiffs claim that because Fluor faced setbacks and took charges relating to a small fraction of its fixed-price projects, Fluor "must have known" that certain statements about those projects were untrue when made. In Plaintiffs' last consolidated complaint (the "Initial Complaint"), Plaintiffs singled out four projects that faced challenges, and claimed that Fluor's competitive bids on these projects were too low to yield a profit. Plaintiffs concluded that Fluor and its senior officers must have known that the bids were too low because ultimately Fluor took charges on them. The Court dismissed the Initial Complaint for "failure to adequately plead the alleged misstatements with the required specificity." Order, Dkt. No. 89 (the "Order") at 5.

Following dismissal, Plaintiffs filed their First Amended Consolidated Complaint ("Complaint"), but they still fall far short of satisfying the heightened pleading requirements of Rule 9(b) and the PSLRA. Rather than attempting to cure these deficiencies with specific facts

to support a fraud claim on the four previously challenged fixed-price projects, as the Court provided them the opportunity to do, Plaintiffs inexplicably expand their theory of fraud.  They now claim that Defendants made material misstatements about a handful of additional projects.  They argue these new projects were supposedly infected by the same bidding procedures that Fluor must have known were flawed and about which it failed to warn investors at the time the bids were made and when problems emerged.  Plaintiffs acknowledge that when Fluor encountered setbacks on these unique and complex projects, the company made numerous attempts to correct course, but that these efforts did not succeed.  What is plainly missing from this new Complaint—just as last time—are *specific facts* showing that the statements about these projects were false when made.  And as to the various statements of opinion (e.g., "We believe that our ability to assess . . . and mitigate project risk . . . in a fixed-price contracting environment . . . .") or optimism (e.g., "I'm pretty bullish on them being able to deliver . . . .") at the core of the Complaint, Plaintiffs fail to plead specific facts demonstrating that Defendants did not believe the statements when they were made.  This pleading failure again compels dismissal.

The Court should also dismiss the Complaint on the separate ground that Plaintiffs fail to plead particularized facts giving rise to a strong inference that Defendants acted with scienter—meaning that the Defendants knew or were severely reckless in not knowing that their statements were false at the time they were made.  Pleading scienter is always difficult in a federal securities fraud case, but even more so in a case like this one, where the core claim is that Defendants made improper estimates, judgments, and predictions about the future.  Plaintiffs must plead facts giving rise to a strong inference that each Defendant *knew* that they would not finish these long-term projects within the fixed costs when they stated otherwise.  The Complaint contains no such pled facts, let alone facts pled with the particularity required under the PLSRA.

Plaintiffs attempt to plead scienter by relying on allegations from supposed "confidential witnesses" that leap to entirely speculative conclusions, but *none* provides the key information needed to plead scienter: specific facts indicating that each Individual Defendant received reports or other information *at the time* of the challenged statements demonstrating that the projects were underbid and doomed to fail. These indispensable allegations simply do not exist.

The far more cogent and compelling inference here is that Defendants made good faith judgments, estimates, and predictions in a competitive market that they specifically disclosed as having significant inherent risks. Some judgments and estimates turn out to be accurate, while others do not, but it is not—as the Complaint suggests—inherently fraudulent when an estimate turns out to be wrong. As a wealth of decisional law holds, Plaintiffs cannot simply rely on "fraud by hindsight" to satisfy the high pleading bar set by the PSLRA. This is the exact type of case the PSLRA was designed to stop at the pleading stage.

Plaintiffs have spent more than two years and hundreds of pages of pleadings trying to plead a viable securities fraud claim. They have failed once again. It is time this Court dismiss this case with prejudice. *See* Order at 7, 8 (granting Plaintiffs a "final opportunity" to replead before dismissing "with prejudice").

## BACKGROUND

### A.      Fluor Corporation

Fluor is one of the largest professional services firms providing engineering, procurement, construction, and project management services. *See id.* ¶ 25.[1]  Headquartered in

---

[1]  All citations to Ex. __ refer to the exhibits to the Declaration of Lissa M. Percopo, which accompanies the Appendix of Exhibits filed concurrently herewith. Appendix page numbers are also provided. As further discussed in Defendants' concurrently filed Request for Consideration of Documents, the Court may properly consider the documents included in the

Irving, Texas, *see id.*, Fluor actively manages some of the largest projects across all sectors. *See* Ex. 2 at 1–6 (2016 10-K) (App. 35–40).

### B.   Fixed-Price Contracts

A significant portion of Fluor's contracts are fixed-price projects (also called lump-sum), meaning that the price paid by the customer is set at the time contracts are awarded. *See* FACC ¶¶ 8, 51; Ex. 3 at 7–8 (2018 10-K) (App. 64–65). Most of these fixed-price contracts are competitively bid, meaning that rather than negotiate the price after winning the contract, Fluor responds to a customer request for proposal by submitting a bid to do the required work on a set timeline for a set amount of money. FACC ¶¶ 7–8, 51. For competitively bid, fixed-price contracts, if the actual cost to perform under the contract is lower than the estimated cost, the bidder makes more money. *See id.* If the actual cost incurred by the bidder is higher than the fixed price, the bidder loses money, unless the contract is renegotiated. *See id.*

The bidding process, therefore, requires the bidder to utilize projections, estimates, and judgments to develop a fixed price to bid. Assessments of the planned and actual progress of the projects also involve judgments, *id.* ¶ 38, and the risk of unforeseen costs, including from scheduling delays (which can require payment of liquidated damages to the customer), fall to the bidder. *See id.* ¶¶ 8, 51, 53.

For any fixed-price project, the risks are always significant, as Fluor repeatedly disclosed to investors. *See, e.g.*, Ex. 1 at 12–25 (2014 10-K) (App. 11–24); Ex. 2 at 14–30 (2016 10-K) (App. 43–59). Fluor disclosed, for example, that the bids involved "complex and lengthy negotiations and competitive bidding processes" that "[could] be impacted by a wide variety of

---

Appendix of Exhibits, which are expressly referenced or quoted in the Complaint. *See Cox v. Richards*, 761 F. App'x 244, 248 (5th Cir. 2019); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

factors." *See, e.g.*, Ex. 1 at 12 (2014 10-K) (App. 11); Ex. 2 at 14 (2016 10-K) (App. 43). Fluor explicitly warned investors that these risks "may lead to cost overruns that may not be paid by our clients thereby resulting in reduced profits or losses." *See, e.g.*, Ex. 1 at 12 (2014 10-K) (App. 11); Ex. 2 at 15 (2016 10-K) (App. 44); *see also* FACC ¶ 51 (acknowledging that Fluor disclosed in each annual report that it bore the risk of increased costs). The risk factors disclosed by Fluor specifically identified: "[u]nanticipated . . . engineering issues," "failures to properly estimate . . . labor," "[d]elays or productivity issues caused by weather conditions," and "[i]ncorrect assumptions related to productivity, scheduling estimates or future economic conditions." *See, e.g.*, Ex. 1 at 13 (2014 10-K) (App. 12); Ex. 2 at 15 (2016 10-K) (App. 44).

## C.     Financial Reporting on Fixed-Price Projects

Fluor uses what is referred to as the "percentage-of-completion method" to record anticipated revenue on fixed-price contracts. *See* FACC ¶ 38. Because the net revenue on these fixed-price projects is dependent on the set price Fluor will be paid for the work and the total costs to complete it (which is a projection until the project is complete), accounting during the project requires the company to regularly re-estimate the anticipated costs to complete. "In making such estimates, judgments are required to evaluate contingencies such as potential variances in schedule and the cost of materials, labor cost and productivity, the impact of change orders, liability claims, contract disputes and achievement of contractual performance standards." *Id.*

At the end of each quarter, Fluor estimates the costs to complete its fixed-price contracts and uses those estimates to update its recorded revenue for each project. *See id.* ¶¶ 38–40. If the estimated costs to complete a contract exceed the fixed-price value of the contract, Fluor immediately recognizes the entire amount of the estimated loss in its independently audited

financial statements, including the reversal of revenue recognized to date.  *See id.* ¶ 42; *see also, e.g.*, *id.* ¶ 267 (reporting "a loss of $60 million (including the reversal of previously recognized profit) resulting from forecast revisions." (emphasis omitted)).

On fixed price projects, Fluor must estimate the costs of supplies, labor, and its potential liability for liquidated damages if it does not complete work on time, *see, e.g.*, *id.* ¶¶ 53, 64, as well as its potential claims if a third party does not adhere to its own contract terms, *see, e.g.*, *id.* ¶¶ 185–88.  Fluor also must estimate its likely recovery for so-called "change orders," which it submits to seek additional compensation when circumstances allow under its contracts.  *Id.* ¶ 43. Accounting standards allow for the recognition of anticipated revenue from change orders before they are approved where it is "probable that the claim will result in additional contract revenue and if the amount can be reliably estimated."  *Id.* ¶ 43(c) (citing ASC 605-25-30).

Fluor conducts regular assessments of its projects through Project Status Reviews, which provide "objective, accurate, and timely information" to assess progress and "inform[] proposed mitigating actions when needed."  *Id.* ¶ 49 (alteration in original).

### D.     The Projects

The Complaint focuses primarily on four contracts Fluor bid and won in the gas-fired power plant market.  *See generally id.* ¶¶ 114–39.  The Complaint also identifies four other fixed-price projects.  *See id.* ¶¶ 57–60, 72–74.  The additional projects are not concentrated in any particular sector, but instead appear only to have been identified because Fluor encountered challenges in its execution of those projects and, as a result, took charges.  The Complaint says nothing about Fluor's approximately 1,000 other contracts during the relevant time period.  *Id.* ¶ 163 (quoting Mr. Seaton noting that the problem projects are only a small number "out of 1,000 that are operating at any given time").

As of August 2013, when the proposed class period would start, Fluor had provided engineering, procurement, construction, and commissioning services for more than 34,000 megawatts of gas-fired power facilities in the previous decade.  *See* Ex. 4 (Aug. 14, 2013 Press Release) (App. 71).  Fluor had also "just come off of a project in th[e lump-sum gas-fired power plant] market where [it] had bettered the [as sold] margin expectation."  FACC ¶ 159 (quoting Mr. Seaton explaining Fluor's perspective when bidding on the power projects) (internal quotations omitted, third alteration in original).

It is with this experience that Fluor bid on four engineering, procurement, and construction contracts (known as "EPC contracts") for gas-fired power plants (collectively, the "Power Projects").  The Power Projects were not uniform.  They varied in size, *see id.* ¶¶ 53, 61, 64, 68, involved turbines that were new to the United States Power market, *see id.* ¶ 126, and, though certain turbines or configurations were similar, no two Power Projects were the same, *see id.* ¶¶ 55, 63, 66, 70.

The *Brunswick Project* was a fixed-price EPC contract in Virginia with Dominion Virginia Electric and Power Company ("Dominion") dated July 31, 2012.  *Id.* ¶ 53.  As part of that contract, Dominion partially assigned its benefits under its turbine supply agreement with Mitsubishi to Fluor.  *Id.* ¶ 186.  Those benefits included liquidated damages provisions governing what Mitsubishi would pay for each day of unexcused delivery delay.  *See* Ex. 5 ¶ 13 (Complaint, *Fluor Enters., Inc. v. Mitsubishi Hitachi Power Sys. Ams., Inc.*, No. 3:17-cv-00622 (E.D. Va. Sept. 13, 2017), ECF No. 1 ("Mitsubishi Complaint")) (App. 77).  The *Anderson* and *Citrus Projects* were fixed-price EPC contracts in South Carolina and Florida, respectively, with Duke Energy ("Duke") originated in Q3 and Q4 2014, respectively.  FACC ¶¶ 61–67.  The

*Greensville Project* was a fixed-price EPC contract in Virginia with Dominion dated April 8, 2015.  *Id.* ¶ 68.

