UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KIN-YIP CHUN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, et al., | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Civil Action No. 3:18-CV-1338-X |
| FLUOR CORPORATION, et al., | § § § | |
| *Defendants*. | § § | |

## MEMORANDUM OPINION AND ORDER

The Simpsons poke fun at a great many things, including lawyers' love of money.  Consider this exchange when Apu's wife approaches a lawyer for help with a divorce:

> Manjula Nahasapeemapetilon: I have to warn you.  Apu does not have much money.
>
> Lawyer: Are you absolutely sure?  Because legally, I am allowed to shake him by the ankles and see what falls out.  It's established in the case of *Lawyers v. Justice*.[1]

While the *Simpsons* is fiction, there's an ankle-shaking development in the law that is both non-fiction and nonsense: attorney's-fees-awards multipliers in common-fund cases.

---

[1] Swartzwelder, J. (Writer) & Nastuk, M. (Director), *The Simpsons*, The Sweetest Apu (Season 13, Episode 19) (Twentieth Century Fox Film Productions May 5, 2002).

When attorneys win, they understandably want to recover their fees. And they often ask for a multiplier because they think their performance was special (for example, a 1.5 multiplier would give them 50% more fees than what they billed). Multipliers work differently in fee-shifting cases than common fund cases. Fee-shifting cases are when a law allows a party to get attorney's fees; and the opposing party is the one who pays those fees. Common fund cases like this lawsuit have a different effect. In common fund cases, a defendant agrees to a settlement and for a certain amount of that settlement to go to the plaintiff's attorneys. If a court uses a multiplier in those cases, the plaintiffs end up paying. The defendant already agreed to part with the settlement funds, and the plaintiffs get what the Court doesn't earmark for the lawyers. So anything the plaintiff's lawyers get effectively comes from their clients.

Adding richness to the situation is the fact that the Supreme Court has been cracking down on loosey-goosey, multi-factor tests for attorney's fees that allow multipliers. Because the Fifth Circuit still has such a test in place that encourages multipliers, and settling defendants routinely don't oppose fee requests that have multipliers (because they made peace with parting with the settlement funds), multipliers are still prevalent in common fund settlements like this. But the Court believes multipliers—especially in common fund cases—should be proven, not assumed.

Here, Fluor Corp. agreed to part with $33 million to settle this class action. Fluor doesn't care *how* those thirty-three million dollars are split, but the plaintiffs'

attorneys certainly do.  The plaintiffs' lawyers filed this motion to approve the proposed settlement and an attorney's fee award with a 1.9 multiplier for fees—meaning the attorneys want an additional 90% of fees for work they didn't perform, which would effectively come from the plaintiff class they represent.  (Cue the *Simpsons* joke from above, but assume the lawyer is shaking his own client by the ankles.)  The lawyer's fee request in terms of the hours billed makes sense.  But even using the hopelessly amorphous Fifth Circuit factors, the Court cannot justify the plaintiffs' attorneys taking more from their client than fees for work actually performed.

Accordingly, the Court **GRANTS IN PART** the motion (Doc. 175) and awards fees for hours actually worked and **DENIES IN PART** as to any multiplier.

## I.  Factual Background

On November 7, 2022, the Court held a hearing on two motions in this securities-fraud class-action lawsuit.[2]  The Lead Plaintiffs[3] asked the Court to (1) approve the parties' settlement agreement and plan of allocation and (2) grant the Lead Plaintiffs' motion for attorney's fees.  Defendants[4] did not oppose either motion.  After the hearing, the Court granted the first motion and denied the second motion.  The Court directed the Lead Plaintiffs to renew their motion for attorney's fees and

---

[2] The Court has previously recounted the underlying facts of the lawsuit, which have no bearing on the present motion.  *See* Doc. 140 at 2.

[3] Lead Plaintiffs are Wayne County Employees' Retirement System, the Town of Fairfield Employees' Retirement Plan, and the Town of Fairfield Police and Firemen's Retirement Plan.  They are represented by Lead Counsel Robbins Geller Rudman & Dowd LLP and Pomerantz LLP.

[4] Defendants are Fluor Corporation ("Fluor"), David T. Seaton, Biggs C. Porter, Bruce A. Stanski, Matthew McSorley, Gary G. Smalley, Carlos M. Hernandez, D. Michael Steuert, and Robin K. Chopra.

address certain concerns the Court raised at the hearing.

Specifically, the Court asked the Lead Plaintiffs to (1) identify the controlling Supreme Court and Fifth Circuit precedent and (2) apply it to justify their requested attorney's fees. As in their previous motion, the Lead Plaintiffs request attorney's fees amounting to 30% of the total settlement amount or, in other words, they ask the Court to apply a multiplier of about 1.9 to the lodestar amount. After receiving the Lead Plaintiffs' motion, the Court ordered them to submit, in camera, contemporaneous billing records of Robbins Geller Rudman & Dowd LLP, Pomerantz LLP, Kendall Law Group PLLC, and the Briscoe Law Firm PLLC. The Lead Plaintiffs then did so.