The other projects discussed for the first time in this amended Complaint are (1) the "*Radford Project*" (a fixed-price subcontract for BEA Systems on the Department of Defense's plan to update the Radford Army Ammunition Plant's power, infrastructure, and manufacturing facilities) (*see id.* ¶¶ 57–58); (2) the *CPChem Project* (a fixed-price contract for Chevron Phillips Chemical's Gulf Coast petrochemicals project in Texas) (*see id.* ¶ 59); (3) the *Penguins Offshore Project* (a fixed-price contract for Shell for the design, procurement, and fabrication of a floating storage and offloading vessel in the North Sea) (*see id.* ¶ 72); and (4) the *Warren Project* (a fixed-price contract with the U.S. Army Corps of Engineers at Frances E. Warren Air Force Base near Cheyenne, Wyoming, to construct a nuclear weapons storage and maintenance facility) (*see id.* ¶¶ 73–74).  These eight projects are referred to collectively as "the Projects."

E.    **Challenges in the Execution of the Projects**

Each of the Projects suffered different setbacks during the time period at issue in the Complaint.  For example, despite confidence in its execution abilities and good initial progress on the Brunswick Project, *see id.* ¶¶ 119–120, by mid-2015, several issues arose that necessitated forecast revisions, including extreme weather, lower labor productivity, and problems with the new Mitsubishi turbines.  *See* FACC ¶¶ 126, 128, 188, 265.  In Q3 2016, Fluor announced charges on the CPChem contract as a result of adjustments necessitated by "several heavy rain events and abnormal site flooding" that rendered it a loss.  FACC ¶ 60; Ex. 11 at 3 (Q3 2016 Earnings Call Tr.) (App. 119).  And Fluor took a charge to its Q1 2017 earnings attributable to forecast revisions for the Anderson Project that the company expected to be able to mitigate.  *See* FACC. ¶¶ 130, 269.

With its Q2 2017 results, Fluor announced charges across three of the Power Projects. *See id.* ¶¶ 131, 273.  Mr. Seaton explained that Fluor had identified issues with the bids on the Power Projects resulting from "improper estimating, craft productivity and equipment issues." *Id.* ¶ 273; Ex. 8 at 3 (Q2 2017 Earnings Call Tr.) (App. 93).  The Power Projects had been bid in a narrow time period by the same bid team that Fluor, years later, determined did not have "good information" on the new equipment being used or "a good handle" on the level of skill and number of craft employees Fluor would need to have available in certain locations.  *See* FACC ¶ 273; Ex. 8 at 6, 12 (Q2 2017 Earnings Call Tr.) (App. 94–95).  Mr. Seaton explained that Fluor was reviewing its gas-fired projects, but that at that time, Fluor did not believe it had a systemic problem across fixed-price projects.  *See* Ex. 8 at 6 (Q2 2017 Earnings Call Tr.) (App. 94).

After experiencing additional setbacks in 2018, Fluor announced that following a "complete review of the business" that involved a "relentless" review of "every aspect" of all of the Projects, the company would take charges for certain Projects at the end of Q2 2019.  FACC ¶ 283.  These charges included $109 million on the remaining Power Projects, $186 million for a fixed-price offshore project, $87 million for two fixed-price downstream projects, $55 million for forecast revisions on several fixed-price infrastructure projects, and $233 million on a fixed-price project from the Department of Defense.  *Id.* ¶ 282.  And on September 24, 2019, Fluor provided an interim update to investors about its "strategic review," which included charges on the Radford Project and the Warren Project.  *Id.* ¶ 286.

Plaintiffs do not allege that Fluor ignored the challenges with the Projects or failed to respond to setbacks as they arose.  Rather, Plaintiffs acknowledge that Fluor repeatedly took steps to address problems on the Projects as they occurred, including by submitting change orders during the course of the Projects, and through alternative solutions, such as creating a

9

welding school to address an unexpected shortage of welders on one project, *see id.* ¶ 125(b). Plaintiffs acknowledge that, where necessary, Fluor took and accurately reported charges for the Projects.  *See, e.g., id.* ¶¶ 265 (Q2 2015), 148–49 (Q3 2016), 151 (Q1 2017), 152–53 (Q2 2017), 157–59 (Q1 2018), 161 (Q2 2018), 164 (Q3 2018), 168 (Q1 2019).

As responsible businesses do, when issues arose, Defendants addressed them by implementing a series of process improvements to identify potential problems and mitigation opportunities.  For example, when Fluor took a charge on the Brunswick Project in 2015, Defendants "t[ook] a very measured look at many of the programs and projects" under way and determined that the challenges on the Brunswick Project were unique to that project.  *Id.* ¶ 126. Following the CPChem loss in Q3 2016, Fluor "significantly increased the independent review of critical projects," "improve[ed its] estimating system," "ma[de] significant investments in applying data analytics to projects [to] identify challenges earlier," and added "more cold eyes review" on projects.  *Id.* ¶ 153 (quoting Mr. Seaton on the Q2 2017 earnings call).

In 2017, Fluor established an Office of Project Executive Governance to oversee the Project Status Reviews.  *See id.* ¶ 50.  Then in 2019, after taking additional charges across multiple projects and sectors, the company's new CEO, Mr. Hernandez, explained that Fluor had undertaken a "complete review of the business," including "relentless[ly] . . . looking into every aspect" of the organization and its operations.  *Id.* ¶ 283.  Fluor formed a new Board Committee, dedicated to monitoring risk.  *Id.*; *see also id.* ¶ 172(a).  And Fluor "implemented a more rigorous framework to [its] pursuit process," "enacted changes in [its] bid/no bid process," and re-reviewed a series of variables that go into cost and revenue judgments.  *See id.* ¶ 284.  Fluor also exited certain markets when it determined that the risks could not be sufficiently mitigated

in future contracts. *See, e.g.*, *id.* ¶ 275 (quoting Q1 2018 10-Q which disclosed that Fluor was exiting the gas-fired power plant market).

> **F.      Procedural History**

In May 2018, Kin-Yip Chun filed a securities class action against Fluor and Messrs. Seaton, Porter, and Stanski.  Dkt. No. 1.  Later that year, the Court appointed the Plaintiffs as lead plaintiffs.  Dkt. No. 41.  Plaintiffs filed the Initial Complaint on March 8, 2019, adding Messrs. McSorley and Smalley as defendants.  Dkt. No. 47.  Plaintiffs alleged that Defendants misled investors about Fluor's bidding practices on fixed-price projects ("Bidding Statements") and its progress executing the Power Projects ("Progress Statements") because those projects encountered issues and were eventually losses.  On March 5, 2020, the Court dismissed the Initial Complaint for failing to allege the challenged statements were false when made and gave Plaintiffs "a final opportunity to make their best substantiated allegations."  Dkt. No. 89.

Plaintiffs filed the Complaint on April 2, 2020, adding Messrs. Hernandez, Steuert, and Chopra as defendants.  Like the Initial Complaint, the Complaint challenged the same Bidding Statements, FACC ¶¶ 85–113 (Statement Nos. 1–19), and Progress Statements, *id.* ¶¶ 114–40 (Statement Nos. 20–36).  It also expanded the class period by seventeen months, identified four additional fixed-price projects across various business segments, and added a new category of challenged statements concerning Fluor's internal and disclosure controls, risk management, revenue, and financial statements ("Control and Revenue Statements"), which Plaintiffs assert misled investors because the identified projects encountered issues and ultimately took charges. *See id.* ¶¶ 1, 51–74, 141–74 (Statement Nos. 37–64).  The Complaint also offers statements from

an additional four confidential witnesses ("CWs") about certain challenges experienced on some Projects, as well as discussion of projects *not* at issue in the Complaint.  *See id.* ¶¶ 81–84.[2]

## ARGUMENT

The Complaint continues to fall far short of the PSLRA's heightened pleading requirements for two reasons.  First, it again fails to plead specific facts showing that any of the challenged statements were false or misleading when made.  Plaintiffs merely repeat their challenge to the previously dismissed statements and now add similar statements that they likewise fail to adequately allege were false or misleading when made.  Second, Plaintiffs again fail to plead specific facts, as required, giving rise to a strong inference that any Defendant knew or recklessly disregarded that the statements were false or misleading.  Rather than pleading factual allegations that create a cogent and compelling inference that Defendants acted with scienter, Plaintiffs simply assert that because the Projects faced serious challenges, Defendants "must have known" years earlier that their estimates, assumptions, and judgments would turn out to be wrong.  This kind of "fraud by hindsight" pleading falls short of the factual specificity required to plead scienter under the PSLRA and Rule 9(b).

## I.      Federal Securities Laws Set Heightened Pleading Burdens.

As the Court explained, Plaintiffs face a series of elevated burdens to plead securities fraud.  First, they must satisfy Federal Rule of Civil Procedure 9(b)'s requirement to "plead with

---

[2]  Union Asset Management Holding AG ("Union") filed a separate case against Fluor and certain Individual Defendants on February 28, 2020.  As acknowledged by the Court and the parties, the Complaint incorporates Union's complaint.  *See* Dkt. No. 110.  The Court has now consolidated the two cases.  Wayne County Employees' Retirement System, the Town of Fairfield Employees' Retirement Plan, and the Town of Fairfield Police and Firemen's Retirement Plan remain the lead plaintiffs of the consolidated case, and the Complaint remains the operative complaint.  This motion seeks to dismiss the entire, consolidated case.

'particularity the circumstances constituting fraud.'" *Local 371 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016); *see also* Order at 4–5.

Second, to adequately plead a misstatement under the PSLRA, Plaintiffs must: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; and (4) explain the reason or reasons why the statements were fraudulent. *ABC Arbitrage Plaintiffs' Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002). A plaintiff may only challenge verifiable assertions of fact, not puffery or subjective beliefs. *See Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1326 (2015). Plaintiffs cannot meet this burden by reciting a series of statements and then asserting they were all false or misleading without connecting "the particular statement they contend is false and misleading" to the "reason why that statement is false or misleading." *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 560 (N.D. Tex. 2003).[3]

Third, to adequately plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), which requires that the inference be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007); *see also Diodes*, 810 F.3d at 957 (a "reasonable" or "permissible" inference is not enough). The required state of mind is an "intent to deceive, manipulate, or defraud or . . . severe recklessness"— an exceedingly high bar that is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or

---

[3] Plaintiffs' pleading formula where "[a]ll explanations regarding how or why the alleged statement is misleading is reserved for the last paragraph of the section addressing a particular series of statements," has been expressly rejected by courts in the Northern District. *In re Capstead*, 258 F. Supp. 2d at 577.

even inexcusable negligence, but an extreme departure from the standards of ordinary care." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005) (citations omitted).

## II. The Complaint Does Not Plead Any False or Misleading Statement with Particularity.

### A. Plaintiffs Do Not Fix the Pleading Failures Identified by the Court.

This Court dismissed the Initial Complaint for failure to plead that the Bidding Statements and Progress Statements were false or misleading with the required specificity. *See* Order at 5. Using four representative examples, the Court explained why the Plaintiffs failed to sufficiently plead falsity. Tellingly, Plaintiffs were unable to fix any of those four examples. They abandoned one of those statements, and for the other three, Plaintiffs continue relying on the same, insufficient allegations of falsity.