## II.  Legal Background

Under the "American Rule," "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser."[5] The "major" exception to this rule is fee-shifting statutes, which feature "congressional authorization for the courts to require one party to award attorney's fees to the other."[6] In other words, these statutes "shift" attorney's fees from one party to another by directly requiring the winning party to pay the losing party's fees. Another relevant exception to the American Rule is known as a "common-fund settlement," which arises when "a court's equitable powers allow it to award fees in commercial litigation to plaintiffs who recovered a 'common fund' for themselves and others through securities or antitrust

---

[5] *Alyeska Pipeline Serv. Co. v. Wilderness Soc.*, 421 U.S. 240, 247 (1975).

[6] *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 561–62 (1986).

litigation."[7]  In other words, securities or antitrust plaintiffs win a sum of money for themselves and their class (a "common fund"), and their attorneys take their attorney's fees out of that sum.  Fee-shifting is a creature of statute and common-fund settlements arise out of courts' equitable powers, but importantly, they accomplish the same goal: Prevailing attorneys are able to circumvent the American Rule and collect fees from the losing party.

Under both fee-shifting statutes and common-fund settlements, court approval of the fee award is a vital safeguard.  In the fee-shifting context, federal statutes often prescribe a "reasonable" attorney's fee, punting all discretion to the district court.[8] And in the common-fund context, defendants maintain no interest in the case once they hand over the common fund to the plaintiffs' attorneys.  Consequently, in both fee-shifting and common-fund cases, the class plaintiffs' interests stand at the mercy of the court.[9]

Courts have taken seriously their duty to shield class-action awards from encroaching attorneys, and competing approaches have emerged.  In the fee-shifting

---

[7] *Id.* at 562 n.6 (cleaned up); *see Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (noting that, since the 1880s, the Supreme Court "has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").  There are two other exceptions to the American Rule, neither of which is relevant here: "First, courts can enforce their own orders by assessing attorney's fees for the willful[] violation of a court order," and "[s]econd, courts are empowered to award fees against a losing party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Del. Valley*, 478 U.S. at 562 n.6.

[8] *See Del. Valley*, 478 U.S. at 562 ("There are over 100 separate statutes providing for the award of attorney's fees; and although these provisions cover a wide variety of contexts and causes of action, the benchmark for the awards under nearly all of these statutes is that the attorney's fee must be 'reasonable.'").

[9] *See In re Arthrocare Corp. Secs. Litig.*, No. A-08-CA-574-SS, 2012 WL 12951371, at *5 (W.D. Tex. June 4, 2012) ("[Common-fund awards] are primarily intended to compensate plaintiffs for their damages, not to line the pockets of their lawyers.").

context, "[c]ourts have struggled to formulate the proper measure for determining the 'reasonableness' of a particular fee award."[10]  Seeking to mold the vast power of the word "reasonable" into a somewhat more objective, empirical form, the Fifth Circuit devised a twelve-factor test to assess awards under fee-shifting statutes in *Johnson v. Georgia Highway Express, Inc.*[11]  The twelve *Johnson* factors are

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[12]

Other courts adopted the test, but—as the Supreme Court gingerly put it about a decade after *Johnson*—the twelve-factor test "gave very little actual guidance to district courts" because its "sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results."[13]

Reacting to the *Johnson* test's subjectivity, the Third Circuit offered another idea for calculating "reasonable" attorney's fees: the lodestar approach.[14]  Courts calculate the lodestar amount "by multiplying the hours spent on a case by a

---

[10] *Del. Valley*, 478 U.S. at 562.

[11] 488 F.2d 714 (1974).

[12] *Hensley v. Eckerhart*, 461 U.S. 424, 430 n.3 (1983).

[13] *Del. Valley*, 478 U.S. at 563.

[14] *Id.* (describing the *Johnson* factors' shortcomings and explaining that, "[f]or this reason, the Third Circuit developed another method of calculating 'reasonable' attorney's fees[] . . . known as the 'lodestar' approach"); *see also Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir. 1973).

reasonable hourly rate of compensation for each attorney involved" before occasionally "mak[ing] adjustments to this figure, in light of [] the contingent nature of the case" and "the quality of the work performed."[15]  The Supreme Court soon recognized the lodestar test as "a more analytical framework for lower courts to follow than the unguided 'factors' approach provided by *Johnson*."[16]  Ultimately, the Supreme Court "adopted a hybrid approach that shared elements of both *Johnson* and the lodestar method," directing courts to calculate the lodestar amount and then modify it, at their discretion, using the *Johnson* factors.[17]  This approach—combining the lodestar calculation with the twelve *Johnson* factors—injected significant subjectivity.  As history has shown, the so-called hybrid approach reduced the analysis of fee awards under fee-shifting statutes to little more than a glorified gut feeling.

But the Supreme Court changed course in 2010, introducing a new framework for fees awarded under fee-shifting statutes in *Perdue v. Kenny A. ex rel. Winn*.[18]  The Court pulled no punches, declaring that "unlike the *Johnson* approach, the lodestar calculation is objective, and thus cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results."[19]  *Perdue* redefined the judicial landscape for fee-shifting statutes.  It also mercilessly undercut

---

[15] *Del. Valley*, 478 U.S. at 563 (quoting *Merola v. Atl. Richfield Co.*, 515 F.2d 165, 168 (3d Cir. 1975)).

[16] *Id.*

[17] *Id.* at 563–64; *see Hensley*, 461 U.S. at 433–40.

[18] 559 U.S. 542 (2010).

[19] *Id.* at 552 (cleaned up).

the rationale behind the *Johnson* factors.  In contrast to the lodestar, the Court's reasoning goes, the *Johnson* approach is subjective, doesn't cabin discretion, bars meaningful judicial review, and produces unpredictable results.