*First*, as noted by the Court, Plaintiffs previously argued that they had sufficiently pled falsity in their Initial Complaint because "Defendants later admitted that Fluor's gas-fired power plant bids were *never* realistic. ¶ 215." *See id.* at 5–6 (quoting Opp. at 16). As the Court explained, the referenced Paragraph 215 of the Initial Complaint actually "contains no such admission," and instead merely quotes a later 2018 call with investors without "indicat[ing] that the defendants knew the four bids contained faulty estimations when they submitted them and informed investors at the time." *Id.* at 6. Now, Plaintiffs challenge the very same statements, *see* FACC ¶¶ 92, 94, again asserting they were false because "Defendants admitted that Fluor's gas-fired power plant bids were never realistic," *see id.* ¶ 113(b)(i), citing only to Paragraph 275, which again "quotes in depth" the very same "2018 call with investors," *id.*; Order at 6.

*Second*, as another example cited by the Court, Plaintiffs argued that they had sufficiently pled falsity because the "[d]efendants later admitted that the four Gas-Fired Plant projects had always 'had a fundamental problem' and 'did not meet the original baseline assumptions due to

14

improper estimating, craft productivity and equipment issues.' ¶ 131." *See* Order at 6.  But, as explained by the Court, the Initial Complaint "does not show that the defendants knew of estimating or labor issues when submitting the bids and informing investors at that time." *See id.* Instead, the Initial Complaint offered only statements from an August 3, 2017 investor call, which explained that the company *then* realized that the bids had a "fundamental problem" because during execution the Projects "did not meet the original baseline assumptions."  In their new Complaint, Plaintiffs repeat these assertions, *see* FACC ¶ 113(b)(ii) (citing *id.* ¶ 273), citing only the very same block quote from August 3, 2017 that the Court already explained was *not* an "admission" that the challenged statements were false or misleading when made, *see* Order at 6.

     *Third*, in its dismissal order, the Court provided another example of Plaintiffs' lack of substantiation.  Plaintiffs were challenging the veracity of statements by Mr. McSorley in November 2014 ("[a]ll of our projects over the past four or five years [were] on budget, on schedule, no claims") by citing to a May 2018 statement by Mr. Seaton ("10 of the 12 have underperformed our as-sold expectations, with 3 suffering losses").  As explained by the Court, the "statement in 2018 of how projects ended does not demonstrate the falsity of a report on progress in 2014."  Order at 6 (quoting Opp. at 17, 18).  Yet, in their new Complaint, Plaintiffs again base their assertion that the November 2014 statement was false on Mr. Seaton's 2018 statement.  FACC ¶ 113(c) (citing Mr. Seaton's 2018 statements in FACC ¶ 275).[4]

---

[4]  Plaintiffs' attempt to use a 2014 reservation of rights letter sent by Fluor to Mitsubishi indicating the delayed delivery of "minor components" does not salvage this argument.  *See* FACC ¶ 12; Ex. 7 (App. 88–89).  As the Court has already recognized, Plaintiffs "fail to acknowledge that the [2014] letter regarded only minor components and [a] lawsuit only happened three and a half years later because 'the late and mis-labeled deliveries continued and worsened.'"  Order at 7.

Even when provided specific examples of pleading failures, Plaintiffs are unable to cure their failures and satisfy the heightened pleading requirements of the PSLRA and Rule 9(b).

### B.    The Challenged Statements Are Nonactionable Opinion or Puffery.

All of the Bidding Statements and most of the Progress Statements and Control and Revenue Statements should be dismissed for the independent reason that they are nonactionable puffery or opinions.  The Fifth Circuit has long held that "generalized, positive statements" including "statements about the company's competitive strengths, experienced management, and future performance are not actionable because they are immaterial."  *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003).  For example, statements cannot serve as a basis for liability when they are describing demand for a company's services in "generally positive" terms, *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 371–72 (5th Cir. 2004), or describing the company's situation using "optimistic generalizations," *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001), or are "generalized positive statements about a company's progress," *Tchuruk*, 291 F.3d at 359.  That is because no reasonable investor would judge a company's value "based on its own generalized and self-serving statements."  *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 902 (5th Cir. 2018).  Similarly, an opinion can be actionable only if the speaker did not genuinely hold it.  *See Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 670 (5th Cir. 2004) (citing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095–96 (1991)); *see also Omnicare*, 135 S. Ct. at 1326.

***Bidding Statements.***  The challenged statements regarding Fluor's bidding process and confidence with fixed-price projects, *see* FACC ¶¶ 85–113, are all nonactionable as a matter of law.  *See, e.g.*, *Omnicare*, 135 S. Ct. at 1326; *Southland*, 365 F.3d at 371–72; *Nathenson*, 267 F.3d at 419.  These statements include that Fluor was "comfortable" taking on fixed-price projects (FACC ¶¶ 90, 95, 105), believed it had a good strategy and the ability to manage risk

16

(*id.* ¶¶ 87, 94, 96–99, 103,[5] 111), was more conservative than its competitors (*id.* ¶¶ 88, 92–93, 100–04), and did a "good job" and "fe[lt] good" about its position (*id.* ¶¶ 93, 100, 102–03, 104, 108).  These types of statements about the "company's competitive strengths, experienced management, and future prospects" are nonactionable.  *Magruder v. Halliburton Co.*, No. 3:05-CV-1156-M, 2009 WL 854656, at *5 (N.D. Tex. Mar. 31, 2009) (citing *Rosenzweig*, 332 F.3d at 869).  In fact, the Fifth Circuit has held that very similar statements such as "[o]ur fundamentals are strong" are "obviously immaterial puffery."  *Rosenzweig*, 332 F.3d at 869.

The Bidding Statements are also nonactionable opinions and beliefs.  *See* FACC  ¶¶ 87–111.  The Complaint fails to plead any facts showing that Defendants did not believe these statements when they made them, relying instead on later-discovered facts to argue that Defendants must have known the statements were false at the time they were made years earlier.  *See id.* ¶ 113 (arguing that the Bidding Statements were false because projects "ultimately" took charges, "Defendants later admitted" problems with their bids, and confidential witnesses "corroborate[d] Defendants' [later] admissions"); *Greenberg*, 364 F.3d at 670.

Plaintiffs ignore that these opinions were stated concurrently with extensive disclosures reminding investors that they were judgments that were not guaranteed.  Fluor disclosed, for example, that these projects involved "complex and lengthy negotiations and competitive bidding processes" that "[could] be impacted by a wide variety of factors."  Ex. 1 at 12 (2014 10-K) (App. 11).  The Form 10-K also lists risk factors that "may lead to cost overruns . . . resulting in reduced profits or losses."  *See id.*  These disclosed risk factors include "[u]nanticipated . . . engineering issues"; "failures to properly estimate . . . labor"; "[d]elays or productivity issues

---

[5]  Based on the audio recording of the June 4, 2015 Credit Suisse Engineering & Construction Conference, Plaintiffs misattribute Statement No. 14 to Mr. Porter (FACC ¶ 103).

caused by weather conditions"; and "[i]ncorrect assumptions related to productivity, scheduling estimates or future economic conditions."  *See, e.g.*, *id.* at 13 (App. 12).

The content and context of the Bidding Statements reveal that they were immaterial, vague positive statements or statements of genuinely held opinion made alongside disclosures of accompanying risks and thus not actionable.

***Progress Statements and Control and Revenue Statements.***  While all of the Progress Statements and Control and Revenue Statements are not alleged to be false or misleading for the reasons stated in Sections II.C.2–3, *infra*, most of them are nonactionable for the independent reason that they are also opinion or puffery.  For the Progress Statements, Plaintiffs rely on optimistic generalizations about Fluor's execution on the Projects, such as statements that Fluor was "comfortable" with its fixed-price projects, felt "good" about its work, had "done well," "had a solid execution," "on budget [and] on schedule" in recent years, "sharpened" its "execution approach," "performing very, very well," "pretty bullish on them being able to deliver," "probably one of the few that can actually implement the gas cycle regardless of what the turbine choice is," and "confident" in its ability to finish the gas-fired projects.  FACC ¶¶ 117–19, 123–24, 127, 132, 135.  Plaintiffs also rely on general positive statements and statements of subjective "belief" about project risks, including the belief that identified problems in certain projects were not "embedded in how we've done any of the others," or that "[w]e've got some opportunities, hopefully, to maybe reverse some [charges]," and "we believe we've captured that," or that projects had been "de-risked," and "[w]e've done everything in our power to lessen that risk."  *Id.* ¶¶ 126, 130, 136–37, 139.

Similarly, for many of the Control and Revenue Statements, Plaintiffs challenge general positive statements related to mitigating risks based on improvements to bidding and execution

processes.  *See id.* ¶¶ 149, 153, 156, 159, 162, 163, 166, 167, 170.  These include statements such as the company has "greater confidence that these types of earnings adjustments [will be] diminished and less frequent," has "done everything in [its] power to lessen the risk and give us a better insight and surety in terms of performance going forward," has "strengthened the decision-making process," and is "really confident that the changes we've made . . . [are] going to provide . . . more sure outcome[s] for Fluor."  *See id.* ¶¶ 153, 162, 163, 166.  Fluor's representatives also said that they believed the company was "in a good place" with regard to remaining projects bid "without [the] benefit of the integrated solutions."  *Id.* ¶ 159.

None of these general expressions of confidence and progress are actionable.  Plaintiffs nowhere allege that each of the Defendants did not honestly believe these statements when made. *See, e.g.*, *Greenberg*, 364 F.3d at 670.  To the contrary, Plaintiffs themselves acknowledge Fluor's prior experience and success in the lump-sum power industry, which further underscore the absence of well-pled facts showing that the Defendants did not honestly believe that the company would deliver on its gas-fired Projects.  *See* FACC ¶ 273 (explaining that "historically, [Power] has provided good profitability for us" and "I can list dozens of projects that have been very positive"); *see also* Ex. 4 (Aug. 14, 2013 Press Release) (App. 71); Ex. 10 at 26 (Nov. 13, 2014 Investor Day Tr.) (App. 115).  Because these statements are either immaterial puffery or opinions, the statements cannot support a securities fraud claim.

Statements that Fluor complied with GAAP also are nonactionable opinions.  *See In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. CV 13-7050, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017) ("Where statements about GAAP compliance are concerned, courts have deemed them to be opinions."), *aff'd*, 905 F.3d 106 (3d Cir. 2018).  The statement made in each public filing during the class period that the company prepared its financial statements in accordance with

GAAP is an opinion about GAAP compliance that the Complaint neither contradicts nor alleges that Defendants did not subjectively believe when made. *See* FACC ¶ 143. Similarly, Fluor's "conclusions" about the reasonableness, effectiveness, and design of its controls, *see id.* ¶¶ 141–43, are also "subjective and based on opinion," *Lemmer v. Nu-Kote Holding, Inc.*, No. CIV. A. 398CV0161L, 2001 WL 1112577, at *10 (N.D. Tex. Sept. 6, 2001), *aff'd*, 71 F. App'x 356 (5th Cir. 2003); *see also S.E.C. v. World-Wide Coin Investments, Ltd.*, 567 F. Supp. 724, 751 (N.D. Ga. 1983) ("[E]valuating the sufficiency of controls [to provide reasonable assurances] . . . is inevitably a highly subjective process . . . ."). But the Complaint neither contradicts those conclusions nor alleges that they were subjectively false when made.

Plaintiffs also state in a conclusory fashion that Defendants falsely recorded revenue on certain change orders because they "had no assurance that payment on those change orders was probable" and lacked "a basis to conclude that it was probable." *Id.* ¶¶ 172(d)–(e). But the "probability" of recovering on a change order is a subjective GAAP opinion. *See In re Hertz*, 2017 WL 1536223, at *11 (noting that whether "an asset impairment is 'probable'" is a "subjective" GAAP standard (citations omitted)). Thus, the challenged statements are not actionable absent particularized allegations that each Defendant did not believe the change orders were recoverable. *See Greenberg*, 364 F.3d at 670. Plaintiffs make no such allegations, and instead improperly rely on after-the-fact determinations from 2019 that cannot support a securities fraud claim. *See* FACC ¶ 172(e).