"I'm not dead!" cries *Johnson*.[20]

While *Perdue*'s smackdown of *Johnson* was still hot off the press, the Fifth Circuit faced a fee award arising under a fee-shifting statute in *Jimenez v. Wood County*.[21]  Unflinchingly, *Jimenez* deployed the all-too-familiar "two-step process" to analyze a challenge to the award: First, the lodestar calculation; second, the *Johnson*-factor adjustment.[22]  With a cautionary "*but see*" citation, *Jimenez* paid quick tribute to *Perdue*, recognizing that *Perdue* "limit[ed] upward adjustments [to the lodestar amount] in light of 'a strong presumption that the lodestar is sufficient.'"[23]  And further, *Jimenez* acknowledged that *Perdue* directed courts to "provide 'a reasonably specific explanation for all aspects of a fee determination.'"[24]  But despite the strong presumption that lodestar-sans-*Johnson* is sufficient, and despite the directive to provide a reasonably specific explanation, *Jimenez* ultimately affirmed the district

---

[20] *See* Jones, Terry, and Terry Gilliam. *Monty Python and the Holy Grail*. Cinema 5 Distributing, 1975.

[21] 621 F.3d 372 (5th Cir. 2010).  The Fifth Circuit took *Jimenez en banc*, but not on the attorney's fees issue.  *Jimenez v. Wood Cnty., Tex.*, 660 F.3d 841, 844 n.1 (5th Cir. 2011) ("The County argued that . . . the district court erred in determining an appropriate award of attorneys' fees.  The panel rejected these arguments, and the County has not raised these issues on rehearing.  Accordingly, we reinstate those portions of the panel opinion that decide these issues[.]").

[22] *Id.* at 379–80.  The Fifth Circuit reheard *Jimenez* en banc and affirmed it in 2011, but the fee award was not before the panel on rehearing.  *Jimenez v. Wood Cnty.*, 660 F.3d 841, 844 n.1 (5th Cir. 2011) (en banc).

[23] *Jimenez*, 621 F.3d at 380 (quoting *Perdue*, 559 U.S. at 546).

[24] *Id.* (quoting *Perdue*, 559 U.S. at 558).

court's fee calculation after analyzing the lodestar and noting, with no further analysis, that "[t]he [district] court finally considered the *Johnson* factors and reduced the lodestar amount by 20% accordingly."[25]

Since *Jimenez*, the Fifth Circuit has held *Perdue* at the margins of its post-2010 statutory fee-shifting jurisprudence, encouraging courts to use the *Johnson* factors to decrease or enhance the lodestar calculation.[26]   Perhaps this is all attributable to the rule of orderliness, where one Fifth Circuit panel can't overrule a prior opinion but must take it *en banc* to overrule it.

And perhaps chilled by the Fifth Circuit's sidelining of *Perdue* in the fee-shifting context of *Jimenez*, district courts have offered *Perdue* an even frostier reception in the common-fund context, generally declining to apply or analyze its reasoning at all.[27]   Granted, *Perdue* dealt with a fee-shifting statute and not a common fund—but its repudiation of the *Johnson* factors was unqualified. Regardless, courts have cabined *Perdue*'s universal logic and doggedly deployed the *Johnson* factors in common-fund cases, heedless of *Perdue*'s stern warning against them.

But how did *Johnson* ever get associated with common-fund cases, since

---

[25] *Id.*

[26] *See, e.g.*, *Ransom v. M. Patel Enters.*, 734 F.3d 377, 388 n.17 (5th Cir. 2013) (describing the lodestar-plus-*Johnson* method when analyzing a fee-shifting statute and citing, but not applying, *Perdue*).

[27] *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 683 (N.D. Tex. 2010) (Fitzwater, J.); *Shepherd v. Dall. Cnty.*, 2010 WL 2573346, at *3 n.2 (N.D. Tex. June 24, 2010) (Fitzwater, J.); *see Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 643 (5th Cir. 2012) (acknowledging that "district courts in [the Fifth] Circuit regularly use the percentage method blended with a *Johnson* reasonableness check" in the common-fund context).

*Johnson* was a fee-shifting case?  In 1981, the Fifth Circuit imported the then-seven-year-old *Johnson* factors to assess a common-fund settlement and held that "[a] district court abuses its discretion" by approving a common-fund fee award "without carefully considering" the *Johnson* factors first.[28]  And just like that, common-fund settlements were in *Johnson*-world.  District courts calculate fees in common-fund cases using either "(1) the percentage method, in which the court awards fees as a reasonable percentage of the common fund; or (2) the lodestar method."[29]  Post-*Perdue*, the Fifth Circuit has confirmed that district courts must use the *Johnson* factors to tweak the results of either approach.[30]  In reviewing such decisions, the Fifth Circuit polices adherence to this *process*, but it often flashes a cursory thumbs-up at its *product*.[31]

When the Supreme Court threw out *Johnson*'s faulty yardstick as applied to the fee-shifting framework,[32] it didn't expressly endorse the application of its holding to the common-fund framework—but it didn't forbid it, either.  Since *Perdue*, the Fifth

---

[28] *Hoffert v. Gen. Motors Corp.*, 656 F.2d 161, 166 (5th Cir. Unit A 1981).

[29] *Dell*, 669 F.3d at 642.