### C. Plaintiffs Fail to Adequately Allege that the Challenged Statements Were False or Misleading When They Were Made.

#### 1. Plaintiffs Fail to Adequately Allege that the Bidding Statements Were False or Misleading When They Were Made.

The Complaint still fails to substantiate its bald assertions that the Bidding Statements were false or misleading at the time they were made. The Bidding Statements concern Fluor's

20

bidding practices, which are based on estimates.  The Complaint rightly notes that Fluor's project estimates required *judgments* about numerous different project *contingencies*.  *See* FACC ¶ 38. At bottom, Plaintiffs complain that Fluor's estimates did not pan out due to changing circumstances and intervening events; but that is no grounds for alleging fraud.

The Fifth Circuit recently confirmed that statements alleged to be inaccurate after changed circumstances or intervening events, but not sufficiently alleged to be untrue *when made*, are not actionable.  *See Masel v. Villarreal*, 924 F.3d 734, 749 (5th Cir. 2019); *see also Rosenzweig*, 332 F.3d at 860, 870 (affirming dismissal because statements about the viability of transactions were not false when made where "plaintiffs did not allege that any of those projects were, at the time of the prospectus, not potentially viable acquisitions"); *Lemmer*, 2001 WL WL 1112577, at *10.

Here, the Complaint identifies a host of intervening events, including extensive productivity issues, labor shortages, a severe winter, a hurricane, and equipment quality and delivery issues.  FACC ¶¶ 125(a)–(b), 126, 134; Ex. 9 at 3 (Q3 2017 Earnings Call) (App. 99). Indeed, the Complaint points to two confidential witnesses (CWs 2 and 8) who stated that poor labor quality affected project budgets, which supports the conclusion that the statements were true when made, but later events altered the outcome.  With no basis to allege that Fluor's estimating judgments were not reasonable when made, Plaintiffs again resort to the same combination of hindsight statements and conclusory assertions that the Court rejected in its Order dismissing the Initial Complaint.  *See* FACC ¶ 113.  The unremediated Bidding Statement allegations demand dismissal with prejudice.

***Statements Relating to Fluor's Experience***—The Complaint persists in alleging that Fluor's description of its management as "experienced" in navigating a fixed-price market was

false, but again makes no attempt to contradict this statement.  *See id.* ¶ 87.  "Although [the

company] ultimately performed poorly in its business enterprises, even well-managed enterprises

can fail.  The mere fact that a business did not live up to expectations is insufficient to create an

inference of fraud."  *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 882 (S.D. Tex. 2002),

*aff'd sub nom. Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003).

   ***Statements Relating to Fluor's Approach to Bidding***—The Complaint lacks facts

demonstrating that Fluor's comments that it was "comfortable" in the fixed-price arena, took a

conservative approach to bidding, had the "ability to say no," and "ha[d] not seen [its] risk

profile increase" were inaccurate when they were made.  *See* FACC ¶¶ 88–90, 92, 96, 103, 105,

108–09, 113(b).  In fact, the Complaint supports that those statements were accurate when made.

   For example, the documents incorporated by reference into the Complaint make clear that

Fluor's bidding practices were more conservative than others in the market.  In May 2014, after

it had won the Brunswick Project contract, incorporated documents indicate Fluor was "in bid"

for seven combined-cycle gas-fired power plants.  Ex. 6 at 5 (Q1 2014 Earnings Call Tr.) (App.

86).  The Complaint admits that Fluor only won contracts to build three such plants after that

time and that contracts are awarded to the lowest bidder.  FACC ¶ 113(b)(iv).  In other words,

Fluor bid higher than its competitors (and, therefore, lost) on over 50% of those bids.

   Plaintiffs must plead *why* the challenged statements are false or misleading.  *See* 15

U.S.C. § 78u-4(b)(1); *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d

527, 533 (5th Cir. 2008).  Plaintiffs assert that these qualitative and comparative statements were

false or misleading, but they allege no factual allegations comparing Fluor's practices to those of

its competitors; the Complaint does not even *name* a single competitive bidder.  Similar failures

have led to dismissal in other cases.  *See, e.g., In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d

879, 882 (8th Cir. 2017) (dismissing as "vague and nonverifiable" challenges to a company's statements that its printer offered "unmatched speed, reliability, quality and connectivity," particularly because plaintiff did not plead any comparison).

The Complaint fails to plead *any* information about the scope of Fluor's fixed-price opportunities. Plaintiffs do not plead how many bidding opportunities there were during the relevant time period or how many of those Fluor bid. The Complaint alleges that Fluor's statements that it had "the ability to say no" were false, but provides no facts to support the proposition that Fluor bid on every opportunity or on more than its competitors.

The Complaint is also devoid of any factual allegation contradicting Fluor's February 2014 statement—made prior to the award of the latter five challenged projects—that it had "not seen [its] risk profile increase." FACC ¶ 90. Fluor had projects around the globe in multiple sectors. *See* Ex. 10 at 6, 10–18 (Nov. 13, 2014 Investor Day Tr.) (App. 103, 105–13); FACC ¶ 163. Therefore, Fluor had an "ability to say no" that its single-market competitors did not. *See* FACC ¶¶ 96–97; Ex. 10 at 6 (Nov. 13, 2014 Investor Day Tr.) (App. 103). Plaintiffs allege no particularized facts, as they must, that in February 2014 Fluor's diverse, company-wide risk profile had increased at all, let alone based on the challenged projects that had been awarded by that time.

***Project "Underperformance" Does Not Support Plaintiffs' Falsity Allegations***—The Complaint asserts that some of the Bidding Statements were false because, before Fluor bid the challenged Projects, six of its eight fixed-price power plants had underperformed, and when the challenged Projects are included, ten of twelve had underperformed, with three suffering losses. FACC ¶¶ 113(b)(iv), 113(c). But these 2018 statistics "of how projects ended does not demonstrate the falsity" of earlier statements. *See* Order at 6. In any event, underperformance

and loss are very different.  "Underperformance" does not mean a loss, but simply that the

company made less profit on the project than it expected.  The Complaint does not assert

whether the earlier underperformance was by one dollar or one hundred million dollars.  *See*

FACC ¶¶ 113(b)(iv), 113(c).  The Complaint also does not assert whether the other two earlier

projects *over*-performed, which could mean that Fluor *on average* had historically profited or

even out-performed expectations.  *See, e.g.*, *id.* ¶ 175 (noting the Power Projects were bid

following a similar project where Fluor had over-performed).  No similar project is alleged to

have suffered a loss prior to the Brunswick Project.  *Compare id.* ¶¶ 113(b)(iv), 113(c) (alleging

that three projects had suffered losses), *with id.* ¶ 129(e) (alleging that, prior to the Brunswick

Project, six of eight plants had "underperformed," but not alleging losses).

> **2.      Plaintiffs Fail to Adequately Allege that the Progress Statements
> Were False or Misleading When They Were Made.**

Plaintiffs' theory of falsity for the Progress Statements suffers from the same fatal flaw as

the Bidding Statements—it relies on the same type of hindsight statements and conclusory

assertions that the Court already rejected.  The Progress Statements fall into four categories:

(1) statements about Fluor's confidence with executing the Power Projects, *id.* ¶¶ 117, 119, 123–

24 (Statement Nos. 22, 24, 27–28); (2) statements about progress on the Brunswick Project, *id.*

¶¶ 114, 116, 118, 120–21 (Statement Nos. 20–21, 23, 25–26); (3) statements about Fluor's belief

that problems on the Brunswick Project were not symptomatic for other Power Projects, *id.*

¶¶ 126–27 (Statement Nos. 29–30); and (4) statements about Fluor's understanding of the

direction of the Power Projects and its efforts to mitigate remaining risk, *id.* ¶¶ 130, 132, 135–37,

139 (Statement Nos. 31–36).

Plaintiffs assert that the Progress Statements were false because the "baseline

assumptions" for the Brunswick estimate would turn out to be wrong, the problems on the

Brunswick Project would end up causing irreversible costs and schedule delays, the subsequent Power Projects would experience similar problems, and the Projects would continue to take charges even after Fluor took remedial measures to mitigate the risks. *See id.* ¶¶ 115, 125, 129, 140.  In other words, Plaintiffs rely exclusively on later determinations after changed circumstances.  They plead no facts showing *when* circumstances caused irreversible delays and costs.  They do not connect those circumstances to each statement at the time it was made.  And they do not explain how circumstances at the time the statements were made rendered them false.

The Complaint is replete with contingencies that changed over the course of the Power Projects and instances of Fluor developing "workarounds" to manage the new circumstances and stay on track.  For example, to manage Brunswick Project delays caused by Mitsubishi, Fluor "accelerat[ed] the construction," reserved its rights to liquidated damages, and developed "learnings" that "put [it] in . . . a better position" to execute on projects "going forward." *See id.* ¶¶ 125(a), 126; Ex. 7 (Letter from B. Stephens to R. Hamilton (Apr. 22, 2014)) (App. 88–89).  To manage unanticipated labor issues with inexperienced welders, Fluor "us[ed] multiple shifts to make the best use of the limited number of welders" and "start[ed] a welding school" to improve the quality of its welders. *See* FACC ¶ 125(b) (internal quotation marks omitted).  And Fluor sought change orders as appropriate and was able to secure a substantial number, which, for the Citrus Project alone, increased Fluor's compensation and secured waivers of liquidated damages for delayed completion. *See, e.g.*, *id.* ¶¶ 194(a) (Nov. 14, 2017 change order), 194(b) (Apr. 6, 2018 change order), 195 (July 9, 2018 change order).

Plaintiffs complain that Fluor misjudged the magnitude and scope of the problems and the effectiveness of its workarounds for the Power Projects to make up for unanticipated costs and delays, but Plaintiffs allege no facts showing that the workarounds were hopeless from the

outset, or that circumstances indicated the costs and delays were unrecoverable at an earlier date. Plaintiffs instead rely on conclusory assertions that the mere existence of a problem meant the Projects could not get back on track or hindsight statements after Fluor realized that some of the workarounds were ineffective (or both).[6]

That the workarounds turned out not to solve the problem does not mean that Defendants knew from the outset—and fraudulently concealed—that they would not work. "Circumstances change." *Lemmer*, 2001 WL 1112577, at \*10. "That circumstances may have dictated a [loss] at one date has little if any probative value in determining whether circumstances at an earlier date would also have dictated a [loss]." *Id.*; *see also Masel*, 924 F.3d at 749; *Rosenzweig*, 332 F.3d at 860, 870. Having failed in its second attempt to allege any facts showing that the Progress Statements were false when made, and coming nowhere close to doing so with particularity, Plaintiffs' challenge to the Progress Statements should be dismissed with prejudice.

### 3. Plaintiffs Fail to Adequately Allege that the Control and Revenue Statements Were False or Misleading When They Were Made.

Plaintiffs add a challenge to the Control and Revenue Statements, which were not in the Initial Complaint, but these statements fail for the same reasons the other statements are not actionable. *See* FACC ¶¶ 172, 174. Plaintiffs resort to the same baseless theory that because

---

[6] *See* FACC ¶¶ 115 (citing *id.* ¶¶ 113 (containing the unremediated hindsight allegations that the Court rejected in its Order) and 273 (discussing hindsight statements from an earnings call on August 3, 2017)), 125(a) (discussing statements from the Mitsubishi complaint filed in 2017 but nothing about when Mitsubishi resisted its obligation to pay liquidated damages), 125(b) (citing *id.* ¶ 113 and referencing "workarounds" but nothing about when circumstances indicated they would prove ineffective), 129(a)–(c) (citing *id.* ¶ 273), 129(d) (citing *id.* ¶ 163 (discussing hindsight statements from an earnings call on October 10, 2018)), 129(e) (discussing hindsight statements from an earnings call on May 3, 2018, *id.* ¶ 275), 140 (citing *id.* ¶ 275, referencing subsequent charges and discussing change orders but nothing about when circumstances indicated Fluor would take a charge on the Project despite the increased payments, waiver of liquidated damages, and extended deadlines).