[30] *Id.* at 644 ("We join the majority of circuits in allowing our district courts the flexibility to choose between the percentage and lodestar methods in common-fund cases, with their analyses under either approach informed by the *Johnson* considerations."); *id.* at 643 n.28 (noting that the Supreme Court has "obliquely" endorsed the percentage method and has not yet "spoken to the appropriateness or desirability of the lodestar method" for common-fund cases).

[31] *See, e.g.*, *Cantu Servs., Inc. v. Frazier*, 682 F. App'x 339, 343 (5th Cir. 2017) (per curiam) (instructing district courts to "take into account their overall sense of a suit" and to "use estimates in calculating and allocating an attorney's time" (cleaned up)); *Jinsun, L.L.C. v. Mireskandari*, No. 20-20563, 2022 WL 35622, at *1 (5th Cir. Jan. 4, 2022) (per curiam) (affirming an award of less than 30% of the requested fee because the court "explained its reasoning, applied the correct legal standard, and concluded that [the amount] was a reasonable award").

[32] *See In re Pilgrim's Pride Corp.*, 690 F.3d 650, 664 (5th Cir. 2012) ("[*Perdue*] state[d] that the lodestar is the more favorable 'alternative' to the *Johnson* factors, indicating that the lodestar has superseded the *Johnson* factors in the fee-shifting arena." (cleaned up)).

Circuit has opted to limit the *Johnson* disavowal to fee-shifting, steadfastly refusing to apply *Perdue* to common-fund cases without distinguishing them in any meaningful way.

With very little supporting rationale, district courts must now apply factors that *Johnson* expressly tailored to the civil-rights context in a fee-shifting case to all common-fund settlements regardless of context.[33]  But nothing in the logic of *Perdue* suggests that the *Johnson* test—with its "subjective factors" and "unlimited discretion" resulting in "very little actual guidance"—is somehow useless in the fee-shifting context but valuable in the common-fund context.[34]  The Supreme Court's scathing critique of the *Johnson* test in *Perdue* was not contextual.  Two years after *Perdue*, the Fifth Circuit conceded that "the *Johnson* factors are *personae non gratae* in *Perdue*'s eyes" and had been "cast[] in a negative light" by *Perdue*.[35]  Nevertheless, that same year, the Fifth Circuit insisted again that district courts must subject common-fund cases to the *Johnson* test.[36]

*Perdue*'s holding is focused on fee-shifting awards, but its reasoning is not so limited.[37]  Other circuits have read the tea leaves and presciently given *Johnson* the

---

[33] *See Johnson*, 488 F.2d at 716, 718–19 (framing several factors in an unequivocal civil-rights context and citing a judicial obligation "to make sure that Title VII works" (cleaned up)); *Clark v. Am. Marine Corp.*, 320 F. Supp. 709, 711–12 (E.D. La. 1970) (prefiguring the *Johnson* factors in a civil-rights case with rationale specific to that context).

[34] *Perdue*, 559 U.S. at 551 (cleaned up).

[35] *Pilgrim's Pride*, 690 F.3d at 663.

[36] *Dell*, 669 F.3d at 644.

[37] The Fifth Circuit has reasoned that *Perdue* was concerned with "cases under § 1988, where fee enhancements often come at the expense of the taxpayer," whereas in other cases like this one, "the public's purse is left untouched." *Pilgrim's Pride*, 690 F.3d at 666.  What about the class plaintiffs' purses?  By definition, fee enhancements in common-fund cases "come at the expense of the" class

11

cold shoulder post-*Perdue*.[38]  A faulty yardstick is faulty, regardless of what it's aiming to measure.  Layering *Johnson* over the lodestar adds nothing to the analysis that can justify the instability it inevitably introduces.[39]

The Court turns now to the motion for attorney's fees drawn from a common-fund settlement award.  The Court is bound by Fifth Circuit precedent to do in this common-fund context what the Supreme Court denounced in the fee-shifting context: send its calculation to run the *Johnson* twelve-factor gauntlet.  So bound, the Court will proceed.

### III.  Analysis

### A.  Lodestar

In common-fund cases like this one,[40] the Fifth Circuit has endorsed two approaches for establishing a baseline number: the percentage method and the lodestar method.[41]  Either way, precedent then obligates courts to subject that

---

plaintiffs, so while *Perdue*'s holding is not binding here, its concerns about fee enhancements in a zero-sum system are inescapable.

[38] *See, e.g.*, *Anchondo v. Anderson, Crenshaw & Assocs., L.L.C.*, 616 F.3d 1098, 1103–04 (10th Cir. 2010) (noting that "[i]n *Perdue* the [Supreme] Court appears to significantly marginalize the twelve-factor *Johnson* analysis, which it discounts as just one possible method that gave very little actual guidance," and that, "after *Perdue*, it has only become clearer that the lodestar determination is primary and that the propriety of such a determination is not automatically called into doubt merely because the trial court did not expressly discuss the *Johnson* factors" (cleaned up)).

[39] *See, e.g.*, *Perdue*, 559 U.S. at 557 ("The court increased the lodestar award by 75% but . . . this figure appears to have been essentially arbitrary.  Why, for example, did the court grant a 75% enhancement instead of the 100% increase that respondents sought?  And why 75% rather than 50% or 25% or 10%?").