Fluor had problems with its bidding and execution on a series of lump-sum projects and ultimately took charges on those projects, that must mean Fluor's Control and Revenue Statements were false when made.

The Control and Revenue Statements concerned: (1) management's *belief* when made that the company had "reasonable" internal controls and "effective" disclosure controls, *id.* ¶¶ 141–43; *see, e.g.*, Ex. 1 at 48, Exhibits 31.1 & 31.2 (2014 10-K) (App. 25, 28–31); (2) improvements made to the company's bidding and execution processes to *mitigate* the risk of similar charges in the future, *see* FACC ¶¶ 149, 153, 156, 159, 162–63, 166–67, 170; (3) a description of Fluor's accounting policy for recognizing revenue, which involves *estimating* costs based on *judgments* about various *contingencies* throughout a project's life cycle, *id.* ¶¶ 144, 173; and (4) the company's financial reports accompanied by certifications that its financial statements complied with GAAP and "fairly" presented the company's financial condition, *id.* ¶¶ 143, 145–48, 150–52, 154–55, 157, 161, 164–65, 168, which, for the annual reports, were accompanied by an unqualified opinion from Fluor's outside auditor, *see, e.g.*, Ex. 1 at 49, F-2 (2014 10-K) (App. 26–27); Ex. 2 at 54, F-2 (2016 10-K) (App. 60–61); Ex. 3 at 45, F-2 (2018 10-K) (App. 66–67, 68–69).

Plaintiffs conclude, without supporting facts, that because Fluor experienced problems that ultimately resulted in charges on the Projects, the Control and Revenue Statements must have been false.  But Plaintiffs are required to plead specific facts demonstrating that these statements were false at the time they were made, not merely that they must have been false because Fluor's estimates and beliefs later turned out to be inaccurate.  *See Tchuruk*, 291 F.3d at 360–61.  Plaintiffs do not, for example, say anything about the design of Fluor's internal controls and make no attempt to explain *how or why* they were not "designed" to "provide reasonable

27

assurance," *see* FACC ¶ 143(d), let alone explain why management's assessment of the controls should have led it to reach that conclusion.  In short, nothing Plaintiffs allege contradicts the challenged statements or makes them materially misleading.

This failing is compounded by the fact that Plaintiffs rely almost exclusively on what Plaintiffs' label a "failure" of Fluor's Project Status Reviews ("PSRs")—referred to repeatedly as the "project governance processes and controls."  *See* FACC ¶¶ 172(a)–(e).  But the Complaint does not make a single factual allegation explaining how, when, or why the PSRs allegedly failed.  *See* FACC ¶¶ 49, 172.  The Complaint acknowledges that the PSR process—only "[o]ne of the critical internal processes" at Fluor—existed to gather current information about the status of projects and that Fluor regularly conducted the PSR process.  *Id.* ¶¶ 49, 170.  The only support Plaintiffs provide for why the PSR allegedly *failed* is—again—that Defendants' judgments in applying the collected data did not pan out, the resulting charges were costly, and Defendants sought to mitigate the risk of future charges, *see id.* ¶ 172—the exact same type of hindsight allegations used to support their failed attacks on the Bidding and Progress Statements, *see, e.g.*, *id.* ¶¶ 114–40.[7]  Plaintiffs come nowhere close to pleading with the particularity required by the PSLRA that the PSR failed or that any Defendant did not believe the company's controls "provide[d] reasonable assurance regarding the reliability of financial reporting."  *Id.* ¶ 143(d).

---

[7]  *See also id.* ¶¶ 172(a) (citing the 2019 formation of a Risk Committee and changes to the company's approach to project risk assessment), 172(b) (citing "ongoing disputes, pending change orders, schedule extensions, closeout items, unpaid receivables, and . . . outstanding claims" in Q2 2019, additional reviews prompted by those problems, and the results of those additional reviews), 172(d) (citing "subcontractor failures and major disputes with customers" in Q2 2019, other unidentified "project execution issues on comparable projects," "low fixed-price bids," unidentified "open and unapproved change orders" and "ongoing customer disputes and schedule extensions, and resulting costs"), 172(e) (citing charges Fluor took on unidentified change orders in Q2 2019 and an SEC investigation into unidentified "accounting and financial reporting" issues), 172(f) (citing "underbidding of large, fixed-price projects," "cost overruns" during the "execution phase," and "charges").

Misjudgments about how project contingencies, such as labor productivity, customer or vendor disputes, and workarounds, will ultimately impact overall project costs does not mean a control failed or that other financial metrics were misleading when stated.  Indeed, Fluor repeatedly explained in its public filings that its cost estimates were based on judgments about a variety of different contingencies and may turn out to be wrong (and the "risks tend to be exacerbated for longer-term contracts"), resulting in cost overruns.  *See, e.g.*, Ex. 1 at 12–13, 17, 24 (2014 10-K) (App. 11–12, 16, 23); Ex. 2 at 1, 7–8, 15–16, 21, 29 (2017 10-K) (App. 35, 41–42, 44–45, 50, 58).  Later realizations about earlier judgments and predictions do not plead an earlier control failure or misstatement.[8]  *Cf. Martin v. Quartermain*, 732 F. App'x 37, 40–41 (2d Cir. 2018) (holding that disagreement over the viability of an estimate does not plead falsity where estimate is believed and not plausibly alleged to be based on false data); *Lemmer*, 2001 WL 1112577, at \*10 (explaining that later inventory write-offs do not show that defendants should have recorded the losses at an earlier date because "[c]ircumstances change").[9]  In any event, as the Complaint acknowledges, controls need to provide only reasonable—not absolute—assurance regarding the reliability of financial results.

---

[8]  The so-called "Red flags" that, according to Plaintiffs, "confirm[ ] that Fluor's project governance processes were either non-existent or grossly ineffective" are simply project contingencies subject to Defendants' judgment.  *See* FACC ¶ 172(d) (citing potential costs from liability claims, execution issues, customer disputes, and change orders).  As explained *supra*, that those judgments did not pan out does not show that the PSR failed.  And Plaintiffs' allegation that Fluor's financial reports were false because the company omitted disclosure "of the underlying bidding, controls, and execution problems" is merely a repackaging of the so-called "red flags" and fails for similar reasons.  *See id.* ¶ 172(f); *Tchuruk*, 291 F.3d at 360–61 (holding that failure to disclose problems did not render growth predictions false where no allegations that the prediction did not account for the problems).

[9]  *See also In re Hertz*, 2017 WL 1536223, at \*11 ("An estimation of an amount" is an "inherently subjective task[] that var[ies] depending on circumstances."); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) ("Accounting or business judgments, even negligent ones, are not actionable.").

Nor does the conduct of additional diligence and revised estimates in Q2 2019 "establish[]" that necessary analyses were not previously conducted. *See* FACC ¶ 172(b). The Complaint admits that Fluor used the PSR "throughout the Class Period" and "[did] a scrub every quarter where we are on each project." *Id.* ¶¶ 49, 170. Plaintiffs allege that Defendants repeatedly identified problems on the Projects, implemented workarounds intended to recover associated costs and overcome schedule delays, made revisions to cost estimates after realizing the workarounds proved ineffective and prior judgments were no longer valid, and consistently adjusted procedures and processes as their understanding of the issues evolved. *See supra* Section II.C.2 (discussing workarounds) & *infra* Section III.F (discussing adjustments to procedures); *see, e.g.*, FACC ¶¶ 148–49 (Q3 2016 reporting "forecast revisions for estimated cost increases"), 152–53 (same for Q2 2017), 157, 159 (same for Q1 2018), 168 (same for Q1 2019). Consistent with GAAP, Fluor's financial statements disclosed this ongoing review and reevaluation process, and the necessary judgments inherent in making cost estimates. *See* FACC ¶¶ 38, 41(e).

Plaintiffs also allege that Fluor's description in public filings of its percentage-of-completion method of revenue recognition "created a duty to disclose the existence of significant open claims, unapproved change orders, and unresolved disputes," and that failure to disclose such information rendered that description "misleading." *See id.* ¶¶ 173–74. Fluor's statement regarding its accounting creates no such duty. Rather, it explains that the accounting standards require the preparation of "estimates of cost to complete for contracts in progress," and that those estimates involve judgments to "evaluate contingencies," such as "change orders, liability claims, [and] contract disputes," and that updates must be provided when the estimates change. *Id.* ¶ 173. Rather than plead *facts* that rendered the statements false *when made*, or a requirement

that the underlying calculations be disclosed, the Complaint simply points to a series of updates "provided when estimates change[d]" in Q2 2019 and concludes the prior statements were "materially misleading." *See id.* ¶¶ 173–74.

Plaintiffs must do more than point to a bad outcome, conclude that controls failed, and cry "fraud." Instead, they must plead with particularity facts which demonstrate that Defendants' earlier statements were false when made. *See In re Capstead*, 258 F. Supp. 2d at 552. Moreover, opinions, such as the estimates at issue here, are "not [ ] misleading [simply because] an issuer knows, but fails to disclose, some fact cutting the other way," because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts." *Martin*, 732 F. App'x at 41 (quoting *Omnicare*, 575 U.S. at 189–90 (alterations in original)). Nor does revising the estimates in later periods "support an inference that a previously filed financial statement was fraudulent." *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 409 (S.D.N.Y. 2010) (dismissing similar allegations as fraud by hindsight).

## III.    Plaintiffs Do Not Plead a Cogent and Compelling Inference of Scienter.

Though the Court did not reach Plaintiffs' scienter allegations in dismissing the Initial Complaint, it squarely rejected the fraud-by-hindsight theory Plaintiffs used when attempting to plead falsity and advised Plaintiffs to take care in repleading their scienter allegations because "[f]alsity and scienter are first cousins in a case such as this." *Order* at 8. Plaintiffs still offer no particularized allegations that each of the Individual Defendants knew that the challenged statements were false when made, or otherwise acted with intent to mislead investors or with severe recklessness that investors would be misled. Despite its volume, the Complaint cannot mask its core—and deficient—scienter theory: Fluor's cost estimates for the Projects turned out to be too low, so Defendants must have committed fraud. This is classic fraud-by-hindsight

pleading, and it is categorically insufficient to plead scienter. *See Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 273 F. Supp. 3d 650, 673–74 (N.D. Tex. 2017).

Plaintiffs attempt to plead scienter through conclusory assertions of supposed facts that were "apparent," or that the Individual Defendants were "aware of, or recklessly disregarded" or "knew or were reckless in not knowing," *see, e.g.*, FACC ¶¶ 177–80, 199(a)–(e), but for each, it (1) pleads no actual facts of which the Individual Defendants were aware or reckless in not knowing and/or (2) fails to identify how the supposed facts have any bearing on scienter for each Defendant. Conclusory assertions are not sufficiently particularized to meet the PSLRA's pleading standards and may be disregarded. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 289 (5th Cir. 2006). The additional "scienter" allegations, consisting primarily of insufficient motive and opportunity allegations, do not contribute to an inference of scienter. *See Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003) ("[A]llegations of motive and opportunity, without more, will *not* fulfill the pleading requirements of the PSLRA.").

Plaintiffs' allegations fail to plead scienter, and are far less compelling than the strong competing inference drawn from the Complaint – that Defendants made good faith judgments on complex projects in a market they disclosed as competitive, and that they regularly disclosed problems throughout the period at issue. *See infra* Section III.F.