[40] This case arises under 15 U.S.C. § 78u-4, which governs private-securities litigation.  Although the statute contains a fee-shifting provision in the event of sanctions, that provision is not at play here.  *Id.* § 78u-4(c)(3)(A).  Instead, since the motion requests attorney's fees as a percentage of a total settlement, this is a common-fund case.

[41] *Dell*, 669 F.3d at 642–44.

baseline number to the *Johnson* factors.[42]   This means that every common-fund analysis in the Fifth Circuit must be infected with the subjectivity those factors entail.  Whether the journey begins with percentage or lodestar, all roads sadly lead to *Johnson*.  Practically, this guarantees that the first analytical step may ultimately provide as much or as little guidance as the district court desires.[43]   The Court chooses to rely on the lodestar method—reasonable hours times reasonable rates—to establish the baseline number because, in the Supreme Court's words, it "produces reasonably predictable results."[44]

The lodestar represents the only (relatively) objective measure within this entire calculus.  In this case, the total lodestar amount is $5,171,728.25.[45]   This amount reflects the hours times the billing rates of the firms at the time of the original filing on October 17, 2022.[46]   In the Lead Counsel's response to the Court's order seeking additional billing records, Lead Counsel noted that had the billing rates

---

[42] *Id.*

[43] The Court again proposes a geometric analogy.  Assume the area of a rectangle equals the proper fee award.  The two components of area—length and width—represent the two steps in a Fifth Circuit fee-award analysis—lodestar and *Johnson*.  Here's the problem.  Lodestar is objective, predictable, and reviewable—which is perhaps why the Supreme Court endorsed it for measuring fee awards.  The *Johnson* factors are the complete opposite; hence, the Supreme Court's denunciation.  In common-fund cases, the Fifth Circuit offers district courts two options for measuring *length*—lodestar and percentage.  But whichever they choose, courts are still constrained to use *Johnson*'s unmarked, unreliable yardstick to measure *width*.  The product is infused with *Johnson*'s subjectivity either way.

[44] *Perdue*, 559 U.S. at 552.

[45] The Court finds that the attorneys have met their "burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."  *Fessler v. Porcelana Corona De Mex., S.A. DE C.V.*, 23 F.4th 408, 415–16 (5th Cir. 2022) (cleaned up); Doc. 180 at 2 (stating the "total lodestar per law firm" is "RGRD ($2,756,336.00) . . . Pomerantz ($2,340,338.50) . . . Kendall ($48,960.00) . . . and Briscoe ($26,093.75)."

167-3 at 8 ($2,756,336); 167-4 at 9 ($2,340,338.50); 167-5 at 6 ($48,960); 167-6 at 6 ($26,093.75).

[46] *See* Docs. 167-3, 167-4, 167-5, and 167-6.

been calculated at the time of the response (November 9, 2023), the lodestar would be higher.[47]   But the Court looks to the original lodestar which, as Lead Counsel recognizes, "the total lodestar was $5,171,728.25."[48]   And, at arriving at this lodestar, Lead Counsel exercised billing judgment and reduced the costs and expenses.[49]   The Court finds the attorneys are entitled to this amount.

Now even if the Court relied on the percentage method, as is allowed in this Circuit, the baseline number would end up right around the lodestar amount.   Here, the attorneys ask for 30% of the $33,000,000 settlement fund, plus interest.  (This is the equivalent of, in their words, "a modest 1.9 [lodestar] multiplier."[50]  That's $9,900,000.  And that's unreasonable.[51]  Generally, 15–50% appears to be defensible under prevailing standards and, in higher dollar settlement cases like this one, 15–30% appears to be the range.

---

[47] Doc. 180 at 1–2.

[48] *Id.* at 2.

[49] Docs. 167-3 at 3; 167-4 at 3; 167-6 at 3.

[50] Doc. 173 at 30.

[51] The attorneys justify the 30% with cherry-picked examples, citing one district court's assertion that "percentage awards of 50% have been approved in some class actions," *Torregano v. Sader Power, LLC*, No. 14-293, 2019 WL 969822, at *4 (E.D. La. Feb. 28 2019),  and another's that 30% in a class action "is on the low side," *Vela v. City of Hous.*, 276 F.3d 659, 681 (5th Cir. 2001) (quoting the district court).  But the attorneys must have overlooked other Fifth Circuit district courts in common-fund cases that, for example, rejected a requested 25% fee in favor of a 15% fee.  *Greer v. Mockingbird Station Partners, L.P.*, No. 3:02-CV-2342-K, 2004 WL 2544967, at *2–3 (N.D. Tex. Nov. 9, 2004) (Kinkeade, J.).  And one empirical study charted the average percentage for comparably sized common funds at 22.3%.  Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUDIES 811, 839 (2010) (finding that settlement amounts of $30 million to $72.5 million that use the percentage method, with or without a lodestar cross-check, yield mean fee awards of 22.3% with a standard deviation of 8.4%).  And though they'd certainly dispute whether this qualifies as a so-called "mega-fund case[]," 15% fee awards "are frequent[]" as the awards climb higher into the millions.  *See Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 972 (E.D. Tex. 2000) (awarding 15% of a $1 billion fund and citing awards including 18% of $170 million, 25% of $190 million, and 14% of $1 billion).