A. **Plaintiffs Fail to Offer Factual Allegations regarding Any Individual Defendant's State of Mind.**

The core of Plaintiffs' scienter allegations are "not specific as to [any D]efendant in question and they rely on an impermissible form of group pleading." *Fener v. Belo Corp.*, 425 F. Supp. 2d 788, 801 (N.D. Tex. 2006). "[T]he PSLRA requires the plaintiffs to distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015) (citation omitted). Therefore, "[i]t is

appropriate to disregard the group-pleaded allegations and determine whether the remaining, properly pleaded allegations raise a strong inference of scienter." *Id.* at 538. Here, "virtually all—if not all—of plaintiffs' allegations concerning defendants' scienter based on [conservative bidding, project execution, the Mitsubishi and Duke lawsuits, and the so-called "red flags"] are addressed to 'defendants' collectively," or to Fluor generally. *Fener*, 425 F. Supp. 2d at 801. This deficiency highlights the lack of any *factual* allegation supporting scienter. The insufficiency of pointing to "Defendants" generally to attempt to plead individuals' state of mind is compounded by the fact that none of the Defendants held a relevant position at Fluor for the entire seven-year class period. *See* FACC ¶¶ 26–33. For example, references to what "Defendants" must have known, *see, e.g.*, *id.* ¶ 199(b), attempt to assign scienter for Fluor actions through 2019 to Messrs. McSorley, Smalley, and Porter, who had left either the company or their relevant positions between two and four years prior, *see id.* ¶¶ 29–30 (Messrs. McSorley and Smalley left their relevant positions in mid-2015), ¶ 27 (Mr. Porter departed Fluor in August 2017).[10] The Complaint's failure to specify which Defendant purportedly "knew" certain facts is "plainly inadequate to plead a strong inference that any particular defendant acted with scienter." *Fener*, 425 F. Supp. 2d at 802. This deficiency alone warrants dismissal of this Complaint. No named Defendant should be forced to continue defending this fraud case when Plaintiffs have refused to plead scienter specifically as to each Defendant.

---

[10]   Plaintiffs also make the baseless allegation that "by the time Fluor started work on the Brunswick [Project in 2013], it was apparent to Defendants"—defined to include Messrs. Hernandez and Steuert—"that their bid for the project was overly aggressive." FACC ¶¶ 179, 56. Messrs. Hernandez and Steuert are not alleged to have started in their relevant positions until 2019. *Id.* ¶¶ 31–32, 280, 283.

### B.    The Confidential Witnesses Add Nothing.

The Complaint now identifies nine confidential witnesses, but none of them support any factual allegation that an Individual Defendant purposefully submitted low-balled bids, hid known execution problems, or "cooked the books" in sharing judgments regarding costs and revenue with investors.  Also glaringly absent from these statements is what specific problems became known to each Individual Defendant and when and exactly how that information put any Individual Defendant on notice that a statement was false when made.  Moreover, no confidential witness purports to offer any information regarding the Control and Revenue Statements.  Some of the statements offer opinions about Fluor's project-level practices, but "[c]ase law standardly finds such opinions add nothing to scienter analysis" where, as here, there are no allegations that any of the Individual Defendants were informed of these concerns.  *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 862 (S.D. Tex. 2016); *see also In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 858 (N.D. Tex. 2005) (finding confidential witnesses did not support scienter "because the allegations show no link between the confidential witnesses and any knowledge by any Defendant as to any allegedly improper activity").

Allegations regarding CWs 1–5 are repeated from the Initial Complaint and offer only that management reviewed and sometimes reduced bids, including during a best-and-final bid process; that insufficient time was devoted to bidding; that Fluor wanted to work with key industry players; and that it later turned out some estimates were too low and the bids did not account for labor and equipment issues that arose later.  *See* FACC ¶¶ 76–80.

Allegations regarding CW-6 fail to identify his or her familiarity with any specific bidding and execution practices or problems on any challenged project.  Instead, the description of CW-6's statements focuses on generalities about Fluor's "Government business" and reiterates only the unremarkable observation that Fluor sought to win bids, sometimes by

lowering its asking prices during a "best and final" bid process, and that sometimes Fluor needed to seek adjustments through change orders. *See id.* ¶ 81.

CW-7 also is not alleged to have any direct involvement or knowledge of the bidding of any relevant project. And, he or she offers only hearsay that senior management was diligent and officers as high as the CEO reviewed major bids, and that Fluor used its extensive experience to aid in finalizing bids. *See id.* at ¶ 82.

CW-8 merely offers that the EPC industry was competitive, and that challenges came to light during the course of Fluor's work on the Anderson and Citrus Projects and that members of senior management were diligent in supervising those issues. *See id.* at ¶ 83. This witness also expressed his or her "belie[f]" that unnamed "executives would have reviewed the budget performance of Fluor's projects" and "had access to" budgeting data. *Id.*

Finally, CW-9 offers general commentary despite the Complaint's admission that this witness never worked on or has any basis of knowledge regarding any of the Projects. *See id.* ¶ 84 (identifying CW-9's first-hand knowledge as limited to a Naval Air Station ("NAS") project in Florida). The Complaint then asserts that this person "learned"—without any detail regarding how, when, or from what or whom—that the Radford Plant was bid and executed similarly to this NAS project. *See id.* In any event, Plaintiffs point to CW-9's assertion that project-level management allegedly issued change orders for work that was, in CW-9's opinion, already "part of the contract," but that does not support an inference of scienter against any Defendant. *See Key Energy Servs.*, 166 F. Supp. 3d at 862; *Alamosa Holdings*, 382 F. Supp. 2d at 858.

In addition to not adding anything substantial to the Complaint's allegations, the allegations related to CWs 6, 7, and 9 are insufficiently pleaded to even be considered. Following *Tellabs*, courts must discount allegations from confidential sources, because "[s]uch

sources afford no basis for drawing the plausible competing inferences required by *Tellabs*."

*Shaw*, 537 F.3d at 535.  "At the very least, such sources must be described with sufficient

particularity to support the probability that a person in the position occupied by the source would

possess the information pleaded."  *Id.* (internal quotation marks and ellipses omitted).  Here, the

allegations from CWs 6, 7, and 9 do not suggest with any particularity that they have personal

knowledge about the specific practices and challenges on the Projects.

### C.   The Complaint Offers Only Fraud-By-Hindsight and Conclusory Assertions regarding the Bidding and Progress Statements.

Plaintiffs' scienter allegations for the Bidding and Progress Statements are premised on

fraud-by-hindsight, which the PSLRA "was intended to eliminate," *City of Cambridge Ret. Sys.*

*v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 883 (3d Cir. 2018), and which has been

consistently rejected by the Fifth Circuit.  *See, e.g.*, *Southland*, 365 F.3d at 383.[11]  This Court has

already held that, in the Initial Complaint, Plaintiffs "d[id] not show that the defendants knew"

either that "the four [Power Project] bids contained faulty estimations when they submitted

them" or that the progress reports were false.  *See* Order at 6.  Plaintiffs have not salvaged their

deficient allegations regarding the Bidding and Progress Statements in the Complaint.  Those

claims should be dismissed with prejudice.

---

[11]   *See also Rosenzweig*, 332 F.3d at 868 (rejecting claim that defendants must have known of problems with the business at the time of the challenged statements because a report published months later identified problems the company faced); *see also N. Port Firefighters' Pension—Local Option Plan v. Temple-Inland, Inc.*, No. 3:11-CV-3119-B, 2013 WL 4405537, at *5 (N.D. Tex. July 30, 2013) (dismissing for failure to plead scienter because a later-in-time "'admission' does not necessarily show that the Individual Defendants knew the purported misstatements were false or misleading, or were severely reckless, when the statements were made").

1.     **Plaintiffs' Reliance on Later "Admissions" Is Improper and Does Not Help Them.**

Plaintiffs' primary scienter argument for the Bidding and Progress Statements is that certain Individual Defendants "admitted" that the bids were flawed and the Projects encountered numerous issues during execution, some of which were similar.  *See* FACC ¶¶ 178–180; *see also id.* ¶¶ 113(b)–(c), 115(b), 125(a)–(b), 129(a)–(c), 140(a) (pointing to the so-called "admissions" as evidence of falsity).  Significantly, the Bidding and Progress Statements were made prior to June 2017, and the so-called admissions followed on August 3, 2017 (*id.* ¶¶ 131, 273, 181, 199(c), 273), September 13, 2017 (filing of complaint against Mitsubishi, *see id.* ¶ 185), May 3, 2018 (*id.* ¶¶ 199(c), 275–276), October 10, 2018 (*id.* ¶¶ 163, 278), May 2, 2019 (*id.* ¶ 171), August 1, 2019 (*id.* ¶¶ 284, 199(b)), and September 24, 2019 (*id.* ¶ 245).[12]

The only attempt Plaintiffs make to tie those later so-called admissions to the earlier statements is to assert that certain Individual Defendants were responsible for approving bids and monitoring projects.  *See, e.g.*, *id.* ¶¶ 175–176, 182–184.  But the Complaint offers no allegation that any Defendant knew *at the time the bids were made* that they were flawed.  Nor does the Complaint allege if or when any Defendants learned—by monitoring the Projects—that later challenges were insurmountable, or even what specific information was supposedly learned by each Defendant.

The Complaint's reference to challenges in the lump-sum, gas-fired power market before the Power Projects were bid are similarly unavailing.  The Complaint identifies Mr. Seaton's

---

[12]   The only statements related to bidding that occurred after that date reflect management's belief that (1) they had identified all of the relevant problems and made adjustments in the form of charges to better reflect the financial status of each, and (2) they had "an experienced management team" and their "competitors may be more inclined to take greater or unusual risks."  As explained, *supra* Sections II.B, II.C.1 and *infra* Section III.D, the Complaint offers no factual allegations that those statements were false or made with scienter.

statement on May 3, 2018 (that ten of twelve of Fluor's lump-sum, gas-fired projects had "underperformed, . . . with 3 suffering losses") as evidence that "Defendants" knew or were reckless in not knowing that prior Bidding Statements were false or misleading.  *See id.* ¶ 178; *see also id.* ¶ 87–112, 275.  This is exactly the kind of improper fraud-by-hindsight allegations this Court already rejected.  *See* Order at 6.

### 2. Plaintiffs' Conclusory Assertions of Fraud Are Insufficient.

Beyond this, the Complaint offers only unsupported conclusory assertions of what Plaintiffs believe Defendants must have known.  For example, the Complaint asserts that "[b]y the time that Fluor started work on the Brunswick County Plant, it was apparent to Defendants that their bid for the project *was* overly aggressive" because initial engineering and procurement work "***would have revealed*** that its 'baseline assumptions' underlying its bid were not achievable."  *See id.* ¶ 179 (emphasis added).  However, the Complaint offers no factual support for the assertion that baseline assumptions would have been proven unachievable based on initial "engineering and procurement" work on that project.  Plaintiffs similarly conclude that "it was apparent to Defendants that the same problems that caused the company to take charges on the Brunswick County Plant would affect the other Gas-Fired Plants," but they plead no facts that would explain what made this apparent.  *See id.* ¶ 180.[13]  It is well established that "[m]ere conclusory statements are insufficient to defeat dismissal under the PSLRA's heightened-pleading requirements."  *Fin. Acquisition Partners*, 440 F.3d at 289; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009).

---

[13]  In fact, the same paragraph of the Complaint makes clear that hindsight is Plaintiffs' primary basis for the assertion.  As support for this statement it points to a *2017* statement by Mr. Seaton and a confidential witness's assertion of an undated problem encountered during *execution* on the Citrus Project that could not have been known "by the time Fluor started work" on it.  *See* FACC ¶ 180.