Here, if the Court were to find that the attorneys are entitled to 16% of the common fund, this would equal a lodestar with a nearly 1.021 multiplier.[52] Sixteen percent of the $33,000,000 settlement fund would equal $5,280,000. Calculated differently, $5,280,000 divided by the lodestar, $5,171,728.25, equals a multiplier of 1.021. "The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection."[53] The lodestar amount itself comes out to just around 15.67% of the common fund.[54] The lodestar is presumptively reasonable, and the percentage method would yield an amount darn close to the lodestar amount. And since the lodestar method is an even more objective method than divining some percentage, the Court relies on the lodestar headed into the *Johnson* factors.

## B. The *Johnson* Factors

The Fifth Circuit permits the lodestar method, so long as courts supplement the mathematically objective part—reasonable hours times reasonable rates—with subjective and wholly discretionary "multipliers" derived from a *Johnson*-esque multi-factor analysis.[55] Having calculated an objective baseline number, the Court

---

[52] The attorneys remind the Court that "oftentimes, courts do not formally calculate multipliers at the step of the lodestar cross-check, opting instead to simply confirm that lead counsel devoted considerable time and resources to the litigation as justification for the percentage fee award." Doc. 173 at 30. Certainly, other courts take this approach, and the attorneys were surely crossing their fingers that the Court would follow suit here. Instead, the Court opts to formally calculate the multiplier and to note that its value—1.021—adequately encompasses the value of the work performed in this case.

[53] *Fox v. Vice*, 563 U.S. 826, 838 (2011).

[54] The lodestar amount, $5,171,728.25, divided by the common fund, $33,000,000, equals .15671904 or around 15.67%.

[55] *See In re Enron Corp. Secs., Derivative & ERISA Lit.*, 586 F. Supp. 2d 732, 751–53 (S.D. Tex. 2008) (and noting that a survey of twenty-four lodestar multipliers "found a range of 0.6–19.6" (cleaned up)).

must turn to the hopelessly amorphous *Johnson* factors.[56]  "[T]he party seeking modification . . . under the *Johnson* factors bears the burden" of demonstrating its entitlement to any enhancement.[57]

(1) *The time and labor required*.[58]  The attorneys say that "dozens of attorneys, paralegals, and support staff . . . collectively spent 7,000+ hours over the past four and one-half years" working on the case[59]—a significant amount of work, but not when compared to the settlement award and weighed against the lodestar amount, which is designed to account for the hours expended on the case.

(2) *The novelty and difficulty of the questions*.  *Johnson* elaborates that this factor contemplates "[c]ases of first impression" and "case[s] which may 'make new law.'"[60]  This is not one of those cases, and the Court finds that it was neither novel nor difficult enough to warrant an enhancement under this factor.

(3) *The skill requisite to perform the legal service properly*.  The Court's "expertise gained from past experience" reveals that the attorneys' "work product, [] preparation, and general ability" were good but not extraordinary.[61]  Hundreds of cases before the Court have featured multiple motions to dismiss, skilled opposing

---

[56] The Court's powers of approximation here take a cue from the inspirational efforts of the late Coach Mike Leach to predict the weather.  *See* Everything Lubbock, *Mike Leach Does the Weather, April 2005*, YOUTUBE (Dec. 12, 2022) (depicting—with particular relevance at 00:18–00:42—a Lubbock Channel 28 News broadcast in which Coach Mike Leach forecasted the weather) (https://www.youtube.com/watch?v=mxOm7jsIQQ8) [https://perma.cc/4RZJ-AC6N] (last visited May 3, 2024).

[57] *Fessler*, 23 F.4th at 416.

[58] All twelve factors discussed in this section are quoted from *Johnson*.  488 F.2d at 717–19.

[59] Doc. 173 at 27.

[60] *Johnson*, 488 F.2d at 718.

[61] *Id.*

counsel, and lengthy negotiations—factors the attorneys point to here as warranting a boost.  While the Court believes the work of counsel was sufficient to compensate them for the work they performed, the work was not so extraordinary as to warrant taking money from the plaintiffs to line the lawyers' pockets even more.

(4) *The preclusion of other employment by the attorney due to acceptance of the case*.  The attorneys point to no conflict of interest generated by this case, so there has been no preclusion of employment on that ground.  This *Johnson* factor further envisions rewarding lawyers because they were "not free to use the time spent on the client's behalf for other purposes."[62]  The Court notes that this opportunity cost has been, is now, and forever will be true of any employment arrangement for which one person pays another in exchange for their time.  The Court sees no justification in this case for multiplying the award based on this completely unremarkable feature common to any lawyer in any case.

(5) *The customary fee*.  This proto-lodestar calculus looks to "[t]he customary fee for similar work in the community."[63]  As the attorneys concede, a reasonable rate multiplied by their hours equals $5,171,728.25.[64]

(6) *Whether the fee is fixed or contingent*.  Here, the fee is contingent.  The attorneys argue that this contingent arrangement warrants an increased fee award because *these* plaintiffs—*i.e.*, their clients—ought to pay for their counsel's risky decision to take a case with the potential for zero earnings.  But "[t]he criterion for

---

[62] *Id.*

[63] *Id.*

[64] Doc. 173 at 30.

17

the court is not what the parties agreed but what is reasonable."[65]  As *Johnson* noted, this factor "is helpful in demonstrating the attorney's fee expectations when he accepted the case."[66]  Complying with *Johnson*, the Court will award a reasonable fee, which will not include an enhancement because of this factor.  The Court acknowledges that the contingent nature of the representation might bear on the attorneys' "expectations when [they] accepted the case," but the law and reasonableness, not attorney expectations, must inform the Court's ultimate decision.