These conclusory assertions are also contradicted by the Complaint itself.  For example, Plaintiffs' assertion that "it was apparent to Defendants that the same problems that caused the company to take charges on the Brunswick County Plant would affect the other Gas-Fired Plants," FACC ¶ 180, is undermined by their acknowledgement that these projects were not "cookie-cutter projects" and that each has "different machines, different site locations, different labor pools, all of which produce different outcomes," *id.* ¶ 275.  Plaintiffs try to elide the differences in each project by generalizing that "Fluor used the same or substantially similar Mitsubishi turbines on the other Gas-Fired Plants" and, therefore, must have known that problems with the turbines on the Brunswick Project meant Fluor would suffer charges on the other Power Projects.  *Id.* ¶ 180.  But the factual allegations show that each project had its own turbine model and configuration, consistent with Fluor's stated belief that each project has "different machines."  *See id.* ¶¶ 55, 63, 66, 70.  In any event, Fluor developed "learnings" about the turbines used on the Brunswick Project that it implemented on other projects, *see id.* ¶ 126, and no factual allegations suggest that any Individual Defendant believed those machines presented an insurmountable problem.

The Complaint also attempts to convert an offhand, hindsight generalization that issues usually arise by the time a project is 30–40% complete into evidence of knowledge, or severe reckless disregard, of allegedly systemic problems.  *Id.* ¶ 181.  This is yet another unwarranted deduction unsupported by any facts.  Plaintiffs try to rely on statements from a confidential witness that the Anderson and Citrus Projects "were seriously into the red about midway through construction," *see id.*; *see also id.* ¶ 83, but the Complaint does not allege *when* that milestone was reached.  More importantly, neither this person—nor anyone else referenced in the Complaint—provides any fact to support that any Individual Defendant was aware of these

39

allegations, when he learned them, or that he was aware of information demonstrating that losses on these projects were inevitable.

Further, no facts are alleged that support an inference that the later-arising problems with the Anderson and Citrus Projects were identical to earlier issues on the Brunswick Project, when the facts pleaded establish that each project was unique, let alone that each Defendant had specific knowledge of any such similarities. *See Southland*, 365 F.3d at 361. Indeed, the Complaint makes clear that the later issues at the Citrus Project were uniquely challenging. *See* FACC ¶¶ 133, 134, 138, 140(a)–(b), 201, 207, 278, 280 (attributing unique problems and hundreds of millions of dollars in charges and customer disputes to the Citrus Project). In any event, it is undisputed that Fluor disclosed extensive problems on the Power Projects in the second quarter of 2017 when the last two Power Projects were at the 40% mark. *See* Ex. 8 at 3, 6 (Q2 2017 Earnings Call Tr.) (App. 93–94).

### 3. Plaintiffs' Allegations about the Mitsubishi and Duke Litigations Add Nothing.

Plaintiffs' reliance on Fluor's positions in litigation with Mitsubishi and Duke filed in 2017 and 2019, respectively, does nothing to change the analysis.

First, the allegations in the 2017 litigation against Mitsubishi, *see* FACC ¶¶ 185–191, establish only that the issues identified in 2014 were "minor," *see id.* ¶¶ 187–188, that those issues "continued and worsened" after that time, *see id.* at ¶ 189, and that, when Fluor finally determined the issues were severe enough to seek relief through litigation, it believed it had a sizeable claim, *see id.* at ¶ 190. The Complaint also admits that Fluor made efforts to mitigate scheduling or budgeting problems resulting from the late delivery of minor parts, *see id.* ¶ 189, and the liquidated damages provision supports Defendants' good-faith belief that they had adequate safeguards in place to protect against overruns from these types of setbacks. The

Complaint makes no effort to explain how these allegations support a strong inference of fraudulent intent—because they do not.

Second, Plaintiffs' attempt to use the 2019 Duke litigation as some form of a confession also fails. The allegations merely recite a series of adjustments made as circumstances changed on the Citrus Project and reflect the relevant parties' positions about responsibility for additional costs and delays. *See id.* ¶¶ 194–95 (citing multiple change orders modifying project deadlines, and Duke's "agree[ment] to waive all otherwise claimable liquidated damages" if the "Power Blocks went into service prior to December 31, 2018.");[14] *see also id.* ¶¶ 194(g)–95 (describing Fluor's "workarounds" to attempt to meet the *modified* deadlines and their ultimate inability to do so). As with the Mitsubishi litigation, Plaintiffs make no attempt to explain how the Duke litigation supports a cogent and compelling inference of scienter for any particular statements.

### D. Plaintiffs' Conclusory Assertions and Hindsight Allegations regarding the Control and Revenue Statements Are Insufficient.

None of Plaintiffs' allegations support a theory of scienter with respect to the Control and Revenue Statements. Plaintiffs instead rely on the same flawed theory that permeates the Complaint: "Something went wrong, so there must have been fraud." As with the Bidding and Progress Statements, Plaintiffs' unsupported conclusory assertions and hindsight allegations come nowhere close to supporting a strong inference of fraud.

"To plead scienter adequately, plaintiffs must state with particularity facts giving rise to a strong inference that the party knew that it was publishing materially false information, or the party was severely reckless in publishing such information." *Shaw*, 537 F.3d at 534 (alterations and citation omitted). Where, as here, the allegations concern alleged internal control and

---

[14] According to Plaintiffs' own allegations, approved change orders "change . . . the fixed contract price and total estimated costs to reflect the amounts approved by the customer and the contractor." FACC ¶ 43(a).

accounting problems, there must be "specific allegations" showing (1) that "the Individual Defendants themselves actually knew about a specific accounting violation or internal control problem," and (2) that they knew of those problems "prior to the date the allegedly fraudulent statements were made." *Magruder*, 2009 WL 854656, at *9. Alleging only that Defendants "should have known" of internal control problems is insufficient. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002); *see also Schiller v. Physicians Res. Grp., Inc.*, No. CIV.A. 3:97-CV-3158L, 2002 WL 318441, at *15 (N.D. Tex. Feb. 26, 2002) (holding that later discoveries which prompted disclosure of internal accounting control problems did not support the inference of earlier knowledge or reckless disregard of information), *aff'd*, 342 F.3d 563 (5th Cir. 2003). Plaintiffs allege no facts that would satisfy either requirement.

Plaintiffs seek to bootstrap the deficient allegations of scienter with respect to the Bidding and Progress Statements to show Defendants' "knowledge" of control and accounting issues. *See* FACC ¶¶ 199(a)–(c), (e). According to Plaintiffs, because Defendants supposedly were aware of issues with the bidding and execution on certain projects, Defendants must also have been aware that Fluor's controls and revenue recognition procedures were deficient. *See id.*; *see also id.* ¶ 199(d). But Plaintiffs allege nothing to connect Defendants' alleged knowledge of the bidding and execution issues to knowledge about the allegedly failed controls and improper accounting, let alone show when Defendants first learned about those issues.

The Complaint recognizes that Fluor used the percentage of completion method of accounting, which allows a company to recognize revenue as it performs work on a long-term contract where estimates and judgments regarding project costs can be reasonably made. *Id.* ¶¶ 38–41; *Shaw*, 537 F.3d at 536. Under the percentage of completion method, Fluor was required to "prepare estimates" of remaining costs on contracts in progress, including conducting

evaluations of contingencies, FACC ¶ 38, and prepare its estimates "with a reasonable degree of accuracy," *see id.* ¶ 41.  As the Complaint also acknowledges, Fluor conducted regular control procedures, including PSRs, to inform its judgments and estimations.  *See id.* ¶¶ 38, 49.  For Plaintiffs to allege fraud with respect to statements regarding the reasonable accuracy of estimates based on contingencies, they would need to plead facts showing that Defendants knew or were severely reckless in not knowing that their estimates and evaluations of contingencies were entirely unreasonable.  *See Shaw*, 537 F.3d at 534.

Yet Plaintiffs do not allege *any* factual content that put any Defendant on notice that those estimates and judgments were unreasonable.  Instead, Plaintiffs' theory appears to be that because cost estimates changed on a number of projects during the putative class period—which is hardly surprising given the size and complexity of Fluor's projects—Defendants should have determined at some undefined time that all of its controls and procedures were hopelessly flawed and abandoned percentage of completion accounting.  The Complaint pleads no facts to support this absurd theory.

Nor does the Complaint identify a factual allegation that the Individual Defendants actually knew or were reckless in not knowing, in real time, that Fluor's Control and Revenue statements were false or misleading when made.  *See generally id.* ¶ 199.  Plaintiffs' formulaic assertion of what "Defendants were aware of, or recklessly disregarded" identifies no facts explaining when and how Defendants learned that certain judgments supposedly were unreasonable or that resulting statements were misleading.  *See id.*  For example, there are no allegations that the Individual Defendants learned that the bidding and execution issues were not being properly recorded by Fluor's controls or considered when making the required accounting

judgments, or that any such notification happened prior to the allegedly misleading statements. *See Key Energy Servs.*, 166 F. Supp. 3d at 862.

Regardless of the terminology used, Plaintiffs' pointing to later charges as evidence that Defendants knew, or were reckless in not knowing, that earlier statements regarding the sufficiency of controls and appropriateness of financial accounting were misleading is patently insufficient. *See id.* at 833 ("[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." (citation omitted)); *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 741 (N.D. Tex. 2018) ("The Fifth Circuit defines 'fraud by hindsight' as a 'case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly.'" (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 248–49 (5th Cir. 2009)), *affirmed sub nom. Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424 (5th Cir. 2019).

To the extent the Complaint attempts to point to *earlier* charges as "red flags," its failure to acknowledge the changes undertaken by Fluor and Individual Defendants to address these negative developments is fatal. *See infra* Section III.F.  Plaintiffs offer no allegation to support the assertion that each of the Individual Defendants knew or were reckless in not knowing that the revised control and accounting procedures would produce unreliable estimates.  Tellingly, each paragraph discussing the so-called "red flags" baldly asserts "Defendants were aware of, or recklessly disregarded," problems on certain projects without factual support.

### E.    Plaintiffs' Additional "Scienter" Allegations Add Nothing.

After reciting insufficient assertions of scienter, the Complaint throws in the kitchen sink with a series of deficient allegations, primarily of supposed motive and opportunity to commit fraud.  Although allegations of motive and opportunity "may meaningfully enhance the strength of the inference of scienter," without more, they "will *not* fulfill the pleading requirements of the

44

PSLRA." *Goldstein*, 340 F.3d at 246 (quoting *Nathenson*, 267 F.3d at 412).  Plaintiffs' laundry list of allegations—whether taken individually or together—does not create a cogent or compelling inference that any Individual Defendant knew or was reckless in not knowing that the statements at issue in the Complaint were false or misleading at the time they were made.[15]

    *Seeking repeat business*—Plaintiffs allege that there was something suspicious about Fluor's apparent motivation to bid on projects with smaller profit margins in anticipation of larger opportunities with the same clients.  *See id.* ¶¶ 248–54.  Plaintiffs' attack on a business practice is not a factual allegation of fraudulent intent.  There are no facts pled suggesting that by bidding on smaller projects, the Defendants knew any project would end up as a loss, much less that such bidding practices constituted fraud.

    *Stock Sales*—Stock sales are a "form of motive and opportunity allegations," *Southland*, 365 F.3d at 368, which are insufficient to withstand dismissal unless made "in suspicious amounts or at suspicious times," *Abrams*, 292 F.3d at 435.  Where the sales are routine, no inference of an improper motive is appropriate.  *See, e.g.*, *Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 182 (5th Cir. 2019) ("Selling shares to pay taxes weighs against a nefarious motive."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997) (Alito, J.) ("[Courts] will not infer fraudulent intent from the mere fact that some officers sold stock.").