(7) *Time limitations imposed by the client or the circumstances.*  *Johnson* instructs that "[p]riority work that delays the lawyer's other legal work" gets "some premium."[67]  *Johnson* continues that "[t]his factor is particularly important when a new counsel is called into prosecute the appeal or handle other matters at a late stage in the proceedings."[68]  Here, the attorneys' claimed time limits aren't of the type especially pertinent to this factor.[69]  And the Court can't help but note that all work delays other work.

(8) *The amount involved and the results obtained.*  This is "the most critical

---

[65] *Johnson*, 488 F.2d at 718 (cleaned up).

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] Doc. 173 at 28 (referencing "accelerated briefing and ramped-up staffing when the tag-along lawsuit triggered a second statutorily imposed deadline for duplicative lead plaintiff motions that were simultaneously litigated with Lead Plaintiffs' motion to consolidate and its opposition to the tag-along plaintiffs' motion to intervene").  Interestingly, in Lead Counsel's initial attorney's fees motion (which the Court previously denied without prejudice), Lead Counsel conceded that this seventh factor was "not relevant here" and would "not be addressed."  Doc. 166 at 11, n.4.  Lead Counsel then about-faced and argued up the few time limits described above in its renewed motion and supplemental briefing. Doc. 173 at 28.

factor in determining the reasonableness of a fee award."[70]  For "the results obtained," *Johnson* urges consideration of "the decision's effect on the law," imagining a result that "corrects across-the-board discrimination affecting a large class of an employer's employees" as a potential justification for an enhancement under this factor.[71]  Here, the attorneys recovered $33 million out of $88 million they sought, or 37.5% of the potential damages.  They don't claim their securities litigation "correct[ed] across-the-board discrimination" or had an "effect on the law'" as *Johnson* envisioned.  And while the amount involved looks high, so is the number of claimants from the class: 200,990.[72]  So if the attorneys took the 30% they seek, leaving $23,100,000 in the common fund, and the remainder was divided among the claimants equally, each claimant would receive $114.93.  So while lots of people would get a win, the wins wouldn't be very big.  The Court finds that this result does not amount to the extraordinary success that would warrant extra fees or make this one of the "rare and exceptional cases" in which enhancement under this factor is warranted.[73]

(9) *The experience, reputation, and ability of the attorneys.*  The attorneys have performed considerable work in the class action space.  But the Court is not persuaded that these attorneys possess extraordinary experience, reputation, or

---

[70] *Enron*, 586 F. Supp. 2d at 796 (cleaned up).

[71] *Johnson*, 488 F.2d at 718.

[72] Doc. 173 at 31.

[73] *Shipes v. Trinity Indus.*, 987 F.2d 311, 322 n.9 (5th Cir. 1993) (finding that a district court "may have been warranted in enhancing the lodestar" under this factor where the plaintiff's "victory was complete on all issues" and "the victory resulted in a substantial award of monetary damages for class members—plus, and very importantly, future protection against discrimination in the form of injunctive relief").

ability in this area of law sufficient to warrant an enhancement under this factor. First, an attorney's experience, reputation, and ability all lead to higher rates, which means that the lodestar (partially a product of the attorneys' rates) will already reflect the value of these factors.  An attorney believing their services to be worth 90% more than they charge should simply charge 90% more.  The market will tell them soon whether they are worth what they think.  And second, "[l]ongevity *per se* [] should not dictate [a] higher fee."[74]  *Johnson* made clear that it's not just about longevity and the associated increase in reputation and ability; more is required to trigger an enhancement.  But the attorneys don't point to anything more.  Instead, they make conclusory assertions, such as describing themselves as "highly experienced" and "well-regarded."[75] And they say they "skillfully navigated" this case through a variety of events the Court sees as normal and largely unremarkable.[76] Thus, while these attorneys may possess great experience in this area of law, they fail to show why it warrants an enhancement beyond the high rates already reflected in the lodestar.

(10) *The "undesirability" of the case*.  This case appears extremely desirable for any law firm within this practice area.  These attorneys will be greatly enriched (not publicly shamed) as a result of the publicity from this case.  The attorneys claim that this factor is satisfied because the case was "risk[y]," but that misunderstands

---

[74] *Johnson*, 488 F.2d at 719.

[75] Doc. 173 at 27.

[76] *Id.* (recounting motions to dismiss, a "consolidation battle," settlement negotiations, and "top-shelf" opposing counsel).

*Johnson*'s intent.[77]   Unlike the civil rights attorneys *Johnson* envisioned, these attorneys will not "face hardships in their communities"[78] as a result of taking this case.

An angry mob came after Atticus Finch because he was a hero fighting for a then-socially unpopular cause.  The Court sees no markings of an angry mob coming after these class-action securities litigators.

(11) *The nature and length of the professional relationship with the client.*  The attorneys concede that this factor does not apply.[79]

(12) *Awards in similar cases.*  *Johnson*'s language makes this factor optional: "The reasonableness of a fee **may** also be considered in the light of awards made in similar litigation[.]"[80]  As discussed above, similar cases have yielded results all over the map.   The Court declines *Johnson*'s invitation to base its guess off of other guesses when the lodestar yields a predictable result and no *Johnson* factor compels a departure.