    Plaintiffs' efforts to establish scienter based on these allegations fail.  *See* FACC ¶¶ 215–28.  The Complaint lists the stock sales made and properly documented in SEC filings by each

---

[15] Plaintiffs also point to an ongoing SEC investigation, but that does not "establish scienter without facts showing that a specific person knew of any purported wrongdoing." *In re Key Energy Servs.*, 166 F. Supp. 3d at 871.  Plaintiffs offer no explanation for "how the ongoing investigation of [Fluor] shows that [Defendants] . . . had the scienter required by the PSLRA." *Id.*; *see also Budde v. Glob. Power Equip. Grp.*, No. 15-cv-1679, 2017 WL 6621540, at *4 (N.D. Tex. Dec. 27, 2017) (finding inference that there was no wrongdoing more compelling despite existence of government investigation).

Individual Defendant during the more than six-year putative class period, but provides no factual allegation to suggest that the trades were somehow unusual or suspicious.  Plaintiffs merely list the number of shares sold in the prior six-and-a-half years, but Plaintiffs nowhere allege that any Individual Defendant changed his sales activity due to the alleged fraud.  All told, the Complaint illustrates the unsurprising fact that top executives at Fluor were compensated in part through equity incentives and sometimes sold some of the shares they received by virtue of their service.

Plaintiffs do not, for example, allege that any Individual Defendant sold all of his common stock prior to any negative disclosure.  In fact, Plaintiffs allege no stock sales by Steuert, and only one Defendant ended the putative class period with fewer shares of Fluor's common stock than the Complaint alleges he held at the beginning.  *See id.* ¶¶ 216, 218, 220, 222, 224, 226, 227; Ex. 12 (Individual Defendants' final Form 4s as alleged in the Complaint— Seaton held 432,109[16] shares, Porter held 97,944 shares, Stanski held 97,546 shares, Smalley held 9,693.73[17] shares, McSorley held 37,392.285 shares, Hernandez held 177,443 shares, and Chopra held 10,854[18] shares) (App. 121–30); *see also Southland,* 365 F.3d at 369 ("The fact that other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit.").  "[T]hat the Individual Defendants, in almost every instance, *increased* their [company]

---

[16]  Plaintiffs' assertion that Seaton gifted 3,320 shares on March 28, 2019, appears to be a typo.  *See* Ex. 14 (App. 143) (dated February 28, 2019).  Plaintiffs also allege that Seaton gifted 9,676 shares on March 28, 2019, but this appears to be erroneously duplicating his March 6, 2019 sale.  *See* Ex. 12 (App. 121).

[17]  Smalley's total shares held includes both direct and indirect holdings.  *See* Ex. 12 (App. 124).

[18]  Plaintiffs allege that Chopra sold 3,889 shares on March 6, 2018, but this appears to refer to a March 9, 2018 transaction.  *See* Ex. 12 (App. 129).

holdings during the Class Period" is "wholly inconsistent with fraudulent intent." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).

Finally, Plaintiffs continue to ignore that many of the transactions the Complaint characterizes as "sales" were not, in fact, sales. Many reflect shares "withheld . . . to satisfy the resulting tax withholding obligation" when incentive awards vested and "no investment decision was made by the Reporting Person." *See, e.g.*, Ex. 13 (sample SEC Form 4 filings) (App. 132–41). Many other transactions reflect routine vesting of a performance right entitling the individual to the "cash equivalent" of each vested share. *See, e.g.*, Ex. 15 (sample SEC Form 4 filings) (App. 146–53). Unremarkable stock "sales" and tax withholdings on vesting dates over which Defendants had no control do not support a cogent and compelling inference of scienter.

***Compensation Structure***—Fluor's executive compensation structure also does not give rise to a strong inference of scienter. *See* FACC. ¶¶ 229–47. The compensation package was, not surprisingly, "tied to company performance," which places the Individual Defendants in "no different position than the vast majority of corporate executives." *Shaw*, 537 F.3d at 544. This "can hardly be the basis on which an allegation of fraud is predicated." *Id.* (citation omitted); *see also Pier 1 Imports*, 325 F. Supp. 3d at 742 ("Generalized financial incentives such as incentive-based compensation do not sufficiently support an inference of scienter."). In any event, Plaintiffs do not explain why Fluor's executive compensation structure is "unusual," or why it would be improper to tie executive compensation to new business at better margins or to update that compensation structure based on changing circumstances. The allegations undermine any assertion of nefarious motive. The changes in compensation in 2015–16 were in response to new disclosure laws, *see* FACC ¶ 239; the reversion back in 2017 was due to a desire to compensate for "superior operating results," *see id.* ¶ 241; and the 2019 changes were based on recent costs

in excess of bid estimates and designed to incentivize a new management team to achieve superior operating results, *see id.* ¶ 245.  In addition, "the Fifth Circuit [has] made it clear that . . . the desire for enhanced incentive compensation and the desire to sell stock at inflated prices, are . . . insufficient to support an inference of scienter." *In re Capstead*, 258 F. Supp. 2d at 564.

*Sale of Debt*—Plaintiffs claim that Fluor's sale of debt somehow supports an inference of scienter. *Id.* ¶¶ 255–59.  The Fifth Circuit has rejected this argument.  *Owens*, 789 F.3d at 539. A company's desire to raise capital "does not support a strong inference of scienter because virtually all corporate insiders share this goal." *Id.*  Only in the severest of circumstances will such efforts give rise to scienter, and those circumstances are not present here.  The Complaint on its face admits that the 2014 offering was to "increase Fluor's share repurchase program," FACC ¶ 256, which "rebuts a finding of scienter, since it is illogical that the company would have been repurchasing its shares had it been aware of facts that would indicate the price would fall," *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 518 (S.D. Tex. 2017) (citation and alteration omitted).  The Complaint also admits that the 2016 offering was sold in European currency to take advantage of falling borrowing costs.  *See* FACC ¶ 257.  And the 2018 offering occurred after Fluor announced problems with the Power Projects and that it was exiting that market, undermining any inference of scienter.  *See id.* ¶¶ 258, 275.

*Changes in Team Leadership*—Plaintiffs' attempt to infer scienter from team leadership changes after performance issues came to light also fail.  *See* FACC ¶¶ 203–211.  Management changes following poor performance is not surprising, and is not indicative of fraudulent intent. *Pier 1 Imports*, 325 F. Supp. 3d at 743, 747–48; *see also Southland*, 365 F.3d at 383; *Abrams*, 292 F.3d at 434.  And Plaintiffs plead no facts connecting the management changes to fraud.

*Magnitude of the Charges*—The magnitude and frequency of charges, FACC ¶¶ 200–02,

"cannot substitute for factual assertions connecting the corporate executives to specific contracts or accounting or management practices that led to the alleged overstatements."  *Shaw*, 537 F.3d at 540.  Because Plaintiffs' allegations are unaccompanied by any such factual allegations, the charges illustrate only Defendants' transparency as problems arose.

F.     **The Powerful Competing Inference—That Defendants Made Good Faith Judgments and Updated Investors Regularly—Is More Compelling than Plaintiffs' Theory that Defendants Deliberately Misled Investors.**

The Complaint itself demonstrates that Defendants were not attempting to shield investors from negative information they already knew, but, rather, were making good faith judgments, reacting to new information as they learned it, and updating investors along the way. The Complaint documents that Defendants repeatedly disclosed to investors that the market was competitive, but that Fluor had performed well on fixed-price projects and had confidence in its team to successfully bid and execute in the market.  *See, e.g.*, FACC ¶¶ 87, 90, 92–94, 97, 99, 100, 106, 111, 119, 127, 252.  It admits that Defendants' estimates about project costs and expected revenue required judgment about a variety of different contingencies that Defendants were expected to periodically review and update as projects evolved.  *Id.* ¶¶ 38, 41(e).  It also admits that as problems arose, Fluor implemented workarounds to recover the costs and ultimately updated investors when those mitigation efforts failed.  *See supra* Section II.C.2; *see, e.g.*, FACC ¶ 202 (citing eight publicly announced charges in nine consecutive quarters).

As each substantial development occurred, Fluor reacted and, where appropriate, took action to improve its bidding and execution processes moving forward:  When Fluor recognized the first charge on the Brunswick Project it "took a very measured look" at other projects and determined that the issues were specific to that project.  FACC ¶ 126.  When Fluor realized CPChem would be a loss in 2016, it "significantly increased the independent review of critical projects," "improv[ed its] estimating system," "ma[de] significant investments in applying data

49

analytics to projects [to] identify challenges earlier," and added "more cold eyes review" on projects. *Id.* ¶ 153 (quoting Mr. Seaton on the Q2 2017 earnings call). When issues arose across multiple Power Projects in 2017, Fluor established an "Office of Project Execution Governance" to oversee the PSR's application across all projects. *Id.* ¶ 50. And when they realized the challenges went beyond the Power Projects and the CPChem project, they undertook a "complete review of the business" that was "relentless in looking into every aspect" of the business, *id.* ¶ 283, and "implemented a more rigorous framework to [its] pursuit process," "enacted changes in [its] bid/no bid process," and re-reviewed a series of variables that go into cost and revenue judgments, *see id.* ¶ 284. That review resulted in the charges in Q2 2019. *See id.*

Fluor's repeated disclosures in a "constant game of 'Catch-up'" undercuts any inference of fraudulent intent. *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 297–98 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015); *see also Neiman v. Bulmahn*, 854 F.3d 741, 750 (5th Cir. 2017) ("[T]he fact that [the company] continuously disclosed its worsening cash position belies a claim of scienter."); *Pier 1 Imports*, 325 F. Supp. 3d at 748.

Plaintiffs have failed to meet their burden of pleading particularized facts raising a strong inference that the opposite is true: that Defendants set out to defraud investors by low-balling bids and concealing cost overruns. Plaintiffs' failure to plead scienter compels dismissal.

## IV.     Because There Is No Primary Violation, the Control Person Claims Fail.

"Control person liability is secondary only and cannot exist in the absence of a primary violation." *Southland*, 365 F.3d at 383. Because there is no primary violation here, control person claims fail as a consequence.

## CONCLUSION

For all of these reasons, Defendants respectfully request that this Court grant this motion and dismiss the Complaint with prejudice.

DATED:  July 1, 2020                    Respectfully submitted,


                                        */s/ Mike Raiff*
                                        Rob Walters
                                          Texas Bar No. 20820300
                                        Mike Raiff
                                          Texas Bar No. 00784803
                                        GIBSON, DUNN & CRUTCHER LLP
                                        2001 Ross Avenue, Suite 2100
                                        Dallas, Texas 75201
                                        Telephone: 214.698.3350
                                        Facsimile: 214.571.2927
                                        RWalters@gibsondunn.com
                                        MRaiff@gibsondunn.com

                                        Brian M. Lutz (*pro hac vice* application forthcoming)
                                        GIBSON, DUNN & CRUTCHER LLP
                                        555 Mission Street, Suite 3000
                                        San Francisco, CA  94105-0921
                                        Telephone: 415.393.8200
                                        Facsimile: 415.374.8474
                                        BLutz@gibsondunn.com

                                        Lissa M. Percopo (admitted *pro hac vice*)
                                        GIBSON, DUNN & CRUTCHER LLP
                                        1050 Connecticut Ave., N.W.
                                        Washington, D.C. 20036
                                        Telephone: 202.887.3770
                                        Facsimile: 202.530.9528
                                        LPercopo@gibsondunn.com

                                        COUNSEL FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of July, 2020, the foregoing document was filed using the Court's CM/ECF system.  In addition, (1) the filing is available for viewing and downloading via the CM/ECF system, and (2) the CM/ECF system will send notification of this filing to all attorneys of record who have registered for CM/ECF updates.

/s/ *Mike Raiff*
Mike Raiff