Finally, the Court must address the lack of objections to the proposed fee.  The lack of an objection doesn't mean the law supports it.  There is good reason for the plaintiffs to not know to object in cases like this.  The class attorneys (1) mailed 405,813 fine-print postcards recounting the settlement details to every class member, describing the requested fee award and directing concerned class members to a

---

[77] *Id.*

[78] *Johnson*, 488 F.2d at 719.

[79] Doc. 173 at 29 n.16.

[80] *Johnson*, 488 F.2d at 719 (emphasis added).

website to learn how to object;[81] (2) stated on that website that objections had to be mailed to the Court;[82] and (3) declared on the website's homepage: "**Please do not contact the Court . . . regarding this Notice**."[83]   Now, in support of their requested fee award, the attorneys boast that *not a single class member* showed up to object.[84]  But the Court won't let the lack of objections prevent justice.

In sum, the Court finds the *Johnson* factors offer no guidance in this case that could justify a variance from the Court's determination under the lodestar method. Applying its broad discretion after careful review of the record,[85] grateful that "trial courts need not, and indeed should not, become green-eyeshade accountants"[86] when calculating fee awards, the Court maintains its view that the lodestar amount of $5,171,728.25 is proper.

## IV.  Other Matters

The attorneys make six requests, which the Court will address in turn.

First, "an increase of the Notice & Administration Account by an extra . . .

---

[81]    *See    Important    Documents*, FLUOR   SECURITIES   SETTLEMENT, https://www.fluorsecuritiessettlement.com/documents [https://perma.cc/UUQ9-DBLJ] (last visited May 3, 2024) (follow "Postcard Notice" hyperlink).

[82]    *See    Frequently    Asked    Questions*, FLUOR   SECURITIES   SETTLEMENT, https://www.fluorsecuritiessettlement.com/faq [https://perma.cc/DF8Y-2RSW] (last visited May 3, 2024) (expand FAQ 17, "How do I tell the Court that I object to the Settlement?").

[83]  *Welcome to the Fluor Securities Settlement Website*, FLUOR SECURITIES SETTLEMENT, https://www.fluorsecuritiessettlement.com/ [https://perma.cc/MD6V-NMXN] (last visited May 3, 2024).

[84]  Doc. 173 at 31–32.

[85]  *See, e.g.*, *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 824 (5th Cir. 1996) (chiding that the "district court's opinion would have benefitted from a more thorough analysis of the *Johnson* factors" but concluding that, nevertheless, "the decision [was] adequately supported by the record").

[86]  *Fox*, 563 U.S. at 838.

$275,000."[87]   The attorneys aver that this amount is necessary to reimburse the Claims Administrator for the most recent invoices and to effectuate distribution of the settlement fund until its depletion.[88]   The Court agrees and **GRANTS** this request.

Second, they seek "payment of attorneys' fees in the amount of 30% of the Settlement Amount plus interest."[89]   The Settlement Amount is $33,000,000, so 30% is $9,900,000.  Since the lodestar amount is $5,171,728.25, that means the attorneys want about a 1.9 multiplier.  For the reasons stated, the Court **DENIES** the request, awarding instead the lodestar amount.  The Court awards $5,171,728.25 in attorney's fees.

Third, they seek "calculation of the Net Settlement Fund."[90]   The attorneys describe the stipulated method for calculating this amount and request the Court's approval.  After the Court's resolution of the first two requests above, the only remaining factor not yet approved is the taxes and tax expenses, which the Claims Administrator estimates at $15,000.[91]  The Court approves this amount and approves the calculation method the motion describes, and therefore **GRANTS** this request.

Fourth, they seek "distribution of the Net Settlement Fund to those Settlement Class Members that the Claims Administrator has determined to be Authorized

---

[87] Doc. 175 at 2.

[88] *Id.* at 3.

[89] *Id.* at 2.

[90] *Id.*

[91] *Id.* at 4.

Claimants."[92]   The Court agrees that—after its resolution of the first three items above—the fund is ready for distribution.   The Court **GRANTS** this request and authorizes distribution according to the plan described in the motion.[93]

Fifth, they seek "selection of a *cy pres* recipient for any remaining balance after all economically feasible distributions to Authorized Claimants."[94]   The attorneys recommend Dallas-based Legal Aid of Northwest Texas as a recipient for any remaining residual funds if another distribution is economically infeasible.   The Court **GRANTS** this request.

And sixth, they seek "entry of the Settlement Distribution Order submitted herewith."[95]   The Court **GRANTS** this request and will enter that order separately (with the attorney's fees modified for consistency with this order).

## V.  Conclusion

For the above reasons, the Court **GRANTS** the motion as to all requests except the amount of attorney's fees.   The Court **DENIES** the request for attorney's fees amounting to 30% of the Settlement Amount or a 1.9 multiplier and instead awards $5,171,728.25 in attorney's fees.

---

[92] *Id.* at 2.

[93] *Id.* at 5–7.   Specifically, the Court agrees with the Claims Administrator's analysis of the proofs of claim, calculation of the recognized losses, decision to approve the late but otherwise valid claims, recommendation of a March 28, 2023 cut-off date, and rejection of inadequate or defective claims.   *Id.*

[94] *Id.* at 2.

[95] *Id.*

**IT IS SO ORDERED** this 23rd day of May, 2024.

_____

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE